In re MIDWAY AIRLINES, INC., Midway Airlines (1987), Inc., Midway Aircraft Engineering, Inc., Debtors.

Sheldon L. SOLOW, Trustee of Midway Airlines, Inc., Midway Airlines (1987), Inc., and Midway Aircraft Engineering, Inc., Plaintiffs–Counterdefendants,

v.

NORTHWEST AIRLINES, INC., Defendant–Counterplaintiff.

Bankruptcy Nos. 91 B 06449, 91 B 06450 and 91 B 06451. Adv. No. 91 A 01176.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

March 10, 1995.

860

Sarah R. Wolff, M. Marshall Seeder, Thomas J. Bamonte, Anne K. Berleman, Sachnoff & Weaver, Ltd., H. Roderic Heard, Matthew Hurd, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Sheldon L. Solow, Trustee of Midway Airlines, Inc., Midway Aircraft Engineering, Inc., and Midway Airlines, (1987), Inc.

Richard T. Franch, David P. Sanders, James A. McKenna, Robert T. Markowski, Lawrence S. Schaner, Edie P. Steinberg, David M. Gormley, Jenner & Block, Chicago, IL, for Northwest Airlines, Inc.

## TABLE OF CONTENTS

MEMORANDUM OPINION ............................................860
SUMMARY OF DECISION...........................................861
THE UNDERLYING MATERIAL BACKGROUND FOR ALL COUNTS
 OF THE COMPLAINT ........................................862
COUNT I.......................................................883
 FINDINGS OF FACT......................................883
 CONCLUSIONS OF LAW....................................912
COUNT III ....................................................925
 FINDINGS OF FACT......................................925
 CONCLUSIONS OF LAW....................................937
COUNT IV .....................................................940
 FINDINGS OF FACT......................................940
 CONCLUSIONS OF LAW....................................943
COUNT V ......................................................946
 FINDINGS OF FACT......................................946
 CONCLUSIONS OF LAW....................................960
COUNT VI .....................................................967
 FINDINGS OF FACT......................................967
 CONCLUSIONS OF LAW....................................967
COUNT VII.....................................................974
 FINDINGS OF FACT......................................974
 CONCLUSIONS OF LAW....................................974
COUNT VIII....................................................977
 FINDINGS OF FACT......................................977
 CONCLUSIONS OF LAW....................................979
COUNT IX .....................................................983
 FINDINGS OF FACT......................................983
 CONCLUSIONS OF LAW....................................985
NORTHWEST'S COUNTERCLAIM .....................................987
 BACKGROUND FACTS FOR COUNT I .........................987
NORTHWEST'S COUNTERCLAIM .....................................996
COUNT I.......................................................996
 FINDINGS OF FACT......................................996
 CONCLUSIONS OF LAW...................................1003
COUNT II .....................................................1008
 FINDINGS OF FACT.....................................1008
 CONCLUSIONS OF LAW...................................1008
CONCLUSION ...................................................1008

---

### *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the amended complaint filed by Sheldon L. Solow, trustee (the "Trustee") of the estates of the debtors, Midway Airlines, Inc., Midway Aircraft Engineering, Inc., and Midway Airlines (1987), Inc. (collectively referred to as "Midway") against Northwest Airlines, Inc. ("Northwest"), and on the counterclaim of Northwest. For the reasons set forth here-

in, the Court, having considered all of the evidence adduced at trial, hereby grants judgment in favor of Northwest and against the Trustee on Counts I, III, IV, V, VI, VII, and VIII of the Complaint. The Court grants judgment in favor of the Trustee and against Northwest on Count IX of the Complaint. As to the Counterclaim, the Court grants judgment in favor of the Trustee and against Northwest on Counts I and II of the Counterclaim.

Had this matter been tried before Sir Walter Scott, he may have described it as follows: "Oh, what a tangled web parties create, when oral contracts they try to make!" With that paraphrase in mind, the Court summarizes its decision and makes the following findings of fact and conclusions of law.

### SUMMARY OF DECISION

Midway brought this lawsuit against Northwest after the parties failed to consummate a proposed purchase and sale of Midway's non-gate assets. Northwest filed a two-count counterclaim against Midway. The following recitation constitutes a summary of the Court's decision in this adversary proceeding. Pursuant to Count I of its Complaint, Midway filed a breach of contract claim against Northwest for an alleged agreement formed on October 8, 1991 for the purchase and sale of substantially all of Midway's non-gate assets. The Court holds that no such agreement was made between the parties. The only binding agreement reached by the parties on October 8 with respect to Midway's non-gate assets was to negotiate in good faith consistent with their representations to the Court and to use their best efforts to close the transaction within thirty days.

Under Count III of its Complaint, Midway claims that Northwest breached a covenant set forth in the parties' Asset Purchase Agreement to negotiate in good faith for the non-gate assets. The Court holds that Northwest did negotiate in good faith for the purchase of Midway's non-gate assets and therefore did not breach the covenant.

In Count IV of the Complaint, Midway asserts a claim for promissory estoppel against Northwest. Midway argues that Northwest promised to purchase the non-gate assets from Midway and to fund Midway's operating losses. The Court holds that Northwest did not make an unambiguous promise to purchase substantially all of Midway's assets or to fund Midway's operating losses, and thus Northwest is not promissorily estopped from claiming there was no binding and enforceable agreement for the non-gate assets.

Pursuant to Count V of the Complaint, Midway alleges that Northwest committed fraudulent misrepresentation by making several misrepresentations of material fact at the October 8, 1991 court hearing and subsequently thereafter. The Court holds that Midway failed to prove all of the requisite elements of fraudulent misrepresentation with respect to each alleged instance.

In Count VI of the Complaint, Midway asserts a claim for equitable estoppel. Midway makes substantially the same allegations with respect to this claim as it does with respect to the fraudulent misrepresentation claim in Count V. The Court holds that Midway failed to prove all of the requisite elements of equitable estoppel, and thus Northwest is not equitably estopped from asserting there was no binding and enforceable agreement for the non-gate assets.

Under Count VII, Midway alleges that Northwest committed negligently misrepresentation with respect to several material facts in connection with the proposed purchase and sale of Midway's non-gate assets. The same alleged misrepresentations that form the basis of Counts V and VI are asserted in this count. The Court holds that Northwest is not in the business of supplying information for the guidance of others in their business transactions. Accordingly, Midway may not recover its alleged economic losses under this theory.

Pursuant to Count VIII, Midway asserts a claim for intentional interference with prospective economic advantage. Midway claims that Northwest interfered with a prospective business relationship it had with Southwest Airlines Co. The Court holds that Midway failed to sustain its burden of proving that Northwest tortiously interfered with

Midway's prospective business relationship with Southwest Airlines. The Court holds that even if Northwest did interfere with a prospective economic advantage, Northwest's conduct was justified under a competitor's privilege.

Finally, in Count IX of the Complaint, Midway asserts that Northwest breached a covenant set forth in the Gate Sale Agreement to reimburse Midway for the October 1991 lease arrearage payment Midway made to the City of Chicago and for the October 1991 and November 1991 security deposit payments Midway made to the City of Chicago. The Court holds that there is no agreement requiring Northwest to assume the security deposit payments Midway owed to the City of Chicago. Thus, Northwest's refusal to reimburse Midway's security deposit payments is justified. However, pursuant to the Gate Sale Agreement, Northwest's failure to pay the October 1991 lease arrearage payment constitutes a breach of that separate agreement. As a result of that breach, Midway is entitled to damages in the sum of $190,345.49 plus $31,602.57 as pre-judgment interest, as well as post-judgment interest.

In Count I of Northwest's Counterclaim, Northwest alleges that Midway fraudulently misrepresented that its data submitted to the United States Department of Transportation was accurate and that Northwest could rely on that data; Midway gave Northwest an incomplete and misleading explanation regarding the data on October 4, 1991; and Midway failed to disclose to Northwest on October 7, 1991 that the data submitted was inaccurate and unreliable. The Court holds that Northwest failed to prove that Midway made the representations in the first allegation, failed to prove that Midway made the alleged misrepresentations in the second allegation, and failed to prove all the elements of fraudulent misrepresentation in the third allegation.

In Count II, Northwest alleges that Midway breached a confidentiality agreement executed by the parties by filing and prosecuting this adversary proceeding. The Court holds that the confidentiality agreement does not bar Midway from filing this lawsuit.

## THE UNDERLYING MATERIAL BACKGROUND FOR ALL COUNTS OF THE COMPLAINT

1. This adversary proceeding is related to *In re Midway Airlines, Inc.*, 91 B 06449, *In re Midway Airlines (1987), Inc.*, 91 B 06450, and *In re Midway Aircraft Engineering, Inc.*, 91 B 06451.

2. Midway Airlines, Inc., Midway Airlines (1987), Inc., and Midway Aircraft Engineering, Inc. are corporations organized under the laws of the State of Delaware. Their principal place of business was located in Chicago, Illinois. Midway operated a domestic airline carrier.

3. Northwest is a corporation organized under the laws of the State of Minnesota with its principal place of business in St. Paul, Minnesota. Northwest is in the business of operating an international airline commonly known as Northwest Airlines.

4. On March 25, 1991, Midway Airlines, Inc., Midway Airlines (1987), Inc., and Midway Aircraft Engineering, Inc. filed their petitions for relief under Chapter 11 of the Bankruptcy Code.

5. On March 26, 1991, the Court consolidated the cases for administrative purposes.

6. Midway Airlines, Inc. and Midway Aircraft Engineering, Inc. were Chapter 11 debtors-in-possession until November 27, 1991, when those cases were voluntarily converted to Chapter 7. Sheldon L. Solow was appointed Chapter 7 Trustee of those cases. Midway Airlines (1987), Inc. converted its case to Chapter 7 on March 9, 1992. Solow was appointed Chapter 7 Trustee of that case as well.

7. Midway filed this adversary proceeding on November 18, 1991. The Trustee has continued to prosecute this action as successor-in-interest to Midway.

8. On February 12, 1992, the Trustee filed a first amended complaint (hereinafter the "Complaint"), which contained nine counts against Northwest. Each of the nine counts relates to the failure of Midway and Northwest to consummate a proposed purchase and sale of Midway's non-gate assets (the "Back–End transaction") and the events

surrounding a hearing held before this Court on October 8, 1991 (the "October 8 hearing"). Midway has made the following claims: breach of a contract, allegedly formed at the October 8 hearing, for the Back–End transaction (Count I); breach of an implied covenant of good faith and fair dealing (Count II); breach of a covenant, set forth in Section 5.7 of the parties' Asset Purchase Agreement dated October 10, 1991, to negotiate in good faith for the Back–End transaction (Count III); promissory estoppel (Count IV); fraudulent misrepresentation (Count V); equitable estoppel (Count VI); negligent misrepresentation (Count VII); intentional interference with a prospective economic advantage (Count VIII); and breach of a covenant in the Gate Sale Agreement to assume certain lease arrearage and security deposit liabilities of Midway (Count IX).

9. On February 18, 1992, Northwest filed an answer to the Complaint and a two-count counterclaim (hereinafter the "Counterclaim") against Midway. In its answer, Northwest denied the material allegations of wrongdoing in the Complaint and raised several affirmative defenses. In its Counterclaim, Northwest asserts claims against Midway for fraudulent misrepresentation (Count I) and breach of a confidentiality agreement executed by the parties (Count II). On May 6, 1992, Northwest filed an amendment to its answer and Counterclaim.

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1334(b). Northwest has consented to the Court's entry of a final order or judgment in this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7008(a). Accordingly, the Court may enter a final order and judgment.

11. This action is properly before this Court pursuant to Rule 2.33(A) of the Local General Rules of the United States District Court for the Northern District of Illinois.

12. Venue is proper pursuant to 28 U.S.C. § 1409.

13. All findings of fact contained herein that are deemed to be conclusions of law shall be additional conclusions of law, and all conclusions of law herein that are deemed to be findings of fact shall be additional findings of fact. See In re Piper's Alley Co., 69 B.R. 382 (N.D.Ill.1987).

14. The function of the Court in a bench trial such as this, where the Court acts as the fact finder, is to resolve conflicting evidence by determining the credibility of witnesses, the weight to be attached to their testimony, and the inferences to be drawn from the evidence. S.T.S. Int'l, Ltd. v. Laurel Sea Transport, Ltd., 932 F.2d 437, 440 (5th Cir. 1991); Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1428 (7th Cir.1985), cert. denied, 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986).

15. Based on the proposed findings of fact submitted by Midway and Northwest, the testimony of the witnesses at trial, and the exhibits entered into evidence, the Court makes the following findings of fact and conclusions of law with respect to the claims in Midway's Complaint and Northwest's Counterclaim.

16. This Court previously granted Northwest's motion for summary judgment as to Count II of the Complaint, but denied that motion as to the remaining counts. See Midway Airlines, Inc. v. Northwest Airlines, Inc., No. 91 A 01176, 1993 WL 65673 (Bankr. N.D.Ill. Feb. 24, 1993).

17. The Court conducted a bench trial on the remaining counts of Midway's Complaint and on Northwest's Counterclaim between May 3, 1993 and September 2, 1993. The parties requested extensions to submit post-trial papers to April 29, 1994, when the matter was taken under advisement. The parties have submitted their prospective proposed findings of fact and conclusions of law. Parenthetical references are made to the trial record and exhibits admitted into evidence.

18. With the Court's approval, Midway retained The First Boston Corporation ("First Boston") as its investment advisor on May 24, 1991. (Tr. (Hinson) 110–11, 212, 214; DX 2).

19. First Boston was retained to assist Midway in analyzing and evaluating Midway's current and prospective financial condition, developing financial forecasts, evaluating Midway's assets and operations under

assumptions including liquidation, maximizing asset values, communicating with potential investors, and negotiating and implementing the plan of reorganization. (Koeneke Dep. 19–20; DX 2).

20. On May 24, 1991, Midway also issued a business plan for the period May 1, 1991 through April 30, 1992. (Tr. (Hinson) 214; DX 49). Midway's plan projected that by April 1992, Midway would have repaid its post-petition loan borrowed with Court approval from Continental Bank, N.A., and accumulated a $2.5 million cash surplus. (DX 49, p. 16; Tr. (Hinson) 216).

21. In July, First Boston completed a prospectus (the "Book") describing Midway as a potential investment opportunity. (PX 93). First Boston also prepared an agreement covering confidentiality and other issues (the "Confidentiality Agreement"), which Midway required interested parties, including Northwest, to sign as a precondition to receiving the Book. (Tr. (Cronin) 2215, 2051–54; (Hinson) 114; Koeneke Dep. 21–22). Northwest signed the Confidentiality Agreement in late July to obtain the Book. First Boston then sent the Book to Northwest. (DX 501; PX 35, PX 93; Tr. (Steenland) 3758–59; (Cronin) 2052–53, 2215).

22. Paragraph 7 of the Confidentiality Agreement states:

> You [Northwest] also understand and agree that *no contract or agreement concerning the possible transaction shall be deemed to exist between you and the Company [Midway] unless and until a definitive agreement has been executed and delivered,* and we and you hereby waive, in advance, any claims (including without limitation, breach of contract) in connection with the transaction unless and until we and you shall have entered into, executed and delivered a *definitive agreement* between the Company and you. In the absence of such definitive agreement being executed and delivered, neither you nor the Company has any legal obligation of any kind whatsoever with respect to any such transaction by virtue of this Agreement or any other written or oral expression with respect to such transaction except, in the case of this Agreement, for the

matters specifically agreed to herein. For purposes of this paragraph, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement, nor does it include any other preliminary written agreement, nor does it include any written or verbal acceptance of an offer on our part. . . . *Neither this paragraph nor any other provision in this Agreement can be waived* or amended *except by written consent* of the Company *which* consent *shall specifically refer to this paragraph* (or such other provision) *and explicitly make such waiver* or amendment.

(PX 35, ¶ 7, emphasis supplied).

23. As of mid-September 1991, no potential investor had made any offer to recapitalize, acquire, or otherwise invest in Midway. (Tr. (Hinson) 120–22; PX 664/DX 5, p. 5).

24. By mid-September 1991, Midway's cash problems were very serious. Midway was experiencing a negative cash flow and had drawn down most of its $40 million debtor in possession ("DIP") credit line from Continental Bank, N.A. ("Continental"). (Tr. (Hinson) 116; (Hanson) 460; (Burgess) 836; Schick Dep. 16–17; Jenkins Dep. 21–23, 82–83).

25. At its September 17, 1991 meeting, Midway's Board of Directors instructed Midway's management and First Boston to inform potential investors that Midway was running out of time and, therefore, potential investors needed to make their proposals for a Midway transaction promptly. (Tr. (Hinson) 119–21; (Hanson) 460; (Burgess) 837–38; Jenkins Dep. 24–25; PX 665/DX 87, pp. 5–6, 8; DX 7).

26. In response to this directive from Midway's Board, First Boston contacted the six most likely prospective investors, which included Northwest, and requested in writing that they submit offers by Thursday, September 19, 1991. (Tr. (Hinson) 120; Jenkins Dep. 24–25; DX 4).

27. Northwest submitted a proposed letter agreement, dated September 19, 1991, to Midway whereby Northwest offered to purchase Midway's gates at Midway Airport at Chicago, Illinois, for $20 million and lease

them back to Midway for a one-year period, and to negotiate in good faith to acquire the remainder of Midway's assets at a later date. (DX 234).

28. James Cronin (a consultant for Checchi and Associates, and Northwest's lead negotiator in the Midway transaction) and Douglas Steenland (Northwest's Vice–President, Deputy General Counsel, and Secretary) were Northwest's primary negotiators regarding the letter agreement. (Tr. (Cronin) 2033–34; (Steenland) 3755).

29. Midway's and Northwest's lawyers further negotiated the terms of the proposed letter of intent on September 20 and 21, 1991. (Tr. (Steenland) 3761; (Burgess) 956; DX 85 (9/20–9/21 entries)). Northwest's draft contained a variety of conditions to Northwest's obligation to consummate the sale of Midway's gates including the execution of definitive documents (DX 234, ¶ 5(a)) and the approval of Northwest's Board of Directors. (DX 234, ¶ 5(h)). The only change requested by Midway to the proposed board approval condition was to add the approval of Midway's Board as a condition to any obligation to close the sale of the gates. (Tr. (Burgess) 955; (Steenland) 3770, 3765–66). Northwest made it clear to Midway during the negotiations over the letter of intent that Northwest did not just want to buy Midway's gates, but, rather, was also interested in purchasing Midway as a going concern. (Tr. (Burgess) 956–57; DX 89, p. 3).

30. On September 23, 1991, Midway's Board of Directors met and approved Midway's execution of the letter agreement (the "Letter of Intent"). (Tr. (Hinson) 121–23; PX 4; PX 669/DX 89).

31. On September 23, 1991, Midway and Northwest signed the Letter of Intent. The Letter of Intent provided that Northwest would purchase Midway's interest in 21 gates at Midway Airport for $20 million, lease the gates back to Midway for a period of one year, assist Midway in marketing and other activities, and enter into good faith negotiations with Midway for the acquisition by Northwest of all or substantially all of Midway's assets. (PX 4). The Letter of Intent also provided Midway an option to re-pur-chase the gates from Northwest at a premium price. (PX 4, ¶ 1(c)). This transaction will be referred to as the "Gate Sale."

32. In addition, the Letter of Intent expressly provided that Northwest's and Midway's obligations to close the transaction contemplated by the Letter of Intent were subject to various conditions precedent. Among the conditions were the execution of definitive documentation (¶ 5(a)), approval of the Board of Directors of both Northwest and Midway (¶ 5(h)), Bankruptcy Court approval (¶ 5(c)), and a due diligence review with results reasonably satisfactory to Northwest (¶ 5(e)). (PX 4; Tr. (Steenland) 3766–69).

33. On September 24, 1991, Midway filed an "Emergency Motion to Approve Sale–Leaseback of Midway's Leasehold Interests at Chicago Midway Airport," asking the Court to approve the sale-leaseback of Midway's 21 gates and related facilities at Midway Airport to Northwest pursuant to the Letter of Intent. (Tr. (Hinson) 122; (Hanson) 478–79; PX 697).

34. By order dated September 26, 1991, the Court scheduled a hearing on Midway's motion, pursuant to Sections 363 and 365 of the Bankruptcy Code, for October 8, 1991. (DX 243, p. 3).

35. Southwest Airlines Co. ("Southwest") submitted a competing offer for Midway's gates at Midway Airport on September 28, 1991, four days after Midway filed its Emergency Motion. (Tr. (Hinson) 123; PX 670).

36. After consideration, Midway determined that this initial Southwest offer was inferior to Northwest's offer. (Tr. (Hinson) 123–24).

37. On Friday, October 4, 1991, Southwest submitted a revised offer which was much more attractive to Midway than Southwest's initial offer. (Tr. (Hinson) 124; (Hanson) 479; (Burgess) 1239–41; PX 77).

38. Unlike Northwest's offer, the revised Southwest offer firmly encompassed assets in addition to Midway's gates at Midway Airport. (Tr. (Hanson) 478–79; PX 77, p. 3).

39. In light of the improved Southwest offer, Ronald Hanson (an attorney with Latham & Watkins and one of Midway's bank-

ruptcy counsel) contacted Steenland and told him that Northwest might not prevail at the October 8 hearing. Hanson encouraged Northwest to expand its offer to include assets in addition to Midway's 21 gates at Midway Airport. (Tr. (Hanson) 455–56, 478–79; (Steenland) 3773, 4066–67).

40. Cronin apprised John Dasburg (President and Chief Executive Officer of Northwest), Gary Wilson (Co–Chair of Northwest's Board and a capital partner of Checchi and Associates (Cronin's employer)), and Northwest's legal counsel of the revised Southwest offer. (Tr. (Cronin) 2030, 2082; Dasburg Dep. 7).

41. To prepare for the special meeting of Northwest's Board of Directors scheduled for October 7, 1991 to discuss a Midway acquisition, Dasburg called a meeting of senior Northwest officials and Northwest's outside bankruptcy counsel on Sunday, October 6, 1991 at Dasburg's house. (Tr. (Steenland) 3775; Parkins Dep. 55–56; Dasburg Dep. 36–37).

42. The participants at the October 6, 1991 meeting included, among others, Dasburg, Steenland, Robert Fornaro (Northwest's Senior Vice President of Marketing and Planning), John Garel (Northwest's Vice President of Financial Planning and Analysis), Elliott Seiden (Northwest's Counsel and head of its Government Affairs Department), Joe Leonard (Northwest's Executive Vice President of Customer Service), Lenard Parkins (an attorney with Sheinfeld, Maley & Kay, P.C. one of Northwest's outside bankruptcy counsel), and Cronin by telephone. (Tr. (Jehn) 2644; (Fornaro) 2975; (Garel) 3472; (Steenland) 3775; Dasburg Dep. 36–37; Parkins Dep. 5–6, 14–15, 55–56; Leonard Dep. 7).

43. The participants at the October 6 meeting discussed whether Northwest should counter Southwest's offer with a proposal to acquire substantially all of Midway's assets. (Parkins Dep. 56).

44. Among the subjects discussed at the October 6 meeting was an acquisition analysis. (Dasburg Dep. 39–40; PX 53).

45. At the end of the October 6 meeting, Northwest's management was still divided about whether Northwest should go forward with the acquisition of Midway. (Tr. (Steenland) 3776; Dasburg Dep. 41; Parkins Dep. 75).

46. Dasburg concluded after the meeting that the direct economic benefits of the transaction were sufficiently positive for Northwest to risk advancing $20 million for the gates to keep Midway afloat while Northwest considered the acquisition of Midway as a going concern. (Dasburg Dep. 39–42). Consequently, Dasburg decided to recommend an acquisition of all of Midway's assets to Northwest's Board, subject to a due diligence examination of Midway by Northwest. (Dasburg Dep. 41, 84).

47. On Monday morning, October 7, Northwest's management called a special telephonic meeting of its Board of Directors for 1:00 p.m. that afternoon to consider Midway's request for a specific proposal to acquire all of Midway's assets. (PX 109; DX 429; PX 10; Tr. (Steenland) 3779).

48. Approximately two to three hours before the meeting, Joseph Francht (Northwest's Senior Vice President of Finance and Treasurer) sent the members of Northwest's Board of Directors a memorandum "seeking approval for the acquisition of substantially all of the assets of Midway Airlines." (Francht Dep. 7; PX 40, p. 1).

49. Northwest's Board of Directors discussed a wide variety of issues at the meeting relating to an acquisition of Midway, including its risks and benefits. (Dasburg Dep. 48–57). Management explained its view that the acquisition of Midway was attractive for Northwest because there were projected substantial direct benefits and indirect benefits. (PX 10, p. 3; Tr. (Steenland) 3783; Dasburg Dep. 53–56; Aziz Dep. 43). Dasburg also informed the Board, however, that Northwest still needed to perform due diligence on Midway. (Dasburg Dep. 83–84, 90–91, 94; Van Wijk Dep. 37, 47). The Board also discussed whether Northwest could recover its $20 million if Northwest bought the Midway gates but did not complete an acquisition of Midway's remaining assets. The consensus was that the $20 million was secure because Northwest would be able to sell

the gates to Southwest if the Back–End transaction did not occur. (Dasburg Dep. 48–49).

50. At the conclusion of the October 7 board meeting, Northwest's Board passed an oral resolution, proposed by Dasburg, authorizing the company's management: (1) to acquire Midway's gates pursuant to the Letter of Intent for $20 million; and (2) to "submit a bid for the remainder of Midway's assets *subject to final approval by the Board.*" (PX 10, p. 5, emphasis supplied; Tr. (Steenland) 3785–86, 3787–88; Bouw Dep. 35; Aziz Dep. 54, 56; Van Wijk Dep. 47, 73, 86; Dasburg Dep. 83–84, 90–91). The vote on this oral resolution was eleven in favor, none opposed, with three abstentions. (PX 10, p. 5; Tr. (Steenland) 3786).

51. Northwest's Board included three representatives from KLM Royal Dutch Airlines ("KLM"). KLM, an investor in Northwest, owned twenty percent of Northwest's voting equity. (Tr. (Steenland) 3778; Leonard Dep. 125).

52. The three KLM representatives on the Northwest Board—Pieter Bouw (President of KLM), Leo Van Wijk (Managing Director of KLM), and Sharyar Aziz (Executive Vice President and Managing Director of Smith Barney, which provided financial advisory services to KLM)—cast the votes to abstain (collectively referred to as the "KLM directors"). (Tr. (Steenland) 3778–79; Dasburg Dep. 67–68).

53. Although the KLM directors had expressed reservations over the strategic merits of the proposed acquisition, they voted to abstain because they felt they did not have adequate time or information to give proper consideration to the proposed Midway transactions. (Bouw Dep. 34–36; Van Wijk Dep. 63–64, 27, 40; Aziz Dep. 61; Tr. (Steenland) 4094–95).

54. The evidence was uncontroverted that at the October 7 meeting, Northwest's Board did not approve the purchase of any Midway assets other than the gates. (Tr. (Steenland) 3786; Van Wijk Dep. 47, 73; Bouw Dep. 34–35; Aziz Dep. 56; Dasburg Dep. 87–88, 91).

55. The minutes from the October 7 meeting indicate that "it was decided that the officers would be granted authority to acquire Midway's gates on the terms as they deemed appropriate and to submit a bid for the remainder of Midway's assets subject to final approval by the Board." (PX 10, p. 5).

56. On the evening of October 7, Dasburg and Steenland briefed Cronin on the special Northwest Board meeting that they had attended, which Cronin had not attended. (Tr. (Cronin) 2085–86).

57. In this briefing, Dasburg and Steenland did not inform Cronin that the three KLM directors had abstained from the vote on the acquisition. (Tr. (Cronin) 2247–48).

58. Parkins had not attended the October 7 Board meeting. Thus, Dasburg and Steenland also briefed Parkins on October 8 with regard to what had occurred at the meeting. (Parkins Dep. 104–06).

59. No one told Parkins that the three KLM directors had abstained from the vote on the acquisition neither prior to nor during the October 8 hearing. (Parkins Dep. 102–04).

60. On the morning of October 8, a meeting was held in Dasburg's office to decide whether management would make a proposal for Midway in court later that day, and, if so, to formulate that proposal. In addition to Dasburg, the participants in the meeting included Gary Wilson, Steenland, and Cronin. (Tr. (Steenland) 3793–95; (Cronin) 2090–91, 2288; Dasburg Dep. 307–08).

61. The testimony about that meeting was consistent and unrebutted. The participants decided that Cronin and Steenland would attend the court hearing that afternoon and present a two-part proposal: (1) Northwest would offer to purchase the gates for $20 million pursuant to the Letter of Intent and the definitive agreements that had been negotiated, and (2) Northwest would offer to negotiate in good faith to acquire all or substantially all of Midway's remaining assets consistent with the following terms: (a) the hiring of substantially all of Midway's operating employees; (b) the assumption of Midway's leases with Fidelcor (also known as Aeron) for 17 aircraft; and (c) a total of $95 million in additional value, comprised of the assumption of Midway's air

traffic liability ("ATL") and its DIP loan, and a combination of cash and notes in the amount of the difference between $95 million and the total value of the assumption of the ATL and DIP. (Tr. (Steenland) 3794–96; (Cronin) 2090–93, 2288; Dasburg Dep. 307–08).

62. In addition, Dasburg and Gary Wilson instructed Steenland and Cronin to make Northwest's proposal for Midway's remaining assets contingent on the approval of Northwest's Board of Directors. (Tr. (Steenland) 3798–99; Dasburg Dep. 232–33, 309–10; Tr. (Cronin) 2095–96, 2090). This instruction was expressly based on the fact that the Northwest Board itself had imposed the board approval condition at its October 7 meeting. (Tr. (Steenland) 3798; (Cronin) 2095–96).

63. After Northwest's senior management decided upon Northwest's revised offer, Steenland called Northwest's outside legal counsel at Dorsey & Whitney, William Hibbs, who was in Chicago, and directed him to prepare a written offer which could be presented in court that afternoon. (Tr. (Steenland) 3804–05, 4128–29; Hibbs Dep. 5).

64. Parkins also received instructions over the phone from Steenland, detailing the offer which Northwest was to make in Court that afternoon. (Parkins Dep. 86–88).

65. Cronin and Steenland flew to Chicago from Minneapolis after the morning meeting on October 8 in order to attend the hearing that afternoon and present Northwest's acquisition offer. (Tr. (Steenland) 3803–04).

66. At 11:00 a.m. on the morning of October 8, shortly after the meeting in Dasburg's office, Cronin spoke by telephone to a number of Midway representatives, including James Jenkins of First Boston. Cronin informed them of the terms and conditions of Northwest's proposal that had just been formulated in Dasburg's office. (Tr. (Cronin) 2096–98, 2293; Jenkins Dep. 39–40, 112–134; DX 9 at FB81). Jenkins, who took extensive notes of the conversation, testified that Cronin said Northwest's proposal for Midway's non-gate assets was subject to conditions: Northwest "had to complete their due diligence and documentation and then they had to get board approval." (Jenkins Dep. 39–40; DX 9 at FB81; Tr. (Cronin) 2096–98).

67. Midway's Board of Directors met at 11:30 a.m. on October 8 to discuss the existing Northwest and Southwest proposals. (DX 98). At approximately 11:55 a.m., Jenkins reported his conversation with Cronin to Midway's Board. Jenkins advised the Board of Northwest's terms and conditions, stating that "Northwest needed to do more due diligence, get Board approval and document the second part of the transaction." (DX 98, p. 4; Tr. (Hinson) 223; Jenkins Dep. 137–38; Tr. (Altschul) 3588–89; (Burgess) 978; Schick Dep. 176–77). Midway Board's was also told that Northwest's Back–End proposal was a "$95 million" offer, which included the assumption of Midway's DIP loan and ATL. (DX 98, pp. 3, 4; Tr. (Burgess) 975; DX 9 at FB81; Tr. (Hanson) 620). There was no discussion of Northwest's willingness to assume any other Midway liabilities. (Tr. (Burgess) 977).

68. Under Southwest's proposal, Midway would cease operations immediately, and Midway's employees would lose their jobs. (Tr. (Burgess) 997; DX 98, pp. 4–5). Although Midway's Board had been advised that Northwest's proposal was subject to conditions, the Board believed that Northwest's existing proposal was superior to Southwest's proposal. (DX 98, pp. 4–5; Schick Dep. 31; (Tr. (Burgess) 982–83). Midway's Board directed its management to support Northwest over Southwest if the proposals turned out to be equal in value after further modifications because of Northwest's willingness—and Southwest's unwillingness—to hire Midway's employees. (DX 98, pp. 4–5; Tr. (Burgess) 979, 982). As Hinson (Chairman of Midway's Board of Directors and Chief Executive Officer) termed it, the possibility that Midway's employees would keep their jobs under Northwest's proposal, but not Southwest's, "was a very important factor." (Tr. (Hinson) 224–25; (Burgess) 977–80). This factor was so important that Hinson even suggested that the Board meet again if Southwest made an offer that was superior to Northwest's, rather than having Midway's officers simply accept the superior Southwest offer. (DX 98, p. 4).

69. When the Board was polled, several of Midway's directors stressed that Midway needed to take the best financial offer. (Tr. (Hinson) 224; DX 98, pp. 4–5).

70. Because of the possibility that the best offer might not emerge until the court hearing, Midway's Board refrained from making a decision regarding which offer Midway should accept. (Tr. (Hinson) 224; DX 98, p. 4).

71. Instead, the Board gave Midway's management the general instruction that if the Northwest and Southwest offers were equal, management should select the Northwest offer because it offered more benefits for Midway's employees. (DX 98, pp. 4–5).

72. The purpose of the October 8 hearing was to approve the sale of Midway's gates to Northwest under the terms of the most recent draft of the definitive agreement (PX 612), which Midway had delivered to the Court on October 7, 1991. (Tr. (Hanson) 484).

73. Midway was represented at the October 8 hearing by a team which included, among others, senior officers Hinson, Schick, and Altschul, outside legal counsel (including Burgess, John Henneman, and bankruptcy counsel Ronald Hanson and John Costello), and several investment bankers from First Boston (including James Jenkins, Michael Koeneke, Randy Hazelton, and others). Northwest was represented at the start of the hearing by its outside bankruptcy counsel, Lenard Parkins, its outside corporate counsel from Dorsey & Whitney, William Hibbs, and its Treasurer, Joseph Francht. Due to the length of the meeting in Dasburg's office that morning, Steenland and Cronin missed their flight to Chicago, and did not arrive in court until after the first recess of the hearing was underway. (Tr. (Steenland) 3803, 3805; (Cronin) 2098–99, 2294; Hibbs Dep. 92). Steenland communicated the terms and conditions of Northwest's proposal (including the Back–End offer) to be presented in court (which had just been determined at the meeting in Dasburg's office) by telephone from the Minneapolis Airport to Francht and Parkins, who were waiting for instructions in Chicago. (Tr. (Steenland) 3803–04, 4127; Parkins Dep. 86–87).

74. At the outset of the October 8 hearing, Midway requested, and the Court set, the ground rules for the hearing. (PX 13). Midway's counsel and the Court stressed that the parties should state both the terms and the conditions of the competing offers on the record in open court, and that only those statements on the record would be the bases for the Court's decision. (PX 13; Tr. (Burgess) 1021; (Hanson) 622, 521).

75. Northwest's counsel, Parkins, presented Northwest's two-part proposal. He divided his presentation into separate parts, discussing the terms and conditions of each part separately. The first part dealt with Northwest's offer to purchase Midway's gates for $20 million as set forth in the Letter of Intent and the draft definitive agreement provided to the Court on October 7 (the Gate Sale). With respect to that transaction, Parkins reported that the conditions had been satisfied, and that Northwest was prepared to close. (PX 13, pp. 16–17).

76. Parkins next presented the second part of Northwest's proposal, which he termed the "Back–End," dealing with the terms which Northwest would include in the negotiations for Midway's remaining assets, as well as the conditions to those terms. Parkins expressly noted that Northwest's Back–End offer was for the "balance" and "all" of Midway's assets, and specified the following consideration which Northwest would include in the negotiations for those assets: (1) the hiring of substantially all of Midway's employees (except "spoke" employees); (2) the assumption by Northwest of Midway's leases with Fidelcor for 17 DC–930 aircraft (the "Fidelcor leases"); (3) Northwest would enter into negotiations to assume Midway's leases with other lessors for an additional 28 aircraft (the "non-Fidelcor" leases); and (4) "$95 million of consideration," in the form of the assumption of Midway's ATL, the assumption of Midway's DIP loan from Continental Bank, cash, and notes. (PX 13, pp. 18–20).

77. Parkins also responded to the request of Midway and the Court for a statement of the conditions to Northwest's proposal. In

contrast to Northwest's offer for the gates—which Parkins stated was no longer conditional—Parkins expressly stated, on the record, that the Back–End transaction was conditioned upon the approval of Northwest's Board and due diligence:

> Now, relative to the second or what has come to be known as the back-end portion of the Northwest transaction, *conditions will be board approval, due diligence,* there is obviously a lot of negotiation to go on with the various creditors relative to the $95 million of consideration to be afforded the estate, in addition to attempting to negotiate and relieve the estate of the liability for the additional DC–930s and MD–80s.

(PX 13, p. 20, emphasis supplied; Parkins Dep. 146–48). The notes that the Midway representatives took during Parkins' presentation reflect the conditions. (DX 96 at L2368 (Hanson); PX 726 (Burgess); DX 9 at FB80 (Jenkins)).

78. As part of his presentation of Northwest's offer, Parkins described the administrative liabilities remaining against the estate under Northwest's offer as follows: "[T]here is a $30 million current liability of the estate, [and] approximately $28 million of other administrative claims...." (PX 13, p. 19).

79. Northwest's assessment of the administrative liabilities remaining under its offer was based on First Boston's claims analysis, which Northwest had earlier requested and received from Midway. (Tr. (Steenland) 4151; PX 125).

80. At the beginning of the hearing, Southwest submitted a revised written offer to Midway. (DX 94; PX 13, pp. 10, 38; Tr. (Hanson) 486). Southwest's counsel, David Heroy, detailed its offer on the record after Parkins' initial presentation. (PX 13, pp. 21–26). In contrast to Northwest's offer, Southwest stated that its offer was not subject to any conditions except verification of the existence of Midway's assets. (PX 13, pp. 22, 24). The notes taken by Jenkins during the Southwest presentation reflect that Southwest's offer did not have a board approval condition. (DX 9 at FB86, FB79; Jenkins Dep. 41–42). Jenkins testified that Northwest's board approval and due diligence con-

ditions made it "weak" compared to Southwest's unconditional offer. (Jenkins Dep. 33–34).

81. Under its initial offer, Southwest would:

a. purchase 21 of Midway's Midway Airport gates for a total of $28 million;

b. purchase certain of Midway's remaining assets for $25.15 million;

c. assume $35 million of Midway's ATL liability;

d. allow Midway to retain $11.7 million in ATL deposits and $13.5 million in accounts receivable; and

e. pay the $1 million security deposit owed by Midway to the City of Chicago.

(PX 13, pp. 21–25).

82. At Midway's request (PX 13, pp. 6, 11), the Court called a recess after Southwest's presentation to allow Midway to meet with Southwest and Northwest and to further consider the competing proposals. (PX 13, p. 29). During the recess, Midway held separate meetings with Northwest and Southwest in conference rooms near the courtroom. (Tr. (Hinson) 128–29).

83. Hanson took contemporaneous notes of the October 8 hearing which are embodied in PX 676/DX 96. (Tr. (Hanson) 489–90; PX 676/DX 96).

84. He divided his notes between those he took during the hearing (the right side of PX 676/DX 96) and those he wrote to himself based on the questions and issues that arose during the hearing and recesses (the left side of PX 676/DX 96). (Tr. (Hanson) 489–90; PX 676/DX 96).

85. Burgess also took contemporaneous notes during the October 8 hearing. (Tr. (Burgess) 845–47, 1252; PX 674/DX 82, pp. 1–2; PX 726).

86. Burgess used the body of the notes in PX 726 to outline the issues which he wanted to discuss with Northwest during the recesses. The margin notes and certain of the parentheticals in PX 726 record these discussions with Northwest. (Tr. (Burgess) 847).

87. Midway's and Northwest's representatives met for 15–20 minutes during the first recess in a conference room outside the courtroom. (Tr. (Hanson) 498; (Burgess) 852–53).

88. Burgess, Hanson, Hinson, and Thomas Schick (Midway's President and Chief Operating Officer) attended the recess meeting on behalf of Midway. (Tr. (Burgess) 853; (Cronin) 2100; Schick Dep. 7).

89. Cronin and Steenland were the representatives most actively involved on behalf of Northwest in the first recess discussions. (Tr. (Burgess) 853; (Cronin) 2101; Schick Dep. 31–32).

90. Midway's representatives began the recess meeting by asking Northwest's representatives to go through Northwest's proposal. (Tr. (Hinson) 130; (Burgess) 855).

91. Parkins described Northwest's offer. (Tr. (Burgess) 855).

92. The meeting then "very quickly evolved into Midway representatives asking specific questions about ... the individual parts of the Northwest proposal and eliciting answers from Northwest to provide either further clarification or understanding...." (Tr. (Burgess) 855).

93. "Bob Burgess and Ron Hanson made a checklist of points and questions they wanted clarification on or to request changes to and they were methodically going through those points that they wanted to understand or have changes made to." (Tr. (Cronin) 2103).

94. During the first recess meeting one of the subjects discussed was the economics of the Northwest offer. Northwest indicated that the Back–End portion of the Northwest offer would provide the Midway estate with approximately $22 million or $23 million of value in the form of cash and notes. This was in addition to the $20 million Midway would receive from the sale of its Midway Airport gates to Northwest in the Gate Sale. (Tr. (Burgess) 856–57, 1252, 1255–56; PX 726).

95. Northwest informed Midway that its analysis showed that the Midway estate would be left with approximately $58 million in administrative claims under the Northwest offer. (Tr. (Burgess) 858).

96. Either Alfred Altschul (Midway's Senior Vice President and Chief Financial Officer) or a First Boston representative confirmed that Northwest's estimate of the amount of administrative claims remaining under the Northwest offer was comparable to the figure Midway had estimated. (Tr. (Burgess) 858; (Altschul) 3586).

97. Midway was "focused primarily on getting administrative claims satisfied because it had appeared from what [it had] done thus far in the claims analysis that ... [it] had a potentially administratively insolvent estate, and consequently the focus was what was the value that would be available to satisfy the priority claims." (Tr. (Hanson) 1394).

98. Another issue the parties discussed during the first recess meeting was the composition of the cash and notes portion of the $95 million of consideration that Northwest would pay for the Back–End transaction. (Tr. (Hanson) 508–09; (Burgess) 859).

99. Northwest agreed to put a $10 million cap on the notes portion of the consideration and provide Midway with a minimum of $10 million in cash. (Tr. (Hanson) 508–09; (Burgess) 859; (Steenland) 3814).

100. Northwest also agreed that First Boston and Northwest's investment banker would fix the terms of the notes so that the actual value equalled their face value. (Tr. (Hanson) 508–09; (Burgess) 859–60; (Steenland) 3814).

101. The parties also discussed Midway's ATL. Northwest's proposal provided that Northwest would satisfy Midway's ATL either by flying the customers holding Midway tickets on Northwest flights or by making refunds to those customers. (Tr. (Steenland) 4171).

102. During the first recess, Burgess also questioned Northwest about the due diligence and board approval conditions mentioned by Parkins during the first court session. (Tr. (Burgess) 862; Schick Dep. 40; Parkins Dep. 160).

103. Burgess asked Cronin whether he viewed due diligence as an "out" or "walk right" or whether he viewed it as an "identification and verification issue." (Tr. (Burgess) 863).

104. Cronin declined to eliminate or limit the scope of Northwest's due diligence. (Tr. (Cronin) 2104–05, 2107, 2112; (Steenland) 3816–18; (Burgess) 1020–21; Jenkins Dep. 208–09; Parkins Dep. 160–61; Steenland Dep. 113–14, 324, 326).

105. Burgess then asked Northwest's representatives about board approval. (Tr. (Hanson) 499; (Burgess) 869).

106. Cronin's response to Burgess' question was that he did not think that board approval would be a problem. (Tr. (Hinson) 130–31; (Hanson) 498–99, 528, 631; (Burgess) 870, 999; (Cronin) 2297–98; Schick Dep. 36–39; Parkins Dep. 158; Jenkins Dep. 146).

107. Cronin had not attended the October 7 Northwest Board meeting, he had no first-hand knowledge of the positions taken by the Northwest directors with respect to the Midway acquisition, and he had not seen any resolution—either proposed or adopted by Northwest's Board—with respect to an acquisition of Midway. (Tr. (Cronin) 2299–2300).

108. Steenland, who was aware of KLM's position on the Midway acquisition, did not offer anything or add to Cronin's response. (Tr. (Burgess) 873).

109. At the first recess, no Northwest representative indicated any disagreement with Cronin's statement.

110. Northwest did not withdraw, modify, or waive any of its conditions during the first recess, or at any other time on October 8. (Tr. (Steenland) 3836, 3828, 3896–97; (Altschul) 3592; Parkins Dep. 159–60). Neither Cronin nor Steenland had any authority to do so. (Tr. (Steenland) 3818, 3836–37, 3895–97; (Cronin) 2117, 2112–13, 2107, 2123–24).

111. After the first recess meeting with Northwest, Midway's representatives met with Southwest's representatives. (Tr. (Hanson) 514–15; (Burgess) 880).

112. At the recess meeting with Southwest, Midway questioned Southwest's representatives about the elements of the Southwest offer. (Tr. (Burgess) 881).

113. At the conclusion of these first recess meetings with Northwest and Southwest, Midway's representatives met privately to assess the situation and determine which offer Midway favored. (Tr. (Hanson) 519).

114. Based on the statements of the participants to this point of the October 8 hearing, Midway's representatives decided that Northwest's offer was still preferable to Southwest's offer (Tr. (Hanson) 519).

115. Midway opened the second session of the October 8 hearing with an offer of proof as to Midway's precarious financial condition and its need for the Court to promptly approve Midway's acceptance of the superior offer in order to avoid a shutdown. (PX 13, pp. 31–35).

116. Hanson then summarized both Northwest's and Southwest's offers for the record. (PX 13, pp. 37–43).

117. In summarizing Northwest's offer, Hanson initially requested "Northwest to correct me if I'm wrong on any of these statements." (PX 13, p. 40).

118. Reiterating his understanding of Northwest's position following the recess meeting, Hanson stated that the Back–End offer was subject to conditions:

Very important to us on that as well, Judge, is the Northwest statement that *subject to reaching agreement on documentation, board approval,* which we understand they don't expect to be a problem, they are ready to ... move ahead.

(PX 13, p. 42, emphasis supplied). Northwest's representatives agreed with this representation: the Back–End offer was subject to these conditions, as they had stated, and they did not expect that obtaining the approval of Northwest's Board or reaching agreement on documentation would be a problem. (Tr. (Steenland) 3830–31; (Cronin) 2114–15).

119. In the first portion of his remarks, Hanson indicated that Northwest was willing to close the asset purchase agreement for the

Gate Sale as drafted and previously submitted to the Court, and that Northwest was now also willing to assume Midway's $4.7 million City of Chicago lease arrearages in the Back–End transaction. (PX 13, pp. 38–39).

120. Hanson advised the Court that, because Midway was losing $2 million per week, the value of the Northwest offer depended upon how quickly the Back–End transaction closed. (PX 13, pp. 39–40).

121. In this regard, Hanson advised the Court that while the draft asset purchase agreement gave Northwest 60 days to reach final agreement on the Back–End transaction:

> They have told us today and they have told us in court that they are ready to move much more quickly. I think I can safely say that we believe that the—and I'd ask Northwest to correct me if I'm wrong on any of these statements—the transaction can safely close and be concluded in three to four weeks at the outside for [the Back–End transaction].

(PX 13, p. 40).

122. Hanson then set forth the following points with regard to Northwest's offer:

a. *Due Diligence:* "What we need to do is verify the assets to their satisfaction as stated on the balance sheet...." (PX 13, p. 40);

b. *Board Approval:* "Very important to [Midway] ... is the Northwest statement that subject to reaching agreement on documentation, board approval, which we understand they don't expect to be a problem ... they're ready to move ahead." (PX 13, p. 42);

c. *Satisfaction of Conditions:* "The Southwest offer also has some conditions attached to it including board approval, arrangements with the City, environmental due diligence, two of which have already been satisfied by Northwest." (PX 13, p. 42);

d. *Other Conditions:* "We have passed the hurdle of the two big conditions, which have been the City of Chicago and Continental Bank." (PX 13, p. 40);

e. *Non–Fidelcor Leases:* In valuing Northwest's offer, Midway did not credit Northwest's promise to negotiate the assumption of the non-Fidelcor leases, but did note that such assumption might eliminate $7–8 million of post-petition arrearages. (PX 13, p. 41);

f. *Amount of Administrative Claims:* Northwest's offer would leave the estates with $50 to 58 million in administrative claims. (PX 13, p. 41; PX 676/DX 96 at L2370).

123. Hanson went on to describe Southwest's offer and the reasons why Midway concluded that Northwest's offer was superior to the Southwest offer. (PX 13, pp. 42–43).

124. Even though Steenland admitted that he was puzzled by Hanson's statement that two of the three conditions in Southwest's offer had already been satisfied by Northwest, Steenland never asked Parkins to clarify Hanson's statements. (Tr. (Steenland) 4149, 4153).

125. Costello followed Hanson's presentation with an offer of proof relating to the Gate Sale transaction. (PX 13, pp. 44–47).

126. The Court then stated that it wanted "a statement on the record right now from the representatives of the offerors whether the statements they made before the last recess have changed in any way as to the terms of what their respective bidders are offering." (PX 13, p. 49).

127. In response to the Court's directive, Parkins stated that "Hanson eloquently went through the [Northwest] proposal, and he accurately stated the Northwest proposal, which I think restated what I said earlier in court." (PX 13, p. 49).

128. Parkins reiterated that Northwest was willing to assume the $4.7 million City of Chicago lease arrearage. (PX 13, p. 49).

129. Parkins told the Court that Northwest had chosen a date for Midway to close and that Northwest had additionally agreed to fund Midway's operating losses if Midway "[hadn't] finished the documents...." (PX 13, pp. 49–50).

130. Despite the Court's request for a statement of any changes to the offer made by Northwest before the recess, Parkins never withdrew, limited, or modified in any way the board approval, definitive documentation, or due diligence conditions which Northwest and Midway had previously stated on the record. (PX 13).

131. Midway understood that Northwest's Back–End offer was conditioned upon due diligence, board approval, and the execution of definitive documentation. (Jenkins Dep. 41–42; DX 9/PX 671 at FB80; Tr. (Altschul) 3589–90; DX 12; DX 251). No one from Midway ever said on the record that due diligence, board approval, or definitive documentation were not conditions of Northwest's Back–End offer as Midway understood it, or that those conditions had been withdrawn, limited, modified, or satisfied by Northwest. (PX 13).

132. Southwest then presented its response to the Court. (PX 13, pp. 50–52). Contrasting its offer with Northwest's, Southwest advised that its offer did not have conditions and that its offer was not subject to board approval. (PX 13, p. 52).

133. Heroy stated that Southwest was improving its offer by: (1) increasing from $35 million to $40 million the amount of Midway's ATL that Southwest would assume; (2) assuming Midway's ATL amount on a confirmed rather than a standby basis; and (3) assuming the $4.7 million City of Chicago lease arrearage. (PX 13, pp. 50–51).

134. Heroy then turned to the "aspects of our offer that were described by ... Hanson, we think a bit erroneously...." and made the following clarifications:

a. *Due Diligence:* the Southwest offer was not contingent on due diligence or approval of the City of Chicago;

b. *Environmental Due Diligence:* the Southwest offer was not contingent upon environmental due diligence; and

c. *Board Approval:* "board approval is not a condition of any part of our offer."

(PX 13, pp. 51–52).

135. On the board approval issue, Heroy emphasized that "as may have been suggest-

ed, and as was contained in the documents [DX 94/PX 678], it [board approval] no longer is a condition of the asset purchase itself. In other words, the assets that we're purchasing ... are essentially without contingencies, except for, of course, the existence of the assets." (PX 13, p. 52).

136. In Hanson's opinion, with these changes and clarifications, Southwest put its offer on par with Northwest's offer. (Tr. (Hanson) 533).

137. After a short recess (PX 13, p. 54), Midway called Jenkins of First Boston to testify as Midway's valuation expert in support of its decision to recommend Northwest's proposal. (PX 13, pp. 55–57; Jenkins Dep. 72, 140–41).

138. Jenkins testified that Northwest's proposal was superior to Southwest's because it provided $125 million in value to the estate, while the Southwest offer provided only $114 million. (PX 13, p. 55; Jenkins Dep. 181, 154–56). Moreover, as Jenkins testified, the $114 million valuation of the Southwest offer overstated its real value because it gave full credit to Southwest's offer to assume up to $40 million of Midway's ATL, even though Midway fully expected that it would retain much of that liability due to the fact that Southwest's limited service would be unattractive to persons who had bought Midway tickets. (PX 13, pp. 55–56, 42–43, 64–65; DX 98/PX 677, p. 3; Tr. (Burgess) 882, 992–94; (Hanson) 570, 651–52).

139. In addition to viewing the Northwest proposal as financially superior, Midway also believed that the Northwest proposal was superior because Northwest said it would hire substantially all of Midway's operating employees if the transaction closed, while Southwest agreed only to provide preferential interviews. (PX 13, pp. 39, 57; DX 98/PX 677, p. 3).

140. Schick then took the stand. He testified that the two competing offers were "equal in nature," but that Midway preferred the Northwest offer because of Northwest's commitment to retain Midway's employees. (PX 13, pp. 58–59).

141. Based on the record before it, the Court determined that Northwest's proposal was in the better interest of the Midway estate than the Southwest proposal. The Court expressly based its decision on what occurred on the record, stating that it relied on "the modified Northwest offer *as represented in open court today*" (PX 13, p. 75); "the transaction *as modified and restated today on the record*" (PX 13, p. 75); and the offer stated "*on the record* by counsel for Northwest" (PX 13, p. 76, emphasis supplied). The Court also observed that "everything has been done in open court. . . ." (PX 13, p. 76).

142. In its oral findings, the Court expressly found that Northwest and Southwest were proceeding in good faith: "There's no question in my mind that both parties who made offers, Mr. Heroy's client [Southwest] and Mr. Parkins' client [Northwest], were in good faith. . . . So there's no question in my mind that the [11 U.S.C. §] 363(m) good faith has been complied with here." (PX 13, pp. 75–76).

143. This Court entered its Order and Judgment (the "Order") on October 8, 1991. (DX 244). The Order authorized the sale of Midway's leasehold interest in Midway's gates to Northwest, the entry by Midway into a one-year sublease for its gates, and the entry by Midway into a one-year exclusive option with Northwest for the repurchase of its gates. (DX 244). The Order, however, is silent regarding the Back–End transaction. Nothing in the Order, which had been approved by Midway's counsel before submission to the Court, states or suggests that the parties had entered into a binding agreement on the Back–End transaction, or that the Court had approved such a transaction.

144. The Court also entered Findings of Fact and Conclusions of Law (the "Findings"). (DX 243). The Findings do not include any statement that the parties had entered into a binding agreement on the Back–End transaction. To the contrary, the Court found only that the parties had agreed to negotiate for the Back–End transaction:

*In addition, upon approval of the Letter [of Intent] and Definitive Agreements, Northwest has agreed to enter into good faith negotiations for the acquisition by Northwest of all or substantially all of Debtors' assets and to use its best efforts to conclude such an agreement within 60 days. Finally, while these negotiations proceed,* the Northwest Transaction will allow the Debtors to operate in the normal course through Northwest's leaseback of the Midway Leasehold and Assets to the Debtors and by providing the Debtors an exclusive purchase option on those assets for a one year period.

(DX 243, p. 5, emphasis supplied).

145. Midway informed Northwest that its liquidity crisis was so severe that if the sale of Midway's gates did not close by Friday, October 11, Midway would have to shut down its operations that weekend. (Tr. (Steenland) 3851, 3820; Hibbs Dep. 123, 132). Accordingly, Northwest had a team of lawyers in Chicago from October 9 through October 11, working with Midway's counsel on the myriad of activities necessary to close the Gate Sale, including finalizing the definitive agreement for that transaction and the exhibits to it, and working out agreements with Continental Bank. (Tr. (Burgess) 1013, 1045; Hibbs Dep. 85, 123, 132–33, 139–141, 150; Tr. (Steenland) 3851–55; Jenkins Dep. 60; PX 408 (10/9–10/11 entries); DX 85 (10/9–10/11 entries)). During this week in Chicago, there was no discussion of the terms of the Back–End transaction. (Jenkins Dep. 60; Hibbs Dep. 88, 249; Tr. (Henneman) 4392).

146. Section 5.7 of the draft definitive agreement for the Gate Sale approved by the Court on October 8 (PX 612) contained the parties' agreement, referred to in the Findings, to negotiate in good faith for Midway's remaining assets. Between October 9 and October 11, the parties negotiated certain revisions to that section as it existed on October 7 to reflect the events of October 8. (Tr. (Steenland) 3860–62; (Henneman) 4290–92; (Burgess) 1099; Hibbs Dep. 125–29). The parties amended Section 5.7 to include a reference to a "definitive agreement" to reflect that the Back–End transaction was subject to the execution of definitive documentation. (Hibbs Dep. 128–29; Tr. (Steenland) 3860). The parties further amended Section

5.7 to clarify that Northwest's October 8 proposal was to negotiate for "all" of Midway's assets, but to assume only "certain" of Midway's liabilities. (Tr. (Steenland) 3860–62; (Henneman) 4292–93). Finally, the parties agreed to insert language to the effect that the subsequent negotiations were to be "consistent with representations of Buyer and Seller made to the Bankruptcy Court on October 8." This language was added because the parties did not have a written letter of intent or draft agreement for the Back–End transaction, and they wanted to make sure there was a reference point for their negotiations to avoid subsequent attempts at re-negotiation. (Tr. (Steenland) 3862–64; (Burgess) 890–91; Hibbs Dep. 126). After these negotiations, Section 5.7 of the executed Gate Sale Agreement provided:

> After the Closing Date Buyer [Northwest] and Seller [Midway] will enter into good faith negotiation of a definitive agreement for the acquisition by Buyer of all of Seller's assets and the assumption of certain of Seller's liabilities by Buyer, consistent with representations of Buyer and Seller made to the Bankruptcy Court on October 8, 1991. Buyer and Seller agree to use their best efforts to execute such definitive agreement and close such acquisition within thirty (30) days of the date hereof.

(PX 19, ¶ 5.7).

147. On the morning of Friday, October 11, Northwest and Midway executed the Gate Sale Agreement and closed the sale of the Midway gates. (PX 19; Tr. (Henneman) 4293; (Steenland) 3872; (Burgess) 1014). There is nothing in the executed Gate Sale Agreement which states or suggests that the parties had entered into a binding agreement for the sale of Midway's non-gate assets on October 8, or that Northwest's conditions to its Back–End offer had been withdrawn or satisfied. (PX 19).

148. In connection with the Gate Sale closing, Northwest and Midway also executed an Option Agreement (DX 433G), which gave Midway the right to re-purchase the gates from Northwest. (Tr. (Burgess) 971–72; (Steenland) 3865; (Cronin) 2131–32, 2324). They also executed a Consent and Forbear-ance Agreement with Continental Bank. (DX 304).

149. On October 8, following the hearing, Northwest announced its acquisition of Midway through a press release headlined "Northwest Airlines Reaches Agreement to Purchase Midway Airlines for $174.7 Million." (PX 55) (hereinafter the "October 8 press release").

150. After the October 8 hearing concluded, Northwest's representatives assembled in a conference room at the offices of Mayer, Brown & Platt, where, among other things, they saw a copy of the October 8 press release. (Tr. (Steenland) 3849).

151. Steenland reviewed the October 8 press release and concluded that it was inaccurate and "not suitable for issuance." (Tr. (Steenland) 3849–50, 4174).

152. Mark Abels (Northwest's Vice President of Corporate Communications), who had attended the October 8 hearing, directed the preparation of the October 8 press release. (Tr. (Steenland) 3849; Abels Dep. 5, 71).

153. Although Steenland knew that the October 8 press release had been issued, Steenland did not raise with Abels the possibility of Northwest issuing a correction. "Once [the press release] was out the door I had a lot more important things in my mind to spend my time on than tracking down this press release." (Tr. (Steenland) 4174–75, 4179).

154. Francht gave Cronin a copy of the October 8 press release soon after the hearing. (Tr. (Cronin) 2127–28).

155. Cronin reviewed the October 8 press release and concluded that "[i]t misstated what had actually happened, what had been agreed to and the terms and conditions of Northwest's proposal." (Tr. (Cronin) 2128).

156. Cronin told Francht "that we couldn't release it [the October 8 press release] because it didn't reflect the transaction...." (Tr. (Cronin) 2128).

157. Although Cronin realized that an erroneous press release had gone out, he did not order, then or at any time, that a correction be issued. (Tr. (Cronin) 2329).

158. Northwest circulated a copy of the October 8 press release to its Executive Management Team ("EMT") on October 8. (Clouser Dep. 54; PX 15).

159. Sometime after the October 8 hearing, Richard B. Hirst (Northwest's Senior Vice President and General Counsel) and a member of its EMT, told Clouser (Northwest's Senior Vice President of Corporate Communications and Advertising) that the October 8 press release misstated the October 8 agreement. (Tr. (Steenland) 3783–84; Clouser Dep. 48–51, 56–57).

160. Parkins testified that he reviewed the October 8 press release and concluded that it was incorrect because it overstated the purchase price and did not include the conditions stated in the hearing. (Parkins Dep. 115–24).

161. Parkins told Steenland or Richard Anderson (Northwest's Vice President and Deputy General Counsel) that the October 8 press release did not include the conditions stated at the hearing, misstated the purchase price, and misused the term "agreement." (Tr. (Cronin) 2063; Parkins Dep. 116–17, 119–21).

162. Hibbs likewise testified that he believed that the October 8 press release had "some inaccuracies," including the $174.7 million purchase price and where, in the first paragraph of the release, "it just says accept the offer to purchase." (Hibbs Dep. 113–14).

163. Hibbs discussed the October 8 press release with Steenland. (Hibbs Dep. 116–17).

164. Clouser saw the October 8 press release after it was issued and concluded that it was inaccurate. (Clouser Dep. 48).

165. Clouser directed Abels to issue a corrected press release and to ensure that he was working with Steenland in that regard. (Clouser Dep. 49–51).

166. Northwest never issued a correction to the October 8 press release. (Clouser Dep. 51).

167. At no time between the October 8 hearing and the closing of the Gate Sale transaction on October 11 did Steenland, Hibbs, or any other Northwest representative tell Midway that Northwest's October 8 press release was inaccurate. (Tr. (Burgess) 1260; (Henneman) 4354–55).

168. Northwest commenced its due diligence investigation and review of Midway's operations immediately after the October 8 hearing. (Tr. (Steenland) 3874–75, 3877–80; (Fornaro) 3026–29; (Garel) 3490–96; DX 523). Midway was aware that Northwest was conducting a due diligence review of Midway after October 8, and cooperated in that process. (E.g., DX 432, DX 431; PX 601–1, PX 632; Tr. (Steenland) 3878–80, 3882; (Hinson) 249; Schick Dep. 210–11, 213–14).

169. The due diligence review of Midway's operations, which Northwest undertook after October 8, revealed two problems. First, Northwest learned that Midway's 1990 United States Department of Transportation (the "DOT") data that was on file was inaccurate. After the acquisition was analyzed on the basis of Midway's internal Passenger Origin–Destination data ("O & D data"), rather than the data Midway had filed with the DOT, the economics of the proposed acquisition of Midway changed. Second, Northwest's environmental due diligence revealed the risk of liability relating to possible subsurface contamination problems at Midway Airport.

170. After learning of the inaccuracies in Midway's DOT data, Northwest ran new revenue projections, substituting Midway's internal O & D data for the DOT data that Northwest had previously relied upon. The results from using the internal data showed a highly material, negative impact on the economics of the proposed acquisition, both quantitatively and qualitatively.

171. Quantitatively, Northwest discovered that the substitution of Midway's internal financial information for Midway's DOT data resulted in a revenue shortfall of more than $35 million per year in Northwest's financial analysis, which would increase in each succeeding year of the forecast. Midway itself conceded this $35 million discrepancy between its internal data and its DOT data. (Tr. (Morris) 2466, 2876; DX 36 at ML1252; Tr. (Phillips) 2930). The ten-year impact of

the $35 million per year discrepancy exceeded $435 million, with a net present value of over $220 million. (DX 521).

172. On October 11, Northwest formally retained an independent environmental consultant to conduct a Phase I environmental due diligence review at Midway Airport in connection with the Back–End transaction. (PX 182). The due diligence review resulted in reports identifying several environmental concerns, primarily a "moderate to high potential for a significant subsurface contamination problem," at the property near Midway's hangars. (DX 436 at ENSR543; DX 226 at ENSR427).

173. While the due diligence and integration projects were proceeding, the parties prepared for the upcoming negotiations for the Back–End transaction contemplated by Section 5.7 of the Gate Sale Agreement. On October 16, Jenkins of First Boston drafted a memorandum and term sheet, which he sent to Midway's top management and outside counsel. (DX 12, DX 246). All of the recipients of the memorandum were present at the October 8 hearing. (Tr. (Burgess) 1030–31). The memorandum stated:

> Please find attached a working draft of the summary terms for the proposed Northwest transaction for the acquisition of substantially all of the assets of Midway. Since the first phase of the Northwest transaction closed on Friday, October 11, I think it would be beneficial to reach a mutual consensus, within the Midway reorganization working group, as to the proposed terms for the overall Northwest transaction before the negotiating process begins for the second phase of the transaction. I would appreciate if you would pass along any comments or suggested changes you may have to this term sheet to either Randy Hazelton ... Tom Groves ... or me....

(DX 12, DX 246).

174. Attached to Jenkins' October 16 memorandum was a term sheet, entitled "Summary Terms of the Transaction," which stated that it was "[b]ased on NWA offer presented on Tuesday, October 8, 1991 in bankruptcy court and discussions between parties during the proceedings." (DX 12 at

FB33 n. 1). As this statement reflects, the term sheet set forth First Boston's understanding of the Back–End transaction developed from statements made both on-the-record and off-the-record on October 8. The term sheet listed three separate "Closing Conditions":

a. Final due diligence

b. Negotiations and documentation

c. Approval by NWA [Northwest] Board of Directors

(DX 12, DX 246). Jenkins testified that he included the closing conditions in the term sheet because the conditions were part of Northwest's offer as stated on October 8. (Jenkins Dep. 49–50). Even though Jenkins requested feedback, no one ever contacted Jenkins and said that anything in the term sheet was wrong. (Jenkins Dep. 64; Koeneke Dep. 87–88).

175. Between October 11 and October 21, Northwest's outside law firm, Dorsey & Whitney, was preparing a draft of the definitive agreement required for the Back–End transaction. (Hibbs Dep. 253; Tr. (Steenland) 3887; PX 408 (10/14–10/21 entries)). On Monday, October 21, six business days after the Gate Sale was closed, Northwest faxed a comprehensive 44–page first draft to Midway's counsel. (DX 248; PX 43; Tr. (Steenland) 3889; Hibbs Dep. 252–53). Article 6 of Northwest's October 21 draft, entitled "Conditions to Obligations of Buyer," listed Northwest's closing conditions, including board approval and due diligence "reasonably satisfactory to Buyer [Northwest]." (PX 43, pp. 33–35).

176. On October 22, three of Midway's attorneys called Steenland to complain about Northwest's October 21 draft. (Tr. (Hanson) 551–53; (Burgess) 1040, 1049–50, 896; (Steenland) 3897–98; DX 100). This conversation lasted approximately one to one-and-a-half hours. (DX 86 (10/22 entry); Tr. (Hanson) 1052–53, 575; (Steenland) 3897). In this conversation, Midway's counsel made demands for terms that had never been discussed at the October 8 hearing. One such demand was that Northwest assume the cost of curing liens on Midway's assets and defaults on its executory contracts as a condi-

tion to Northwest receiving those assets and contracts. As Hanson acknowledged, Northwest had never agreed to assume this liability, which had never before been proposed by Midway or even discussed. (Tr. (Hanson) 1328, 1342–44; (Steenland) 3897–3910; (Burgess) 1106–07). Steenland responded that Midway was trying to increase Northwest's purchase price. (Tr. (Steenland) 3906). When Steenland did not acquiesce in their demands for new terms, the Midway lawyers threatened litigation. (Tr. (Steenland) 3909; (Hanson) 1342, 555; (Burgess) 1073–74).

177. On October 24, Midway's in-house counsel, Michael Osajda, prepared a term sheet for internal Midway use. (DX 251; Tr. (Henneman) 4304–05; Schick Dep. 186). Osajda had been present at the October 8 hearing. (Tr. (Hinson) 129, 243). Like First Boston's October 16 term sheet (DX 12), the October 24 Midway term sheet listed the following "closing conditions" for the Back–End transaction:

a. NWAL [Northwest] board approval

b. due diligence

c. negotiations with creditors

d. documentation

The October 24 term sheet also listed 13 "open issues," and noted that this list of "open issues" was not complete. (DX 251).

178. The Midway team held a five-hour meeting to discuss its upcoming negotiating strategy on October 23, and held another four-hour meeting for the same purpose on October 25. (DX 86 (10/23, 10/25 entries); DX 419, App. C, p. 1 (10/25 entries); Tr. (Burgess) 1083–84; (Hanson) 1355–56; (Henneman) 4302–04; Jenkins Dep. 188–89). Osajda's October 24 term sheet (DX 251) was distributed to the participants at the October 25 meeting. (Tr. (Henneman) 4303–04).

179. After its October 25 strategy meeting, Midway sent Northwest a letter setting forth Midway's view of the terms of the proposed Back–End transaction (PX 44B), a term sheet (PX 44C), and a mark-up of Northwest's October 21 draft agreement (PX 44A/DX 101). The packet was the collective effort of the Midway team. (Tr. (Burgess) 1084; (Henneman) 4306). In preparing these materials, Midway understood that

agreement on definitive documentation was a condition to the Back–End transaction. (Tr. (Burgess) 1290, 1262–63).

180. In its October 25 cover letter, Midway observed that "there are significant business terms that remain unresolved...." (PX 44B, p. 1). The letter also stated that the enclosed term sheet (PX 44C) detailed what Midway considered to be "certain essential" business terms for the deal. (PX 44B, p. 1) The letter acknowledged that Midway was requiring business terms which it had not raised on October 8, describing them as "natural extensions of the structure and intent of this transaction." (PX 44B, p. 1; Tr. (Burgess) 1087–88).

181. Midway's mark-up of Northwest's October 21 draft (PX 44A) also reflected the major disagreements between the parties. The mark-up deleted large sections of the text and changed certain business terms. One of the sections that Midway did not propose to delete or change in its mark-up was Section 6.9 of the Northwest draft—the section that set forth due diligence "reasonably satisfactory to Buyer [Northwest]" as a condition to Northwest's obligation to close. (Tr. (Burgess) 1043–44; PX 44A, p. 35).

182. Steenland and Northwest's outside counsel spent the weekend of October 26 and 27 preparing a response to Midway's October 25 term sheet. (Tr. (Steenland) 3917–18; (Cronin) 2155–56; PX 408 (10/26–10/28 entries)).

183. On October 28, Northwest faxed its response to Midway's term sheet. (PX 45). Northwest's cover letter stated that the October 25 term sheet was "unacceptable" and did "not reflect the terms of Northwest's offer for all of Midway's assets presented to and accepted by Midway and [the] Bankruptcy Court on October 8, 1991." (PX 45 at ML14291). The letter contained a point-by-point response to the various terms in Midway's term sheet that were "in direct conflict with several fundamental provisions of Northwest's offer that were clearly articulated to Midway and reflected in the transcript of the October 8, 1991 Bankruptcy Court hearing." (PX 45 at ML14291; Tr. (Steenland) 3920–28). In summarizing its position, Northwest stated that it was "prepared to

negotiate and enter into definitive agreements based on the terms and conditions of Northwest's October 8, 1991 offer," but was "unwilling to modify or renegotiate [its] offer." (PX 45 at ML14291; Tr. (Steenland) 3918–20). Northwest also enclosed a redraft of Midway's October 25 term sheet "to make it consistent with Northwest's offer." (PX 45). Northwest's letter suggested that the parties meet in Chicago on Wednesday, October 30, to attempt to resolve their differences and negotiate definitive agreements. (PX 45 at ML14293).

184. On October 29, Midway's counsel prepared a comparison of the key differences between Midway's position, as reflected in its October 25 term sheet, and Northwest's position, as reflected in its October 28 re-draft of Midway's term sheet. (DX 186; Tr. (Henneman) 4322–23; (Burgess) 1132–33). Midway's comparison shows that the parties disagreed about virtually every business issue material to the proposed transaction. All of the key participants agreed that these disagreements involved millions of dollars of economic value. (Tr. (Burgess) 1133; (Henneman) 4323; (Cronin) 2149; (Steenland) 3916).

185. On October 30, representatives of Midway, Northwest, and the Creditors Committee met in Chicago to discuss their many disputes over the terms of the Back-End transaction. (Tr. (Steenland) 3937–39; (Cronin) 2165–66; Parkins Dep. 50–51). As Schick testified, "it was obvious that both sides were not close to resolving the issues...." (Schick Dep. 69). Schick also noted that "we were so many miles apart on so many different things...." (Tr. (Burgess) 907).

186. By the end of the day on October 30, few issues had been resolved. (Tr. (Steenland) 3948). The open issues included, among others:

- which party would bear the cost of curing liens on Midway's assets and the arrearages on Midway's executory contracts (Tr. (Henneman) 4329–30, 4334; (Cronin) 2181–82, 2194; DX 252; Tr. (Burgess) 1145), which Midway estimated to be in the $12–20 million range.

(Tr. (Steenland) 4208, 3952; (Cronin) 2180–81; (Burgess) 1145);

- whether Northwest was required to provide an additional $30 million in value to Midway in connection with its October 8 offer to negotiate with the lessors of Midway's non-Fidelcor aircraft. (Tr. (Steenland) 3954–55; (Cronin) 2184);

- whether Northwest was required to cover Midway's operating losses commencing November 8. (Tr. (Steenland) 3959; (Henneman) 4333; Hibbs Dep. 309; Tr. (Cronin) 2189; (Burgess) 1152; DX 252 (Burgess));

- the amount of ATL deposits to which Northwest was entitled. (Tr. (Steenland) 3949–50; (Cronin) 2178; (Henneman) 4328; (Burgess) 1147);

- which party was responsible for Midway's excise tax liability. (Tr. (Burgess) 1146; (Henneman) 4330; (Cronin) 2185); and

- which party would bear any WARN Act liability to Midway employees and indemnify the other party. (Tr. (Cronin) 2185; (Steenland) 3956; (Henneman) 4330; (Burgess) 1147–48).

187. At the October 30 negotiating meeting, Burgess stated that Midway could not convey its assets and contracts to Northwest free and clear of liens and claims. (Tr. (Cronin) 2181; (Burgess) 1144). After the meeting, Cronin and Koeneke, an investment banker from First Boston, discussed the estimated $12–20 million cost of curing Midway's liens and defaults. Koeneke confirmed Burgess' statement that there was not much Midway could do financially to resolve this problem. (Tr. (Cronin) 2181, 2192–93).

188. The negotiations resumed in Chicago on October 31. (Tr. (Burgess) 918; Hibbs Dep. 320–21; Tr. (Steenland) 3964). Steenland began the meeting by stating that Northwest would stand behind the terms of its October 8 offer, but would not renegotiate the transaction or pay more than $95 million in value, as he believed Midway was asking Northwest to do. (Tr. (Burgess) 1162–63, 919–20; DX 254 (Burgess) at L6; Tr. (Steenland) 3964–65; (Altschul) 3598; DX 306 (Altschul); Tr. (Henneman) 4335–36; DX 253 at L1923 (Henneman); Hibbs Dep. 199; PX 87

(Hibbs) at DW5533). Steenland then re-stated the terms of Northwest's $95 million October 8 proposal. *Id.* In addition, he offered a number of compromises, including a $3 million credit to Midway to resolve the parties' dispute over the funding of Midway's operating losses. (DX 253 at L1923; Tr. (Steenland) 3965–67; DX 254 at L6; DX 306; Tr. (Burgess) 1163–64, 920–21; (Henneman) 4337, 4401). After this presentation, the parties resumed their negotiations, discussing their positions on several of the disputed issues. (Tr. (Henneman) 4339; (Steenland) 3969).

189. By the end of the October 31 meeting, there were still many unresolved issues, including responsibility for the cost of removing liens on Midway's assets and curing defaults on Midway's contracts, the funding of Midway's operating losses as of November 8, and the WARN Act liability. (Tr. (Steenland) 3971–73, 4209–10; (Altschul) 3599–3600, 3612; Koeneke Dep. 105; Tr. (Burgess) 1169–71; (Henneman) 4340; Hibbs Dep. 309). Steenland made clear that Northwest's October 31 proposal was as far as Northwest was prepared to go, and that it would not make additional economic concessions. (Tr. (Steenland) 3969, 3973, 4278–79). Midway did not agree with Northwest's proposal, and no one present at the meeting said that the parties had a deal. (Tr. (Steenland) 3972–73; (Altschul) 3600; (Henneman) 4340).

190. At the conclusion of the October 31 meeting, Midway agreed to provide Northwest with an accurate list of assets. (Hibbs Dep. 323). Midway asked Northwest to submit new documentation memorializing its position on the terms for the Back–End transaction, along with a list of which of its assets Northwest would require in the transaction, so that Midway could consider the value of the Northwest offer as a whole—as Schick put it, determine "the nut"—and then decide whether it was able to, and whether it wanted to, complete the transaction with Northwest. (Tr. (Henneman) 4340, 4342; (Steenland) 3969–70, 3973–74; (Burgess) 1171–72, 1177, 924; Hibbs Dep. 205; PX 87 at DW5537). Northwest agreed to provide this information as Northwest's "final and absolutely best offer" for Midway's acceptance or rejection. (Tr. (Steenland) 3973–74). Midway gave Northwest no assurances that it would agree to the terms Northwest discussed at the meeting. *Id.*

191. The Northwest Board of Directors held its regular quarterly meeting on November 5. (Tr. (Steenland) 3977–79; PX 29, PX 50). In anticipation of that meeting, Dasburg sent the board members a short memorandum summarizing the status of the Midway transaction. (PX 28).

192. The proposed Midway acquisition was one of many items on the Board's agenda, and was discussed extensively. (PX 50, PX 29, p. 6; Tr. (Steenland) 3980–81). Among the topics considered were Midway's DOT data discrepancy and the resulting $35 million annual revenue shortfall in Northwest's analysis; the risk of potentially significant environmental liabilities at Midway Airport discovered during Northwest's environmental due diligence; and the unresolved business terms, particularly the dispute over liens and cure costs. (Tr. (Steenland) 3981–85, 4277; Dasburg Dep. 236–37, 247, 145–49, 168–69; Bouw Dep. 56–58; Tr. (Fornaro) 3056).

193. The focal point of the Board's discussion was the material change to the economics of the proposed Midway transaction resulting from a substitution of Midway's internal traffic and revenue data for Midway's DOT data. (Dasburg Dep. 143–44, 146–49; Tr. (Steenland) 3981–82; Bouw Dep. 56–57; Aziz Dep. 99–100; Tr. (Fornaro) 3056; Francht Dep. 184–86; PX 29, p. 6). As reflected in PX 28 (the November 5 analysis that substituted Midway's internal revenue information for the DOT data), the expected direct benefits to Northwest from the Midway acquisition were now zero or negative. (Tr. (Thayer) 4735–36; (Fornaro) 3045–46, 3050; (Garel) 3505–08; (Steenland) 3982; Dasburg Dep. 143–44). Nonetheless, management did not make a recommendation at that meeting as to how to proceed because it had not finalized its analysis. (Tr. (Fornaro) 3056).

194. At the end of its discussion, the Board took no formal action. It "directed management to report back to the Board on further developments and for the approvals

necessary to consummate the transaction." (PX 29, p. 6; Aziz Dep. 105).

195. On the evening of November 6, Dasburg called Hinson to discuss the problems with the transaction. (Tr. (Hinson) 158–59; Dasburg Dep. 165–66; Tr. (Steenland) 4023–24). Dasburg told Hinson about the November 5 meeting of the Northwest Board. Dasburg stated that there were three principal obstacles to the Back–End transaction that would have to be resolved if the deal were to go forward: (1) the major revenue shortfall to Northwest resulting from its reliance on Midway's DOT data; (2) the potential environmental problems; and (3) the costs of curing liens and arrearages. Hinson asked Dasburg for a day or two to consider Northwest's position. (Dasburg Dep. 165–66; Tr. (Steenland) 4023–24; DX 113/PX 635; DX 114/PX 640 at ML14382).

196. On November 7, Northwest wrote to Midway in response to Midway's October 31 request for Northwest's written position as well as a list of assets and to follow up on Dasburg's November 6 and 7 conversations with Hinson and Schick. (PX 47; Tr. (Steenland) 4023, 4279; Schick Dep. 148). In its November 7 cover letter, Northwest discussed the $35 million per year shortfall caused by the DOT data discrepancy, the environmental due diligence issues raised by Cronin at the October 30 negotiating meeting, and the open issues relating to the cure costs. (PX 47).

197. In a final attempt to resolve the dispute over business terms, Northwest included several financial concessions in its November 7 term sheet, including an offer to pay more than the $95 million in total value it offered in court on October 8 (PX 47, App. A, ¶¶ 3 and 4), a $3 million credit to resolve the operating losses dispute (PX 47, App. A, ¶ 8), and a covenant to use its best efforts to induce Midway's non-Fidelcor aircraft lessors to forgive or reduce their post-petition claims against Midway (PX 47, App. A., ¶ 9). (Tr. (Steenland) 4032–33; (Burgess) 1184).

198. After receiving Northwest's list of assets on November 7, Midway and First Boston calculated the cost to cure the liens and defaults on those assets and contracts. They determined that the cure costs were approximately $13.6 million. (DX 263, DX 203/PX 683 at ML48602; Schick Dep. 104–06, 143).

199. Although Northwest's November 7 package provided the specific information which Midway had said it needed in order to decide whether to accept the Northwest proposal, Midway did not disclose its position on Northwest's modified proposal. On November 8, Midway wrote to Northwest. (PX 63). Midway's letter did not state that Midway was prepared to accept any of the terms in Northwest's November 7 term sheet. (Schick Dep. 149; Tr. (Henneman) 4349). Instead, the letter called for yet more negotiating sessions, but specifically noted that the parties still needed to resolve their "differences" over the terms of the transaction. (PX 63).

200. On November 11, Northwest's executives met to discuss whether the proposed Midway transaction could be salvaged. (Tr. (Steenland) 4039; Dasburg Dep. 196; Leonard Dep. 168–69). Steenland reported that the dispute over due diligence and the business terms remained unresolved. (Tr. (Steenland) 4039–40). The discussion then focused on the November 11 analysis, with its new, aggressive revenue assumptions. Northwest's executives concluded that the "yield gap closure" assumptions on which the new analysis was based were unrealistic and involved too much risk to justify the transaction. (Tr. (Fornaro) 3060–61; (Garel) 3517–18, 3520; (Steenland) 4040–41; Dasburg Dep. 195–96). When Northwest's senior executives refused to commit themselves to revenue budgets based on the new assumptions, Dasburg concluded that the forecast was unrealistic, and refused to accept the analysis. (Dasburg Dep. 196–97).

201. On November 12, Midway faxed another letter to Northwest. (PX 67). The letter again invited further negotiating sessions, but expressed no willingness to accept the terms in Northwest's November 7 term sheet, and did not delineate which terms were acceptable and which were not.

202. On November 12, Northwest's management convened a special telephonic meeting of its Board of Directors for late that

afternoon. (Tr. (Steenland) 4041–42). During the meeting, Dasburg informed the Board that there had been no resolution of the three principal issues—the DOT data discrepancy issue, the environmental issue, and the liens and cure cost issues—since the November 5 Board meeting. Dasburg also reviewed the revenue shortfall problem stemming from Midway's DOT filings, and reported that there was no solution to the fundamental problems with the Midway transaction uncovered during Northwest's due diligence. (PX 33; Dasburg Dep. 178–79; Bouw Dep. 66; Van Wijk Dep. 100; Francht Dep. 199–200; Tr. (Steenland) 4043–44). Accordingly, he recommended that the Board disapprove any further transaction with Midway. (Tr. (Steenland) 4043–44; Bouw Dep. 66).

203. The Board voted unanimously to disapprove "the acquisition by Northwest Airlines, Inc. of the remaining assets of Midway Airlines, Inc." (PX 33; Tr. (Steenland) 4044–45, 4264).

204. On November 13, Northwest communicated the decision of its Board to Midway. (PX 68; Tr. (Steenland) 4045–46; (Hinson) 165).

205. In March 1992, Northwest sold the gates it had purchased from Midway on October 11 to Southwest which, at the time of trial, was the dominant air carrier at Midway Airport. (Tr. (Steenland) 4047–48; (Cronin) 2355).

## COUNT I

### FINDINGS OF FACT

1. In Count I, Midway claims that Northwest breached a valid and binding contract formed at the October 8 hearing for the purchase and sale of substantially all of Midway's non-gate assets (the Back–End transaction).

2. In response, Northwest contends that Midway failed to prove that the parties entered into a binding agreement for the purchase by Northwest of Midway's non-gate assets at the October 8 hearing, because the evidence showed that the parties agreed only to the purchase and sale of Midway's gates and to negotiate in good faith towards the purchase and sale of Midway's remaining assets consistent with the terms and conditions stated in Court on October 8.

3. Northwest also contends that Midway failed to prove that the parties entered into a binding and enforceable agreement on October 8 because the evidence showed that they did not reach a "meeting of the minds" on material business issues, involving tens of millions of dollars, which had not even been discussed, much less agreed upon, as of October 8.

4. Northwest argues alternatively that even if an otherwise binding agreement was formed for the Back–End transaction on October 8, Midway is not entitled to enforce that agreement because:

 a. the Back–End transaction was expressly subject to the conditions precedent of (1) the approval of Northwest's Board of Directors, (2) the execution of definitive documentation, and (3) the completion of a due diligence review with results reasonably satisfactory to Northwest, and these conditions were never satisfied;

 b. Paragraph 7 of the Confidentiality Agreement that Northwest and Midway executed bars Midway's claim for breach of contract;

 c. Northwest was induced to enter into an agreement on October 8 by Midway's misrepresentations and omissions regarding its DOT data;

 d. the agreement was based on mutual mistake relating to the data filed by Midway with the DOT, or, in the alternative, the agreement was based on Northwest's mistaken belief that the data was reasonably accurate; and

 e. Midway repudiated that agreement during the ensuing negotiations for the Back–End transaction by insisting on terms materially different than those contained in Northwest's Back–End offer, which Midway claims it accepted.

5. For the reasons set forth below, the Court finds that Midway and Northwest did not enter into a binding and enforceable agreement regarding the Back–End transaction on October 8. This finding is based on,

*inter alia,* the parties' conduct prior to October 8, the documents actually executed by the parties, the parties' conduct during and surrounding the October 8 hearing, the Court's Findings and Order regarding that hearing, and the parties' post-hearing conduct.

6. The Court finds that the only binding agreement reached by the parties on October 8 with respect to the Back–End transaction was to negotiate in good faith consistent with their representations to the Court. While the Court approved the Gate Sale, it did not approve the terms of the Back–End transaction, which was to be a matter for further good faith negotiations subject both to the terms and conditions represented to the Court on October 8 as well as subsequent Court approval.

7. The Court finds that the evidence further demonstrates that the parties did not then agree to the purchase and sale of Midway's non-gate assets and were well aware that the Back–End transaction was not a "done deal" on October 8.

8. Events prior to the execution of the Gate Sale Agreement reflect that the parties did not intend to bind themselves on October 8 to the purchase and sale of Midway's non-gate assets, and did not do so.

9. Midway recognized in its emergency motion that it was not submitting, for the Court's approval, a binding agreement regarding the non-gate assets. The motion before the Court on October 8 was Midway's "Emergency Motion to Approve Sale–Lease-back of Midway's Leasehold Interests at Chicago Midway Airport." (DX 455/PX 697; Tr. (Hanson) 484). The motion requested the Court's approval of the Gate Sale as agreed upon by the parties in their Letter of Intent of September 23, and only required the parties to negotiate the Back–End transaction in good faith:

> Upon Court approval of the Letter Agreement [the Gate Sale], *Northwest has agreed to enter into good faith negotiations* for the acquisition by Northwest of all or substantially all of Midway's assets and to use its best efforts to conclude such an agreement within 90 days.

(DX 455/PX 697, p. 4, emphasis supplied). Midway's motion also stated that the approval of the Gate Sale would provide Midway the resources to negotiate the structure of a plan of reorganization "which may *or may not* include a sale of the remaining assets to Northwest." (DX 455/PX 697, p. 8, emphasis supplied).

10. The draft documents provided to the Court on October 7 consisted of the contracts and related materials pertaining to the Gate Sale. The sole reference in the documents to a Back–End transaction appeared in Section 5.7 of the draft asset purchase agreement, which provided: "After the Closing Date [for the Gate Sale,] Buyer [Northwest] will enter into good faith negotiations with Seller [Midway] for the acquisition by Buyer of all or substantially all of Seller's assets." (PX 42, p. 13).

11. The documents actually executed by the parties indicate that the parties did not enter into a binding and enforceable agreement on October 8 regarding the Back–End transaction. These documents include, *inter alia,* the Gate Sale Agreement (PX 19), the Option Agreement (DX 433G), and the Consent and Forbearance Agreement (DX 304).

12. The Gate Sale Agreement (PX 19) contradicts Midway's claim that the parties entered into a binding agreement for the Back–End transaction on October 8. The Gate Sale Agreement, executed as modified on October 11, does not state anywhere that the parties had reached a binding agreement for the purchase and sale of Midway's non-gate assets.

13. The only reference to the Back–End transaction in the Gate Sale Agreement appears in Section 5.7 therein. Following the October 8 hearing, the parties negotiated significant changes to the language of Section 5.7 as it existed in the draft before the Court on October 8 (PX 612). Rather than stating that the parties had reached an agreement for the Back–End transaction, the parties chose to state in Section 5.7 that:

> After the Closing Date Buyer [Northwest] and Seller [Midway] will enter into *good faith negotiation of a definitive agreement* for the acquisition by Buyer of all of Seller's assets and the assumption of certain of

Seller's liabilities by Buyer, *consistent with representations of Buyer and Seller made to the Bankruptcy Court on October 8, 1991.*

(PX 19, § 5.7, emphasis supplied).

14. The Court finds that the Gate Sale Agreement, particularly Section 5.7, shows that the parties did not enter into any binding agreement relating to the Back–End transaction other than to negotiate in good faith within the parameters of the representations made to the Court on October 8.

15. Midway contends that the Back–End transaction was a "done deal" as of the end of the hearing on October 8, with only minor details of the transaction remaining to be negotiated, and that the parties had no "outs" after Northwest's proposal was accepted by this Court on October 8.

16. However, the Court finds that these contentions are not supported by the Gate Sale Agreement, and they are rebutted by other documents which the parties executed at the closing of the Gate Sale on October 11.

17. The Option Agreement (DX 433G), which the parties agreed to execute in Section 8.1(e) of the Gate Sale Agreement (PX 19, ¶ 8.1(e)), is another of the documents for the Gate Sale which shows that the Back–End transaction was not a "done deal" on October 8. (Tr. (Hanson) 1338–39; (Steenland) 3865).

18. The Order and Findings specifically authorized Midway to enter into the Option Agreement. (DX 243, ¶ 7; DX 244, ¶ 11). Northwest and Midway signed the Option Agreement in connection with the October 11 closing of the Gate Sale.

19. The Option Agreement granted Midway an exclusive option to repurchase the gates from Northwest for a period of one year. (Tr. (Burgess) 1077–78; (Steenland) 3865).

20. Even before the Gate Sale was closed, Midway recognized the possibility that the Back–End transaction might not be consummated. Midway's counsel acknowledged that the Option Agreement was in full force and effect following its execution on October 11, and that Midway wanted the Option Agreement to permit it to reacquire the gates in the event that Northwest did not perform the Back–End transaction. (Tr. (Hanson) 1340–41; (Burgess) 971–72, 1077–78).

21. The Option Agreement was to Midway's advantage because it gave Midway the right to negotiate with other potential buyers and reacquire the gates even if Northwest had been prepared to consummate the Back–End transaction. (Tr. (Hanson) 1341; (Burgess) 1076–78, 972; (Cronin) 2069). Northwest agreed that Midway had this right. (Tr. (Cronin) 2324, 2131–32, 2069; (Steenland) 3865).

22. The Court finds that Midway's position that there was a binding obligation to proceed with the Back–End transaction is inconsistent with the Option Agreement.

23. The Option Agreement gave Midway the right to reacquire the gates irrespective of Northwest's willingness to proceed with the Back–End transaction. If Midway elected to exercise the option before the Back–End transaction was closed, which was its clear right, the Back–End transaction would not have occurred even if Northwest was prepared to proceed with it, for, as Midway knew, without the gates, Northwest had no use for Midway's non-gate assets, *i.e.,* the assets that were the subject of the Back–End transaction. (Tr. (Burgess) 879; Leonard Dep. 74–75).

24. Accordingly, in its October 21 and November 8 drafts of a definitive agreement for the Back–End transaction, Northwest expressly provided that the Option Agreement was canceled and became ineffective upon the consummation of the Back–End transaction; otherwise, Midway would have retained the right to reacquire the gates until October 1992, even after the Back–End transaction had been consummated. (PX 43 at ¶ 5.11(c); PX 46 at ¶ 5.10(c); Tr. (Cronin) 2131–32).

25. Midway did not delete or amend this portion of the draft definitive agreement in its October 25 mark-up. (PX 44A, ¶ 5.11(c)).

26. The Court finds that Midway's execution of the Option Agreement refutes Midway's position that the parties had reached a binding agreement with respect to the Back–End transaction on October 8, as well as

Midway's contention that it reasonably relied on the existence of a binding agreement in conducting itself after October 8.

27. The Consent and Forbearance Agreement (DX 304), which Midway, Northwest, and Continental Bank, Midway's DIP lender, negotiated between October 9 and October 11, is another of the documents for the Gate Sale which shows that the Back–End transaction was not a "done deal" on October 8. (Tr. (Altschul) 3596–97; (Steenland) 3852, 3866).

28. Because Midway's gates had served as collateral for Continental Bank's loan to Midway, the Consent and Forbearance Agreement was required to enable Midway to transfer its interest in the gates to Northwest. (Tr. (Steenland) 3853–55).

29. The parties executed the Consent and Forbearance Agreement on October 11 in connection with the closing of the Gate Sale. (Tr. (Steenland) 3866).

30. The Consent and Forbearance Agreement included provisions which show that Northwest had not bound itself to buy Midway's remaining assets, that Northwest and Midway instead had bound themselves only to negotiate in good faith, and that there was uncertainty as to whether the negotiations would result in a binding agreement. Section 5 of that agreement provides:

> The agreements of Continental under Section 3 of this Agreement to forbear and under Section 4 of this Agreement to make Loans to Midway shall expire on the first to occur ("Forbearance Termination Date") of . . . (c) written notification to Continental from Northwest that negotiations between Northwest and Midway with respect to the Second Phase Purchase have terminated. The Forbearance Termination Date, as determined by clause (a) herein, shall be extended 21 days *if prior thereto Northwest and Midway enter into a definitive agreement for the Second Phase Purchase.*

In addition, Section 6 provides:

> Northwest shall notify Continental in writing promptly *upon the termination,* as determined in good faith by Northwest, *of negotiations between Midway and North-west with respect to the Second Phase Purchase.*

(DX 304, emphasis supplied).

31. The language of Sections 5 and 6 of the Consent and Forbearance Agreement, which provided for an unwinding of Northwest's Consent and Forbearance Agreement obligations in the event that the Back–End negotiations proved unsuccessful, was included due to the uncertainty as to whether the Back–End transaction would occur. (Tr. (Steenland) 3867).

32. The Court finds that these provisions in the Consent and Forbearance Agreement reflect that subsequent to the October 8 hearing, Midway, Northwest, and Continental Bank did not believe that there was a final, binding agreement for the Back–End transaction.

33. The Court finds, therefore, that the Consent and Forbearance Agreement demonstrates that the parties did not enter into any binding agreement relating to the Back–End transaction other than to negotiate in good faith within the parameters of their statements to the Court on October 8.

34. The Court finds that the parties' conduct during and surrounding the October 8 hearing also demonstrates that the parties did not enter into a binding and enforceable agreement regarding the Back–End transaction on October 8.

35. Midway's lawyers recognized that the focus of the October 8 hearing was the Gate Sale. At the outset of the hearing, one of Midway's counsel, Costello, stated: "Judge, we have a motion up to approve on an emergency basis the Northwest Airlines transaction. Basically it involves the sale of 21 gates at Midway Airport and certain related property for $20 million. It involves a one-year option to reacquire it at various prices. . . ." (PX 13, p. 5). One of Midway's other counsel, Hanson, testified that the purpose of the hearing was "to approve the gate sale to Northwest under the terms of the definitive documentation that was filed with the Court on Monday, October 7th. That's what we were there for." (Tr. (Hanson) 484). Another of Midway's lawyers, Burgess, concurred that the matter before the

Court on October 8 was Midway's motion to approve the draft definitive contract for the Gate Sale. (Tr. (Burgess) 985).

36. As shown by their statements at the October 8 hearing, the Court finds that the parties understood that they were not agreeing to the purchase and sale of the non-gate assets, which was a matter for further good faith negotiation consistent with the terms and conditions stated on the record.

37. For example, Parkins prefaced his recitation of the Back–End offer by specifically referring to the requirement of further negotiations, which was set forth in Section 5.7 of the draft Gate Sale Agreement pending before the Court (PX 612):

Now, with respect to the change or the update as to the subsequent negotiations between Northwest and Midway reflected *and embodied, in fact, your Honor, in the definitive agreement which provides [in Section 5.7] that there will be subsequent negotiations for the acquisition of the balance of the assets,* those negotiations have proceeded, and the proposal by Northwest as it presently stands embodies these salient points....

(PX 13, pp. 18–19, emphasis supplied). In his remarks, Parkins also noted that "a lot" of negotiations remained. (PX 13, p. 20).

38. Hanson's statements on the record also demonstrate that only the Gate Sale had been finalized, that the Back–End transaction was still a matter for negotiation as set forth in Section 5.7 of the draft agreement (PX 612) before the Court, and that the parties were not at that time agreeing to the purchase and sale of the non-gate assets. For example:

a. Following the first recess, Hanson advised the Court that Northwest had agreed to assume the $4.7 million City of Chicago lease arrearage "*if* their offer is accepted and *Midway Airlines proceeds to conclude and negotiate Phase II [the Back–End transaction] with them....*" (PX 13, p. 38, emphasis supplied).

b. In summarizing Midway's position, Hanson informed the Court that "Midway wishes to pursue the Northwest offer ... and it wishes to proceed *for approval of the transaction, the documents that are before the Court.*" (PX 13, p. 39, emphasis supplied). The only transaction and documents before the Court related to the Gate Sale, and nothing in those documents purported to bind Midway and Northwest to a purchase and sale of Midway's non-gate assets.

c. Hanson then explained his analysis, stating: "The $20 million Phase I [Gate Sale], the extent to which that's available to ultimately satisfy unpaid administrative expenses in this case is going to be a function of *how quickly we can negotiate and conclude the Phase II [Back–End] transaction....* There is nothing in the documents before the Court that requires Midway to continue running until that $20 million is consumed." (PX 13, pp. 39–40, emphasis supplied).

d. In concluding his post-recess remarks, Hanson said, "For those reasons ... Midway would like to move ahead with the Northwest offer as modified *and obtain approval of the Phase I [Gate Sale] transaction,* close that transaction promptly, get the $20 million in, *and proceed to conclude the negotiations for Phase II [Back–End transaction].*" (PX 13, p. 43, emphasis supplied).

39. The following exchange on the record among Midway's lawyers demonstrates that the parties were not agreeing to bind themselves to a Back–End transaction, and that Midway realized this. Referring to Midway's obligations regarding Hangar No. 2 at Midway Airport, Costello advised the Court, "We do not have a fixed deal *until we have the rear-end deal.*" (PX 13, p. 47, emphasis supplied). After Hanson agreed that was the case, Costello added: "Yes, that's the back-end portion. We don't have a fixed deal for that." (PX 13, p. 48).

40. The Court finds that the parties' off-the-record discussions during the first recess show that they had not bound themselves, and that much of the Back–End transaction remained to be negotiated.

41. For example, Burgess asked whether Northwest would consider paying all cash for the cash/note portion of the $95 million of consideration which Northwest had said it

would include in the Back–End negotiations. Cronin responded on behalf of Northwest. As Burgess testified, "Mr. Cronin indicated that they were giving us the rough idea of what they perceived as a back-end of the deal for the remaining assets and that certainly that [sic] was up for consideration." (Tr. (Burgess) 859).

42. Significantly, the Court finds that no one stated on the record by the end of the October 8 hearing that Midway and Northwest had reached a binding agreement for the Back–End transaction.

43. Both Northwest and Midway understood that the Court was approving only the Gate Sale on October 8, and that Bankruptcy Court approval would be required before a Back–End transaction could be effective. (Tr. (Henneman) 4320; (Steenland) 3848, 3868; (Burgess) 909).

44. For example, Hanson acknowledged to the Court on October 8 that Midway was seeking Court approval only of the Gate Sale, stating "Midway would like to move ahead with the Northwest offer as modified and *obtain approval of the [Gate Sale] transaction....*" (PX 13, p. 43, emphasis supplied).

45. The Court finds that the parties' conduct during and surrounding the October 8 hearing demonstrates that the parties did not enter into a binding and enforceable agreement for the purchase and sale of Midway's non-gate assets on October 8.

46. The Court also finds that the Order (DX 244) and Findings (DX 243) entered by the Court demonstrate that on October 8, the Court approved only the Gate Sale Agreement.

47. The Order shows that the Gate Sale was the only transaction approved by the Court. The Order makes no reference whatsoever to a Back–End transaction. (DX 244).

48. The Findings also make clear that the Court granted only Midway's emergency motion, which included an obligation on both parties to negotiate in good faith for the purchase and sale of Midway's remaining assets, and that the Court did not purport to find or approve a binding agreement for the

purchase and sale of Midway's remaining assets. The Court found that:

The sale, assignment, and assumption and assignment by the Debtors to Northwest of the Midway Leasehold and Assets (the "Northwest Transaction") is an integral part of the Debtors' efforts to increase their cash position and to avoid a shutdown of their operations and the consequent liquidation of their estates. The Northwest Transaction provides the Debtors with a possibility of entering into certain marketing and services programs with Northwest in order to support the Debtors in generating revenue and eliminating expenses. *In addition, upon approval of the Letter and Definitive Agreements, Northwest has agreed to enter into good faith negotiations for the acquisition by Northwest of all or substantially all of the Debtors' assets and to use its best efforts to conclude such an agreement within 60 days. Finally, while these negotiations proceed,* the Northwest Transaction will allow the Debtors to operate in the normal course through Northwest's leaseback of the Midway Leasehold and Assets to the Debtors and by providing the Debtors an exclusive purchase option on those assets for a one year period.

(DX 243, ¶ 7, emphasis supplied).

49. As reflected by the Order and Findings, the Court finds that the Gate Sale Agreement, as supplemented by the parties' representations in open court, did not purport to bind the parties to anything more than good faith negotiations consistent with the terms and conditions of the Back–End offer.

50. The Court finds that Midway's post-hearing conduct also reflects that it knew that it had not entered into a binding agreement for the purchase and sale of its remaining non-gate assets on October 8.

51. Hinson wrote a memo to Midway's Board of Directors on October 17 stating that he would not schedule another Board meeting "until we know the certain closing on the second stage with Northwest." (DX 118).

52. On October 21, Marvin Pollack (Midway's Director of Marketing Programs and

Advertisement) drafted a letter agreement to Northwest outlining a working agreement for a frequent flyer partnership. Pollack wrote in Paragraph 3:

> This partnership will survive even if the merger between Midway Airlines and Northwest Airlines falls through for any reason.

> . . . . .

> If the merger of the two programs and the two airlines does not take place, the two programs will settle up. . . .

(DX 312 at ML3309; Tr. (Pollack) 428–29).

53. Pollack gave the draft letter agreement (DX 312) for review to Michael Osajda (Midway's in-house counsel) who was present at the October 8 hearing. (Tr. (Pollack) 432; (Hinson) 129, 204–05). As reflected on the marked-up draft (DX 313A), Osajda changed these paragraphs to read:

> This partnership will survive *even if the proposed sale of assets* by Midway to Northwest does not occur for any reason.

> . . . . .

> If the merger of the two programs and the two airlines does not occur, the two programs will settle up. . . .

(DX 313, DX 313A, emphasis supplied; Tr. (Pollack) 434).

54. Pollack implemented Osajda's changes and sent Northwest the letter outlining the proposed working agreement on October 24. (DX 314; Tr. (Pollack) 434–35). Pollack also sent copies of the letter to David Kunstler (a senior Midway officer) and Osajda. (Tr. (Pollack) 435). On October 28, Lois Gallo of Midway sent Schick a summary of the proposed letter agreement, which stated: "Agreement will survive through 12–31–92 *regardless of outcome* of acquisition. Conversion of credits to World Perks is *contingent upon acquisition* by NW." (DX 275 at ML14279, emphasis supplied).

55. Based on Midway's references in the letter outlining the proposed working agreement to the possibility that "the proposed sale of assets by Midway" (DX 314) might not occur, the Court finds that Midway knew that Northwest and Midway had not bound themselves on the Back–End transaction on October 8.

56. Northwest included a court approval condition for the Back–End transaction in Section 6.2 of its October 21 draft of a proposed agreement. (PX 43; Tr. (Steenland) 3868).

57. Midway's counsel did not delete Section 6.2 in its October 25 mark-up. (PX 44A; Tr. (Henneman) 4321).

58. Midway did not otherwise challenge the inclusion of the court approval condition. (Tr. (Steenland) 3868).

59. Midway also expressly recognized the need for court approval of a Back–End transaction at the October 30–31 negotiating sessions. On October 30, Burgess made Midway's point "very clear that our [Midway's] position was that in the end it [the Back–End transaction] had to be approved by the Court." (Tr. (Burgess) 909). Burgess again pointed out the need for Court approval at the October 31 meeting. (Tr. (Burgess) 922–23).

60. The Court further finds that the Court could not have approved a Back–End transaction on October 8 based on the representations made to it even if the parties had reached agreement.

61. Before it could approve a Back–End transaction, the Court would have had to make findings about whether the proceeds of the transaction were sufficient to enable Midway to convey its assets free and clear of liens and encumbrances, but nonetheless leave some value for the benefit of Midway's estate. Midway even raised this point at the October 30 meeting, stating that, "in the end, the only deal that *would get approved* by the Court and that we could with a straight face recommend is a deal that got the estate a dollar more than liquidation value." (Tr. (Burgess) 909, emphasis supplied).

62. The Court did not make these findings on October 8 (DX 243; PX 13), and was not in a position to make them then because Midway had not yet quantified the amounts of its liens and encumbrances (Tr. (Hanson) 1365), and because the precise amount of cash that the Midway estate would receive

from Northwest had not yet been quantified. (Tr. (Hanson) 527).

63. It is undisputed that at no point did Midway ever present a motion to this Court to approve a Back–End transaction, nor did the Court ever enter an order approving an agreement for the Back–End transaction.

64. The Court finds that the parties' recognition of a need for court approval of a Back–End transaction, coupled with the absence of any request for the Court to approve a Back–End transaction on October 8, further demonstrates that the parties did not agree to the purchase and sale of Midway's non-gate assets on October 8.

65. For the foregoing reasons, the Court finds that the parties did not enter into a binding agreement for the purchase and sale of Midway's non-gate assets on October 8.

66. In addition, the Court finds that Midway has failed to prove that the parties entered into a binding and enforceable agreement for the purchase and sale of Midway's non-gate assets for a second and independent reason: the evidence shows that the parties did not reach a meeting of the minds on October 8 concerning material terms of any such agreement.

67. On October 8, Northwest outlined the terms and conditions it would include in the negotiations for the Back–End transaction. Midway subsequently expressed a materially different understanding of Northwest's proposal, interpreting it to include business terms which Midway and Northwest had not agreed upon on October 8, and, in virtually every instance, had not even discussed. Midway's position that the agreement included new and different terms than those stated on the record by Northwest demonstrates that the parties failed to reach a meeting of the minds on material business terms on October 8.

68. The issues subject to misunderstanding or disagreement were so significant and material that the Court is unable to determine or ascertain the terms of the Back–End transaction.

69. The existence of different understandings about the Back–End transaction became apparent during the October 22 tele-phone call from Midway's attorneys to Steenland. Midway's counsel complained that Northwest's October 21 first draft of a definitive agreement failed to comport with Midway's understanding of the terms for the Back–End transaction. Hanson's notes of the conversation show that Burgess and Hanson told Steenland that Midway had "some very serious problems with the contract," and that the parties must "deal with fundamental conceptual issues." (DX 100). The parties then discussed their numerous areas of disagreement. (Tr. (Steenland) 3897–99).

70. At the end of the October 22 conversation, the Midway lawyers said that they would send Northwest a term sheet which would set forth what Midway believed to be the terms of the Back–End transaction. Midway wanted to prepare its own term sheet at that time to see "if we [Northwest and Midway] really had a conceptual agreement or understanding on what had happened before we start negotiating words." (Tr. (Burgess) 902–03). Burgess acknowledged that if Northwest believed that its October 21 draft reflected Northwest's October 8 proposal, there were significant business issues unresolved. (Tr. (Burgess) 1087).

71. Midway's October 24 term sheet also reflected the uncertainty. In a section captioned "Open Issues, including without limitation," the term sheet listed 13 "open issues." (DX 251).

72. Hinson acknowledged that there were "a lot of open items" that the parties had not previously discussed. (Tr. (Hinson) 279).

73. In its October 25 cover letter to Northwest, Midway noted that "there are significant business terms that remain unresolved...." (PX 44B). Burgess testified that Midway provided its October 25 term sheet with the letter to determine whether the parties had reached an agreement on October 8:

> Well, what we were trying to accomplish ... was to see if the parties had an understanding as to what the deal was, because it had been presented in court and over the course of a long day ... and that it was important to see if we could have a concep-

tual agreement on the basic terms of the deal....

(Tr. (Burgess) 903–04).

74. Although Midway contends that its term sheet was intended to be an accurate reflection of what Midway believed happened on October 8 (Tr. (Burgess) 1086), its representatives conceded at trial that Midway's term sheet contained numerous terms which had never been discussed previously, and which were different from those reflected in Northwest's October 21 draft. Northwest's view is that the Midway term sheet indicated "that there was no meeting of the minds" as to a Back–End transaction. (Tr. (Steenland) 3912–13).

75. Northwest's October 28 response to Midway's October 25 packet also reflects the major disagreements: "The Term Sheet as proposed by Midway is unacceptable. It does not reflect the terms of Northwest's offer for all of Midway's assets...." Northwest added: "Midway's Term Sheet is in direct conflict with several fundamental provisions of Northwest's offer that were clearly articulated to Midway and reflected in the transcript of the October 8, 1991 Bankruptcy Court hearing." (PX 45 at ML14291). Northwest attached a mark-up of Midway's term sheet intended "to make it consistent with Northwest's offer." (PX 45 at ML14288–90).

76. As Burgess testified, Midway had a major disagreement with Northwest if the October 28 term sheet reflected, as was the case, Northwest's view of what occurred on October 8. (Tr. (Burgess) 1131). Schick agreed that "it was obvious that both sides were not close to resolving the issues...." (Schick Dep. 69).

77. The disagreement on the fundamental terms of the proposed Back–End transaction is most clearly demonstrated by the October 29 chart (DX 186) prepared by Midway's counsel, titled "Term Sheet Differences," which summarizes the parties' widely-divergent positions.

78. Burgess testified that at the negotiating meeting on October 30, Schick made an opening statement for Midway in which Schick acknowledged the gulf between the parties. Schick said that he felt "that we were so many miles apart on so many different things...." (Tr. (Burgess) 907). Northwest agreed that there was a "dramatic disagreement" over the basic economic terms of the proposed transaction. (Tr. (Cronin) 2161). As Cronin said, "[m]y conclusion was that we had a very serious misunderstanding, that I felt that it was either because the—the parties on the other side didn't understand what we negotiated or felt that because we were so far down the road on this transaction, that they were in a position to negotiate a better deal than they originally agreed to." (Tr. (Cronin) 2149).

79. The Court finds that the parties disagreed upon several material terms and issues, including, *inter alia*, the following:

a. which party would bear the cost of removing liens and curing defaults and arrearages;

b. the point in time that Northwest would assume responsibility for the salaries and accrued vacation pay of Midway's employees;

c. which party would be responsible for Midway's federal excise taxes;

d. which party would bear the risk of potential WARN Act liability;

e. whether Northwest would pay Midway's professional fees;

f. which assets would be included in the Back–End transaction;

g. the extent of Northwest's obligations regarding the non-Fidelcor aircraft;

h. the composition of the purchase price; and

i. the funding of Midway's operating losses.

(Underlying Material Background ¶ 186; PX 44B and 44C; PX 45; PX 47; DX 100; DX 186). These terms and issues were not included in the presentation made to the Court on October 8.

80. The first material term upon which the parties did not reach a meeting of the minds is which party would bear the cost of removing liens on the assets Northwest would be purchasing, as well as the cost of curing the defaults or arrearages on Mid-

way's executory contracts and leases that Northwest required.

81. The uncontroverted testimony indicates that these expenses were not included in the Back–End offer stated by Northwest to the Court on October 8, that the parties had not discussed this issue on or before October 8, and that the issue was first raised in the parties' conversation on October 22. (Tr. (Hanson) 616, 1328, 1342–44, 1365, 1373; (Burgess) 1106, 1103, 1089, 1107–08, 989, 1109–10, 1309–10; (Henneman) 4314–16; (Cronin) 2148, 2142; (Steenland) 3905–06; Schick Dep. 201, 203–04; Schick Disc.Dep. 215; Hibbs Dep. 245–46, 302; Koeneke Dep. 95).

82. As of October 8, Midway had not yet calculated the amounts required to cure its liens and defaults. (Schick Disc.Dep. 215–16; Tr. (Hanson) 1365). Midway estimated at the October 30 meeting, however, that the amount necessary to cure the liens and arrearages was between $6 million on the low end to $30 million on the high end, with $12–20 million the likely range. (Tr. (Burgess) 1145; (Steenland) 4208, 3952; Schick Dep. 83; Tr. (Cronin) 2180–81, 2194; Leonard Dep. 164–65). Ultimately, Midway calculated the cure costs for those assets and contracts which Northwest identified on its November 7 list (PX 47) at $13.6 million. (DX 263, DX 203/PX 683 at ML48602; Tr. (Burgess) 1190).

83. The Court finds that this issue was highly material to the Back–End transaction, both in absolute dollar amount and from the impact of that dollar amount on the parties' concept of the proposed transaction. (Leonard Dep. 163).

84. The Court finds that, based on the parties' failure to discuss on October 8 the issue of which party would bear the cost of removing liens and curing defaults and arrearages, Midway and Northwest did not reach a meeting of the minds regarding this material issue.

85. Another material issue upon which the parties failed to agree concerned Midway's employees.

86. Northwest's Back–End offer included jobs for substantially all of Midway's operating employees. (PX 13, p. 19). In the event

that the closing occurred in the middle of a Midway pay period, which was likely, there was an issue as to whether Midway or Northwest would be responsible for compensation earned by the employees before closing. In addition, Midway's employees, during their tenure with Midway, accrued vacation bonuses or vacation pay. An issue arose as to whether Northwest was responsible for this pre-closing Midway obligation. (DX 186; Tr. (Cronin) 2185–86).

87. Midway asserted in its October 25 term sheet that Northwest was responsible for the pre-closing or "stub" payroll, and that Northwest, as part of hiring Midway's employees, must assume responsibility for their accrued vacation pay. (PX 44C).

88. Northwest's position was that Midway was responsible for employee salaries up until the day of the closing, and that the employees would be treated as new hires, so that Northwest had no responsibility for vacation pay accruing before Northwest hired them. (DX 186; Tr. (Cronin) 2185–86).

89. The testimony was consistent that Northwest and Midway did not, on or before October 8, discuss or agree on the issue of who would pay Midway's last payroll. (Tr. (Burgess) 1089–90; (Steenland) 3915; Schick Dep. 203–04; Tr. (Cronin) 2147). Similarly, they did not discuss or agree on the issue of accrued vacation pay. (Tr. (Cronin) 2147–48; (Steenland) 3915).

90. One of the main reasons that Midway selected Northwest's proposal over Southwest's proposal was Northwest's treatment of the employee issues. (PX 13, pp. 58–59).

91. The payroll and accrued vacation time was a cash item valued at approximately $8 to $10 million. (Tr. (Cronin) 2148).

92. The Court finds that the employee issues were material both in absolute dollar value as well as in relative significance to the selection of Northwest's proposal.

93. The Court finds that, based on the parties' failure to discuss on October 8 the issue of at what point in time Northwest would assume responsibility for the salaries and accrued vacation pay of Midway's employees as well as the parties' subsequent

disagreement, the parties failed to have a meeting of the minds with respect to this material issue.

94. Another material issue which arose after October 8 concerned Midway's liability for federal excise taxes for airline tickets sold before the closing of the Back–End transaction.

95. Midway maintained that these taxes were to be paid by Northwest. (DX 186).

96. In contrast, Northwest believed that Midway was liable for the taxes on tickets it sold prior to closing. (DX 186; PX 47 at NW10111).

97. The testimony was consistent that the excise tax issue was not discussed or agreed upon by the parties on or before October 8. (Tr. (Burgess) 1091–92; Schick Dep. 204; Tr. (Henneman) 4313; (Cronin) 2148).

98. Midway's liability for the federal excise taxes involved a minimum cash liability of $2.5 to $3.5 million. (Tr. (Cronin) 2148).

99. The Court finds that this issue was material based on the absolute dollar amount involved as well as the strong divergence in the parties' viewpoints.

100. Based on the parties' failure to discuss on or before October 8 the issue of which party would be responsible for Midway's federal excise taxes, the Court finds that the parties did not reach a meeting of the minds on this material issue.

101. A material issue regarding potential WARN Act liability arose after October 8.

102. Although Northwest offered to hire most of Midway's operating employees, it did not agree to hire all of them. In particular, the Back–End offer did not extend to so-called "spoke employees," i.e., Midway employees working in cities other than Chicago. (PX 13, p. 19; Koeneke Dep. 101). Midway did not give any WARN Act notices to its spoke employees or any other employees until November 4, raising the possibility of WARN Act liability on Midway's part. (Tr. (Henneman) 4318; DX 443, DX 444).

103. Midway asserted that if it had any WARN Act liability, Northwest should indemnify Midway for that liability. (DX 186).

104. Northwest contended that the WARN Act liability, if any, belonged to Midway, and that Midway should indemnify Northwest for any potential WARN Act liability. (DX 186).

105. The parties did not discuss the issue of responsibility for WARN Act liability on or before October 8. (Tr. (Burgess) 1092; (Steenland) 3916; Schick Dep. 205–06; Tr. (Henneman) 4318; (Cronin) 2149; (Hanson) 1374).

106. This liability potentially involved many millions of dollars. (PX 729).

107. The Court finds that the issue was material because of the dollar amount involved and the issue's importance relative to the Back–End transaction.

108. Based on the parties' failure to discuss on or before October 8 the issue of which party would bear the risk of potential WARN Act liability, the Court finds that the parties did not reach a meeting of the minds with respect to this material issue.

109. The parties further failed to agree prior to October 8 on the material issue of the payment of Midway's professional fees.

110. During the subsequent negotiations, Midway repeatedly argued that Northwest should pay Midway's professional fees, including its legal fees. Burgess raised this issue immediately after the October 11 closing of the Gate Sale. (Tr. (Steenland) 3871–72). Hanson's notes of the issues Midway's counsel raised in the October 22 call to Steenland list the payment of Midway's professional fees as the third example of the "fundamental conceptual issues" dividing the parties. (DX 100, ¶ 3). Much of that conversation was devoted to Midway's position that Northwest was responsible for this expense. (Tr. (Steenland) 3904–05; (Hanson) 1347–48). In its October 25 term sheet, Midway repeated its assertion that Northwest should pay Midway's professional fees. (PX 44C; Tr. (Steenland) 3915; (Burgess) 1093–94). Midway did so again at the October 30 meeting. (Tr. (Steenland) 3956–57; (Cronin) 2186–87; (Burgess) 1149; PX 89 at DW6012).

111. Asserting that it had not agreed to this obligation on October 8, Northwest re-

fused to pay Midway's professional fees. (Tr. (Burgess) 1073, 1149; (Steenland) 3905).

112. The Court finds that there was no discussion or agreement on or before October 8 regarding Northwest's responsibility for Midway's professional expenses, including its legal fees. (Tr. (Hanson) 1374, 1348; (Burgess) 1093; (Steenland) 3915; Schick Dep. 206; Tr. (Cronin) 2149).

113. The professional fees, as of September 30, were $1.4 million. (DX 203 at ML48610).

114. The Court finds that the issue of Midway's professional fees was material because of the dollar value of these fees as well as the strong disagreement by the parties.

115. Based on the parties' failure to discuss on or before October 8 the issue of whether Northwest would pay Midway's professional fees, the Court finds that the parties did not reach a meeting of the minds regarding this material issue.

116. Midway and Northwest did not reach a meeting of the minds on or before October 8 with respect to the material issue of which assets Northwest would acquire as part of the Back–End transaction.

117. Northwest's October 8 offer was for the acquisition of "all" or the "balance" of Midway's remaining assets. (PX 13, pp. 18, 20; Tr. (Cronin) 2139, 2141–42; Hibbs Dep. 267). Moreover, Section 5.7 of the executed Gate Sale Agreement (PX 19) stated that Midway had agreed to negotiate "a definitive agreement" for the acquisition by [Northwest] of *all* of [Midway's] assets...." (PX 19, ¶ 5.7, emphasis supplied).

118. Nonetheless, Midway asserted in the October 22 conversation with Steenland (Tr. (Steenland) 3902; (Hanson) 567, 638; (Burgess) 898; DX 100) and in its October 25 letter (PX 44B) and term sheet (PX 44C) that Midway was entitled to exclude a variety of significant assets from the Back–End transaction, including: (1) prepaid expenses and deposits relating to liabilities other than ATL; (2) deposits relating to ATL in excess of the aggregate amount of those deposits as of October 8; and (3) any asset subject to a lien which Northwest did not agree to pay and discharge and any executory contract or

lease with an arrearage or default, unless Northwest agreed to pay the cure cost. (PX 44C; DX 186; Tr. (Burgess) 1096; Hibbs Dep. 266–68).

119. The record is uncontroverted that, with the exception of the ATL deposit issue, the parties did not discuss or agree upon the exclusion of these assets from the Back–End transaction. (Tr. (Hanson) 1343–45, 1373, 637; (Burgess) 1101–03, 1309; Schick Dep. 191–92; Tr. (Steenland) 3913–14; (Henneman) 4315, 4309–11; (Cronin) 2139–42).

120. The Court finds that this issue was material because the assets Midway sought to exclude were worth millions of dollars and because a purchase and sale cannot be accomplished without some agreement as to the specific assets being sold.

121. Based on the parties' failure to discuss on or before October 8 the issue of which assets would be included in the Back–End transaction, the Court finds that the parties did not reach a meeting of the minds on this material issue.

122. During the Back–End negotiations, a material issue arose with respect to Northwest's obligations regarding the non-Fidelcor aircraft.

123. Northwest's view was that its offer of October 8 was only to negotiate with the non-Fidelcor lessors, not necessarily to assume these leases or provide monetary value to Midway if it did not do so. (PX 13, p. 19; Tr. (Steenland) 3925; PX 45 at ML14289, 14292).

124. Midway maintained in the October 22 telephone call and in its October 25 packet that Northwest's proposal required Northwest to provide Midway's estate with $30 million in value either through the assumption of these leases or by some other means. (DX 100 (Hanson) ¶ 3; Tr. (Steenland) 3899–3901; (Burgess) 1117; (Hanson) 563–64; PX 44C).

125. The parties did not reach an agreement with respect to Northwest's obligations regarding the non-Fidelcor aircraft on or before October 8.

126. The Court finds that this issue was material because it involved $30 million.

127. The Court finds that, based on the parties' failure to discuss on or before October 8 the extent of Northwest's obligations regarding the non-Fidelcor aircraft, the parties did not reach a meeting of the minds on this material issue.

128. Furthermore, as of October 8, the parties had not reached a meeting of the minds regarding the material issue of the composition of the purchase price.

129. At the October 8 hearing, Northwest offered to pay $95 million of consideration, consisting of three components: (1) the assumption of Midway's DIP indebtedness; (2) the assumption of Midway's ATL; and (3) a combination of cash and notes. (PX 13, pp. 19–20; Tr. (Hanson) 624–27, 1326).

130. At the time of the hearing, the parties assumed that the DIP loan balance would be approximately $40 million and the ATL was $35 million, leaving an estimated $20 million as the amount of cash and notes. (Tr. (Cronin) 2143–44; (Steenland) 3811, 3888–89; (Hanson) 508; (Burgess) 857).

131. Following the hearing, Midway's ATL increased, as anticipated, from $35 million to approximately $44 million. (PX 729 at MAA3, MAA62; Tr. (Cronin) 2146; (Hanson) 577, 1376; (Steenland) 3928).

132. The parties disagreed on how the change in Midway's ATL would affect the total consideration to be paid by Northwest.

133. Northwest's position was that the increase in the ATL would result in a decrease in the amount of cash and notes, leaving the total consideration at $95 million. (Tr. (Cronin) 2142–46, 2163–64; (Steenland) 3929–30). For example, Northwest would assume the DIP for $40 million and all of the increased post-October 8 ATL for $44 million, and pay $11 million in cash and notes, so that the total value of the consideration package would remain $95 million. (Tr. (Cronin) 2142–46, 2163–64; (Steenland) 3930).

134. Burgess testified at trial that this was his understanding as well, and that he even criticized Steenland in the October 22 conversation for purportedly not comprehending that "for every dollar ATL went up, some other element of consideration came down...." (Tr. (Burgess) 897–98).

135. Nonetheless, Midway's October 25 term sheet (PX 44C) provided otherwise. As set forth in that term sheet, Northwest had to assume all of Midway's ATL, regardless of amount, but would only receive a credit toward the $95 million consideration equal to the lower amount of the ATL as of October 8 (*i.e.,* $35 million). Under Midway's interpretation (as reflected in its term sheet), therefore, Northwest would assume an ATL of $44 million (but receive only a $35 million credit), assume the DIP for $40 million, and still pay $20 million in cash and notes. (DX 186 at ML15565; PX 44C; Tr. (Hanson) 580).

136. The Court finds that this issue was material because this formulation of the purchase price would have increased the amount of consideration to be paid by Northwest from a total of $95 million to $104 million, which is a significant dollar value. (Tr. (Cronin) 2142–46, 2164–65; (Steenland) 3929–30; (Burgess) 1182–83; DX D (admitted for demonstrative purposes only)).

137. The parties' disagreement leads the Court to find that Midway and Northwest did not reach a meeting of the minds on or before October 8 as to how fluctuations in the ATL and DIP loan would be resolved in determining the total consideration of the Back–End transaction.

138. On October 8, the parties had not yet reached a meeting of the minds with respect to the funding of Midway's operating losses.

139. Midway maintained in the negotiations that Northwest had made an unconditional commitment at the hearing to fund Midway's operating losses commencing November 8, even if the parties were still negotiating material business terms, and that this was a "fundamental conceptual issue." (DX 100; PX 44B, PX 44C; Tr. (Hanson) 1349; (Burgess) 1127; (Steenland) 3906).

140. Northwest's position was that it offered to cover Midway's operating losses only if the parties had reached agreement on all material business terms and certain technicalities, such as completing documentation, remained to be ironed out, or if Northwest desired to defer the closing for its own rea-

sons after the transaction was ready to be closed. (Tr. (Steenland) 3905–07, 3841–44, 3846, 3957–58; PX 45; Tr. (Cronin) 2187–88; (Henneman) 4332–33).

141. Northwest and Midway did not discuss the subject of Northwest's willingness to cover Midway's operating losses before Parkins raised the issue well into the October 8 hearing. (PX 13, pp. 49–50; Tr. (Steenland) 3840; (Hanson) 505, 530; Parkins Dep. 168–69, 110; Tr. (Burgess) 1125–26). Moreover, Midway did not say anything on the record on October 8 concerning its understanding of the circumstances which would give rise to Northwest's obligation to fund its operating losses. (PX 13).

142. Midway was losing approximately $1.5 to $2 million per week. (Tr. (Hanson) 504).

143. The Court finds that this dispute was a material issue because the dollar value was significant and important to the parties.

144. The Court finds the parties did not reach a meeting of the minds on or before October 8 concerning the circumstances giving rise to a duty on Northwest's part to fund Midway's operating losses.

145. The Court finds that the issues separating Northwest and Midway were numerous and substantial.

146. The positions taken by Midway during the subsequent negotiations were not stated on the record on October 8 after Northwest articulated its Back–End offer. Both sides agreed—albeit for different reasons—that they had "a very serious misunderstanding" about what had occurred on October 8. (Tr. (Cronin) 2149; Jenkins Dep. 173).

147. Accordingly, the Court finds that there was no binding agreement made on the Back–End transaction due to a lack of a meeting of the minds on material business terms.

148. The Court finds that the parties did not enter into a binding agreement on October 8 for a third reason. The terms which Northwest included in its Back–End offer were subject to the satisfaction of certain conditions precedent, including: (1) the ap-

proval of Northwest's Board of Directors; (2) the execution of definitive documentation; and (3) a due diligence review with results reasonably satisfactory to Northwest.

149. Northwest included these conditions to ensure that its Board would have the opportunity to consider the proposed transaction as a whole, that it would not be obligated to purchase Midway's remaining assets until the parties memorialized their agreement in an executed document, and that its management had completed a thorough due diligence review of Midway's operations prior to being obligated on the Back–End transaction.

150. The Court finds that these conditions precedent were not satisfied.

151. The Court finds that the approval of Northwest's Board of Directors was a condition precedent of Northwest's Back–End offer which was not satisfied. This finding is based on, *inter alia;* (1) the lack of approval of the Back–End transaction by Northwest's Board of Directors; (2) Midway's pre-hearing conduct and knowledge; (3) the October 8 hearing itself; (4) the absence of withdrawal of the board approval condition; (5) Midway's post-hearing conduct; and (6) Northwest's post-hearing conduct.

152. The evidence at trial demonstrates that Northwest intended to condition its offer on board approval, and that Midway knew this.

153. Both Northwest and Midway stated the board approval condition on the record at the October 8 hearing. (PX 13, pp. 20, 42).

154. After the hearing, both parties prepared term sheets and engaged in other conduct which demonstrated that they both understood that the board approval condition remained in effect. (DX 251; DX 12; DX 246; PX 245; PX 44C; PX 45).

155. There is no dispute that Northwest's Board considered the Back–End transaction and never approved it.

156. The acquisition of Midway was discussed by the Northwest Board during meetings on October 7, November 5, and November 12. (PX 10; PX 29; PX 33). The evidence is uncontroverted that Northwest's

Board did not approve the Back–End transaction during these meetings or at any other time.

157. At the October 7 meeting, the Northwest Board approved the acquisition of Midway's gates, but reserved approval of the Back–End transaction. The undisputed evidence reflects that the only action taken by Northwest's Board of Directors at its October 7 meeting with respect to the Back–End transaction was to authorize Northwest's management to make an offer for Midway's non-gate assets "subject to final approval by the Board." (PX 10, p. 5). Northwest's Board did not place any limits or restrictions on its own discretion or right to review and approve the Back–End transaction. (Tr. (Steenland) 4267).

158. On November 5, Northwest's Board discussed the status of the Northwest/Midway negotiations and various due diligence concerns. As reflected by the minutes of that meeting (PX 29), the Board took no formal action.

159. At the November 12 meeting, Northwest's Board voted unanimously to reject the Back–End transaction. (PX 33).

160. The Court finds that Northwest's Board never approved the Back–End transaction.

161. On the morning of October 8, Northwest's top officials, including Gary Wilson and Dasburg, directed Cronin and Steenland, who would be attending the hearing for Northwest, to be certain to include board approval as a condition of Northwest's Back–End offer to be presented in court. (Tr. (Steenland) 3798–99; Dasburg Dep. 232–33, 309–10; Tr. (Cronin) 2095–96, 2090).

162. The Court finds that Midway knew prior to the start of the hearing that Northwest's Back–End offer was expressly conditioned on the subsequent approval of Northwest's Board, as demonstrated by, *inter alia*, the following events.

163. Northwest expressly asserted the board approval condition in its recitation of the terms and conditions of the Back–End offer in the call to Midway's representatives at 11:00 a.m. on the morning of October 8. Jenkins testified that Cronin specifically stat-

ed that Northwest "had to complete their due diligence and documentation and then they had to get board approval." (Jenkins Dep. 40). The board approval condition also appears in Jenkins' notes of this conversation. (DX 9/PX 671 at FB81; Jenkins Dep. 39–40).

164. Jenkins immediately reported the terms and conditions of Northwest's Back–End offer, including the board approval condition, to the Midway Board. As the minutes of Midway's October 8 board meeting indicate: "At 11:55 a.m. Mr. James Jenkins of First Boston arrived and he stated that he had spoken to Mr. James Cronin of Northwest. Mr. Cronin stated that *Northwest needed to* do more [due] diligence, *get Board approval* and document the second part of the transaction." (DX 98, p. 4, emphasis supplied).

165. Hinson spoke with Dasburg on the morning of October 8 (Tr. (Hanson) 221), and reported to the Midway Board that Northwest's Back–End offer was subject to board approval. (Tr. (Hanson) 619).

166. The Court finds that the October 8 hearing itself further demonstrates both that Midway knew the board approval condition existed and was not yet satisfied.

167. This Court has previously recognized that counsel for Northwest at the October 8 hearing "stated that the Back–End Purchase was subject to the conditions of board approval and due diligence...." *Midway Airlines, Inc. v. Northwest Airlines, Inc.*, No. 91 A 01176, 1993 WL 65673, at *2 (Bankr.N.D.Ill. Feb. 24, 1993).

168. After the Court and Midway had asked Northwest and Southwest to state the conditions, as well as the terms, of their respective offers on the record at the outset of the October 8 hearing, Parkins asserted that Northwest's Back–End offer was subject to several conditions, including board approval:

Now, relative to the second or what has come to be known as the back-end portion of the Northwest transaction, conditions will be board approval, due diligence....
(PX 13, p. 20).

169. Parkins did not state on the record at any time on October 8 that the Northwest

board approval condition was limited or that the Board's discretion was limited. (PX 13).

170. Northwest and Southwest each presented offers at the October 8 hearing. One of the major differences between the offers was that Northwest's offer included board approval as a condition precedent whereas Southwest's offer did not. (PX 13, pp. 20, 52).

171. Southwest recognized that the Northwest offer was subject to board approval and other conditions. Southwest's counsel emphasized that Southwest's offer was superior to Northwest's offer because Southwest's offer "does not have the contingencies." (PX 13, p. 26).

172. This Court has already found that Southwest "stated [in its initial presentation] that its proposal was not conditioned upon board approval and was without any contingencies." *Midway v. Northwest*, 1993 WL 65673 at *3.

173. Southwest referred to the lack of contingencies in its offer at least eleven times during the hearing. (PX 13 at 22:9, 22:19, 22:24, 24:9, 25:10, 25:11, 26:24–25, 51:18, 51:22, 52:4, 52:10). For example, after Midway erroneously suggested later in the hearing that the Southwest offer was subject to board approval, Southwest stated, "in terms of board approval, board approval is not a condition of any part of our offer." (PX 13, p. 52).

174. The Court finds that Midway not only knew that board approval was a condition of Northwest's Back–End offer before the hearing, but its own statements and conduct during the hearing also demonstrate that Midway understood that board approval was a condition.

175. When Parkins made his presentation to the Court, Midway's representatives were taking notes. The notes listed board approval as a condition of the Back–End transaction. (DX 96/PX 676 at L2368 (Hanson); PX 726 (Burgess); DX 9/PX 671 at FB80 (Jenkins)). Midway understood that Northwest was stating that its Back–End offer was subject to board approval. (Tr. (Altschul) 3588–90; Jenkins Dep. 49–50).

176. Immediately after the recess Hanson acknowledged the continuing existence of Northwest's board approval condition in statements he made on the record. After informing the Court that Midway "wish[ed] to pursue the Northwest offer" (PX 13, p. 39), Hanson then summarized Midway's understanding of Northwest's offer. In doing so, he confirmed that board approval remained a condition of Northwest's Back–End offer:

> Very important to us on that as well, Judge, is *the Northwest statement that subject to reaching agreement on documentation, board approval,* which we understand *they [Northwest] don't expect to be a problem,* they are ready to ... move ahead.

(PX 13, p. 42, emphasis supplied).

177. At trial, Burgess testified that Hanson's statement was an accurate summary of Cronin's comments during the recess meeting (Tr. (Burgess) 1000), and that Burgess never suggested that Hanson inform the Court of any other statements about the board approval condition supposedly made by Northwest at the recess. (Tr. (Burgess) 1009–10).

178. Steenland believed that Hanson's comments to the Court reflected Midway's understanding that Northwest's Back–End offer was subject to the conditions. (Tr. (Steenland) 3830).

179. At trial, Hanson acknowledged that board approval was an open condition of the Northwest proposal that had not·yet been satisfied, testifying that board approval was an "open unsatisfied item...." (Tr. (Hanson) 1322).

180. The Court finds that at no time did any representative of Midway, or anyone else, state on the record after the recess meeting that board approval was not a condition of the Back–End offer or that Northwest had withdrawn or limited that condition.

181. Jenkins testified in Court on October 8 as Midway's expert. Midway's counsel represented to the Court that Jenkins was "competent to evaluate the differences between these deals...." (PX 13, p. 48). In discussing his duties during his deposition in

this matter, Jenkins acknowledged that "we and the other advisors for the company were responsible for clarifying the terms of the offer and understanding all of its implications." (Jenkins Dep. 35). In his deposition, Jenkins testified that Northwest's board approval condition, along with its due diligence condition, were "two specific areas their [Northwest's] proposal was weak in comparison with the Southwest proposal...." (Jenkins Dep. 34). He added:

Q: What do you mean when you say their [Northwest's] proposal was weak compared to the Southwest proposal?

A: Southwest did not say they had to do any more due diligence and they did not say that they needed board approval.

(Jenkins Dep. 34). Jenkins' notes, which he used to testify on October 8, show that the Southwest proposal, unlike the Northwest proposal, did not require board approval. (DX 9/PX 671 at FB79). Jenkins stated, "[e]ssentially ... Northwest had to do more due diligence and then had to negotiate with us and then had to get board approval." (Jenkins Dep. 41).

182. Other witnesses for Midway agreed that they understood that board approval remained a requirement of the Northwest offer.

183. Burgess knew that the Northwest two-stage proposal involved a "bifurcated board approval" procedure. (Tr. (Burgess) 987).

184. Altschul also testified that he understood board approval to be a condition to the Back-End transaction. (Tr. (Altschul) 3590).

185. Hinson testified that while he believed that board approval would be a formality, board approval "would certainly be required from a signature standpoint." (Tr. (Hinson) 290).

186. Schick testified that he understood that while board approval was not a condition of Southwest's offer, it was a condition of Northwest's proposal, and that Northwest's Board would have to approve the Back-End transaction before it could be completed. (Schick Dep. 36, 38, 44, 134, 182).

187. Hanson similarly testified that he knew that Northwest's Board had not yet passed a resolution approving the Back-End transaction. (Tr. (Hanson) 510).

188. Midway contends that Northwest withdrew its board approval condition during the recess.

189. The Court finds that the record rebuts this contention.

190. There is no dispute that the parties discussed the board approval condition. After Midway asked Northwest about its board approval condition, Cronin responded on behalf of Northwest. Cronin testified: "I was asked if I thought it was going to be a problem and I said I didn't expect it to be a problem." (Tr. (Cronin) 2297).

191. The Court finds that Northwest did not withdraw its board approval condition on the record on October 8.

192. To the contrary, Northwest reaffirmed that board approval was a condition of its offer. While noting two changes to Northwest's proposal, Parkins did not report at that time—or any other time—that there were any changes relating to the board approval condition he had previously stated. (PX 13, pp. 49–50).

193. Others present at the recess meeting confirm that Cronin did not withdraw the board approval condition, but instead opined that he did not expect board approval would be a problem. (Tr. (Hanson) 499; Jenkins Dep. 146; Parkins Dep. 158; Schick Dep. 36).

194. No one from Northwest, during the recess, or at any other time, said that board approval was not a condition to Northwest's offer or that it had been withdrawn. (Tr. (Cronin) 2117; Parkins Dep. 159–60; Tr. (Henneman) 4320).

195. Nor did anyone from Northwest say that board approval was just procedural, not a substantive condition, or just a matter of corporate formalities or housekeeping. (Tr. (Steenland) 3821–22, 4268; (Cronin) 2116–17; (Burgess) 1001; (Henneman) 4397; (Hanson) 642).

196. Similarly, on October 8, no one said that Northwest's Board had already ap-

proved the Back–End transaction, or that the condition had been satisfied. (Tr. (Burgess) 999, 1001; (Cronin) 2116–17; (Altschul) 3592; (Henneman) 4319).

197. The Court finds that Midway's conduct following the October 8 hearing further demonstrates that Midway understood that the board approval condition to the Back–End transaction remained in effect.

198. On Friday, October 11, Midway closed the Gate Sale knowing that Northwest's Board of Directors had not yet approved the Back–End transaction. (Tr. (Burgess) 1001).

199. Northwest delivered to Midway a written resolution and certificate of Northwest's Corporate Secretary for the Gate Sale closing. The certificate, dated October 10, certified both that the Northwest Board had met on October 7, as well as the actions taken by the Board at that time. (PX 12; Tr. (Steenland) 3868; (Henneman) 4293). The attached resolution contained a recital that the Board had been asked to approve the purchase of substantially all of Midway's assets. The body of the resolution stated, however, that the Board had only authorized the purchase of the gates. The certified resolution lacked any authorization for the purchase of Midway's remaining assets, which were the subject of the Back–End transaction. (PX 12; Tr. (Steenland) 3868–70).

200. Midway itself had reported to the Court on October 8 that the Back–End offer was still subject to approval by Northwest's Board. (PX 13, p. 42).

201. No one from Northwest informed Midway prior to the October 11 closing of the Gate Sale that the Northwest Board had approved the Back–End transaction or had withdrawn the board approval condition. (Tr. (Steenland) 3870; (Henneman) 4294–95).

202. Northwest's October 10 certificate also noted that the October 7 resolution "ha[d] not been altered, amended or repealed, but remains in full force and effect at this date [October 10]." (PX 12).

203. Although Midway knew as of the closing of the Gate Sale that Northwest's Board had not yet approved the Back–End

transaction, Midway went ahead with the closing without objection.

204. On October 16, more than a week after the hearing, Jenkins prepared the First Boston term sheet (DX 12A), which was "a summary of what we here at First Boston believed to be the main terms of the transaction proposed by Northwest...." (Jenkins Dep. 46). The term sheet was expressly "[b]ased on NWA offer presented on Tuesday, October 8, 1991 in bankruptcy court *and discussions between parties* during the proceedings." (DX 12 at FB33 n. 1, emphasis supplied). Significantly, the term sheet listed "Approval by NWA [Northwest] Board of Directors" under the heading "Closing Conditions." (DX 12A). Jenkins included this term because he understood that board approval was a condition of the Back–End transaction, as his testimony concerning the October 16 term sheet shows:

Q: Under "Closing Conditions," it says, "Final due diligence, negotiations and documentation, approval by NWA board of directors."

A: Right.

Q: To your understanding, those were closing conditions as of October 16, 1991, to the second step of the Northwest transaction, correct?

A: *They were closing conditions and as stated they were my view of what the closing conditions were as stated by Northwest in court on the 8th.* I had not heard anything since then to change any of that.

(Jenkins Dep. 49–50, emphasis supplied).

205. The October 16 term sheet was circulated to other First Boston representatives before being distributed. Neither those representatives nor any other recipients of the term sheet ever indicated that anything therein was incorrect. (Jenkins Dep. 61–64).

206. The Court finds that the evidence shows that the recipients of the October 16 term sheet did not disagree with the listing of the conditions to the Back–End transaction.

207. Hinson, for example, believed that the October 16 term sheet was accurate. (Tr. (Hinson) 233).

208. Likewise, while Schick marked up his copy of the October 16 term sheet to reflect areas with which he disagreed, he made no comments or markings with respect to any of the conditions, including the board approval condition. (Schick Dep. 183–84; DX 185).

209. Hanson also reviewed the October 16 term sheet and discussed it with others. (Tr. (Hanson) 1353). He did not believe that listing board approval as a condition to the Back–End transaction was inaccurate. (Tr. (Hanson) 1354–55).

210. The October 16 term sheet was also sent to Koeneke. (Jenkins Dep. 62; Koeneke Dep. 87–88; DX 12). He does not recall anything in the document with which he disagreed. (Koeneke Dep. 87–88).

211. Midway's internal October 24 term sheet (DX 251) also listed "NWAL [Northwest Airlines] board approval" among the "Closing Conditions" to the Back–End transaction. Al Altschul (Midway's Chief Financial Officer) attended the October 25 meeting at Midway, and received a copy of the October 24 term sheet. (Tr. (Altschul) 3594–95). DX 251 bears his handwriting in the upper right-hand corner and reads, "10–25–91" and the word "draft." (Tr. (Altschul) 3594). No one ever told Altschul that there were any errors in the October 24 term sheet. (Tr. (Altschul) 3595).

212. The Court finds that Northwest's post-hearing conduct also demonstrates that board approval remained a condition precedent of the Back–End transaction and the condition was not satisfied.

213. At the conclusion of the October 8 hearing, Steenland phoned Dasburg from the courthouse to report on the outcome of the hearing. Dasburg asked for assurances that Northwest had reserved board approval and due diligence as conditions precedent, and Steenland confirmed that Northwest had done so. (Dasburg Dep. 95, 232, 311; Tr. (Steenland) 3847).

214. On October 9, Northwest advised its lenders that the Back–End transaction was subject to approval by Northwest's Board of Directors. In a letter from Francht to John Moses (Vice President of Bankers Trust Company, which was the lead lender among Northwest's lenders), Francht stated that Northwest would be meeting with Moses the next day "to review the proposed Midway transaction in its entirety." (DX 430/PX 130). Francht described the transaction as having two steps: the Gate Sale and the acquisition of Midway's remaining assets. He wrote that "[c]ompletion of the second step is subject to due diligence and Northwest Board of Directors' approval." (DX 430/PX 130, p. 1).

215. Shortly after the October 8 hearing, Steenland prepared a term sheet summarizing the Back–End or Phase II transaction for use within Northwest. (PX 245; Tr. (Steenland) 3882–83, 4191). The document, titled "Term Sheet for Phase II of Midway Transaction," included a section for the "Conditions to Northwest's Obligations." Among the conditions listed was "Board of Directors approval." Steenland included the conditions because they were an integral part of the Northwest offer which had to be satisfied before any agreement became final. (PX 245, p. 2; Tr. (Steenland) 3887).

216. Northwest communicated the board approval condition to the KLM directors. On October 18, Northwest faxed a copy of its internal term sheet (PX 245) to Jantiene Roseboom, the KLM analyst who was assigned by KLM to analyze the proposed Midway acquisition for the KLM representatives on the Northwest Board. (PX 22; Roseboom Dep. 50, 51, 57–58; Tr. (Steenland) 3883). The term sheet included the board approval condition. (PX 22; PX 245, p. 2).

217. Roseboom met with Steenland on October 25 during a visit to Minneapolis, and was told by Steenland that the Back–End transaction was "subject to due diligence and board approval." (Roseboom Dep. 89; PX 49 (10/25 entry); Tr. (Steenland) 4190).

218. Following her meetings in Minneapolis, Roseboom wrote in her memo to the KLM directors to whom she reported that "[t]he completion and consummation of Phase–2 [the Back–End transaction] is still

subject to due diligence and Board approval." (PX 82 at K497).

219. Similarly, Northwest included the board approval condition in the first draft of a purchase agreement which it circulated to Midway on October 21. (PX 43, ¶ 6.10).

220. The term sheet which Northwest sent to Midway on November 7 also provided that Northwest's obligations were subject to approval by Northwest's Board of Directors (PX 47, App. A, ¶ 16(ix)), as did the revised purchase agreement which Northwest sent to Midway on November 8. (PX 46, ¶ 6.10).

221. For the foregoing reasons, the Court finds that board approval was a valid condition precedent of the Back–End transaction which was never withdrawn, limited, or satisfied.

222. The Court finds that the execution of definitive documentation was a condition precedent of the Back–End transaction, and that this condition precedent was not satisfied. This finding is based on, *inter alia:* (1) the Confidentiality Agreement; (2) transactional custom; (3) the execution of definitive documentation with respect to the Gate Sale; (4) Midway's knowledge and acceptance of this condition precedent; and (5) the parties' post-hearing conduct.

223. It is undisputed that the parties never executed definitive documentation for the Back–End transaction.

224. Northwest's management, on Steenland's advice, decided to make definitive documentation an express condition of the Back–End transaction at the October 8 morning meeting in Dasburg's office. (Tr. (Steenland) 3801–02).

225. In order to protect themselves from the danger of a premature claim that they had entered into a binding contract, Northwest and Midway agreed that neither would have binding obligations to the other prior to the execution of definitive documentation. (PX 35, ¶ 7).

226. The requirement of an executed definitive agreement was implemented by the parties' July 1991 Confidentiality Agreement. *Id.* It was also a condition precedent to the Back–End transaction.

227. Northwest and Midway agreed in Paragraph 7 of the Confidentiality Agreement they executed in July 1991 (PX 35) that they would not be bound to any sales agreement or obligated to the other prior to the execution and delivery of definitive documentation. They also agreed in Paragraph 7 of the Confidentiality Agreement to waive all claims, including claims for breach of contract, unless and until a definitive document had been executed. That same paragraph also expressly provided that a verbal acceptance did not satisfy the requirement of a written definitive agreement:

> You also understand and agree that *no contract or agreement concerning the possible transaction shall be deemed to exist between you and the Company unless and until a definitive agreement has been executed and delivered, and we and you hereby waive, in advance, any claims (including without limitation, breach of contract) in connection with the transaction unless and until we and you shall have entered into, executed and delivered a definitive agreement between the Company and you. In the absence of such definitive agreement being executed and delivered, neither you nor the Company has any legal obligation of any kind whatsoever with respect to any such transaction by virtue of this Agreement or any other written or oral expression* with respect to such transaction except, in the case of this Agreement, for the matters specifically agreed to herein. For purposes of this paragraph, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement, nor does it include any other preliminary written agreement, nor does it include any written or verbal acceptance of an offer on our part. . . . *Neither this paragraph nor any other provision in this Agreement can be waived or amended except by written consent of the Company which consent shall specifically refer to this paragraph (or such other provision) and explicitly make such waiver or amendment.*

(PX 35, ¶ 7, emphasis supplied).

228. The Confidentiality Agreement was prepared by First Boston to protect Midway

from being accidentally or prematurely bound to agreements. (Koeneke Dep. 133, 21–22).

229. Steenland reviewed the draft Confidentiality Agreement, suggested one minor change (PX 35, ¶ 2), and executed it on behalf of Northwest. (Tr. (Steenland) 3755, 3757; DX 501). In doing so, Steenland understood that Paragraph 7 was "an attempt by Midway to make absolutely crystal clear and to leave no possible ambiguity that unless definitive documents had, in fact, been executed, that there would be no agreement between the parties with respect to the transaction that was being considered between them." (Tr. (Steenland) 3757–58).

230. There is no dispute that the Confidentiality Agreement was never expressly waived or amended. *See Midway v. Northwest,* 1993 WL 65673 at *2.

231. By its own terms, the provisions of the Confidentiality Agreement could only be waived or amended by a writing that "shall specifically refer" to Paragraph 7 of the Confidentiality Agreement and that explicitly stated the waiver or amendment. (PX 35, ¶ 7). The Court finds that no such writing exists.

232. Events occurring after the termination of the parties' negotiations also confirm that the Confidentiality Agreement remained in full force and effect. On November 18, 1991, five days after it ceased operations, Midway filed a motion for a temporary restraining order and preliminary injunction against Northwest. Midway claimed this relief was necessary, in part, to prevent "Northwest from utilizing any proprietary or other confidential data or trade secrets or any other information to its advantage that it obtained through the course of negotiations with Debtors for the acquisition of Debtor's assets...." (Motion for a Temporary Restraining Order and Preliminary Injunction, p. 2). On November 18, this Court entered a temporary restraining order, agreed to by both Midway and Northwest, which provided, among other things, that "Northwest shall abide by the July 30, 1991 Confidentiality Agreement it has with Debtors." (Order of 11/18/91, p. 2).

233. On November 21, counsel for Northwest wrote to counsel for Midway, suggesting that the Confidentiality Agreement was inoperative with respect to certain information Midway had communicated to the DOT. (DX 569).

234. Rather than claiming that the Confidentiality Agreement was moot or inoperative in any way, counsel for Midway asserted the continued effectiveness of the Confidentiality Agreement in Midway's November 22 response to Northwest:

> On November 21, 1991, you suggested that Northwest is free to refer to data despite the Confidentiality Agreement. Midway does not agree with your position. *The Confidentiality Agreement speaks for itself,* and any actions of Northwest regarding the use of Midway data are undertaken at Northwest's peril.

(DX 448, emphasis supplied).

235. On November 26, this Court vacated portions of the November 18 temporary restraining order, but reaffirmed the viability of the Confidentiality Agreement, stating: "Nothing herein shall relieve Northwest or the Debtors of their contractual duties under the Confidentiality Agreement." (Order of 11/26/91).

236. The Court reaffirms its previous finding that the Confidentiality Agreement is a valid and binding agreement of the parties which has not been waived.

237. Based on transactional or business custom and the execution of definitive documentation for the Gate Sale, this Court finds that execution of definitive documentation was a condition to Northwest's obligation to close the Back–End transaction and this condition was not satisfied as of the October 8 hearing.

238. A definitive documentation condition is customary in large asset acquisitions, such as the Gate Sale and the Back–End transaction. (Tr. (Steenland) 3766, 3758, 3801–02; (Cronin) 2072; (Burgess) 1018–19). The purpose of this condition is to make sure that the parties have a full and complete meeting of the minds and are agreeing to the same things, and to clarify that they do not intend to be bound to a transaction until documents

are signed. (Tr. (Steenland) 3766; (Cronin) 2072).

239. In keeping with the usual practice for large corporate acquisitions, Midway and Northwest made definitive documentation an express condition to their obligations in the Letter of Intent. (PX 4, ¶ 5(a)).

240. The parties executed a definitive agreement for the Gate Sale (PX 19), which suggests that the parties knew how to execute definitive documentation.

241. The Court finds that Midway knew of, understood, and accepted that the execution of definitive documentation was a condition precedent to formation of a binding and enforceable agreement with respect to the Back–End transaction.

242. Northwest communicated its definitive documentation condition in Cronin's call to Midway on the morning of October 8, and Jenkins immediately reported to Midway's Board, as reflected in the minutes of Midway's October 8 board meeting (DX 98/677, p. 4), that "Mr. Cronin stated that Northwest needed to do more [due] diligence, get Board approval and document the second part of the transaction."

243. During the first recess meeting, Steenland, in restating Northwest's Back–End offer, specifically said that it was subject to the execution of definitive documentation. (Tr. (Steenland) 3808; (Burgess) 1018). Midway did not ask any questions about the definitive documentation condition during the recess meeting. (Tr. (Steenland) 3809).

244. In Hanson's summary to the Court of Midway's understanding of the Northwest proposal, Hanson stated on the record that Northwest's Back–End proposal was "subject to reaching agreement on documentation...." (PX 13, p. 42).

245. Burgess repeatedly testified that Midway understood and accepted Northwest's definitive documentation condition. (Tr. (Burgess) 1018–19).

246. Similarly, in explaining the concept of "natural extensions" referred to in Midway's October 25 letter (PX 44B), Burgess testified:

In this instance, what the parties had agreed to is reflected in what happened on October 8th, but we didn't yet have a definitive agreement. *I think that is expected by everyone because that was, in fact, one of Northwest's own stated conditions to closing a transaction. We needed to negotiate a definitive agreement. And frankly, if anybody would have asked me, I would have said that would be one of my conditions too.* If you are not going to close on a handshake or close on letter of intent or close on an oral understanding and sometimes you might if you are selling an automobile, and all you have got to do is transfer the title. But here we are dealing with the purchase of a business.

(Tr. (Burgess) 1262–63, emphasis supplied).

247. Burgess also testified:

Q: At that time [October 25] what was your understanding if any as to whether Midway and Northwest had to complete negotiations on documentation before they could close the second phase of the acquisition?

A: We were still in the phase of not having arrived at a definitive agreement that was capable of being signed.

Q: *Was it your understanding that you had to reach a definitive agreement before you could close the second phase of the acquisition?*

A: *That was the understanding from October 8th. I don't think there's—we ever debated or disputed that.*

(Tr. (Burgess) 1290, emphasis supplied).

248. Finally, in response to being asked why Midway did not accept Northwest's November 7 letter and attached term sheet, Burgess testified that the letter and term sheet were not capable of being accepted because the parties did not have a final definitive agreement that dealt with all of the open issues. (Tr. (Burgess) 1282). As he later testified concerning the importance of a written definitive agreement, "until you reach a definitive agreement, you don't know what you got." (Tr. (Burgess) 1313–14).

249. The Court finds that the parties' post-hearing conduct further shows that agreement on definitive documentation was a

condition precedent to their obligation to consummate the Back–End transaction, and that this condition was never satisfied.

250. Between October 8 and October 11, the parties negotiated over the language of Section 5.7 of the Gate Sale Agreement, which set forth the parties' understandings with respect to the Back–End transaction. The result of these negotiations was to add a reference to definitive agreements in Section 5.7 in order to make clear that the consummation of the Back–End transaction was contingent upon the execution of definitive documentation. (*Compare* PX 612, ¶ 5.7 with PX 19, ¶ 5.7; Hibbs Dep. 128–29; Tr. (Steenland) 3860). As William Hibbs (Northwest's outside corporate counsel) testified:

Q: As one of the drafters, what was the purpose of adding the language, a 'definitive agreement,' to that sentence?

A: Well, I think it was incorporated in there to make it real clear to the parties, and everyone was agreeable, [be]cause we signed this agreement, that the so-called back end of the deal would be subject to the definitive acquisition agreement, much as the gates front end part of the deal was the subject of the definitive agreement; ...

(Hibbs Dep. 128–29).

251. The term sheets which Midway prepared also demonstrate that definitive documentation was a closing condition. Definitive documentation is listed as a closing condition in First Boston's October 16 (DX 12) and Midway's October 24 term sheets. (DX 251).

252. The term sheet prepared by Northwest after the court hearing (PX 245) also includes definitive documentation among the conditions to the Back–End transaction.

253. Based on the above Findings of Fact, the Court finds that Northwest's Back–End transaction was subject to the condition precedent of the execution of definitive documentation. As the parties do not dispute that they did not execute definitive documentation regarding the Back–End transaction, this condition precedent was necessarily never satisfied.

254. The Court finds that due diligence was a condition precedent of Northwest's Back–End offer, and that the condition was never satisfied nor waived, and that Midway knew this. This finding is based on, *inter alia:* (1) the events leading up to the October 8 hearing; (2) the October 8 hearing itself, including the meeting held during the recess; (3) the parties' post-hearing conduct; and (4) Northwest's performance of extensive due diligence with respect to the Gate Sale.

255. In order to ensure that they made a well-informed decision regarding Midway's non-gate assets, Northwest insisted on conducting satisfactory due diligence as a condition precedent to contract formation.

256. At the meeting in Dasburg's office on the morning of October 8, Dasburg specifically instructed Steenland and Cronin to be certain to make due diligence a condition to Northwest's Back–End offer at the court hearing. (Tr. (Steenland) 3798–3801; Dasburg Dep. 232–33, 224–25, 309–10; Tr. (Cronin) 2095–96, 2365–66). Dasburg not only instructed Cronin and Steenland on the morning of the hearing to make Northwest's right to conduct due diligence a condition of the Back–End transaction, (Tr. (Steenland) 3798–3801; Dasburg Dep. 232–33, 224–25, 309–10; Tr. (Cronin) 2095–96, 2365–66), but he even told Steenland to confirm at the end of the hearing that due diligence was made a condition, which Steenland did. (Dasburg Dep. 95, 232, 311; Tr. (Steenland) 3847).

257. Midway's representatives admit that they understood from Parkins' statement on the record on October 8, that the Back–End transaction was subject to a due diligence condition. (Tr. (Altschul) 3589–90; Jenkins Dep. 41). They also knew that "due diligence" is a short-hand term for a fact-finding investigation of data about a company which is the subject of a possible acquisition. (Tr. (Henneman) 4295; (Burgess) 1019–20).

258. The events leading up to the October 8 hearing show that Northwest intended to impose a due diligence condition on the proposed Back–End transaction, and that Midway knew this.

259. For example, Northwest's management assured Northwest's Board of Di-

rectors during the October 7 board meeting that Northwest would conduct extensive due diligence prior to coming back to the Board for approval of the transaction. (Dasburg Dep. 83–84, 91, 94; Van Wijk Dep. 47, 76).

260. Northwest communicated the due diligence condition to Midway prior to the hearing. Cronin told Midway that due diligence was a condition of the Back–End transaction in his telephone conversation with Midway's representatives at approximately 11:00 a.m. on the morning of October 8. (Tr. (Cronin) 2096–98, 2293; Jenkins Dep. 39–40, 112–34; DX 9/PX 671 at FB81).

261. Jenkins promptly relayed the due diligence condition in his presentation to Midway's Board. (DX 98/PX 677, p. 4; Tr. (Hinson) 233; Jenkins Dep. 137–38; (Tr. (Altschul) 3588–89; (Burgess) 978; Schick Dep. 176–77).

262. Dasburg spoke with Hinson by telephone on the morning of October 8 concerning the Back–End transaction. (Tr. (Hinson) 221; DX 98, p. 3).

263. Hinson then reported to Midway's Board that due diligence was a condition of Northwest's Back–End offer. (Tr. (Hanson) 619; DX 98, p. 3).

264. The October 8 hearing, including the Court's Findings and the parties' statements both in court and during the recess, further demonstrates that due diligence was a condition precedent which was not satisfied as of October 8 and that Midway knew this.

265. This Court has previously recognized that Northwest's counsel, at the October 8 hearing, "stated that the Back–End Purchase was subject to the conditions of board approval and due diligence." *See Midway v. Northwest*, 1993 WL 65673 at \*2–3. That finding was based on Parkins' statement on the record that:

> Now, relative to the second or what has come to be known as the back-end portion of the Northwest transaction, *conditions will be* board approval, *due diligence* . . . .

(PX 13, p. 20, emphasis supplied).

266. Parkins' statement regarding the due diligence condition is recorded in the notes taken by Jenkins of First Boston dur-

ing the hearing (DX 9/PX 671 at FB80), as well as in those taken by Burgess (PX 726).

267. Northwest did not make any statement on the record or elsewhere that it had withdrawn, modified, or limited its due diligence condition. Northwest did not do so even when instructed by the Court after the recess meeting to state any changes to Northwest's offer. (PX 13, pp. 49–50).

268. Steenland restated Northwest's due diligence condition during the first recess. (Tr. (Steenland) 3806–08).

269. Midway contends that Northwest agreed at the recess to forego its due diligence, limit its scope, or limit its remedy in the event of adverse due diligence findings. The Court finds to the contrary.

270. During the recess meeting, Cronin declined Midway's requests to limit the scope of its due diligence or its remedies. Cronin explained that while Northwest did not anticipate discovering problems, it was not in a position to withdraw or limit its due diligence condition and needed flexibility because of the speed with which the transaction had come together. (Tr. (Cronin) 2104–05, 2107, 2112; (Steenland) 3816–18; (Burgess) 1020–21; Jenkins Dep. 208–09; Parkins Dep. 160–61; Steenland Dep. 113–14, 324, 326). Cronin also explained that Northwest had done little due diligence on Midway as a going concern, and could not forego the due diligence simply because of Midway's financial crisis or the competing Southwest offer. (Tr. (Steenland) 3817; (Cronin) 2104–05). After Cronin rejected Midway's requests, Midway asked no further questions about the due diligence condition. (Tr. (Steenland) 3818; Parkins Dep. 160–61).

271. The Court finds that the record after the recess confirms that due diligence remained a condition to the Back–End transaction. Burgess and Hanson testified that it was important to them to memorialize what occurred at the recess on the record, and Hanson testified that he consciously tried to set forth on the record the events that had transpired during the recess and elsewhere, because he knew that what was said on the record governed. (Tr. (Hanson) 485–86, 490, 622; (Burgess) 1021).

272. Hanson never stated on the record that Northwest had agreed to withdraw, modify, or limit its due diligence condition, and Burgess did not suggest to Hanson that he state on the record that Northwest had done so. (PX 13; Tr. (Burgess) 1025).

273. Midway acknowledges that Northwest never limited its due diligence rights on the record. (PX 13; Tr. (Burgess) 1023–24).

274. The Court finds that the parties' conduct after the October 8 hearing demonstrates that Midway knew due diligence remained a condition precedent to Northwest's obligation to close, and that Midway knew that condition had not been satisfied.

275. There is no evidence that Northwest withdrew its due diligence condition after October 8. (Tr. (Henneman) 4320). In fact, Midway's October 16 and 24 term sheets list due diligence, without qualification as to scope or remedy, as a condition to the Back–End transaction, demonstrating that Midway recognized that due diligence remained a condition. (DX 12; DX 251).

276. Midway's counsel called Steenland on October 22 to raise the important points from Northwest's October 21 draft (PX 43) with which Midway disagreed (Tr. (Hanson) 551–53; (Burgess) 1040, 1049–50; (Steenland) 3897–98; DX 100). Section 6.9 of that draft included Northwest's completion of "a due diligence review of Sellers and of the Purchased Assets ..., [with] results ... reasonably satisfactory" to Northwest as a condition to Northwest's obligation to close the Back–End transaction. However, despite the opportunity to do so, Midway's attorneys did not tell Steenland during that conversation that they believed that due diligence was not a condition, that it was not an "out" or "walk right," or that it was limited, based on the events of October 8. (Tr. (Steenland) 3908; (Burgess) 1041).

277. Section 6.9 also makes clear that Northwest's right to conduct due diligence extended to a review of "Sellers [Midway]" as well as of "the Purchased Assets." (PX 43). Burgess understood that Section 6.9 gave Northwest the unilateral right to refuse to close, if the results of the due diligence review of Midway or its assets were not

reasonably satisfactory to it. (Tr. (Burgess) 1039–40, 1044).

278. Although Midway made numerous modifications to Northwest's draft in Midway's October 25 mark-up, including minor word and punctuation changes (*e.g.,* PX 44A, pp. 5, 12, 22, 23, 25, 27, 29, 36, 37, 38, 40), Midway did not delete or change the due diligence condition (Section 6.9) or even note that the condition was limited in any way. (PX 44A, p. 35; Tr. (Burgess) 1043–44). The significance of this fact is highlighted by Burgess' testimony concerning how he typically responds during negotiations to a draft submitted by the other side of a transaction:

> What I'm saying is you typically respond to a document and mark it up in specifics to communicate the things you want to change and that you have problems with, and by implication, *the things you don't mark up and don't change you are presumably agreeing with....*

(Tr. (Burgess) 1314, emphasis supplied).

279. The Court finds that Midway knew it had agreed on October 8 to the unlimited due diligence closing condition stated by Northwest on October 8 and reflected in Section 6.9, and did not attempt to formally change this despite several opportunities to do so.

280. The Court finds that Northwest's post-hearing conduct also shows that due diligence was a condition of the Back–End transaction.

281. For example, Steenland promptly confirmed to Dasburg at the end of the hearing on October 8 that Northwest's offer was subject to due diligence. (Dasburg Dep. 95, 232, 311; Tr. (Steenland) 3847).

282. In addition, Northwest advised its lenders on October 9 that the Back–End transaction with Midway was subject to due diligence (DX 430/PX 130, p. 1); included the condition in its internal term sheet (PX 245), which it sent to KLM on October 18 (PX 22; Roseboom Dep. 50, 51, 57–58; Tr. (Steenland) 3883); informed Roseboom of KLM on October 24 that due diligence was a condition to the Back–End transaction (Roseboom Dep. 89); and set forth the condition in its October 21 draft agreement (PX 43, ¶ 6.9), its

November 7 term sheet (PX 47, App. A, ¶ 16), and its November 8 draft definitive agreement (PX 46, ¶ 6.9).

283. The parties' agreement to the due diligence condition was also manifested by Northwest's performance of extensive due diligence with respect to the Gate Sale Agreement, with Midway's knowledge and assistance, just as Midway had expected. (Schick Dep. 210–16; Tr. (Burgess) 1026).

284. Midway never questioned Northwest's reasons for doing due diligence or its right to conduct the due diligence review. (Tr. (Steenland) 3945–46). Even when Cronin raised Northwest's troubling due diligence findings at the October 30 meeting, the Midway representatives did not question Northwest's right to conduct a due diligence review of Midway's operations or otherwise suggest that Northwest had waived or limited its due diligence condition on October 8. (Tr. (Cronin) 2175; (Burgess) 1139; (Steenland) 3945–46).

285. Likewise, the Court finds that there is no evidence that Hinson or Schick asserted that due diligence was not a condition after Dasburg identified Northwest's due diligence problems during their November 6 and 7 telephone conversations and in Northwest's November 7 letter.

286. For the foregoing reasons, the Court finds that due diligence was a condition precedent of the Back–End transaction which was never satisfied nor waived, and that Midway knew this to be so.

287. Nevertheless, Midway has contended that even if the Back–End transaction was subject to conditions precedent on October 8 that were not yet satisfied, Northwest subsequently waived those conditions, or at least ratified a Back–End agreement with Midway that was not subject to the conditions, by working on the integration of the two airlines and issuing press releases and other communications about the Back–End transaction after October 8 which did not refer to the conditions.

288. The Court finds that Northwest did not expressly waive any of its conditions, did not impliedly waive any of the conditions by its conduct, and did not ratify any agreement

for the Back–End transaction that was not subject to these conditions.

289. The Court further finds that Midway did not reasonably rely on the conduct which it claims constituted the waiver and ratification by Northwest.

290. Northwest stated the conditions in Cronin's conversation with Jenkins the morning of October 8. (Tr. (Cronin) 2096–98, 2293; Jenkins Dep. 39–40, 112–34; DX 9 at FB81). It stated them again in open court on October 8. (PX 13, p. 20). Midway presented no evidence that Northwest expressly waived or withdrew the conditions in court on October 8, and the transcript of the hearing (PX 13) reflects that Northwest did not do so.

291. The Court finds that Midway did not present any evidence that Northwest expressly waived the conditions at any other time, and the evidence fails to support an assertion to the contrary. Nor is there any evidence that the Northwest Board ratified any agreement with Midway after October 8. Similarly, the Court finds that Midway did not present any evidence that Northwest ever communicated to Midway—or anyone else—that Northwest intended to withdraw or waive the conditions, or ratify an agreement without the conditions.

292. The Court finds that the record reflects that the conditions were crucial components of the Back–End transaction which Northwest did not intend to waive. Rather than relinquishing its rights, Northwest continuously and consistently manifested its intention to preserve the conditions as precedent to and as fundamental components of the Back–End transaction. To illustrate:

● Northwest listed the conditions in the description of the October 8 Back–End offer sent to its lead banker at Bankers Trust on October 9 (DX 430);

● Northwest negotiated, between October 9 and October 11, an addition to Section 5.7 in the form of a reference to the definitive agreement condition (Tr. (Steenland) 3860–62; (Henneman) 4290–92; (Burgess) 1099; Hibbs Dep. 125–29) as well as an obligation that the negotiations for the Back–End transaction were

to be consistent with the representations made to the Court on October 8, which included the conditions at issue;

- Northwest listed the conditions in its internal term sheet (PX 245), which was sent to KLM's analyst on October 18 (Roseboom Dep. 57–58);

- Northwest prepared a draft definitive agreement (PX 43) which included the conditions, and sent that draft to Midway on October 21 (PX 43, ¶¶ 6.9, 6.10; Tr. (Steenland) 3896–97);

- Northwest conducted extensive due diligence with Midway's knowledge and participation after October 8 (Tr. (Steenland) 3874–75, 3877–80; (Fornaro) 3026–29; (Garel) 3490–96; DX 523; PX 182);

- Northwest reiterated the due diligence condition at the October 30 negotiating meeting with Midway (Tr. (Cronin) 2166–68; (Steenland) 3940–41, 3945);

- Northwest presented the Midway transaction for consideration by Northwest's Board on November 5 and November 12 in accordance with the board approval condition (PX 50; PX 29; PX 33);

- Northwest referred to the conditions in its November 7 letter to Midway and listed the conditions in the term sheet attached thereto (PX 47, App., ¶ 16); and

- Northwest listed the conditions in the November 8 draft purchase agreement that it sent to Midway. (PX 46, ¶¶ 6.9, 6.10).

This conduct rebuts any suggestion that Northwest, by its post-hearing conduct, intended to relinquish the rights that the conditions precedent afforded it, or that it ratified an agreement that was not subject to conditions.

293. Moreover, Midway's waiver and ratification theories are completely refuted by Midway's own documents. Both Jenkins' October 16 term sheet (DX 12) and Midway's October 24 term sheet (DX 251) were prepared after the Northwest press releases were issued and the integration efforts were well under way (Tr. (Hinson) 227–28), yet both term sheets list all of Northwest's conditions. Midway's representatives and officers admitted that these term sheets accurately listed the conditions of Northwest's offer that had to be satisfied. (Tr. (Hinson) 233; Schick Dep. 183–84; DX 185; Tr. (Hanson) 1354–55; Koeneke Dep. 87–88).

294. The Court finds that notwithstanding Northwest's publicity program and the integration efforts, Midway knew that the conditions remained. This same evidence (¶ 293 above) also establishes that Midway did not reasonably rely on the conduct which it claims constituted a waiver or ratification.

295. In sum, the Court finds that the record fails to support and actually refutes Midway's claim that Northwest knowingly and intentionally relinquished its right to exercise the conditions to the Back–End transaction or ratified an agreement that was not subject to the conditions.

296. Midway further contends that Northwest's integration efforts after the October 8 hearing constituted an implied waiver.

297. The Court finds, however, that the evidence of Northwest's continuing assertion of the conditions after October 8, and Midway's own recognition of the continuing existence of those conditions, refute Midway's assertion of implied waiver.

298. The Court further finds that Northwest's integration efforts were not inconsistent with its continuing reliance on the conditions.

299. Northwest and Midway both understood that integrating Midway into Northwest would be an enormous undertaking. (Tr. (Gallo) 1901; (Steenland) 3875). As Midway knew, because Northwest was interested in Midway solely as a going concern (Tr. (Burgess) 879; (Henneman) 4287–88; (Hinson) 252–56; (Steenland) 3768, 3800–02, 3817; (Gallo) 1895–96), it was essential to Northwest that the integration occur as quickly as possible, and that it be "seamless." (Tr. (Gallo) 1830–31, 1896; (Steenland) 3875–77, 4180–81).

300. Moreover, Midway knew that Northwest was not waiving its rights by beginning the integration process even though the parties still had to negotiate the Back–End transaction. During Cronin's conference call with Midway's representatives on the morn-

ing of October 8, Cronin and Midway agreed that Northwest would work on integrating the two airlines even before the Back–End transaction closed, because doing so would have a positive impact on the public perception of Midway and would help preserve the viability of Midway's business. (Jenkins Dep. 120). Hinson also understood that Northwest intended to immediately commence integration efforts. (Tr. (Hinson) 245–46, 248).

301. The Court finds that Northwest's conduct in the integration effort was fully consistent with its desire to protect the value of Midway as a going concern by avoiding a shut-down of operations before the parties had the opportunity to consummate a Back–End transaction.

302. The Court finds that Northwest's integration activities do not constitute an unequivocal and decisive act that evidences an intentional relinquishment of Northwest's right to exercise the conditions set forth in Northwest's proposal as presented to the Court on October 8.

303. Mark Abels (a member of Northwest's public relations staff) caused two press releases to be issued on October 8, one before the hearing and one after. (PX 66; PX 55; Abels Dep. 18–19, 37). The press release issued after the hearing (PX 55) did not include a discussion of the conditions precedent to the Back–End transaction. Midway contends that this omission constitutes a waiver of those conditions and an agreement by Northwest to be bound to the Back–End transaction.

304. The Court finds, based on the following facts, that the issuance of the press releases absent the conditions precedent did not waive those conditions.

305. As part of the integration effort, Northwest sought to reassure Midway customers and employees about the future of the airline. Because Northwest was interested in Midway only as a going concern, both Northwest and Midway knew that it was important to generate publicity concerning their proposed transaction to stem any negative public perception of Midway caused by its bankruptcy, and to reassure the public

and Midway's employees that Midway would not shut down. (Tr. (Hinson) 245, 248; (Burgess) 970–71; Leonard Dep. 137, 160–61; Tr. (Steenland) 4179–80; Clouser Dep. 66–67; Tr. (Gallo) 2002). To that end, the two aforementioned press releases were issued by Northwest.

306. Abels was a public relations employee of Northwest. Abels was not an attorney. (Abels Dep. 6, 9, 17–18). He did not present the press releases to Steenland, Parkins, or Hibbs, the counsel for Northwest at the October 8 hearing, for review before issuing them. They (as well as Cronin) first saw the contents of the press release (PX 55) concerning the events at the October 8 hearing only after it had been transmitted to the press. (Tr. (Steenland) 3849–50; Parkins Dep. 116–18; Hibbs Dep. 117–18; Tr. (Cronin) 2127–28, 2325).

307. The Court finds that under these circumstances, Abels was not purporting to act on behalf of Northwest to relinquish the rights Northwest had reserved in Court.

308. Moreover, the Court finds that Midway could not reasonably believe that a press release, issued only moments after the hearing, was intended to communicate an off-the-record change in the position Northwest had just stated on the record to the Court.

309. Finally, Midway claims that Northwest waived the conditions by Northwest's communications about the proposed Back–End transaction to employees of both Midway and Northwest.

310. Northwest intended to hire Midway's employees, and therefore needed to integrate the Midway and Northwest work forces. (Abels Dep. 79–80). Because employee involvement was essential to making the integration effort work, both Northwest and Midway repeatedly acknowledged the importance of allaying the concerns of both sets of employees and trying to maintain their morale. (Leonard Dep. 137, 143; Tr. (Burgess) 970–71; (Steenland) 4189; Steenland Dep. 354; Abels Dep. 88–90). Northwest's communication of optimism about the Midway transaction to the affected employees does not show that Northwest intention-

ally waived its rights or ratified a contract without the three conditions.

311. The Court finds that Northwest's integration efforts, press releases, advertisements, and communications to Midway and Northwest employees were fully consistent with Northwest's desire to protect Midway's value as a going concern.

312. The Court finds that Northwest's conduct does not constitute an unequivocal and decisive act that evidences an intentional relinquishment of Northwest's right to stand on the conditions precedent, particularly in light of Northwest's repeated and express assertions of the conditions.

313. As a second affirmative defense, Northwest asserts that Paragraph 7 of the July 1991 Confidentiality Agreement by its terms bars Midway's claim for breach of contract.

314. Paragraph 7 of the Confidentiality Agreement states:

You [Northwest] also understand and agree that no contract or agreement concerning the possible transaction shall be deemed to exist between you and the Company [Midway] unless and until a definitive agreement has been executed and delivered, and *we and you hereby waive, in advance, any claims (including without limitation, breach of contract) in connection with the transaction unless and until we and you shall have entered into, executed and delivered a definitive agreement between the Company and you.* In the absence of such definitive agreement being executed and delivered, neither you nor the Company has any legal obligation of any kind whatsoever with respect to any such transaction by virtue of this Agreement or any other written or oral expression with respect to such transaction except, in the case of this Agreement, for the matters specifically agreed to herein. For purposes of this paragraph, the term "definitive agreement" does not include an executed letter of intent or any other preliminary written agreement, nor does it include any other preliminary written agreement, nor does it include any written or verbal acceptance of an offer on our part.... Neither this paragraph nor any

other provision in this Agreement can be waived or amended except by written consent of the Company which consent shall specifically refer to this paragraph (or such other provision) and explicitly make such waiver or amendment.

(PX 35, ¶ 7, emphasis supplied).

315. Paragraph 7 references only "the transaction." The Confidentiality Agreement does not define the term "the transaction."

316. The Court finds that the parties proffered no testimony regarding the meaning of the term "transaction."

317. While no definite documentation was entered into or executed regarding the Back–End transaction, definitive documentation was entered into and executed with respect to the Gate Sale. (PX 19).

318. Paragraph 7 does not distinguish between the Gate Sale and the Back–End transaction.

319. Midway contends that the merger clause in Section 11.5 of the Gate Sale Agreement (PX 19) superseded the Confidentiality Agreement.

320. The merger clause provides that the Gate Sale Agreement constituted "a complete statement of the entire agreement and understanding between the parties with respect to the subject matter hereof and thereof and supersede all prior statements, representations, discussion, agreements, draft agreements and undertakings, whether written or oral, express or implied, of any and every nature with respect thereto...." (PX 19, § 11.5).

321. The principal subject matter of and the assets sold under the Gate Sale Agreement were Midway's gates at Midway airport. Section 2.1 of the Gate Sale Agreement (PX 19), titled "Purchase and Sale of Assets," lists the assets to be bought and sold under the Gate Sale Agreement. The "Purchased Assets" are defined to include Midway's leasehold interest in the Midway Airport gates, and certain fixtures, contracts, permits, licenses, and documents related directly to the use and operation of the gates.

Midway's other non-gate assets are not included in this definition.

322. There was a transaction that emanated out of the exchange of confidential information from Midway to Northwest, namely, the Gate Sale Agreement, which was not only entered into, but also closed and consummated.

323. The Court finds that Section 11.5 of the Gate Sale Agreement does not supersede the Confidentiality Agreement.

324. Northwest asserts as its final affirmative defense that Midway repudiated an agreement reached on October 8 during the ensuing negotiations for the Back–End transaction by insisting on terms materially different than those contained in Northwest's Back–End offer, which Midway claims it accepted.

325. The Court finds that the record, including the documentary evidence submitted, the testimony of the witnesses, and Northwest's proposed findings of fact and conclusions of law, is devoid of any such allegation.

## CONCLUSIONS OF LAW

1. The substantive law of the State of Illinois governs the issues in this lawsuit.

2. In Illinois, " 'a party seeking to enforce an agreement has the burden of establishing the existence of the agreement.' " *Bower v. Jones,* 978 F.2d 1004, 1013 (7th Cir.1992) (quoting *Commonwealth Edison Co. v. Industrial Comm'n,* 167 Ill.App.3d 229, 233, 118 Ill.Dec. 91, 93, 521 N.E.2d 159, 161 (3d Dist.1988)).

3. "Under a contract theory, the plaintiffs carry the burden to prove all elements of a contract...." *Johnson v. Johnson,* 244 Ill. App.3d 518, 527, 185 Ill.Dec. 214, 221, 614 N.E.2d 348, 355 (1st Dist.1993).

4. It is not compelling that the parties share a subjective understanding as to the terms of a contract; the parties' conduct must indicate an agreement to the terms of same. *Steinberg v. Chicago Medical Sch.,* 69 Ill.2d 320, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977).

5. In order to establish a claim for breach of contract, Midway must prove by a prepon-

derance of the evidence that: (1) Midway and Northwest entered into a binding contract; (2) Midway performed its obligations under the contract; (3) Northwest breached its obligations under the contract; and (4) Midway suffered damages as a proximate result of the breach. *Mannion v. Stallings & Co.,* 204 Ill.App.3d 179, 186, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1st Dist.1990); *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.,* 818 F.Supp. 1152, 1155 (N.D.Ill.1993). *Accord Penzell v. Taylor,* 219 Ill.App.3d 680, 688, 162 Ill.Dec. 142, 147, 579 N.E.2d 956, 961 (1st Dist.), *appeal denied,* 142 Ill.2d 656, 164 Ill.Dec. 919, 584 N.E.2d 131 (1991); *see also Valenti v. Qualex, Inc.,* 970 F.2d 363, 366 (7th Cir.1992) (citing *Penzell* ).

6. Based on the Findings of Fact as set forth above, the Court concludes that Midway has failed to prove that the parties intended to or did enter into a valid, binding, and enforceable contract; in other words, Midway failed to prove that a binding and enforceable contract ever existed with respect to the purchase and sale of Midway's non-gate assets.

7. The Court concludes that Midway has not met its burden of proving each of these elements by a preponderance of the evidence. Therefore, Midway has failed to prove that Northwest breached a binding and enforceable agreement for the purchase and sale of Midway's non-gate assets under the proposed Back–End transaction.

8. The Court concludes that Midway failed to prove by a preponderance of the evidence the existence of an enforceable contract for a second and independent reason: there was no meeting of the minds on material business terms.

9. To create an enforceable contract, the parties must have agreed on all essential terms and conditions of an agreement. *Magid Mfg. Co. v. U.S.D. Corp.,* 654 F.Supp. 325, 332 (N.D.Ill.1987). In other words, "it is essential that the parties to the agreement have a meeting of the minds, and that they truly assent to the same things in the same sense on all of [the agreement's] essential terms and conditions." *LaSalle Nat'l Bank*

*v. International, Ltd.,* 129 Ill.App.2d 381, 394, 263 N.E.2d 506, 513 (2d Dist.1970).

■ 10. What is required to establish a "meeting of the minds" is "a common definite meeting of intent of two parties in selecting or accepting ... those items essential to a complete contract as their contract.... It must be shown that those parties selected and concurred in the terms of contract...." *Mannion,* 204 Ill.App.3d at 187, 149 Ill.Dec. at 442, 561 N.E.2d at 1138 (quoting *Richton v. Farina,* 14 Ill.App.3d 697, 704, 303 N.E.2d 218, 223 (1st Dist.1973)). A literal meeting of the minds, however, is not required for an enforceable contract. *Colfax Envelope Corp. v. Local No. 458–3M, Chicago Graphic Communications Int'l Union,* 20 F.3d 750, 752 (7th Cir.1994).

11. For there to be an enforceable contract for the Back–End transaction, Midway and Northwest must have had a meeting of the minds with respect to the terms of the contract, and they must have intended to be bound. *Academy Chicago Publishers v. Cheever,* 144 Ill.2d 24, 30, 161 Ill.Dec. 335, 338, 578 N.E.2d 981, 984 (1991); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 118 Ill.2d 306, 313, 113 Ill.Dec. 252, 256, 515 N.E.2d 61, 65 (1987). Midway has failed to prove either point.

12. Under Illinois law, the intent of the parties governs the question of whether an enforceable contract exists. *Bercoon,* 818 F.Supp. at 1155; *Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 288, 152 Ill.Dec. 308, 312, 565 N.E.2d 990, 994 (1990).

13. In determining the intent of the parties, the Court focuses on the parties' objective manifestations of intent and not on their subjective beliefs. *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 432 (7th Cir.1993) ("intent is an objective concept"); *Empro Mfg. Co. v. Ball–Co. Mfg., Inc.,* 870 F.2d 423, 425 (7th Cir.1989) (" 'intent' in contract law is objective rather than subjective"); *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 678 F.Supp. 193, 195 (N.D.Ill.1988) ("A determination of the 'intent of the parties' is, however, dependent not upon their subjective beliefs but upon

their objective manifestations of intention."), *aff'd,* 873 F.2d 155 (7th Cir.1989).

14. Because the parties in this case never fully reduced the Back–End transaction to an unambiguous writing, the Court must "look to all of the circumstances surrounding the negotiations, including the actions of the principals both during and after, to determine what the parties intended." *A/S Apothekernes,* 873 F.2d at 157. *See also David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.,* 897 F.2d 288, 292 (7th Cir.1990) (the parties' conduct and statements are relevant to the question of whether a binding contract ever came into existence); *Olympic Restaurant Corp. v. Bank of Wheaton,* 251 Ill.App.3d 594, 602, 190 Ill.Dec. 874, 880, 622 N.E.2d 904, 910 (2d Dist.1993) ("When seeking to determine the intent of the parties to a contract, courts may look to the acts or conduct of the parties.").

15. The Court concludes that the objective facts establish that Midway and Northwest did not intend, and did not agree, to be bound to a Back–End transaction on October 8. The objective facts further establish that Midway and Northwest agreed only to enter into good faith negotiations for the acquisition by Northwest of Midway's non-gate assets consistent with their representations to the Court on October 8.

16. The courts applying Illinois law have recognized a distinction between agreements to negotiate and agreements to purchase. *See, e.g., A/S Apothekernes,* 873 F.2d at 159; *Kemmerer v. John D. & Catherine T. MacArthur Found.,* 594 F.Supp. 121, 122 (N.D.Ill.1984); *Casati v. Aero Marine Management Co.,* 43 Ill.App.3d 1, 6, 1 Ill.Dec. 544, 548, 356 N.E.2d 826, 830 (1st Dist.1976). Where an offer "contemplates action or deliberations beyond acceptance in order to create a binding contract, it is an offer to negotiate rather than an offer to purchase." *Casati,* 43 Ill.App.3d at 6, 1 Ill.Dec. at 548, 356 N.E.2d at 830.

17. Where parties have entered into an agreement to negotiate, rather than an agreement to purchase, there is no duty to consummate the transaction. *See A/S Apothekernes,* 873 F.2d at 159 (duty to nego-

tiate for purchase of corporate assets "does not encompass an automatic duty to approve the final deal"); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223 (7th Cir.1988) (where agreement was to negotiate, both parties were free to walk away from the transaction); *Kemmerer*, 594 F.Supp. at 122 (where agreement was to negotiate, seller could properly reject buyer's offer and enter into deal with another party); 1 E. Allen Farnsworth, *Contracts* § 3.8a at 188 (1990) (where parties have agreed to negotiate, if "ultimate agreement is not reached, *the parties are not bound by any agreement*") (emphasis in original)); *Scott v. Assurance Co. of America*, 253 Ill.App.3d 813, 821, 192 Ill.Dec. 479, 485, 625 N.E.2d 439, 445 (4th Dist.1993) (Cook, J. dissenting) ("An agreement to agree in the future is not an agreement."), *appeal denied*, 155 Ill.2d 576, 198 Ill.Dec. 553, 633 N.E.2d 15 (1994).

18. "Illinois [law] permits parties to agree to negotiate, and to work toward some goal, without committing themselves to its achievement—or to pay damages if it is not achieved." *Murray v. Abt Assocs., Inc.*, 18 F.3d 1376, 1378 (7th Cir.1994).

19. The Court concludes that the parties' statements and conduct on and after October 8 show that the parties neither intended nor agreed to be bound to an enforceable agreement for the purchase and sale of Midway's non-gate assets. Rather, the evidence indicates that the parties intended and agreed only to enter into good faith negotiations for the acquisition by Northwest of Midway's non-gate assets consistent with the representations to the Court on October 8.

20. Therefore, the Court concludes that Midway has failed to meet its burden of proving by a preponderance of the evidence that the parties entered into an enforceable contract for the purchase and sale of Midway's non-gate assets on October 8.

21. Absent an agreement regarding consideration, an enforceable contract does not exist. Among other things, the parties must have agreed on price, which is "generally thought to be 'essential' as a matter of law in all common-law contracts." *Respect, Inc. v. Committee on Status of Women*, 781 F.Supp. 1358, 1364 (N.D.Ill.1992). *See also Penzell*,

219 Ill.App.3d at 688, 162 Ill.Dec. at 147, 579 N.E.2d at 961 (all "material terms and conditions" must be ascertainable for an enforceable agreement to be created).

22. "[T]he failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking." *Delcon Group, Inc. v. Northern Trust Corp.*, 187 Ill.App.3d 635, 643, 135 Ill. Dec. 212, 217, 543 N.E.2d 595, 600 (2d Dist.), *appeal denied*, 128 Ill.2d 672, 139 Ill.Dec. 511, 548 N.E.2d 1067 (1989).

23. As the Seventh Circuit explained in *United States v. Orr Constr. Co.*, 560 F.2d 765, 769–70 (7th Cir.1977), the definiteness of a contract can be determined either objectively by deriving a fixed meaning from the contractual language itself and/or by examining the subsequent conduct of the parties to determine whether they reached a meeting of the minds.

24. The fact that some matters have been left for future agreement does not necessarily preclude a finding of an enforceable contract. *Borg–Warner Corp. v. Anchor Coupling Co.*, 16 Ill.2d 234, 243–44, 156 N.E.2d 513, 517–18 (1958).

25. "[T]here is nothing in the law of contracts [which] requires parties' minds to meet on *all* conceivably related questions." *Lambert Corp. v. Evans*, 575 F.2d 132, 137 (7th Cir.1978) (emphasis supplied).

26. The dispositive question is whether the Court is " 'enabled ... under proper rules of construction and [the] applicable principles of equity, to ascertain what the parties have agreed to do.' " *Midland Hotel*, 118 Ill.2d at 314, 113 Ill.Dec. at 256, 515 N.E.2d at 65 (quoting *Morey v. Hoffman*, 12 Ill.2d 125, 131, 145 N.E.2d 644, 648 (1957)); *see also Dawson v. General Motors Corp.*, 977 F.2d 369, 373 (7th Cir.1992); *Orr Constr.*, 560 F.2d at 769.

27. The Court concludes that Midway and Northwest did not reach agreement, *i.e.*, they did not "truly assent to the same things," on all material terms and conditions. In particular, they did not agree on consideration. There were open business terms that

involved tens of millions of dollars in consideration payable under the purported contract for the Back–End transaction, including: the proper calculation of the purchase price; which party was responsible for liens and cure costs and a variety of other liabilities; the exclusion of assets from the transaction; the circumstances under which Northwest was responsible for Midway's operating losses; and whether Northwest was obliged to provide value to Midway for its non-Fidelcor leases. Thus, there was no meeting of the minds. Consequently, the Court holds that the parties did not form a binding contract for the sale of Midway's non-gate assets.

28. The general rule in Illinois is that the purchaser of assets does not acquire the seller's liabilities unless he agrees to do so. *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424 (7th Cir.1993) (citing *Nilsson v. Continental Mach. Mfg. Co.*, 251 Ill.App.3d 415, 190 Ill.Dec. 579, 621 N.E.2d 1032 (2d Dist.1993) and *Myers v. Putzmeister, Inc.*, 232 Ill.App.3d 419, 173 Ill.Dec. 130, 596 N.E.2d 754 (1st Dist.), *appeal denied*, 146 Ill.2d 632, 176 Ill.Dec. 804, 602 N.E.2d 458 (1992)). Thus, as to the issues surrounding the assumption of Midway's liabilities such as the defaults and arrearages, the Midway employees' salaries and vacation pay pre-closing of the Back–End transaction, Midway's federal excise taxes, Midway's potential WARN Act liability, Midway's incurred professional fees, and Midway's operating losses, Northwest did not acquire those liabilities unless Northwest agreed to do so.

29. Moreover, for an enforceable contract to have existed between Midway and Northwest, the contract's terms must have been sufficiently definite to enable the Court to use proper rules of construction and applicable principles of equity to ascertain what Midway and Northwest agreed to do. *Cheever*, 144 Ill.2d at 29, 161 Ill.Dec. at 337, 578 N.E.2d at 983. "Where an agreement is not sufficiently definite to enable a court to give it exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result." *In re Englewood Community Hosp. Corp.*, 117 B.R. 352, 362 (Bankr.N.D.Ill.1990).

30. The Court has already found that the parties' disagreement as to the terms and issues was so material and significant that the Court could not ascertain the terms of the Back–End transaction. (Findings of Fact, ¶ 68 supra).

31. The Court concludes that on October 8, Midway and Northwest did not enter into an agreement sufficiently definite to enable the Court to give it exact meaning because of the numerous, material terms that had not been discussed, much less agreed upon, by the parties as of that date.

32. A court may not rewrite the parties' agreement or impose obligations on the parties that they have not intended to impose upon themselves. *LaScola v. US Sprint Communications*, 946 F.2d 559, 564–65 (7th Cir.1991). *See also Englewood Community Hosp.*, 117 B.R. at 362; *Cheever*, 144 Ill.2d at 31, 161 Ill.Dec. at 338, 578 N.E.2d at 984. ("It is not the role of the court to rewrite the contract and spell out essential elements not included therein."). Because all material terms and conditions of the Back–End transaction were not ascertainable, and the parties' views of the terms were so fundamentally different, particularly with respect to consideration, an enforceable agreement was not created between Midway and Northwest. The Court cannot rewrite the Back–End transaction to impose obligations on Midway and Northwest that they did not actually or intend to impose upon themselves.

33. Because Northwest and Midway left numerous business terms for the Back–End transaction open on October 8, the Court concludes that the parties did not form a binding contract for the Back–End transaction on October 8.

34. Accordingly, the Court concludes that Midway has not satisfied its burden of proving by a preponderance of the evidence that an enforceable contract was formed on October 8.

35. In addition to its other defenses, Northwest has asserted several affirmative defenses to the effect that Midway cannot enforce whatever agreement it may prove existed regarding the Back-end transaction. These affirmative defenses are:

- The Back–End offer was conditioned upon the satisfaction of certain conditions precedent, none of which were satisfied.
- Paragraph 7 of the Confidentiality Agreement that Northwest and Midway executed bars Midway's claim for breach of contract.
- Northwest's obligation to close the Back–End transaction was excused because the alleged October 8 agreement was induced by Midway's misrepresentations or omissions regarding its DOT data.
- Northwest's obligation to perform the alleged October 8 agreement was excused because the agreement was caused by the mistaken belief concerning Midway's DOT data.
- Northwest's obligation to perform the Back–End transaction was excused because Midway repudiated the agreement by demanding terms that were materially different from the terms Northwest proposed at the October 8 hearing.

36. As the party asserting affirmative defenses, Northwest has the burden of proving them. *Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating,* 58 Ill.App.3d 173, 175, 15 Ill.Dec. 617, 619, 373 N.E.2d 1089, 1091 (4th Dist.1978).

37. The failure of a condition is an affirmative defense to a breach of contract cause of action. *Local 165, Int'l Bhd. of Elec. Workers v. Bradley,* 149 Ill.App.3d 193, 205–206, 102 Ill.Dec. 20, 28–29, 499 N.E.2d 577, 585–86 (1st Dist.1986); *LaGrange Fed. Sav. & Loan Ass'n v. Rock River Corp.,* 97 Ill. App.3d 712, 714, 53 Ill.Dec. 112, 115, 423 N.E.2d 496, 499 (2d Dist.1981).

38. The Court concludes that Northwest first affirmative defense has merit.

39. Northwest did not breach a contract for the Back–End transaction because its obligation to consummate that transaction was subject to three conditions precedent, none of which were satisfied.

40. First, the Court concludes that Northwest's offer to purchase Midway's assets was subject to three conditions precedent: (1) the approval of Northwest's Board of Directors, (2) the execution of definitive documentation, and (3) the performance of a due diligence review with results reasonably satisfactory to Northwest.

41. Because Northwest claims that it imposed conditions precedent to contract formation, Northwest must clearly establish that the "parties intended to create [these] condition[s] at the time of contracting." *Wasserman v. Autohaus on Edens, Inc.,* 202 Ill.App.3d 229, 235–36, 147 Ill.Dec. 571, 576, 559 N.E.2d 911, 916 (1st Dist.), *appeal denied,* 135 Ill.2d 567, 151 Ill.Dec. 394, 564 N.E.2d 849 (1990). The existence and scope of a condition is defined by the parties. *See, e.g., Morin Bldg. Prods. Co. v. Baystone Constr., Inc.,* 717 F.2d 413, 416 (7th Cir.1983) (in interpreting a condition in a contract, the ultimate touchstone of decision must be the intent of the parties).

42. The Court has found that Northwest established that the parties intended to create conditions at the time of contracting. (Findings of Fact, ¶148 supra).

43. "Conditions precedent ... are not favored by Illinois courts, and contracts will not be construed as having conditions precedent unless required to do so by plain, unambiguous language." *Boulevard Bank Nat'l Ass'n v. Philips Medical Sys. Int'l, B.V.,* 811 F.Supp. 357, 365 (N.D.Ill.), *amended,* 827 F.Supp. 510 (N.D.Ill.1993), *aff'd,* 15 F.3d 1419 (7th Cir.1994); *A.A. Conte, Inc. v. Campbell–Lowrie–Lautermilch Corp.,* 132 Ill. App.3d 325, 329, 87 Ill.Dec. 429, 432, 477 N.E.2d 30, 33 (1st Dist.1985).

44. The Court has already found that the transcript of the October 8 hearing indicates that there were three conditions precedent regarding the Back–End transaction. (Findings of Fact, ¶¶166, 167, 168, 174, 175, 176, 244, 249, 253, 254, and 265 supra). Further, the Court has already found that these conditions precedent were unsatisfied. (Findings of Fact, ¶¶148 and 150 supra).

45. Under Illinois law, "a condition precedent is one which must be performed before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform. If the condition remains unsatisfied, the obligations of the parties are at an

end." *Lester v. Resolution Trust Corp.,* 994 F.2d 1247, 1254 (7th Cir.1993) (citing *McKee v. First Nat'l Bank of Brighton,* 220 Ill. App.3d 976, 983, 163 Ill.Dec. 389, 394, 581 N.E.2d 340, 345 (4th Dist.1991), *appeal denied,* 143 Ill.2d 639, 167 Ill.Dec. 401, 587 N.E.2d 1016 (1992)). *See also Ansvar America Ins. Co. v. Hallberg,* 209 Ill.App.3d 206, 210, 154 Ill.Dec. 77, 79, 568 N.E.2d 77, 79 (1st Dist.1991); *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.,* 962 F.2d 628, 633 (7th Cir.1992).

46. There are at least two types of conditions precedent: conditions precedent to performance and conditions precedent to formation. The primary difference lies in the effect of a failure to satisfy the conditions. In the former, a contract exists but is unenforceable, whereas in the latter, a contract does not exist in the first place.

47. A condition precedent to performance relates solely to the parties' obligation to perform and does not prevent the formation of a valid contract. *McAnelly v. Graves,* 126 Ill.App.3d 528, 532, 81 Ill.Dec. 677, 679, 467 N.E.2d 377, 379 (5th Dist.1984); *see also Heritage Commons Partners v. Village of Summit,* 730 F.Supp. 821, 823 (N.D.Ill.1990).

48. The conditions precedent of board approval and due diligence are conditions precedent to performance, and as such, when unsatisfied, an otherwise valid contract is rendered unenforceable.

49. In contrast, a condition precedent requiring the execution of definitive documentation is a condition precedent to formation, and thus, when unsatisfied, no contract exists in the first place. *Ceres Ill., Inc. v. Illinois Scrap Processing, Inc.,* 114 Ill.2d 133, 143–44, 102 Ill.Dec. 379, 383, 500 N.E.2d 1, 5 (1986); *Chicago Inv. Corp. v. Dolins,* 107 Ill.2d 120, 127, 89 Ill.Dec. 869, 872, 481 N.E.2d 712, 715 (1985).

50. In determining the meaning of an agreement or a term of an agreement, the preferred meaning is that "which operates against the party who supplie[d] the words." RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981); *see Larkin v. Sanelli,* 213 Ill.App.3d 597, 603–04, 157 Ill.Dec. 681, 686, 572 N.E.2d 1145, 1150 (1st Dist.),

*appeal denied,* 141 Ill.2d 543, 162 Ill.Dec. 491, 580 N.E.2d 117 (1991). As such, the agreement will be construed against Midway.

51. A corporation may properly condition the binding effect of a contract on the approval of its board of directors. *A/S Apothekernes,* 873 F.2d at 158; *Empro,* 870 F.2d at 425; *Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1055–56 (7th Cir. 1988); *Cinman v. Reliance Fed. Sav. & Loan Ass'n,* 155 Ill.App.3d 417, 425–26, 108 Ill.Dec. 78, 84, 508 N.E.2d 239, 245 (1st Dist.), *appeal denied,* 116 Ill.2d 549, 113 Ill.Dec. 294, 515 N.E.2d 103 (1987). On October 8, Northwest properly conditioned the binding effect of the Back–End transaction on the approval of its Board of Directors. (Findings of Fact, ¶¶ 151 and 221 supra).

52. When a corporation conditions the existence of a contract upon board approval, and the corporation's board votes not to approve the contract, the contract is not enforceable. *A/S Apothekernes,* 873 F.2d at 157–58; *Runnemede,* 861 F.2d at 1055–56; *Empro,* 870 F.2d at 425; *Cinman,* 155 Ill. App.3d at 425–26, 108 Ill.Dec. at 84, 508 N.E.2d at 245.

53. The Court has already found that Northwest's Board of Directors did not at any time approve the Back–End transaction. (Findings of Fact, ¶¶ 155, 156, and 160 supra).

54. Therefore, due to the lack of satisfaction of the board approval condition, the Court concludes that there was no enforceable contract with respect to the Back–End transaction.

55. Contract law does not recognize a distinction between conditions which are substantive and conditions which are mere formalities. *See A/S Apothekernes,* 873 F.2d at 157–58. Thus, even if Midway viewed the board approval condition as a mere formality, as some of the witnesses testified, (Findings of Fact, ¶¶ 185 and 195 supra), the condition nonetheless existed and had to be formally satisfied before a contract could become binding and enforceable.

56. Moreover, the subjective beliefs of parties are irrelevant for purposes of con-

tract law. Courts look to the objective manifestations of parties' intentions and not to their subjective beliefs. *See Empro,* 870 F.2d at 425 (" '[I]ntent' in contract law is objective rather than subjective...."); *A/S Apothekernes,* 678 F.Supp. at 195 ("A determination of the 'intent of the parties' is ... dependent not upon their subjective beliefs but upon their objective manifestations of intention....").

57. Optimistic predictions about the likelihood of board approval do not affect the validity of a board approval condition, nor do they by themselves satisfy that condition. *See, e.g., A/S Apothekernes,* 873 F.2d at 158 (board approval condition not affected by negotiator's assurances that his company's board would approve any deal he made); *Runnemede,* 861 F.2d at 1055–56 (loan committee approval condition valid and enforceable, even though lender's negotiator assured his counterpart, "Don't worry about the committee, I am the committee. What I say, goes. We have a deal.").

58. Hence, the Court concludes that Northwest's statement, optimistic as it was, that it did not expect board approval to be a problem did not affect the validity, the existence, or the necessity of satisfaction of the board approval condition.

59. As approval by Northwest's Board of Directors was a condition precedent to performance of the Back–End transaction, and this condition precedent was not satisfied because Northwest's Board did not approve the Back–End transaction, the Court concludes that Northwest had no obligation to perform under any agreement that may have existed.

60. It is well established that parties may condition their obligations on the signing of a definitive written contract. *Ceres,* 114 Ill.2d at 143–44, 102 Ill.Dec. at 383, 500 N.E.2d at 5; *Venture,* 987 F.2d at 432–33; *Empro,* 870 F.2d at 424–25; *Runnemede,* 861 F.2d at 1056–57; *Feldman,* 850 F.2d at 1222.

61. The Court concludes that Midway and Northwest validly conditioned the Back–End transaction on the signing of a definitive written contract (*i.e.* the execution of definitive documentation).

62. With respect to definitive documentation as a condition precedent, "even where the essential terms have been agreed upon, 'if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery.' " *Ceres,* 114 Ill.2d at 143–44, 102 Ill.Dec. at 383, 500 N.E.2d at 5 (citations omitted).

63. To determine whether the parties intended to reduce an agreement to writing before becoming bound, the Court should consider the following factors: (1) whether the type of agreement involved is one usually put into writing; (2) whether the agreement contains few or a great many details; (3) whether the amount of money involved is large or small; (4) whether the agreement requires a formal writing for the full expression of the covenants; and (5) whether the negotiations indicated that a written document was contemplated at their conclusion. *Quake,* 141 Ill.2d at 289, 152 Ill.Dec. at 312, 565 N.E.2d at 994 (citing *Ceres,* 114 Ill.2d at 144, 102 Ill.Dec. at 383, 500 N.E.2d at 5). *Accord Mellencamp v. Riva Music, Ltd.,* 698 F.Supp. 1154, 1168 (S.D.N.Y.1988) (fact that agreement involved large sum of money ($3 million) "strongly supports the inference that a written agreement was contemplated"). *See M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1407–08 (7th Cir.1991) (no intent to be bound where the parties planned to execute a written agreement).

64. Considering all of these factors, the Court concludes that the evidence demonstrated that Midway and Northwest did not intend to be bound until they executed a written contract, which they never did.

65. The Court has found that Midway and Northwest agreed to the execution of definitive documentation as a condition precedent to contract formation. (Findings of Fact, ¶¶ 222, 249, and 253 supra). The Court has also found that this condition precedent was not satisfied. *Id.*

66. Consequently, under Illinois law, the lack of satisfaction of the definitive documentation condition necessitates the conclusion that no binding and enforceable contract ever

existed in the first place. *See Ceres,* 114 Ill.2d at 143–44, 102 Ill.Dec. at 383, 500 N.E.2d at 5.

67. A party may properly condition an agreement on the satisfactory completion of a due diligence review. *See Feldman,* 850 F.2d at 1222 (parties may contract about their own negotiations); *Henderson v. Texas Commerce Bank–Midland, N.A.,* 837 S.W.2d 778, 780–81 (Tex.Ct.App.1992) (defendant had no obligation to perform contract where the contract was conditioned upon the verification of the value of plaintiff's collateral and status of his debt, and defendant later determined that plaintiff overstated the value of his collateral and understated his debt). A due diligence condition is "inconsistent with the pre-existence of a binding deal." *Mellencamp,* 698 F.Supp. at 1168. If a party could not withdraw from a deal based on information discovered through a due diligence review, there would be no reason why such a review would go forward. *Id.*

68. The Court concludes that Northwest properly conditioned its obligation to consummate the Back–End transaction on the satisfactory completion of a due diligence review, and with Midway's knowledge, it conducted extensive due diligence after October 8.

69. While Northwest did in fact conduct a due diligence review, the results were not satisfactory to Northwest. (Underlying Material Background, ¶¶ 169–172). Thus, this condition precedent to performance was unsatisfied, thereby rendering the agreement unenforceable. (Findings of Fact, ¶¶ 254, 274, and 286 supra). In other words, the Court concludes that Northwest had no obligation to perform under the alleged agreement.

70. Midway claims that even if board approval, definitive documentation, and due diligence were conditions precedent to the Back–End transaction which were not satisfied, Northwest nevertheless waived those conditions expressly or impliedly.

71. The burden of proving that conditions have been modified or waived is on Midway, the party asserting the waiver. *See Ryder v. Bank of Hickory Hills,* 146 Ill.2d 98, 105, 165 Ill.Dec. 650, 653, 585 N.E.2d 46, 49 (1991); *Breckenridge v. Cambridge Homes, Inc.,* 246 Ill.App.3d 810, 817, 186 Ill.Dec. 425, 430, 616 N.E.2d 615, 620 (2d Dist.), *appeal denied,* 152 Ill.2d 555, 190 Ill.Dec. 884, 622 N.E.2d 1201 (1993).

72. "The determination as to what facts are sufficient to constitute waiver is a question of law." *Havoco of America, Ltd. v. Sumitomo Corp. of America,* 971 F.2d 1332, 1337 (7th Cir.1992) (citing *Whalen v. K–Mart Corp.,* 166 Ill.App.3d 339, 343, 116 Ill.Dec. 776, 779, 519 N.E.2d 991, 994 (1st Dist.), *appeal denied,* 121 Ill.2d 587, 122 Ill.Dec. 448, 526 N.E.2d 841 (1988)). However, "whether waiver exists must be based on the particular circumstances of each case." *Kelly v. Economy Fire & Casualty Co.,* 196 Ill.App.3d 337, 340, 142 Ill.Dec. 898, 900, 553 N.E.2d 412, 414 (3d Dist.), *appeal denied,* 132 Ill.2d 546, 144 Ill.Dec. 258, 555 N.E.2d 377 (1990).

73. Waiver principles apply to prevent a party from "lull[ing] another into a false assurance that strict compliance with a contractual duty will not be required" and then seeking to enforce the duty. *Whalen,* 166 Ill.App.3d at 343, 116 Ill.Dec. at 779, 519 N.E.2d at 994; *see also Wagner Excello Foods, Inc. v. Fearn Int'l Inc.,* 235 Ill.App.3d 224, 233, 176 Ill.Dec. 258, 264, 601 N.E.2d 956, 962 (1st Dist.1992); *Saverslak v. Davis–Cleaver Produce Co.,* 606 F.2d 208, 213 (7th Cir.1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980).

74. "Waiver may be proven by words or deeds of the party against whom waiver is invoked that are inconsistent with an intention to insist on that party's contractual rights." *Chicago College of Osteopathic Medicine v. George A. Fuller Co.,* 776 F.2d 198, 202 (7th Cir.1985) (citing *John Kubinski & Sons, Inc. v. Dockside Dev. Corp.,* 33 Ill.App.3d 1015, 1020, 339 N.E.2d 529, 533 (1st Dist.1975)).

75. "Conditions precedent may be waived when a party to a contract intentionally relinquishes a known right either expressly or [impliedly] by conduct indicating that strict compliance with the conditions is not required." *Hardin,* 962 F.2d at 633 (7th Cir.

1992) (citations omitted). *See also Ryder,* 146 Ill.2d at 104–05, 165 Ill.Dec. at 653, 585 N.E.2d at 49.

76. A party may expressly waive a condition precedent through words to that effect. *Cf. In re Marriage of Myers,* 257 Ill.App.3d 560, 562, 195 Ill.Dec. 624, 625, 628 N.E.2d 1088, 1089 (1st Dist.1993) (finding settlement agreement entered at divorce lacked an express waiver of divorced wife's rights in now deceased former husband's pension).

77. The Court has already found that such words on the part of Northwest are lacking. (Findings of Fact, ¶¶ 288, 292, 302, and 312 supra). Therefore, the Court concludes that Midway failed to meet its burden of proving by a preponderance of the evidence that Northwest expressly waived any of the three conditions.

78. In contrast to express waivers, a party may be found to have impliedly waived a condition precedent on the basis of the party's conduct, acts, or deeds. *See Hardin,* 962 F.2d at 633. In order to establish an implied waiver, the party claiming the existence of the waiver must prove that the other party clearly, unequivocally, and decisively acted to waive the conditions. *Ryder,* 146 Ill.2d at 105, 165 Ill.Dec. at 653, 585 N.E.2d at 49. Waiver of a contractual right is shown only when a party conducts itself in a manner which is wholly inconsistent with the clause or condition, thereby indicating its intent to abandon the contractual right. *Id.; Kelly,* 196 Ill.App.3d at 340, 553 N.E.2d at 414; *Kane v. American Nat'l Bank & Trust Co.,* 21 Ill.App.3d 1046, 1052, 316 N.E.2d 177, 182 (2d Dist.1974).

79. Conduct constituting an implied waiver "might include continuing to accept the breaching party's performance and the benefits thereof after learning of the breach." *Hardin,* 962 F.2d at 633.

80. Waiver of conditions precedent also may arise when a party treats the contract as binding and effective and takes some substantial action under the contract. *See USX Credit Corp. v. Lichterman,* 876 F.2d 1283, 1286 n. 4 (7th Cir.1989).

81. The Court has already found that Northwest conducted itself in a manner that was consistent with the existence of the conditions. (Findings of Fact, ¶ 292 supra).

82. Accordingly, the Court concludes that Midway failed to meet its burden of proving by a preponderance of the evidence that Northwest clearly, unequivocally, or decisively acted to waive any of the three conditions or that Northwest's conduct was wholly inconsistent with any of the conditions.

83. Thus, the Court concludes that Midway failed to prove an implied waiver of the conditions.

84. Midway has also claimed in the alternative that Northwest ratified an unauthorized agreement regarding the Back–End transaction, allegedly consummated by Northwest's agents, which was not subject to the conditions precedent stated on October 8.

85. For the reasons set forth below, the Court concludes that Midway failed to prove by a preponderance of the evidence the requisite elements of ratification.

86. The Court concludes that Northwest did not ratify an unauthorized agreement regarding the Back–End transaction.

87. The party seeking to establish a ratification has the burden of proving the ratification. *See Evanston Bank v. ContiCommodity Servs., Inc.,* 623 F.Supp. 1014, 1034–35 (N.D.Ill.1985). " '[R]atification will not be implied ... from acts or conduct which are as consistent with an intention not to ratify as to ratify.' " *Id.* at 1037 (quoting *Arthur Rubloff & Co. v. Drovers Nat'l Bank,* 80 Ill.App.3d 867, 872, 36 Ill.Dec. 194, 198, 400 N.E.2d 614, 618 (1st Dist.1980)).

88. The doctrine of ratification is comprised of three requisite elements: (1) there must be an unauthorized agreement; (2) the principal, with full knowledge of all material facts, must conduct itself in a manner inconsistent with the repudiation of its agent's unauthorized transaction; and (3) a third party must rely on the principal's conduct to the third-party's detriment. *Old Sec. Life Ins. Co. v. Continental Ill. Nat'l Bank & Trust Co.,* 740 F.2d 1384, 1392 (7th Cir.1984); *Evanston Bank,* 623 F.Supp. at 1034.

89. The Court concludes that Midway failed to prove that Northwest ratified an unauthorized agreement regarding the Back–End transaction because Midway failed to prove the requisite elements of ratification.

90. First, Midway failed to meet its burden of proving the existence of an unauthorized agreement. The Northwest representatives were authorized to make the offer which they made: an offer to enter into good faith negotiations for Midway's non-gate assets that was subject to three conditions precedent. (Count V, Findings of Fact, ¶ 24). As a matter of law, the doctrine of ratification cannot be applied in the absence of an unauthorized agreement.

91. Second, the principal, Northwest, did not conduct itself in a manner inconsistent with the repudiation of its agent's unauthorized transaction. Rather than repudiating the conditions precedent, Northwest reasserted the conditions consistently and repeatedly following the October 8 hearing.

92. Third, Midway did not rely to its detriment on the alleged ratification. The integration efforts, press releases, and advertisements occurred after Midway chose to pursue the Northwest offer on October 8. (Findings of Fact, ¶¶ 299–311 supra).

93. In addition, any assertion by Midway that it relied on the alleged ratification is belied by Midway's post-hearing conduct which shows that Midway knew that the conditions were still in effect. (Findings of Fact, ¶¶ 197, 212, 249, and 274 supra).

94. Moreover, the Court concludes that Northwest's press releases are not conclusive evidence that Northwest intended to be bound to the Back–End transaction. *See, e.g., Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.) (reversing district court and holding parties did not intend to be bound despite issuance of press release announcing the deal), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 816 (7th Cir.1987) (citing *Reprosystem* with approval); *Bradley v. West Sioux Community Sch. Bd. of Educ.*, 510 N.W.2d 881 (Iowa 1994) (finding no intent to be bound to alleged contract despite press release announcing that parties

had resolved all outstanding issues). The authorities cited by Midway suggest only that the issuance of press releases is one among many factors courts may consider in determining the intentions of the parties. *E.g., Arnold Palmer Golf Co. v. Fuqua Indus., Inc.*, 541 F.2d 584 (6th Cir.1976) (court stated that it was permissible to consider extrinsic evidence, such as a press release, to determine whether the parties intended to be bound to a memorandum of intent, but declined to take a position on whether the parties intended to bind themselves).

95. For the reasons set forth above, the Court concludes that Northwest did not ratify an agreement regarding the Back–End transaction.

96. Northwest's second affirmative defense involves Paragraph 7 of the July 1991 Confidentiality Agreement (PX 35, ¶ 7) (hereinafter "Paragraph 7"). Northwest asserts that this paragraph bars Midway's claim for breach of contract.

97. However, the Court rejects this argument and concludes that Midway is not barred from asserting its breach of contract claim against Northwest by virtue of Paragraph 7.

98. As the party attempting to use the Confidentiality Agreement to bar a claim, Northwest has the burden of proving its theory.

99. The Confidentiality Agreement will be construed against Midway as the drafter thereof. *Brown v. City of Pekin*, 129 Ill. App.3d 46, 49, 84 Ill.Dec. 327, 329, 472 N.E.2d 77, 79 (3d Dist.1984).

100. When enforcing a contract, the primary objective is to construe the contract to ascertain the intent of the parties and to give effect to that intent. *United Airlines, Inc. v. City of Chicago,* 116 Ill.2d 311, 318, 107 Ill. Dec. 705, 708, 507 N.E.2d 858, 861 (1987). Generally, where no ambiguity exists, the intention of the parties must be ascertained from the contract itself. *Lenzi v. Morkin*, 103 Ill.2d 290, 293, 82 Ill.Dec. 644, 645, 469 N.E.2d 178, 179 (1984).

101. A contract should be given a fair and reasonable construction based on a consider-

ation of all of its language and provisions. *Shelton v. Andres*, 106 Ill.2d 153, 159, 87 Ill.Dec. 954, 957, 478 N.E.2d 311, 314 (1985). In determining a fair and reasonable construction, "courts are not confined to a strict and literal construction of the language used, when such construction will frustrate the intention of the parties, gathered from a consideration of the whole instrument." *Id.* (quoting *Shadden v. Zimmerlee*, 401 Ill. 118, 123, 81 N.E.2d 477, 480 (1948)).

▬ 102. Thus, while the language used in a contract is ordinarily the best evidence of the intention of the parties, a court may properly disregard even unambiguous language when it is clear that the parties meant something different from what was said. *White v. Roughton*, 689 F.2d 118, 119 (7th Cir.1982), *cert. denied*, 460 U.S. 1070, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983).

103. A contract is ambiguous if it is subject to more than one reasonable interpretation. The determination of whether a contract is ambiguous is a question of law to be determined by the Court. *Quake*, 141 Ill.2d at 288, 152 Ill.Dec. at 312, 565 N.E.2d at 994; *Goodwine State Bank v. Mullins*, 253 Ill. App.3d 980, 993, 192 Ill.Dec. 901, 913, 625 N.E.2d 1056, 1068 (4th Dist.1993), *appeal denied*, 155 Ill.2d 563, 198 Ill.Dec. 542, 633 N.E.2d 4 (1994) (citing *URS Corp. v. Ash*, 101 Ill.App.3d 229, 233, 56 Ill.Dec. 749, 753, 427 N.E.2d 1295, 1299 (4th Dist.1981)). An ambiguity is not created merely because the parties disagree as to the meaning of a contract clause. *People ex rel. Burris v. Memorial Consultants, Inc.*, 224 Ill.App.3d 653, 656, 167 Ill.Dec. 152, 155, 587 N.E.2d 34, 37 (3d Dist.1992).

104. The Court concludes that the language "the transaction" in the Confidentiality Agreement is latently ambiguous in that it could refer to the Gate Sale, the Back–End transaction, or both.

105. If the contract language is ambiguous, extrinsic evidence is admissible to determine the parties' intent and the interpretation of the language is a question of fact. *Pre–Fab Transit Co. v. Northbrook Property & Casualty Ins. Co.*, 235 Ill.App.3d 103, 106, 175 Ill.Dec. 623, 625, 600 N.E.2d 866, 868 (4th Dist.), *appeal denied*, 147 Ill.2d 637, 180 Ill.Dec. 158, 606 N.E.2d 1235 (1992).

106. Northwest argues that Midway and Northwest did not enter into, execute, and deliver a definitive agreement for the Back–End transaction.

107. Because there was definitive documentation on the Gate Sale, the Court concludes that the Confidentiality Agreement does not act per se to bar Midway's breach of contract action regarding the Back–End transaction.

108. Hence, the Court concludes that the execution of the Gate Sale Agreement constituted definitive documentation within the purview of Paragraph 7.

109. Accordingly, the Court concludes that Midway is not barred from asserting its breach of contract claim against Northwest in this matter by virtue of Paragraph 7.

▬ 110. The Court further concludes that the Confidentiality Agreement was not superseded by the merger clause contained in Section 11.5 of the Gate Sale Agreement. (PX 19).

111. The Court concludes that the Gate Sale Agreement, however, was not a "complete statement" of the Back–End transaction. The "subject matter" of the Gate Sale Agreement could not, therefore, have included the Back–End transaction.

112. Therefore, the Court concludes that Paragraph 7 of the Confidentiality Agreement cannot act as a bar to the instant cause of action.

113. Consequently, the Court concludes that because there was a transaction that was entered into with definitive documentation that closed—the Gate Sale—that transaction satisfied the language in Paragraph 7 of the Confidentiality Agreement. Both parties may properly maintain their causes of action against each other. The merger clause in the Gate Sale Agreement does not necessarily obviate the duties and requirements in the Confidentiality Agreement. The Confidentiality Agreement was a separate and independent contract from the Gate Sale Agreement. Further, the merger clause in the Gate Sale Agreement does not

reference a merger of the Confidentiality Agreement.

■ 114. Northwest asserts as a third affirmative defense that its obligation to close the Back–End transaction was excused because the alleged October 8 agreement was induced by Midway's misrepresentations or omissions regarding the data Midway submitted to the DOT and by the mistaken belief concerning that data.

115. The Court's Findings of Fact and Conclusions of Law regarding this affirmative defense are fully set forth in Count I of Northwest's Counterclaim, which asserts the same facts. The Court hereby incorporates and adopts by reference those findings and conclusions into this count.

116. For the same reasons as set forth in Count I of the Counterclaim, the Court concludes that this affirmative defense is without merit.

117. Under Illinois law:

A court of equity may grant the remedy of rescission where there has been some fraud in the making of a contract, such as an untrue statement or the concealment of a material fact or where one party enters into a contract *reasonably relying* on the other party's innocent misrepresentation of a material fact.

*Puskar v. Hughes,* 179 Ill.App.3d 522, 528, 127 Ill.Dec. 880, 884, 533 N.E.2d 962, 966 (2d Dist.1989) (citations omitted) (emphasis supplied); *accord Giacomazzi v. Urban Search Corp.,* 86 Ill.App.3d 429, 432, 41 Ill.Dec. 123, 125, 407 N.E.2d 621, 623 (1st Dist.1980); *Geist v. Lehmann,* 19 Ill.App.3d 557, 560, 312 N.E.2d 42, 45 (2d Dist.1974).

■ 118. Thus, the "innocent" party must nevertheless reasonably rely on the misrepresentation, whether it is fraudulent (*i.e.* intentional), negligent, or innocent.

119. In Count I of Northwest's Counterclaim, the Court finds that (a) Northwest failed to prove by clear and convincing evidence that Midway represented to Northwest that Midway's DOT data was accurate or that Northwest could or should rely on it and (b) Northwest failed to prove by clear and convincing evidence that Midway gave Northwest an incomplete and misleading explanation regarding Midway's DOT data on October 4, 1991. (Counterclaim, Count I, Findings of Fact, ¶¶ 3 and 18).

120. As the Court found the representations were not made, it follows that they were not made fraudulently or innocently.

121. In Count I of Northwest's Counterclaim, the Court finds that Northwest failed to prove that Midway committed fraudulent misrepresentation by failing to disclose to Northwest on October 7, 1991 that Midway's DOT data was inaccurate and unreliable. (Counterclaim, Count I, Findings of Fact, ¶ 65).

122. In Count I of Northwest's Counterclaim, the Court concludes that Northwest's reliance on Midway's silence was not reasonable. (Counterclaim, Count I, Conclusions of Law, ¶¶ 17 and 43; *see also* Counterclaim, Count I, Findings of Fact, ¶¶ 69–83).

123. As the Court has found that Northwest's reliance was not reasonable or justified with respect to fraudulent misrepresentation, it was also not reasonable with respect to innocent misrepresentation. Therefore, the Court concludes that Northwest's affirmative defense of innocent misrepresentation fails due to a lack of reasonable reliance.

■ 124. The Court concludes that Northwest's fourth affirmative defense that its obligation to perform the alleged October 8 agreement was excused because the agreement was caused by the mistaken belief concerning the data Midway submitted to the DOT is without merit.

125. Under Illinois law, a party to a contract is entitled to rescission when: (1) the mistake relates to a material feature of the contract; (2) the mistake occurred despite the exercise of reasonable care; and (3) the other party is placed in the position it was in before the contract was made. *John J. Calnan v. Talsma Builders, Inc.,* 67 Ill.2d 213, 218, 10 Ill.Dec. 242, 245, 367 N.E.2d 695, 698 (1977); *Wilkonson v. Yovetich,* 249 Ill.App.3d 439, 446, 188 Ill.Dec. 550, 556, 618 N.E.2d 1120, 1126 (1st Dist.1993); *S.T.S. Transport Serv., Inc. v. Volvo White Truck Corp.,* 766 F.2d 1089, 1093 (7th Cir.1985).

126. Generally, the unilateral mistake of one party to a contract may not be relied upon to relieve that party from the obligations of the contract where the party's own negligence and lack of prudence resulted in the mistake. *Harney–Morgan Chevrolet Olds Co. v. Rabin,* 118 Ill.App.3d 602, 606, 74 Ill.Dec. 100, 104, 455 N.E.2d 130, 134 (3d Dist.1983) (citation omitted); *Zink v. Maple Inv. & Dev. Corp.,* 247 Ill.App.3d 1032, 1038, 187 Ill.Dec. 548, 553, 617 N.E.2d 1269, 1274 (2d Dist.1993).

127. A party seeking rescission based on mutual mistake must prove, as part of its prima facie case, that both parties were mistaken as to a material matter. *Casanas v. Nelson,* 140 Ill.App.3d 341, 346, 95 Ill.Dec. 137, 140, 489 N.E.2d 358, 361 (2d Dist.1986). The mutual mistake must be shown by clear and positive evidence. *Id.* (citation omitted).

128. The Court concludes that Northwest is not entitled to rescission of the alleged agreement based on either unilateral mistake or mutual mistake.

129. Under the theory of unilateral mistake, Northwest is not entitled to rescission because of its own lack of prudence in relying on the DOT data in its financial analysis of Midway when it had access to Midway internal data. Northwest failed to exercise reasonable care in its use of the DOT data instead of Midway's internal data. *See* Counterclaim, Count I.

130. Consequently, the Court will not rescind the alleged agreement based on Northwest's unilateral mistake.

131. The Court concludes that under the theory of mutual mistake, Northwest is not entitled to rescission of the alleged agreement. Northwest has failed to prove by clear and positive evidence that Midway was mistaken as to the accuracy of the DOT data. *See* Counterclaim, Count I.

132. The final affirmative defense asserted by Northwest involves a theory of anticipatory breach or repudiation. Northwest contends that Midway repudiated whatever agreement may have been reached with respect to the Back–End transaction by demanding new terms that materially differed from the terms Northwest proposed at the October 8 hearing.

133. Based on the Court's Findings of Fact as set forth above and the following Conclusions of Law, the Court concludes that Midway did not repudiate the alleged agreement because Midway did not clearly manifest an intent not to perform the contract.

134. Under Illinois law, the

doctrine of anticipatory repudiation requires a clear manifestation of an intent not to perform the contract on the date of performance. The failure of the breaching party must be a total one which defeats or renders unattainable the object of the contract. That intention must be a definite and unequivocal manifestation that he will not render the promised performance when the time fixed for it in the contract arrives. Doubtful and indefinite statements that performance may or may not take place are not enough to constitute anticipatory repudiation.

*In re Marriage of Olsen,* 124 Ill.2d 19, 24, 123 Ill.Dec. 980, 982, 528 N.E.2d 684, 686 (1988) (citations omitted).

135. Furthermore, although parties may differ on interpretation of a contract, a mere offer by one to perform in accordance with its interpretation does not itself constitute an anticipatory repudiation. *Id.* (quoting 4 A. Corbin, Contracts § 973, at 911–12 (1951)). Rather, an anticipatory repudiation exists in that situation only when that offer is accompanied by a clear manifestation of an intent not to perform under any other interpretation. *Id.*

136. Moreover, a party has not anticipatorily repudiated an agreement merely by demanding that the other party perform under an interpretation that lacks legal basis. *Olsen,* 124 Ill.2d at 24, 123 Ill.Dec. at 982, 528 N.E.2d at 686. However, not much else is needed to justify the other party's belief that the demanding party will accept only the performance demanded. *Id.* at 24, 123 Ill. Dec. at 982–83, 528 N.E.2d at 686–87.

137. The Court concludes that Northwest's affirmative defense of repudiation is insufficient as a matter of law.

138. Northwest has failed to allege that Midway clearly manifested an intent not to perform the Back–End transaction.

139. The Court concludes that Northwest's allegation that Midway asserted materially different terms from those proposed on October 8 by itself does not constitute the requisite clear manifestation of an intent not to perform on the part of Midway.

140. Thus, the Court concludes that Northwest's affirmative defense of repudiation fails as a matter of law.

141. Accordingly, the Court hereby concludes that the following affirmative defenses of Northwest lack merit: (1) Paragraph 7 of the Confidentiality Agreement acts as a bar to Midway's claim for breach of contract; (2) Northwest's obligation to close the Back–End transaction was excused because the October 8 agreement was induced by Midway's misrepresentations or omissions regarding the data Midway submitted to the DOT; (3) Northwest's obligation to perform the alleged October 8 agreement was excused because the agreement was caused by a mistaken belief concerning Midway's DOT data; and (4) Northwest's obligation to perform the Back–End transaction was excused because Midway repudiated the agreement by demanding terms that were materially different from the terms Northwest proposed at the October 8 hearing.

142. The Court concludes that Northwest's affirmative defense regarding the Back–End transaction being conditioned upon the satisfaction of conditions precedent, none of which were satisfied, is, however, meritorious for the reasons set forth above.

143. To the extent that these affirmative defenses are again raised in other counts, the Court hereby concludes that the same Findings of Fact and Conclusions of Law are applicable.

### COUNT III

#### FINDINGS OF FACT

1. As an alternative to its theory that Northwest and Midway entered into a binding and enforceable agreement for the purchase and sale of Midway's non-gate assets on October 8, Midway claims in this count that Northwest breached Section 5.7 of the Gate Sale Agreement by failing to negotiate in good faith towards the Back–End transaction.

2. The Court finds that Midway has failed to prove that Northwest did not negotiate in good faith consistent with the representations made to this Court on October 8.

3. To the contrary, the Court finds that Northwest negotiated in good faith consistent with its representations made on October 8, despite Midway's assertion of new and different terms which went well beyond the representations made on the record and which would have materially changed the economics of the transaction.

4. After their post-October 8 negotiations over the language of Section 5.7, the parties ultimately agreed to the following covenant:

> After the Closing Date Buyer [Northwest] and Seller [Midway] will enter into good faith negotiation of a definitive agreement for the acquisition by Buyer of all of Seller's assets and the assumption of certain of Seller's liabilities by Buyer, consistent with representations of Buyer and Seller made to the Bankruptcy Court on October 8, 1991. Buyer and Seller agree to use their best efforts to execute such definitive agreement and close such acquisition within thirty (30) days of the date hereof.

(PX 19, ¶ 5.7). As Section 5.7 reflects, the parties had two obligations for the Back–End negotiations: to negotiate in good faith "consistent with" the representations made to the Court on October 8 and to use their best efforts to execute a definitive agreement and close the transaction within thirty days.

5. The Court finds that the Gate Sale Agreement (PX 19) was a binding agreement.

6. This Court has already found that "[i]t is undisputed that the parties negotiated." *See Midway v. Northwest*, 1993 WL 65673 at *12.

7. The evidence shows that the parties negotiated extensively through numerous telephone calls, exchanges of correspondence, exchanges of draft agreements, exchanges of term sheets, and face-to-face meetings.

8. The financial components of Northwest's Back–End offer were few and not conceptually complicated. In essence, Northwest agreed to negotiate to buy all of Midway's remaining assets in exchange for (1) Northwest's assumption of Midway's aircraft leases with Fidelcor; (2) a $95 million package of consideration consisting of (a) Northwest's assumption of Midway's DIP loan, (b) the assumption of Midway's ATL, and (c) the payment of cash and notes necessary to bring the total of (a) and (b) to $95 million; (3) an agreement to negotiate with the non-Fidelcor lessors for an assumption of Midway's leases with them; and (4) hiring substantially all of Midway's operating employees. (PX 13, pp. 18–20). Later on October 8, Northwest also agreed to assume Midway's $4.7 million lease arrearage with the City of Chicago, and to fund Midway's operating losses under certain limited conditions. *Id.*, pp. 49–50.

9. Midway has acknowledged that Northwest's negotiating positions were consistent with Northwest's representations to the Court at the October 8 hearing.

10. At the parties' meeting on October 31, Steenland informed Midway that Northwest would stand by its October 8 offer, and then he restated the terms of that offer. (Tr. (Burgess) 1162–63, 919–20; (Steenland) 3964–65; (Altschul) 3598; (Henneman) 4335–36; Hibbs Dep. 199). Steenland's comments are reflected in the notes taken by the participants at the meeting. (DX 254 at L6 (Burgess); Tr. (Burgess) 1162; DX 306 (Altschul); Tr. (Altschul) 3598; DX 253 at L1923 (Henneman); PX 90 at DW6018 (Hamel)).

11. Burgess testified that Northwest "stated the offer exactly as they had stated it, or close to exactly as they had stated it on October 8." (Tr. (Burgess) 919–20). Burgess also testified that he and Schick told Steenland, "we hear you are now repeating what you said on October 8." (Tr. (Burgess) 921). As Hinson (Chief Executive Officer of Midway) conceded in discussing Northwest's conduct at the October 30–31 negotiating meetings, Northwest was reasonable in asserting its position. (Tr. (Hinson 279).

12. The Court finds that this evidence is inconsistent with and refutes Midway's claim that Northwest negotiated in bad faith after October 8. Rather, the Court finds that the evidence shows that Northwest's positions were consistent with its representations to the Court on October 8 and thus asserted in good faith.

13. The Court finds that the evidence concerning the negotiation of specific issues also demonstrates that Northwest complied with its obligations under Section 5.7 by taking positions consistent with the representations made on October 8.

14. The Court finds that the parties spent considerable time negotiating over the liabilities which Northwest was obligated to assume. The disputed liabilities included: (1) the cost of removing liens on Midway's assets and curing defaults and arrearages on Midway's executory contracts; (2) Midway's last payroll; (3) vacation pay for Midway's employees; (4) potential WARN Act liability; (5) federal excise taxes; and (6) professional fees. (PX 44B and 44C; PX 45; PX 47; DX 100; DX 186; Count I, Findings of Fact, ¶ 79).

15. In each case, Midway argued that Northwest should incur the liability, and Northwest, in turn, maintained that the liability remained with Midway, and refused to agree to assume it.

16. The Court finds that Northwest's refusal to shoulder these additional liabilities was consistent with its representations to the Court.

17. First, Midway concedes that Northwest never agreed on the record or at the recess on October 8 that it would assume any of these liabilities as part of a Back–End transaction. (Schick Dep. 196–98, 200; Tr. (Burgess) 1103–06, 1109–10; (Hanson) 627, 1326, 1328, 1342–44). Actually, these issues were simply not discussed on or prior to October 8. (Tr. (Steenland) 3923; Schick Dep. 198, 200–01; Tr. (Henneman) 4292–93; (Hanson) 1328).

18. The most substantial area of disagreement between the parties related to whether Northwest was responsible for removing liens on Midway's assets and curing defaults on Midway's executory contracts in

order to receive them in the Back–End transaction.

19. Despite Midway's insistence in the negotiations that Northwest bear these costs, Hanson admitted that Northwest did not agree on October 8 to assume those liabilities:

Q: Okay. So, it is correct, is it not, Mr. Hanson, that Northwest did not agree to assume the liens, encumbrances and defaults on the remaining assets that Midway agreed to convey to Northwest in Phase II [the Back–End transaction]?

A: They did not commit to satisfy those, that's correct.

Q: That issue wasn't even raised on October 8th, correct?

A: It was not discussed. That's correct.

(Tr. (Hanson) 1328). Burgess agreed:

Q: Now, you would agree that on the record, Mr. Parkins never stated during his presentation on October 8 that Northwest agreed to pay to cure any liens on Midway's assets?

A: In those terms, I would agree.

Q: And he never stated that Northwest agreed to cure defaults or arrearages on Midway's executory contracts with the exception of his statement about Northwest being willing to cure the $4.7 million lease arrearage, is that correct?

A: In those terms, yes.

(Tr. (Burgess) 1103–04, 1309–10).

20. The Court finds that these admissions show that Northwest's subsequent refusal to assume these large costs was consistent with its representations to the Court on October 8 and thus Northwest acted in good faith.

21. Second, Northwest expressly stated on the record the specific liabilities it would assume as part of its Back–End offer.

22. By stating which liabilities it was willing to assume, the Court finds that Northwest manifested that it was not agreeing to assume any other liabilities relating to the assets it was purchasing. (Tr. (Steenland) 3922–23, 3905–06; PX 45, p. 2; Tr. (Burgess) 1144, 1310–11; Hibbs Dep. 267–68, 304–05;

Schick Dep. 198, 200; Tr. (Cronin) 2160, 2180–81, 2335).

23. Section 5.7 of the Gate Sale Agreement reflects Northwest's limited offer. (PX 19, § 5.7). In that paragraph, the parties expressly agreed that Northwest would negotiate to buy "*all* of Seller's assets," but only to assume "*certain* of Seller's liabilities," consistent with its October 8 representations. (PX 19, § 5.7, emphasis supplied; Tr. (Steenland) 3861–63; Hibbs Dep. 306).

24. The "certain ... liabilities" which Northwest agreed to assume were the DIP loan, the ATL, and the Fidelcor leases (plus the $4.7 million arrearage Midway owed the City of Chicago in connection with the Gate Sale Agreement). (PX 13, pp. 18–20; Tr. (Hanson) 1325–26).

25. Third, Midway itself never stated on the record or at the recess that it viewed any other of its liabilities to be Northwest's responsibility. (PX 13; Tr. (Burgess) 1109–10, 1308–09).

26. The Court finds that Midway's assertion that Northwest was obligated to assume additional liabilities is not consistent with the representations made to this Court. Moreover, Midway did not raise the issue of the additional liabilities Northwest would assume until October 22 and October 25. (Tr. (Hanson) 1344; (Steenland) 3924).

27. Fourth, Midway knew before the hearing that Northwest's proposal was for $95 million in consideration, which included the assumption of Midway's DIP loan and ATL. (Tr. (Hanson) 620, 624–27; Schick Dep. 197; Tr. (Burgess) 856–57, 975, 977, 1104–06; DX 98, pp. 3–4). In addition, both Northwest and Midway expressly stated on the record that the total dollar amount of consideration in the Back–End offer, *i.e.*, its value, was $95 million, plus the assumption of Midway's Fidelcor leases and the City of Chicago lease arrearage. (PX 13, pp. 19, 20, 40). Northwest also told Midway at the recess how the $95 million in total consideration was calculated. (Tr. (Burgess) 856–57, 1104–05).

28. Northwest's proposal included the assumption of certain specified Midway liabilities. (PX 13, p. 19–20). Thus, the assump-

tion of Midway liabilities was already included as a fundamental component in the parties' calculation of the total value of the Northwest proposal.

29. Accordingly, the value of the Northwest proposal necessarily would have been greater if Northwest had agreed to take on the additional liabilities later demanded by Midway. (Tr. (Henneman) 4316–17; (Steenland) 4269, 3905–06; (Hanson) 1369–70).

30. At the October 8 hearing, Hanson stated that Midway valued Northwest's proposal as being "in the area" of $140 million. (PX 13, p. 41). In addition, Jenkins testified at the hearing that the value of Northwest's proposal was "in the approximate range of $125 million." (PX 13, p. 55). These numbers would have to have been higher if Midway had believed that Northwest was agreeing to assume additional Midway liabilities. (Tr. (Steenland) 4269).

31. Fifth, where Northwest agreed to modify its proposal on October 8 to assume an additional liability, it did so expressly, as in the case of Northwest's decision to expand its offer to include the assumption of Midway's $4.7 million lease arrearage with the City of Chicago. (Tr. (Hanson) 605–06; (Steenland) 3923). After the recess, however, Northwest did not agree to assume any other liability (Tr. (Steenland) 3923–24), even after the Court requested a statement as to whether there were any changes to the parties' pre-recess proposals. (PX 13, pp. 49–50).

32. Sixth, as to the liens and cure costs, Northwest was buying the Midway gates free and clear of all liens and encumbrances (Tr. (Hanson) 484–85, 605, 615), and Midway never said on October 8 that Midway's other assets would not also be sold free and clear. (PX 13; Tr. (Steenland) 3923).

33. The Court finds that it would not have been reasonable for Midway to assume that Northwest was buying the gates and related assets free and clear, but purchasing Midway's other assets and leases subject to liens and encumbrances, particularly when Northwest specifically enumerated on the record the liabilities it would assume in exchange for all of Midway's remaining assets.

34. Finally, Southwest's offer on October 8 was for the purchase of assets from Midway free and clear of all liens and encumbrances. (Tr. (Hanson) 570, 657). No one from Midway, Southwest, or Northwest stated on the record that Southwest's offer was different than Northwest's offer in this regard. (PX 13).

35. The Court finds that, if Northwest's offer had included the assumption of the liens and encumbrances on Midway's assets, this would have been an important point in Northwest's favor, which Northwest or Midway could have been expected to emphasize.

36. The Court finds that the absence of any such statement on the record further indicates that the participants in the October 8 hearing understood that the Back–End transaction was like Southwest's offer with respect to the requirement that Midway deliver its assets free and clear.

37. For the reasons set forth above, the Court finds that Northwest's unwillingness in the negotiations to assume additional liabilities was consistent with the representations to the Court on October 8 and thus in good faith.

38. The parties also disagreed over whether Midway had the right to exclude certain assets from the Back–End transaction. Northwest contended it was entitled to "all" of Midway's assets or those of Midway's assets it desired to take. Midway sought to exclude the following assets from the Back–End transaction: (1) prepaid expenses and non-ATL deposits; (2) ATL deposits above the amount existing on October 8; (3) assets subject to liens which Northwest did not pay to remove; and (4) cash. (PX 44C).

39. Based on the events of October 8 and thereafter, the Court finds that Northwest did not agree to exclude any assets, and that the positions that Northwest took in the Back–End negotiations were maintained in good faith.

40. The Court finds that Midway knew even before the hearing that the Back–End transaction would be for all of Midway's remaining assets, as reflected by the First Boston notes of the conversation between

Cronin and Midway's representatives on the morning of October 8.

41. As those notes reflect, Cronin told Midway that Northwest's Back–End proposal was for the *"rest of"* and "all" of Midway's assets. (DX 9 at FB81, emphasis in original; Tr. (Cronin) 2157–59).

42. At the start of the October 8 hearing, Hanson specifically asked counsel for Northwest and Southwest to state "exactly what assets are involved" in their proposals, and to "focus on exactly what assets they're prepared to purchase," describing this information as one of the two "critical factors" (along with the conditions) at issue in the hearing. (PX 13, pp. 10, 15–16).

43. Following this directive, Parkins responded that the negotiations under the proposed Back–End transaction would be "for the acquisition of *the balance of the assets*" (PX 13, p. 18, emphasis added), and that "at the time of closing on the second phase of the transaction, which is for the *balance of the assets of Midway,* that *all current assets at that point in time* ... would be owned by Northwest." (PX 13, p. 20, emphasis supplied).

44. Hanson's notes concerning Parkins' presentation reflect that "[a]ll current assets would be bought/owned by NW." (DX 96/PX 676 at L2367).

45. Hanson and Koeneke (Midway's investment banker) testified that they knew that Northwest's October 8 offer was for all of Midway's current assets as of closing. (Koeneke Dep. 107; Tr. (Hanson) 1342, 627–28).

46. Thereafter, Midway and Northwest specifically agreed in Section 5.7 of the Gate Sale Agreement (PX 19) that their good faith negotiations, consistent with Northwest's October 8 Back–End offer, were to be for "the acquisition by Buyer [Northwest] of all of Seller's assets" in exchange for the consideration Northwest had stated on the record. (PX 19, § 5.7). This language was added to the draft of Section 5.7 as it existed on October 8 to reflect that notwithstanding Midway's prior requests to eliminate assets from the proposed transaction, the parties had agreed that a Back–End sale would include all of Midway's assets. (Tr. (Steenland) 3861–62).

47. Burgess testified that he disagreed with the interpretation of Section 5.7 that Northwest was to receive all of Midway's assets, but conceded that "on the words within the four corners of the documents there may not be any ambiguity to the reader...." (Tr. (Burgess) 1098).

48. Midway first sought to exclude assets from the Back–End transaction during the negotiations commencing on October 22. Northwest, however, did not agree on October 8 to forego any of the assets Midway later sought to exclude. (Tr. (Cronin) 2139–40). Nor did Northwest agree between October 8 and October 25 that Northwest was willing to exclude assets from the Back–End transaction. (Tr. (Henneman) 4309–11; (Burgess) 1107–08).

49. The Court finds that Northwest did not take a position inconsistent with its representations on October 8 by maintaining that it was entitled to all of Midway's assets as of the closing of the Back–End transaction in exchange for the consideration it stated in Court on October 8, and therefore Northwest negotiated in good faith.

50. Midway suggests that Northwest negotiated in bad faith because a section of its October 21 draft agreement (PX 43) purported to have Midway transfer its cash to Northwest, including the proceeds of the Gate Sale. This issue was first raised by Midway during a telephone call by Steenland to Midway. (Tr. (Steenland) 3902–03; (Hanson) 562–63).

51. The Court finds that the consistent testimony of the participants to that conversation and the contemporaneous notes of Midway's counsel demonstrate, however, that Steenland immediately assured Midway that it was not Northwest's intent to take back the cash proceeds of the Gate Sale, that the misunderstanding was essentially a drafting problem caused by the speed with which Northwest put together its draft, and that Northwest was prepared to correct the drafting problem. (DX 100 (Hanson); Tr. (Hanson) 562–63, 1349–50; DX 79/PX 658 at

L1060; Tr. (Burgess) 899, 1142–43; (Steenland) 3902–03, 4273–74).

52. Northwest made the same point at the October 30 negotiating meeting. (DX 253 at L1920 (Henneman); Tr. (Burgess) 1142; (Steenland) 3948–49; (Henneman) 4329; (Cronin) 2177).

53. Ultimately, Northwest restructured its proposal in its October 28 and November 7 term sheets to resolve this drafting problem. (PX 45 at ML14288; PX 47, App. A, ¶ 3(a)).

54. The Court finds that Northwest's position on the cash issue in the October 21 draft does not constitute bad faith negotiation. To the contrary, Northwest acted in good faith by expressing its willingness to remedy what was most likely a drafting error. (Tr. (Steenland) 3902–03).

55. The parties also disagreed during the negotiations over the interpretation of the portion of Northwest's proposal concerning Midway's leases with aircraft lessors other than Fidelcor ("non-Fidelcor leases").

56. The Court finds that, based on the following facts, Northwest's negotiating position on the non-Fidelcor leases was consistent with representations made to the Court by the parties at the October 8 hearing. Thus, the Court finds that Northwest negotiated in good faith with regard to the non-Fidelcor leases.

57. On October 8, Northwest expressly offered to "assume" Midway's obligations under its leases with Fidelcor for 17 aircraft. (PX 13, p. 19). Midway also had leases with lessors other than Fidelcor for 28 additional aircraft, which Northwest believed it might be able to use. In contrast to its willingness to assume Midway's Fidelcor leases, Northwest offered on October 8 only "to enter into negotiations to effect an assumption" of the non-Fidelcor leases for the other 28 planes. *Id.* Northwest also told the Court that it would only be "attempting to negotiate and relieve the estate of the liability" for the additional non-Fidelcor leases. (PX 13, p. 20). Northwest did not propose to do anything other than enter into negotiations with the non-Fidelcor lessors. (Tr. (Steenland) 3925; PX 45 at ML14289, ML14292).

58. In his initial presentation to the Court, Parkins estimated that the rental payments due the non-Fidelcor lessors from Midway under their leases from the date of a closing of the Back–End transaction to the expiration of the term of the leases totaled approximately $30 million, and that the value to the estate for this element would be $30 million if those leases were "so assumed" by Northwest. (PX 13, p. 19; PX 45 at ML14289, ML14292; Tr. (Burgess) 1112).

59. Midway, however, informed Northwest during the first recess on October 8 that Midway had not yet assumed the non-Fidelcor leases in the bankruptcy proceedings, and thus could reject those leases and relieve its estate of any liability for lease payments. As a result, Midway and Northwest agreed at the recess that Midway should not attribute any value to this portion of Northwest's offer. (Tr. (Cronin) 2102–03, 2295; (Steenland) 3808–10, 3925). Northwest confirmed this with Midway at the end of the recess. (Tr. (Steenland) 3828).

60. After the recess Hanson expressly stated on the record that Midway was assigning no value to the portion of the Northwest offer relating to the non-Fidelcor leases:

We didn't give any particular credit to the fact that they want to negotiate for 28 additional aircraft. Those are not—except to the extent that those negotiations may take up some of the post-petition arrearages that have not been paid, and that's uncertain. There's a possibility of that in our minds.

(PX 13, p. 41).

61. Moreover, the Court finds that there is no dispute that: (1) the combined value of Northwest's Gate Sale ($20 million) and the Back–End transaction ($120 million, comprised of $95 million plus $25 million for the Fidelcor lease assumption) would total only $140 million if the non-Fidelcor leases were excluded from a valuation of Northwest's proposal; and (2) the value of the combined Gate Sale and Back–End transaction would have totaled $170 million if the assumption of the non-Fidelcor leases was included in a valuation.

62. Hanson acknowledged on the record that Northwest had not agreed to assume the non-Fidelcor leases or provide $30 million in value for those leases in his October 8 summary of Midway's valuation of the Northwest proposal:

So we didn't view it as a $170 million offer. We viewed it as something more in the area of [$]140 [million] with the possibility for a little more coming out of the negotiations on the post-petition lease arrearages. (PX 13, p. 41).

63. As a result of these remarks, Northwest reasonably believed that Hanson was confirming Midway's agreement at the recess that no value was to be placed on Northwest's offer to negotiate for the non-Fidelcor leases. (Tr. (Steenland) 3829, 4269).

64. Midway's valuation expert, James Jenkins of First Boston, also understood that Northwest had not obligated itself to assume the non-Fidelcor leases or provide $30 million in value to Midway. He did not include any value for the Northwest offer to negotiate for the non-Fidelcor aircraft in his valuation of the total Northwest proposal on October 8, which he valued at $125 million. (PX 13, pp. 55–57; Jenkins Dep. 167–69). Moreover, Jenkins' October 16 term sheet indicated only that "NWA intends to negotiate with all other aircraft lessors to enter into new contracts." It did not indicate that Northwest had agreed to assume those leases or otherwise provide $30 million in value to Midway. (DX 12 at FB33).

65. Midway, however, took the opposite position during the negotiations, repeatedly demanding that Northwest provide an additional $30 million in value to Midway for the non-Fidelcor leases. Midway first raised this demand in the October 22 telephone call to Steenland, telling Steenland that Northwest's October 21 draft was deficient because it did not provide for $30 million in value for the non-Fidelcor leases. (DX 100 (Hanson), item 1; Tr. (Steenland) 3899–3901; (Burgess) 1117; (Hanson) 563–64). Midway repeated the demand for an additional $30 million in value in its October 25 letter (PX 44B) and term sheet (PX 44C). In its letter, Midway described this demand for $30 million in value as one of its "essential" terms, stating that, "Midway and Northwest must agree on the mechanism through which Northwest will provide the estate with the $30 million in value related to [the non-Fidelcor aircraft leases]." (PX 44B; Tr. (Burgess) 1111). Midway's accompanying term sheet (PX 44C, p. 2) also demanded the additional $30 million in value. Under the heading "Composition of Purchase Price," the term sheet called for "additional value to the estate of $30 million (see paragraph 2 under "Other liabilities to be assumed by Northwest" below)." Midway repeated the demand at the October 30 meeting. (Tr. (Cronin) 2183).

66. Northwest refused to accede to Midway's demands. Northwest contended that its October 8 proposal required it only to negotiate with the non-Fidelcor lessors, and that it was not obligated to assume the leases or create a monetary value for Midway as Midway claimed. (Tr. (Cronin) 2183–84, 2139; (Steenland) 3899, 3901, 3955; PX 45 at ML14289, ML14292). Northwest also reminded Midway during the October 22 conversation of the agreement formed during the recess of the October 8 hearing that there was to be no value attributed to this component of the Back-End offer (Tr. (Steenland) 3901; (Hanson) 563–66; (Burgess) 1117; DX 100 at L2374); in Northwest's October 28 letter and term sheet (PX 45 at ML14292–93); and at the October 30 meeting. (Tr. (Steenland) 3954–55; (Cronin) 2182–84; PX 89 at DW6014).

67. Midway conceded at the October 30 meeting that it was not entitled to the $30 million in value, and that it included this term to get Northwest's "attention," knowing Northwest would "hit the ceiling." (Tr. (Steenland) 3954–55; (Cronin) 2184; PX 89 at DW6014). After abandoning the demand for $30 million in value, Midway asked Northwest at the meeting for help in getting the non-Fidelcor lessors to waive Midway's $7–9 million post-petition arrearage. *Id.*

68. The Court finds that Northwest did not agree to pay such $30 million in value on October 8 or at any time prior or subsequent thereto. Midway's ultimate acknowledgement that it was not entitled to this value demonstrates that Northwest's position in

the subsequent negotiations was consistent with the representations on October 8 and hence maintained in good faith.

69. The Court finds that Northwest's good faith is further demonstrated by its offer on October 31 to use its best efforts to cause the non-Fidelcor lessors to forgive or reduce their post-petition claims against the Midway estate. (Tr. (Steenland) 3967, 4033, 4213–14; DX 254 at L6; DX 253 at L1923; DX 306).

70. Northwest memorialized this compromise in its November 7 term sheet. (PX 47, App. A, ¶ 9). This offer provided value to Midway at the economic expense of Northwest. (Tr. (Steenland) 4213–15).

71. The Court finds that Northwest's refusal to provide an additional $30 million in value was both consistent with the representations made to the Court on October 8 and made in good faith.

72. During the Back–End negotiations, an issue arose concerning the funding of Midway's operating losses. Midway asserted during the October 22 call to Steenland that one of the "fundamental conceptual" defects with Northwest's October 21 draft agreement was that it did not provide for Northwest's funding of Midway's operating losses commencing November 8, 30 days from the October 8 hearing. (DX 100; Tr. (Hanson) 1349; (Burgess) 1049–50; (Steenland) 3906). It was Midway's position that Northwest had an unconditional and unlimited obligation to fund Midway's operating losses as of November 8. (PX 44B, PX 44C; Tr. (Burgess) 1127; (Steenland) 3957–58; (Cronin) 2187). Midway's October 25 letter even stated that "[i]t is equally crucial that the agreement contemplate the funding by Northwest of Midway's losses commencing November 8." (PX 44B).

73. Northwest agreed that it had made a proposal to fund Midway's operating losses under certain circumstances, but denied that its commitment was unconditional 30 days from October 8. Northwest's view was that it would become responsible for operating losses only after the parties had reached agreement on the material business points and only technicalities or ministerial tasks

held up a closing, or if the transaction was ready to close but Northwest elected to defer the closing for its own business reasons. Northwest also explained to Midway in the negotiations that Northwest was not responsible for funding Midway's losses commencing November 8 because any delay in closing would result from the fact that the parties obviously had not reached agreement on material business terms. (PX 45 at ML14293; Tr. (Steenland) 3906–08, 3957–58, 3843–44; (Henneman) 4331–33; (Cronin) 2187–88, 2320; Schick Dep. 86; Tr. (Burgess) 1152; DX 253 at L1921). Northwest's position was memorialized in its October 28 term sheet, which closely tracked the concept of Northwest's October 8 commitment to fund operating losses. (PX 45 at ML14289; Tr. (Steenland) 3926–27).

74. The Court finds that Northwest's position was a reasonable interpretation of the statements made to the Court on October 8.

75. Parkins stated that Northwest's offer to cover Midway's operating losses would be applicable "if it's because we just haven't finished the documents or those kind of technicalities," or "if it's because people haven't finished the documents." (PX 13, p. 50). He referred back to that offer again stating that "we have already said that we'd undertake to fund the losses for the period necessary to close...." (PX 13, p. 64).

76. The Court finds that Parkins' comments, in context, do not constitute an unconditional promise to fund Midway operating losses irrespective of whether the parties had reached agreement on all material business terms and were still negotiating.

77. The Court finds that the circumstances surrounding Northwest's proposal to fund Midway's operating losses also demonstrate that Northwest's position in the negotiations was consistent with its representations to the Court and therefore in good faith.

78. Northwest never discussed the subject of covering Midway's operating losses with Midway before Parkins raised the issue on the record. (Tr. (Hanson) 505, 530; (Burgess) 1126; Parkins Dep. 168–69, 138, 110; Tr. (Steenland) 3840). By that time, Midway

had already advised the Court that it "wishes to pursue the Northwest offer" rather than the Southwest proposal. (*Compare* PX 13, p. 39 with PX 13, p. 50; Tr. (Steenland) 3839).

79. The Court finds that Northwest's two statements on the record concerning operating losses were at the most ambiguous.

80. Northwest acted in good faith by offering, on October 31 and in its November 7 term sheet (PX 47, App. A, ¶ 8), to give Midway a $3 million credit to compromise the dispute concerning the operating losses issue.

81. The Court finds that that concession reflects a material and good faith attempt to compromise the dispute on the issue arising out of any ambiguity in Parkins' statements on the record on October 8.

82. Therefore, the Court finds that Northwest's position regarding the operating losses was consistent with its representations to the Court on October 8 and consequently in good faith.

83. The Court further finds that Northwest's concessions and compromises further demonstrate that it negotiated in good faith consistent with its representations on October 8.

84. Section 5.7 of the Gate Sale Agreement did not require Northwest to make concessions or compromises; it merely required that Northwest negotiate in good faith consistent with its representations in Court.

85. Nevertheless, Northwest did offer concessions and compromises at the October 31 meeting and in its November 7 term sheet. Among other things: (1) Northwest offered to allow Midway to retain $3 million of assets as a compromise for the dispute over the funding of Midway's operating losses (Tr. (Burgess) 1163–64, 920–21; (Steenland) 3965; DX 253 at L1923; DX 254 at L6; DX 306; PX 47, App. A, ¶ 8); (2) Northwest offered an adjustment to the method for determining the purchase price which would result in Northwest's paying more than $95 million in consideration if, as turned out to be the case, Midway's ATL was greater than $35 million, by assuming all of Midway's ATL and still providing $20 million in cash and notes (Tr. (Steenland) 3966; PX 47, App., ¶¶ 3–4; Tr. (Burgess) 1182–83); (3) North-

west offered to use its best efforts to cause the non-Fidelcor lessors to forgive or reduce their post-petition administrative claims against the Midway estate (DX 253 at L1923; DX 254 at L6; DX 306; Tr. (Steenland) 3966–68, 4033, 4213–14; PX 47, App. A, ¶ 9); (4) Northwest offered to leave behind certain assets and contracts (PX 47, App. A, ¶ 2); (5) Northwest offered to enter into a master sublease agreement with Midway, which would have avoided the need for Midway to cure defaults and would have created risks for Northwest (Tr. (Steenland) 3966; Steenland· Dep. 420; PX 47, App. A, ¶ 11); (6) Northwest offered to permit Midway to take an offset against the promissory note which Northwest would provide, rather than forcing Midway to use its own dwindling cash to cover the costs of curing liens (DX 306; PX 47, App. A, ¶ 5; Steenland Dep. 421; Tr. (Burgess) 1168–69); (7) Northwest agreed to have Midway's representations and warranties terminate in six months rather than in two years as in the Gate Sale Agreement (PX 47, App. A, ¶ 15); and (8) Northwest offered to permit Midway's ex-employees, who would have been employed by Northwest, to assist in winding up the affairs of the Midway estate. (PX 47, App. A, ¶ 13; Steenland Dep. 421).

86. Northwest memorialized these concessions in its November 8 draft agreement. (PX 46). These concessions further reflect Northwest's good faith.

87. Midway suggests that Northwest acted in bad faith because Midway accepted Northwest's compromise proposal on or after October 31, but Northwest still refused to close the Back–End transaction.

88. The Court finds that the record does not support this assertion.

89. The parties negotiated extensively on October 30 and 31. One of the hotly debated topics was which party would bear the cost of removing liens and curing defaults. Altschul testified that there was no resolution of this issue on October 31:

Q: And it is correct that Midway never agreed to cure the liens or defaults on the assets?

A: Yes.

(Tr. (Altschul) 3599–3600). Burgess' testimony was to the same effect:

Q: But Midway did not tell Northwest that it unconditionally agreed to cover the cost of curing all the liens on its assets, did it?

A: No, it couldn't.

Q: Right, it couldn't. It couldn't and it didn't?

A: That's right.

(Tr. (Burgess) 1170).

90. Similarly, on November 1, Koeneke and Cronin still were discussing the $12–20 million in cure costs as a problem that needed to be resolved. (Tr. (Cronin) 2200, 2336–37).

91. The Court finds that this also demonstrates that the issue of which party would bear the cure costs had not been resolved on October 31.

92. The Court finds that the evidence further demonstrates that Northwest did not believe that Midway had agreed to cover the cure costs.

93. Steenland told Dasburg after November 5 that Northwest could not get Midway's assets without assuming more debt. (Dasburg Dep. 242–43). Moreover, in its November 7 letter, Northwest wrote, "[c]ontrary to Midway's position, Midway must deliver to Northwest the purchased assets free and clear of all liens, claims and encumbrances...." (PX 47 at 215023).

94. Although this sentence plainly reflects that Midway had not agreed on October 31 to deliver its assets free and clear, the Court finds that Midway never responded that Northwest's characterization of Midway's position was wrong.

95. Rather than agreeing on October 31 to assume the cure costs, Midway asked Northwest to provide a list of assets that it wanted Midway to convey to Northwest so that Midway could determine the cure costs on those assets and the value of Northwest's offer as a whole, and then decide whether or not to proceed with the Back–End transaction. The testimony of Henneman, one of Midway's lawyers, confirms this:

Q: And you can recall no other resolution at the meeting, at the end of the meeting on October 31st other than Midway saying that it needed to consider the value of the Northwest offer as it stood at that time?

A: Correct.

(Tr. (Henneman) 4340). Altschul testified to the same effect:

Q: It is also correct that at the end of the October 31st meeting, there were still areas to be negotiated between Midway and Northwest?

A: Yes.

(Tr. (Altschul) 3600).

96. At the October 31 meeting, Northwest made it clear to Midway that its position was its best offer, but agreed to Midway's request for a written term sheet and a list of assets so that Midway could decide whether or not to accept Northwest's terms. Northwest provided the requested documents on November 7. (PX 47).

97. Midway's conduct also rebuts its claim that it had reached agreement with Northwest on October 31 or thereafter. Midway's letters of November 8 and November 12 (PX 63, PX 67) simply state that Midway wanted to negotiate more; there are no statements in these letters to the effect that Midway had agreed to Northwest's offer on October 31—or even that Midway was prepared to accept Northwest's last and best offer reflected in the November 7 term sheet. To the contrary, the November 8 letter refers to "differences" between the parties. (PX 63, p. 1).

98. In view of the foregoing evidence, the Court finds that Midway did not reach agreement with Northwest on October 31 or at any time thereafter.

99. In Section 5.7 of the Gate Sale Agreement (PX 19), the parties agreed to use their best efforts to close the Back–End transaction by November 9, thirty days after the date of the Gate Sale Agreement.

100. Northwest terminated the negotiations on November 13, thirty-four days after the good faith negotiation period set forth in Section 5.7.

101. The Court finds that by that time, Northwest and Midway had negotiated extensively on the Back–End transaction, but had not reached an agreement.

102. Midway suggests that Northwest terminated the negotiations in bad faith for business reasons unrelated to the merits of the Midway transaction, and that the reasons stated by Northwest for not proceeding were subterfuges. Midway suggests that Northwest backed out of the Midway transaction because of concerns about jeopardizing a proposed financing package from the State of Minnesota, objections from Northwest's bankers, problems with Northwest's own financial performance, or the desire to effectuate an even bigger acquisition or merger.

103. The Court finds that these theories about why Northwest did not consummate any Back–End transaction are not supported by the facts.

104. Even if true, the Court finds that Northwest did negotiate in good faith during the thirty day period.

105. The Court finds Midway's theory that Northwest's decision not to proceed with the Back–End transaction was in bad faith based on these alleged subterfuges is unsupported by the record.

106. In 1991, the State of Minnesota was competing against several other states, including Louisiana and Oklahoma, to induce Northwest to build two aircraft maintenance facilities in Minnesota because the facilities would employ approximately 5,000 employees at a high average wage of $45,000 per year. (Tr. (Steenland) 3788–3790, 4259; (Moses) 1471–72; Clouser Dep. 19). To encourage Northwest to build the facilities in Minnesota, and pursuant to legislative authorization, the State of Minnesota offered Northwest financial incentives as part of an overall package. (Tr. (Moses) 1472).

107. In May 1991, well before Northwest and Midway first discussed the terms of any proposed transaction, the Minnesota legislature enacted legislation authorizing a financing package for the two maintenance facilities. (PX 135).

108. The Minnesota financing package was not, as Midway has characterized it, a state financed "bailout" of Northwest. (Tr. (Steenland) 3790; (Moses) 1472).

109. The Court finds that the Minnesota financing package was an inducement to Northwest to build its facilities in Minnesota.

110. After long negotiations, the financing package was finalized in late April 1992, long after the decision on November 12, 1991 by Northwest's Board not to proceed with the Midway transaction. (Tr. (Steenland) 4046; Clouser Dep. 18; Francht Dep. 81–82).

111. The Court finds that Midway failed to produce any evidence that Northwest chose not to consummate the Back–End transaction because of a concern about the effect of an acquisition of Midway on Northwest's ability to obtain the Minnesota financing package.

112. The evidence showed that the impact of a transaction with Midway on the proposed Minnesota financing was not discussed at the October 7 Northwest Board meeting (Tr. (Steenland) 3790–91; Francht Dep. 81; Van Wijk Dep. 44), the November 5 Board meeting (Francht Dep. 176; Tr. (Steenland) 4222), or the November 12 Board meeting (Francht Dep. 201; Tr. (Steenland) 4044; Bouw Dep. 67–68; Van Wijk Dep. 105–06).

113. Each witness questioned on the subject testified that there was no connection between obtaining the Minnesota financing and the decision to terminate the Back–End transaction. (Wilson Dep. 144; Tr. (Garel) 3520; Hibbs Dep. 226, 156; Tr. (Steenland) 4046; Leonard Dep. 46–47; Clouser Dep. 148; Fornaro Dep. 386–87; Roseboom Dep. 85; Tr. (Moses) 1472; Francht Dep. 192; Schutzbank Dep. 186; Abels Dep. 107–08, 188–90; Tr. (Jehn) 2692).

114. The Court finds that Midway presented no testimony at trial from any representative of the State of Minnesota or the other financing authorities to support Midway's theory that the State was opposed to Northwest's proposed acquisition of Midway or tried to dissuade Northwest from consummating it.

115. The Court finds that the evidence that was put forth was undisputed to the effect that no one from the State of Minneso-

ta, or the other interested agencies, expressed concern to anyone at Northwest regarding the Midway transaction. (Francht Dep. 45, 41, 193–94; Fornaro Dep. 386–87; Leonard Dep. 47; Garel Dep. 106–107).

116. Midway also suggests that Northwest refused to consummate the Back–End transaction because Northwest learned sometime after the October 11 closing of the Gate Sale that Northwest did not have the financial ability to consummate the transaction or because its lenders opposed the transaction.

117. The Court finds that the record rebuts these unsupported allegations.

118. In 1989, Bankers Trust Company and approximately sixty-five other banks (the "Bank Group") loaned Northwest $3.1 billion. (Tr. (Moses) 1411–12). In connection with that loan, the Bank Group and Northwest entered into a credit agreement containing certain covenant restrictions. (Tr. (Moses) 1413–14; PX 126; Francht Dep. 33–34). The Bank Group received monthly financial reports from Northwest. (Tr. (Moses) 1482).

119. The proposed Back–End transaction did not have any impact on the credit agreement covenant restrictions. (Francht Dep. 181–183; Roseboom Dep. 83–84). The Bank Group was not concerned about such covenants in connection with the Back–End transaction. (Francht Dep. 34–35, 37; Tr. (Moses) 1474, 1482–85; PX 69; PX 131).

120. Midway called as a witness John C. Moses, who was a Vice President of Bankers Trust Company and the principal contact between the Bank Group and Northwest. (Tr. (Moses) 1409–12; PX 130/DX 430). Moses learned of the proposed Midway transaction in early October from Joseph Francht, Northwest's Treasurer. (Tr. (Moses) 1472–73). On October 9, Francht sent Moses a letter summarizing the proposed transaction and confirming a meeting for October 10 to "review the proposed Midway transaction in its entirety." (PX 130/DX 430). After reviewing the lending agreements with Bankers Trust's counsel, Moses told Francht that Bank Group approval would not be a requirement for the Back–End transaction. (Tr. (Moses) 1476–78; Francht Dep. 63).

121. Moses also testified that while Northwest predicted it might need relief from certain loan covenants, Northwest was one year ahead of its repayment schedule by the end of the third quarter of 1991, having repaid approximately $1.7 billion of its original $3.1 billion loan, including repaying approximately $300 million in advance. (Tr. (Moses) 1466–68).

122. The Court finds that there was no evidence that Northwest's decision not to consummate the Back–End transaction had anything to do with objections from Northwest's bankers or concerns about the lending covenants.

123. Neither Moses nor anyone associated with the Bank Group voiced any opposition to the proposed Midway transaction. (Tr. (Moses) 1466; Francht Dep. 36, 45–46; Garel Dep. 105–07; Fornaro Dep. 386). Moses also testified that he never told anyone from Northwest that proceeding with a Midway transaction would make it more difficult to obtain Bank Group approval of covenant changes. (Tr. (Moses) 1470–71).

124. Moses also testified that he never told Northwest that he thought Northwest could not afford the Back–End transaction, which he felt did not involve a large amount for a company of Northwest's substantial size. (Tr. (Moses) 1474).

125. Each witness questioned on the subject of Northwest's financial condition testified that Northwest had the financial ability to acquire Midway. (Francht Dep. 151–152; Tr. (Steenland) 4159; Steenland Dep. 118; Tr. (Garel) 3520; Garel Dep. 196–97; Tr. (Fornaro) 3058). The Northwest Board was so advised on November 5. (Aziz Dep. 104).

126. The Court finds that there was no dramatic and unforeseen change in Northwest's financial condition between October 8 and November 12 that made the Midway acquisition suddenly unaffordable.

127. Each witness questioned on the subject testified that Northwest's projected losses for 1991 and 1992 were not the basis of Northwest's decision not to consummate the Back–End transaction. (Garel Dep. 224–25; Tr. (Fornaro) 3058; Fornaro Dep. 385–86; Leonard Dep. 167; Wilson Dep. 16; Abels

Dep. 109; Tr. (Steenland) 4044; Schutzbank Dep. 184).

128. Finally, the Court finds that Midway failed to provide any evidence that the directors who voted to disapprove the transaction at the November 12 Board meeting did so because of concerns that Northwest was in such financial trouble that it could not afford the Back–End transaction.

129. Midway also suggests that Northwest terminated the Back–End transaction so it could effectuate an even bigger acquisition or merger—either with Continental Airlines or a three-way transaction with British Airways and KLM.

130. The Court finds that Midway presented no evidence that Northwest's analysis of these proposals had any effect on the decision whether or not to proceed with the Back–End transaction.

131. To the contrary, every witness questioned on the subject testified that Northwest's decision not to consummate the Back–End transaction had nothing to do with the Northwest–British Airways–KLM analysis, the Northwest–Continental analysis, or discussions between Northwest and any other airline. (Tr. (Garel) 3519–20; Roseboom Dep. 85; Abels Dep. 108–109; Tr. (Steenland) 3791, 4047; Bouw Dep. 67–68; Van Wijk Dep. 44, 106; Tr. (Moses) 1481).

132. Similarly, the evidence shows that Northwest's Board did not even discuss these other initiatives during their deliberations about whether to go forward with a Midway transaction at the October 7, November 5, and November 12 Board meetings. (Tr. (Steenland) 3791, 4044, 4047; Van Wijk Dep. 44, 106; Bouw Dep. 67–68).

133. Accordingly, the Court finds that Midway failed to prove that Northwest terminated the Back–End transaction because of concerns that Northwest was in financial trouble or so Northwest could effectuate a larger merger or acquisition.

134. Northwest alleges that Midway may not recover under this count because Northwest sustained its burden of proving the following affirmative defenses: (1) Northwest did not breach its duty to negotiate in good faith because Northwest's obligation was ex-pressly subject to conditions which were not satisfied; (2) Paragraph 7 of the Confidentiality Agreement bars Midway's claim for breach of the duty to negotiate in good faith; (3) Northwest's obligation to negotiate in good faith was excused because of Midway's misrepresentations or omissions regarding the data Midway submitted to the DOT; (4) Northwest's obligation to negotiate in good faith was excused because of the mistaken belief concerning Midway's DOT data; and (5) Northwest's obligation to negotiate in good faith was excused because Midway repudiated the agreement by demanding terms that were materially different and inconsistent with the terms set forth at the October 8 hearing.

135. The Court has previously found that the first affirmative defense, that Northwest's obligation was expressly subject to conditions precedent which were not satisfied, is meritorious. *See* Count I. As for the remaining affirmative defenses, the Court has already found that they lack merit, and thus will not reconsider those defenses. *See* Count I.

### CONCLUSIONS OF LAW

1. "The obligation to negotiate in good faith has been generally described as preventing one party from, 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'" *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 873 F.2d 155, 158 (7th Cir.1989) (citing *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987)); *see also Milex Products., Inc. v. Alra Lab., Inc.,* 237 Ill.App.3d 177, 189, 177 Ill.Dec. 852, 860, 603 N.E.2d 1226, 1234 (2d Dist.1992), *appeal denied,* 149 Ill.2d 651, 183 Ill.Dec. 863, 612 N.E.2d 515 (1993).

2. Every contract implies good faith and fair dealing between the parties. *Martindell v. Lake Shore Nat'l Bank,* 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958); *LaScola v. US Sprint Communications,* 946 F.2d 559, 565 (7th Cir.1991).

3. The scope of an obligation to negotiate in good faith is determined by the framework

the parties have established for themselves. *A/S Apothekernes*, 873 F.2d at 158–60. The test of Northwest's good faith, therefore, was whether it adhered to its agreement in Section 5.7.

■ 4. The Court concludes that good faith is good faith, whether analyzed in the context of an implied or express duty. The analysis of what constitutes good faith should not change depending upon whether it is an implied or express duty. The Court has been unable to find any case that made an analytical distinction between the implied and express duties of good faith. Thus, the Court concludes that the cases construing the implied duty of good faith apply equally to the express duty of good faith.

■ 5. A breach of the duty of good faith and fair dealing is a breach of contract. *Raprager v. Allstate Ins. Co.*, 183 Ill.App.3d 847, 861, 132 Ill.Dec. 224, 233, 539 N.E.2d 787, 796 (2d Dist.1989).

6. In order to prevail upon this claim, Midway must show, by a preponderance of evidence, that: (1) the Gate Sale Agreement was a binding contract; (2) Midway performed its obligations under the Gate Sale Agreement; (3) Northwest breached the Gate Sale Agreement by refusing to negotiate in good faith concerning the Back–End transaction; and (4) Midway was damaged as a result of Northwest's breach. *See Mannion v. Stallings & Co.*, 204 Ill.App.3d 179, 186, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1st Dist.1990); *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.*, 818 F.Supp. 1152, 1155 (N.D.Ill.1993).

7. As the party claiming the breach, Midway bears the burden of proving the breach. *See Bower v. Jones*, 978 F.2d 1004, 1013 (7th Cir.1992).

8. Paragraph 5.7 became binding upon the parties when they executed the Gate Sale Agreement on October 11, 1991.

■ 9. A duty to negotiate in good faith does not guarantee that the negotiations will be fruitful or lead to a final contract. *A/S Apothekernes*, 873 F.2d at 159 (The duty to negotiate in good faith "is no guarantee that the final contract will be con-cluded, even if the parties fulfill their good faith obligations."). The duty to negotiate in good faith only binds the parties to negotiate until they disagree; it does not require them to reach a final agreement. *Id.* *See also PSI Energy, Inc. v. Exxon Coal USA, Inc.*, 17 F.3d 969, 973–74 (7th Cir.) (an obligation to negotiate in good faith does not require one side to reveal its strategy), *cert. denied*, —— U.S. ——, 114 S.Ct. 2712, 129 L.Ed.2d 838 (1994); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223 (7th Cir.1988) (where the parties disagree, "[t]he proper recourse is to walk away from the bargaining table, not to sue for 'bad faith' in negotiations"). Thus, the mere fact that the parties failed to reach an agreement regarding the Back–End transaction does not necessarily mean that the duty to negotiate in good faith has been breached.

10. The duty of good faith and fair dealing "requires the party vested with contractual discretion to exercise it reasonably, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *First Nat'l Bank of Cicero v. Sylvester*, 196 Ill.App.3d 902, 910, 144 Ill.Dec. 24, 30, 554 N.E.2d 1063, 1069 (1st Dist.), *appeal denied*, 133 Ill.2d 555, 149 Ill.Dec. 320, 561 N.E.2d 690 (1990); *see also Foster Enterprises, Inc. v. Germania Federal Sav. & Loan Ass'n*, 97 Ill.App.3d 22, 30, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (3d Dist.1981); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1443 (7th Cir.1992); *Rao v. Rao*, 718 F.2d 219, 222–23 (7th Cir. 1983).

11. The duty of good faith implied in every contract prohibits the parties from taking "opportunistic advantage" of their contractual partners. *See Capital Options Inv., Inc. v. Goldberg Bros. Commodities, Inc.*, 958 F.2d 186, 189 (7th Cir.1992); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990) (regarding equitable subordination of priority claims in bankruptcy); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir.1987) (former shareholder-employee of closely held corporation brought lawsuit against that corporation for fraud), *cert. dismissed*, 485 U.S. 901, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988).

12. A party behaves opportunistically and breaches this duty whenever it attempts to advance its own interests by changing the conditions of the deal or exercising discretion that is inconsistent with the terms of the agreement. *See Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 281 (7th Cir. 1992). Not only did Northwest not act opportunistically toward Midway, but it was Midway who acted opportunistically by changing the conditions of the deal on October 22.

13. The Seventh Circuit has opined:

An obligation to negotiate "in good faith" nixes trickery and certain forms of obduracy, *see Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 594–96 (7th Cir.1991), but it does not require one side in negotiations to reveal its bargaining strategy or its reservation price, to disclose every tidbit that would be of use to the other side, or to refrain from taking advantage of its opportunities. *See Continental Bank, N.A. v. Everett,* 964 F.2d 701, 703–05 (7th Cir.1992).

*PSI Energy,* 17 F.3d at 973.

14. As part of the duty of good faith and fair dealing, parties to a contract "impliedly promise not to do anything which will destroy or injure the other party's right to receive the fruits of the contract." *Vincent v. Doebert,* 183 Ill.App.3d 1081, 1090, 132 Ill.Dec. 293, 299, 539 N.E.2d 856, 862 (2d Dist.1989) (citation omitted).

15. When a party's obligation under a contract is subject to a condition, the duty of good faith and fair dealing comes into play and imposes on that party an obligation "to cooperate and to not hinder the occurrence of the condition." *Unit Trainship, Inc. v. Soo Line R.R.,* 905 F.2d 160, 163 (7th Cir.1990); *Gould v. Artisoft, Inc.,* 1 F.3d 544, 549 (7th Cir.1993); *see also A/S Apothekernes,* 873 F.2d at 159 n. 2 (party must use "reasonable efforts" to make the condition occur) (citing *Dodson v. Nink,* 72 Ill.App.3d 59, 64, 28 Ill.Dec. 379, 382, 390 N.E.2d 546, 549 (2d Dist.1979)); *Cummings v. Beaton & Assocs.,* 249 Ill.App.3d 287, 306, 187 Ill.Dec. 701, 712, 618 N.E.2d 292, 303 (1st Dist.1992) (party cannot take advantage of her own conduct

and then claim the resulting failure of the condition defeats her liability), *appeal denied,* 149 Ill.2d 648, 183 Ill.Dec. 860, 612 N.E.2d 512 (1993); *Grill v. Adams,* 123 Ill. App.3d 913, 917, 79 Ill.Dec. 342, 346, 463 N.E.2d 896, 900 (1st Dist.1984) (same).

16. Section 5.7 of the Gate Sale Agreement required the parties to negotiate in good faith towards arriving at a Back–End agreement, consistent with their representations to the Court on October 8. Northwest's agreement to negotiate in good faith did not guarantee that its negotiations with Midway would be fruitful or obligate it to reach a binding contract for the Back–End transaction. Because Northwest negotiated in good faith consistent with the representations to the Court on October 8, the Court concludes that Northwest did not breach Section 5.7.

17. The duty to negotiate in good faith does not prohibit a party from bargaining to its own economic advantage. *Feldman,* 850 F.2d at 1223 ("[O]ne cannot characterize self-interest as bad faith."). It does not compel a party to agree to a proposal or make a concession. *In re Gray Line of Boston, Inc.,* 62 B.R. 811, 816 (Bankr. D.Mass.1986). Because Northwest was entitled to bargain to its own advantage, the Court concludes that Northwest's refusal to agree to Midway's proposals or make concessions or deviations from the terms of its Back–End offer as stated on the record at the October 8 hearing did not constitute bad faith.

18. Even when the parties have few or no material disagreements left to resolve, the duty to negotiate in good faith does not compel either party to consent to the other's position. *Feldman,* 850 F.2d at 1223 n. 2. Refusing "to budge an inch" is not necessarily an indication of lack of good faith. *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership,* 734 F.Supp. 1181, 1190 (D.Md.1990), *aff'd,* 937 F.2d 603 (4th Cir. 1991). Thus, just because Northwest refused to give in to Midway's demands does not necessarily mean that Northwest acted in bad faith.

19. The consistency of Northwest's negotiating positions with the October 8 representations to the Court relating to the Back-End transaction, Northwest's participation in negotiations to resolve the parties' open issues, and the concessions which Northwest offered (but was not obligated to offer) demonstrate that Midway has failed to meet its burden of proving bad faith.

■ 20. Moreover, the Court concludes that Northwest had no obligation to negotiate forever. Section 5.7 provided a thirty-day period for negotiations. A time limit for negotiating like that agreed to by Midway and Northwest in Section 5.7 is enforceable. *See A/S Apothekernes*, 873 F.2d at 156 (the defendant "was no longer obligated to continue negotiations and could have broken them off at any time" after the sixty-day period for negotiating had run). Thus, Northwest was excused from its obligation to negotiate with Midway after November 9, the end of the thirty-day period for negotiations agreed to in Section 5.7.

21. In sum, the Court concludes that Midway has failed to prove that Northwest breached its obligation, set forth in Section 5.7 of the Gate Sale Agreement, to negotiate in good faith towards reaching an agreement for the Back-End transaction because of the consistency of Northwest's positions with the October 8 representations to the Court, Northwest's participation in negotiations to resolve the parties' open issues, and the concessions which Northwest offered.

22. The Court further concludes that Midway's assertions as to the allegedly improper reasons for Northwest's decision to not go forward with the Back-End transaction lack merit and are unsupported by the evidence.

### COUNT IV

### FINDINGS OF FACT

1. In Count IV, Midway asserts a claim for promissory estoppel. Midway alleges that at the October 8 hearing Northwest made unambiguous promises to acquire substantially all of Midway's assets and to fund Midway's operating losses after November 7, 1991 until closing; that Midway reasonably relied on these promises and other conduct on the part of Northwest to Midway's detriment; and that Northwest expected and could have foreseen that Midway would so rely. Midway asserts that Northwest is estopped from asserting that Northwest had no obligation to proceed with the Back-End transaction.

2. Based on the Findings of Fact as set forth below, the October 8 hearing, and the record formed therein, the Court finds that (a) Northwest did not make the alleged promises upon which Midway claims it relied; (b) any reliance by Midway on the alleged promises or upon Northwest's public statements, press releases, or conduct was not reasonable; (c) Northwest could not reasonably have foreseen that Midway would so rely; and (d) Midway did not reasonably rely on Northwest's alleged promises to Midway's detriment.

3. The Court finds that Northwest did not make the alleged unambiguous promise to acquire substantially all of Midway's assets.

4. On October 8, Northwest promised to negotiate for Midway's non-gate assets in good faith consistent with the terms stated to the Court; Northwest did not, however, promise to acquire Midway's non-gate assets. (Count I, Findings of Fact, ¶¶ 6 and 7).

5. The Court has already found that the Back-End transaction was subject to three conditions precedent: approval by Northwest's Board of Directors, the execution of definitive documentation, and the completion of a due diligence review with results reasonably satisfactory to Northwest, and that these conditions were not satisfied. (Count I, Findings of Fact, ¶¶ 148 and 150).

6. Similarly, the Court has already found that Northwest did not make an unambiguous promise to fund Midway's operating losses under any and all circumstances after November 7, 1991 as Midway has claimed. (Count I, Findings of Fact, ¶¶ 71–75).

7. The transcript of the October 8 hearing (PX 13) shows that Northwest's promise to fund these operating losses, like Northwest's other promises, was subject to three

conditions precedent which were not satisfied. (Findings of Fact, ¶ 5 supra).

8. Midway makes several assertions to support its allegation that Northwest made an unambiguous promise to acquire Midway's assets.

9. The Court finds that none of these assertions support Midway's allegation.

10. The Court finds that Northwest did not promise to this Court on the eve of the October 8 hearing that the acquisition of Midway's assets would be a "virtual certainty."

11. In support of its allegation that Northwest made an unambiguous promise to purchase substantially all of Midway's assets, Midway cites to PX 221. PX 221 is Northwest's response to Southwest's objections to Midway's emergency motion to approve the sale and leaseback of Midway's twenty-one gates to Northwest.

12. Midway seizes upon two words contained in that response: "Southwest would substitute the uncertainty of a piecemeal disposition of assets to persons unknown—except for Southwest's cream skimming—for the *virtual certainty* of an acquisition by Northwest." (PX 221, p. 12, emphasis supplied).

13. The Court finds that Northwest's response in general, and the emphasized language in particular, does not support Midway's assertion that Northwest unambiguously promised to purchase substantially all of Midway's assets.

14. The Court finds that, in the context of the entire pleading, Northwest was merely arguing in support of its position.

15. The phrase "virtual certainty," when considered in the context and circumstances under which it was tendered, does not support the assertion that Northwest made an unambiguous promise to purchase Midway's assets.

16. Midway contends that "[g]oing into the October 8 hearing Northwest publicly announced it was offering Midway an 'acquisition package'. (PX 614)." (Midway's Trial Brief, p. 73).

17. The Court finds that PX 614 is a news release issued by Midway, not by Northwest. The Court is unpersuaded by Midway's reliance on its own news release as evidence of a public announcement by Northwest.

18. The Court finds that PX 614 does not support Midway's assertion that Northwest unambiguously promised to acquire Midway's assets.

19. The Court adopts and incorporates by reference its Findings of Fact set forth in Count V.

20. The Court finds that Northwest's representatives had the actual authority to make the proposal which they made in Court: a firm offer to purchase Midway's gates and an offer to negotiate in good faith for Midway's non-gate assets, subject to the specific condition and conditions precedent stated to the Court. (Count V, Findings of Fact, ¶ 24).

21. Northwest's representatives did not represent their authority to Midway to be any different from the actual authority Northwest's representatives had. (Count V, Findings of Fact, ¶¶ 24–27).

22. The Court finds that Northwest did not promise that its due diligence condition was limited to identification and verification of assets. (Count V, Findings of Fact, ¶¶ 7–10).

23. Based on the Findings of Fact in Count V, the Court finds that Northwest did not promise that board approval would not be a problem.

24. The Court further finds that Northwest did not make such a promise. *See* Count V.

25. Any statements by Northwest regarding board approval were opinions only. (Count V, Findings of Fact, ¶¶ 95 and 106).

26. The Court finds that Northwest did not promise that its Board of Directors was "fully advised, fully informed ... and supportive" of the Back–End transaction.

27. The Court finds that no Northwest representative made such a statement at any time. (Count V, Findings of Fact, ¶¶ 67 and 68).

28. The Court finds that no Northwest representative made the statement that board approval was a mere formality. (Count I, Findings of Fact, ¶ 195).

29. The Court finds that Northwest did not promise that Northwest's environmental due diligence and board approval conditions "were not issues for Northwest."

30. Although the testimony is conflicting, the Court finds that Midway has failed to prove by a preponderance of the evidence that Steenland told Hanson that environmental due diligence and board approval were not issues. (Tr. (Hanson) 531–33; (Steenland) 3836–37); (Count V, Findings of Fact, ¶¶ 5–10).

31. The Court finds that Northwest's October 8 press release (PX 55) does not indicate a promise by Northwest to acquire Midway's assets.

32. The Court finds that Midway knew that Northwest's commitments and obligations on October 8 regarding the Back–End transaction were stated on the record to the Court, not in a general press release. (Count I, Findings of Fact, ¶ 308; Count V, Findings of Fact, ¶ 52).

33. For the following reasons, the Court finds that Midway did not reasonably rely on the alleged promises.

34. The Court finds that Midway did not reasonably rely on Northwest's alleged promise to acquire Midway because Midway knew or should have known that Northwest had made a conditional offer.

35. Northwest did not make an absolute promise on or off the record to buy Midway. Both Northwest and Midway expressly stated on the record that Northwest's Back–End transaction was subject to conditions. (PX 13, pp. 20, 40–42). In addition, both Midway and Northwest acknowledged, post-October 8, that the Back–End transaction was subject to conditions. (Count I, Findings of Fact, ¶¶ 154, 174, 204, 211, 220, 221, 222, 245, 246, 248, 251, 252, 253, 254, 278, 279, 280, and 286).

36. Moreover, Midway's reliance on Northwest's alleged promise was not reasonable because the parties had not yet resolved several significant business issues worth millions of dollars. (Count I, Findings of Fact, ¶¶ 79, 82, 83, 91, 92, 98, 99, 106, 107, 113, 114, 120, 126, 136, 142, 143, and 145).

37. For the same reasons as with respect to the alleged promises to purchase Midway's assets, the Court finds that Midway did not reasonably rely on Northwest's alleged promise regarding operating losses.

38. The Court finds that Midway did not actually rely on Northwest's alleged promise to fund Midway's operating losses.

39. Midway had already recommended the Northwest proposal to the Court before Northwest said anything to Midway or the Court about funding Midway's operating losses. (PX 13, pp. 43, 49–50).

40. Midway's October 16 and 24 term sheets (DX 12 and DX 251) establish that Midway knew about the conditions and, therefore, that Midway did not actually rely on any promises of Northwest.

41. The Court finds that any reliance by Midway on an alleged unconditional promise by Northwest to fund Midway's operating losses as of October 8 was unreasonable in the face of the unsatisfied conditions precedent.

42. The Court further finds that Northwest could not and did not expect and foresee that Midway would rely on the alleged promises.

43. Northwest believed that it had made a conditional offer. (Parkins Dep. 146–48, 159–161; Tr. (Steenland) 3816–18, 3808–09, 3830–31; (Cronin) 2104–07, 2297, 2114–17).

44. The Court finds that the record supports the finding that Northwest's belief that it had made an offer subject to three conditions precedent was justified.

45. The conditions were stated on the record, and Northwest did not withdraw the conditions at any time. (Count I, Findings of Fact, ¶¶ 221, 249, 253, 254, 286, and 288).

46. Midway did not tell Northwest or the Court that Midway believed that the conditions had been withdrawn, nor did Midway state on the record that this was its view.

47. The Court has already found that Northwest's post-hearing conduct demonstrates that Northwest believed it had made a conditional offer. (Count I, Findings of Facts, ¶ 292).

48. The Court finds that Northwest was reasonable in not foreseeing that Midway would believe that Northwest's conditions no longer existed.

49. Based on the Court's findings of a lack of actual or reasonably reliance on the part of Midway (Findings of Fact, ¶¶ 33–41 supra), the Court finds that Midway did not reasonable rely on Northwest's alleged promises to Midway's detriment.

50. Northwest alleges that Midway cannot recover on its promissory estoppel claim based on the following affirmative defenses: (1) in Paragraph 7 of the Confidentiality Agreement, Midway waived its claim for promissory estoppel; (2) Midway's promissory estoppel claim is barred because Northwest was induced to make the alleged promises by Midway's misrepresentations or omissions regarding the data Midway submitted to the DOT; (3) this claim is barred because Northwest made the alleged promises in the mistaken belief that the data Midway submitted to the DOT was reasonably accurate; and (4) this claim is barred because Midway repudiated any agreement resulting from the alleged promises by demanding terms that were materially different from the terms set forth at the October 8 hearing. This Court has already found that those defenses lack merit, and thus will not reconsider those defenses. *See* Count I.

51. In addition, Northwest alleges that Midway's promissory estoppel claim is barred by the doctrine of unclean hands. Northwest asserts that Midway had unclean hands in that Midway allegedly filed false information with the DOT and misrepresented and failed to disclose material facts concerning its data submitted to the DOT, which caused Northwest to participate in the October 8 hearing and to make the alleged promises.

52. In Count I of the Counterclaim, the Court found that Midway did not commit fraudulent misrepresentation in connection with the data filed with the DOT. The Court adopts and incorporates by reference those findings.

### CONCLUSIONS OF LAW

1. Promissory estoppel is an equitable tool that allows the Court to infer a contract where none would otherwise exist. *Quake Constr., Inc. v. American Airlines, Inc.*, 141 Ill.2d 281, 309–10, 152 Ill.Dec. 308, 322, 565 N.E.2d 990, 1004 (1990); *Dickens v. Quincy College Corp.*, 245 Ill.App.3d 1055, 1062, 185 Ill.Dec. 822, 827, 615 N.E.2d 381, 386 (4th Dist.1993); *Genin, Trudeau & Co. v. Integra Dev. Int'l*, 845 F.Supp. 611, 616 (N.D.Ill. 1994). "Promissory estoppel is an equitable device invoked to prevent a person from being injured by a change in position made in reasonable reliance on another's conduct." *Lawrence v. Board of Educ. of Sch. Dist. 189*, 152 Ill.App.3d 187, 201, 105 Ill.Dec. 195, 204, 503 N.E.2d 1201, 1210 (5th Dist.1987) (citation omitted).

2. To prevail on a claim for promissory estoppel, Midway must prove each of the following elements by a preponderance of the evidence: (1) Northwest made an unambiguous promise to Midway; (2) Midway reasonably relied on such promise; (3) Midway's reliance was expected and foreseeable by Northwest; and (4) Midway reasonably relied on Northwest's promise to Midway's detriment. *Quake*, 141 Ill.2d at 309–10, 152 Ill.Dec. at 322, 565 N.E.2d at 1004; *Vajda v. Arthur Andersen & Co.*, 253 Ill.App.3d 345, 356, 191 Ill.Dec. 965, 972, 624 N.E.2d 1343, 1350 (1st Dist.), *appeal denied*, 153 Ill.2d 570, 191 Ill.Dec. 630, 624 N.E.2d 818 (1993); *Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1223 (7th Cir.1991); *Jaskowski v. Rodman & Renshaw, Inc.*, 842 F.Supp. 1094, 1100 (N.D.Ill. 1994).

3. Midway bears the burden of proving that it relied on the alleged promise, and that its reliance was reasonable and justified. *Quake*, 141 Ill.2d at 309–10, 152 Ill.Dec. at 322, 565 N.E.2d at 1004; *IK Corp. v. One Financial Place Partnership*, 200 Ill.App.3d 802, 816–17, 146 Ill.Dec. 198, 208, 558 N.E.2d 161, 171 (1st Dist.), *appeal denied*, 135 Ill.2d 556, 151 Ill.Dec. 383, 564 N.E.2d 838 (1990); *A–Abart Elec. Supply, Inc. v. Emerson Elec.*

*Co.,* 956 F.2d 1399, 1404 (7th Cir.) *cert. denied,* —— U.S. ——, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992); *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1408 (7th Cir. 1991).

4. The promise required to establish promissory estoppel does not have to be an express promise; rather, the promise may be inferred from the words and conduct of the defendant. *First Nat'l Bank of Cicero v. Sylvester,* 196 Ill.App.3d 902, 912, 144 Ill.Dec. 24, 31, 554 N.E.2d 1063, 1070 (1st Dist.), *appeal denied,* 133 Ill.2d 555, 149 Ill.Dec. 320, 561 N.E.2d 690 (1990); *see* RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981) ("A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made.").

5. Without an unambiguous promise by Northwest, Midway cannot recover under a theory of promissory estoppel. *See People ex rel. Nelson v. Village of Long Grove,* 169 Ill.App.3d 866, 875, 119 Ill.Dec. 900, 906, 523 N.E.2d 656, 662 (2d Dist.), *appeal denied,* 122 Ill.2d 593, 125 Ill.Dec. 235, 530 N.E.2d 263 (1988); *Simmons v. John F. Kennedy Medical Ctr.,* 727 F.Supp. 440, 443 (N.D.Ill.1989). *See also Ziese v. Ramada Inns, Inc.,* 463 F.2d 1058, 1060 (7th Cir.1972) (promise must be "unequivocal").

6. The Court concludes that Midway failed to prove by a preponderance of the evidence that Northwest made an unambiguous promise to purchase, unconditionally, Midway's remaining assets, or to fund, unconditionally, Midway's operating losses. Consequently, Midway cannot recover under its claim for promissory estoppel.

7. Midway cites two authorities that it claims support the finding that Northwest made unambiguous promises: *Quake,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 and *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.,* 818 F.Supp. 1152 (N.D.Ill.1993). However, in neither case did the respective court find an unambiguous promise. In *Quake,* the Illinois Supreme Court held only that the plaintiff's promissory estoppel claim should not have been dismissed, and remanded the claim to

the trial court for consideration of the evidence. 141 Ill.2d at 310–11, 152 Ill.Dec. at 322–23, 565 N.E.2d at 1004–05. In *Bercoon,* the district court merely denied a motion to dismiss a promissory estoppel claim. 818 F.Supp. at 1161. The decision in *Bercoon* actually undermines Midway's claim. In *Bercoon,* the plaintiff alleged that the defendant's agent had informed plaintiff that the parties had a "done deal." *Id.* at 1160. Nonetheless, the court observed that the statement was not sufficient by itself to satisfy the unambiguous promise requirement. *Id.* (citing *Ziese,* 463 F.2d at 1060 (statement "Quit worrying ... you've got a deal" was not sufficiently unequivocal to support a claim for promissory estoppel)). Here, Midway cannot even point to a statement as definite as the assurance determined to be insufficient in *Bercoon. See Rockford Cutting Tools & Abrasives v. Norton Co.,* 1991 WL 191601 (N.D.Ill. Sept. 19, 1991) (rejecting attempt by plaintiff to patch together an unambiguous promise from numerous separate factual allegations).

8. The Court concludes that Midway has failed to prove by a preponderance of the evidence that Northwest made unambiguous promises either regarding the acquisition of substantially all of Midway's assets or regarding the funding of Midway's operating losses.

9. A party claiming promissory estoppel must also prove that its reliance on the defendant's promise was reasonable. *IK Corp.,* 200 Ill.App.3d at 816, 146 Ill.Dec. at 207, 558 N.E.2d at 170. Where the defendant's promise is conditional, the plaintiff's reliance is not reasonable, as "[o]pinions based on contingent or future events are not the basis of an action for ... promissory estoppel," as in *IK Corp.,* 200 Ill.App.3d at 816, 146 Ill.Dec. at 208, 558 N.E.2d at 171.

10. The Court concludes that Midway did not reasonably and justifiably rely to its detriment on any promises made by Northwest regarding the Back–End transaction because Northwest's offer was subject to conditions precedent which were never satisfied. (Count I, Findings of Fact, ¶¶ 148 and 150).

11. Additionally, the Court concludes that any reliance by Midway on the alleged promises was not reasonable because Midway and Northwest had several significant open business terms to resolve and millions of dollars at stake. (Count I, Findings of Fact, ¶¶ 79, 82, 83, 91, 92, 98, 99, 106, 107, 113, 114, 120, 126, 136, 142, 143, and 145).

12. In addition, the Court concludes that Midway's alleged reliance was also not reasonable because of the large number of terms which were left open on October 8. Where, as here, a purported contract is too indefinite to be enforceable because of open price terms, the doctrine of promissory estoppel "is inapplicable as a matter of law." *Demos v. National Bank of Greece*, 209 Ill. App.3d 655, 661–62, 153 Ill.Dec. 856, 861, 567 N.E.2d 1083, 1088 (1st Dist.1991).

13. A party claiming promissory estoppel must also prove that the defendant expected and could have foreseen that the plaintiff would rely upon the promise. *See Moore v. Illinois Bell Tel. Co.*, 155 Ill.App.3d 781, 785–86, 108 Ill.Dec. 358, 360, 508 N.E.2d 519, 521 (2d Dist.), *appeal denied*, 116 Ill.2d 562, 113 Ill.Dec. 303, 515 N.E.2d 112 (1987).

14. The Court concludes that Midway has failed to prove this element by a preponderance of the evidence.

15. The Court concludes that Midway's purported reliance on Northwest's alleged promises could not have been expected or foreseen by Northwest because Northwest believed, justifiably, that it had made an offer subject to three conditions precedent that were unsatisfied as of the conclusion of the October 8 hearing.

16. Finally, a party claiming promissory estoppel must also prove that it reasonably relied on the promise to its detriment. *Quake*, 141 Ill.2d at 310, 152 Ill.Dec. at 322, 565 N.E.2d at 1004.

17. A party cannot reasonably rely on an alleged promise when the transaction is subject to a condition precedent of the execution of definitive documentation. *IK Corp.*, 200 Ill.App.3d at 816, 146 Ill.Dec. at 207, 558 N.E.2d at 170 (plaintiff could not have reasonably expected to sign a contract

where the contract was conditioned on execution of a definitive agreement). *See also A/S Apothekernes*, 873 F.2d at 158 (where parties condition their agreements on execution of a definitive agreement or board approval, even statements that might be construed as unambiguous promises cannot give rise to binding obligations); *Runnemede*, 861 F.2d at 1055–56 (same); *Feldman*, 850 F.2d at 1220–23 (same).

18. The Court has already found that the Back–End transaction was subject to the condition precedent of the execution of definitive documentation. (Count I, Findings of Fact, ¶¶ 222, 249, and 253). The Court has also previously found that this condition was not satisfied. *Id.* Thus, the Court concludes that Midway's reliance on Northwest's alleged promises was not reasonable in light of the unsatisfied definitive documentation condition.

19. Based on the Court's conclusion that Midway's reliance was neither actual nor reasonable, the Court must necessarily conclude that such alleged reliance caused no detriment to Midway.

20. Furthermore, Midway "can only seek promissory estoppel damages on promises made at the time of the alleged justifiable reliance." *Monetti, S.p.A. v. Anchor Hocking Corp.*, No. 87 C 9594, 1992 WL 109106, at *4 (N.D.Ill. May 12, 1992). On October 8, Midway could not have rejected Southwest's offer in reliance upon Northwest's post-hearing statements, advertisements, or conduct because those events occurred after October 8, *i.e.*, after the Southwest offer had already been rejected. Additionally, any reliance on public statements and advertisements, rather than on the communications directly made between Midway and Northwest, or on the record on October 8, was not reasonable.

21. In summary, Midway has failed to prove by a preponderance of the evidence its claim for promissory estoppel because it failed to prove that Northwest made any unambiguous, unconditional promises regarding the acquisition of all or substantially all of Midway's assets, or regarding the funding of Midway's operating losses; that any reli-

ance by Midway on those alleged promises was reasonable and justified; that Midway actually relied on the alleged promises; that Northwest could have foreseen Midway's reliance; or that Midway relied on the alleged promises to its detriment. Therefore, the Court concludes that Midway's claim for promissory estoppel fails.

22. Assuming that Midway has meet its burden with respect to its claim for promissory estoppel, Northwest invokes the equitable doctrine of unclean hands as a bar thereto.

23. In Illinois, a party seeking equitable relief cannot take advantage of his own wrong or, as otherwise stated, he who comes into equity must come with clean hands. *See Mills v. Susanka,* 394 Ill. 439, 444–46, 68 N.E.2d 904, 907 (1946); *Fair Automotive Repair, Inc. v. Car–X Serv. Sys., Inc.,* 128 Ill.App.3d 763, 767–68, 84 Ill.Dec. 25, 29, 471 N.E.2d 554, 558 (2d Dist.1984).

24. The purpose of the doctrine of unclean hands is to protect courts of equity from assisting litigants in accomplishing their fraudulent or unlawful purposes, not to protect the party raising the doctrine as a defense. *Carlyle v. Jaskiewicz,* 124 Ill.App.3d 487, 498, 79 Ill.Dec. 847, 855, 464 N.E.2d 751, 759 (1st Dist.1984).

25. Equitable relief may be denied if the applicant has committed some misconduct, fraud, or bad faith toward the party against whom the relief is sought. *Metcalf v. Altenritter,* 53 Ill.App.3d 904, 908, 12 Ill.Dec. 1, 4, 369 N.E.2d 498, 501 (5th Dist.1977). The misconduct, fraud, or bad faith must have been in connection with the very transaction at issue before the court. *Cole v. Guy,* 183 Ill.App.3d 768, 777, 132 Ill.Dec. 126, 132, 539 N.E.2d 436, 442 (1st Dist.), *appeal denied,* 127 Ill.2d 613, 136 Ill.Dec. 582, 545 N.E.2d 106 (1989).

26. Although the invocation of the doctrine of unclean hands is within the trial court's discretion, its application has not been favored by the Illinois courts. *LaSalle Nat'l Bank v. 53rd–Ellis Currency Exchange, Inc.,* 249 Ill.App.3d 415, 437, 188 Ill.Dec. 533, 549, 618 N.E.2d 1103, 1119 (1st Dist.1993); *Baal*

*v. McDonald's Corp.,* 97 Ill.App.3d 495, 501, 52 Ill.Dec. 957, 962, 422 N.E.2d 1166, 1171 (1st Dist.1981).

27. The Court concludes that the doctrine of unclean hands is inapplicable to the transaction involved in this litigation. Northwest has failed to produce any evidence of improper conduct by Midway that would serve as the basis of a finding of unclean hands. Accordingly, the Court concludes that Northwest's invocation of the doctrine of unclean hands fails.

## COUNT V

### FINDINGS OF FACT

1. Midway asserts that Northwest committed fraudulent misrepresentation. Midway alleges in the Complaint that Northwest, at the October 8 hearing and thereafter, made the following fraudulent misrepresentations: (a) that Northwest had, in all material respects, completed its due diligence; (b) that Northwest would acquire substantially all of Midway's assets in a transaction which was valued at $174.7 million; (c) that senior Northwest representatives had the authority to enter into an agreement to purchase substantially all of Midway's assets; (d) that Northwest's representatives were silent when Midway's counsel informed the Court that the board approval condition to Northwest's offer had been satisfied; (e) that Northwest would act in good faith and use its best efforts to close the Back–End transaction within 30 days; (f) that if the Back–End transaction did not close within 30 days, Northwest would fund operating losses sustained by Midway in the period from November 7, 1991, to the date the transaction closed; and (g) that Northwest had acquired Midway, as stated in public statements issued after the October 8 hearing, and Northwest failed to correct these statements even though senior Northwest officers believed the information was inaccurate.

2. Midway has also alleged, albeit not in the Complaint, that Northwest represented that Northwest's Board approval was "not a problem" and that Northwest's Board was "fully behind" the acquisition even though three members of Northwest's Board of Di-

rectors affiliated with Northwest's largest outside investor, KLM, had expressed their opposition to the transaction.

3. The Court finds that Midway has failed to establish the elements of its fraudulent misrepresentation claim by clear and convincing evidence as to each of the alleged misrepresentations. The Court will address each alleged misrepresentation in turn.

4. First, Midway alleges that Northwest committed fraudulent misrepresentation with respect to the due diligence condition in three ways: (1) Midway alleges that Cronin, on behalf of Northwest, stated at the October 8 recess meeting that Northwest had in all material respects completed its due diligence; (2) Midway alleges that Cronin also stated that Northwest's due diligence was limited to verification of assets; and (3) Midway alleges that Northwest breached a duty to speak through its silence when Hanson told the Court that the due diligence condition involved Midway verifying the assets to Northwest's satisfaction.

5. The Court finds that Midway has failed to demonstrate by clear and convincing evidence that Northwest's representatives, during the first recess meeting, or at any other time on October 8, said that Northwest had completed or substantially completed its due diligence for the Back–End transaction. (Tr. (Steenland) 3819, 3834–35; Jenkins Dep. 208–09; Tr. (Cronin) 2105, 2107, 2112).

6. Cronin expressly told Burgess that Northwest had not yet completed its due diligence. (Tr. (Cronin) 2105; (Steenland) 3819).

7. The Court finds that Midway has failed to prove by clear and convincing evidence that Northwest's representatives, including Cronin, said that Northwest's due diligence was limited to verification of assets during the first recess meeting.

8. Midway requested that Northwest forego or limit the scope of Northwest's due diligence. (Tr. (Cronin) 2105; (Steenland) 3816–19).

9. Cronin, on behalf of Northwest, expressly refused this request. (Tr. (Cronin) 2105, 2107; (Steenland) 3819).

10. Cronin referred to verification of assets as an example of the type of due diligence Northwest intended to undertake, and did not refer to verification of assets as the sole form of due diligence Northwest intended to undertake. (Tr. (Cronin) 2112; (Steenland) 3819).

11. The Court finds that Midway has failed to prove by clear and convincing evidence that Northwest's silence, in the face of Midway's statement to the Court on October 8 regarding the due diligence condition, amounts to fraudulent misrepresentation by omission.

12. Hanson told the Court that Midway needed to verify the assets to Northwest's satisfaction. (PX 13, p. 40).

13. Hanson never stated on the record that the only due diligence remaining was verification or that Northwest's due diligence amounted to only a verification of assets. (PX 13, p. 40).

14. Based on the foregoing, the Court finds that Midway has failed to prove by clear and convincing evidence that Northwest committed fraudulent misrepresentation with respect to the due diligence condition.

15. Second, Midway claims that Northwest committed fraudulent misrepresentation by promising at the October 8 hearing to acquire substantially all of Midway's assets in a transaction which Northwest valued at $174.7 million. Midway's fraudulent misrepresentation claim is based on the same basic allegations as Midway's claim for breach of contract in Count I. Accordingly, the Court adopts and incorporates by reference its Findings of Fact contained in Count I.

16. The Court finds that Northwest did not promise to acquire substantially all of Midway's assets in a transaction valued at $174.7 million. Rather, Northwest only made a proposal to buy Midway's gates and to negotiate in good faith to buy Midway's remaining assets within the guidelines it stated on the record at the October 8 hearing. (Count I, Findings of Fact, ¶¶ 6, 7, and 8). Moreover, the portion of the proposal dealing with Midway's remaining assets was subject to the satisfaction of three conditions precedent: board approval by Northwest's Board

of Directors, execution of definitive documentation, and a due diligence review with results reasonably satisfactory to Northwest, which were not satisfied. (Count I, Findings of Fact, ¶¶ 148 and 150).

17. The evidence presented at trial reflects that, at the time Northwest made the Back–End offer, its representatives expected that Northwest would acquire Midway's non-gate assets. (Tr. (Cronin) 2114–15; (Steenland) 3831–32, 3768).

18. Northwest did not make a fraudulent misrepresentation regarding which assets it would acquire. Northwest did not propose to acquire all of the assets. Rather, it only made a proposal to buy Midway's gates and to negotiate in good faith for the remaining Midway assets (i.e. the non-gate assets). (Count I, Findings of Fact, ¶¶ 6 and 7).

19. The Court finds that Midway has failed to prove by clear and convincing evidence that Northwest made a fraudulent misrepresentation regarding the acquisition and valuation of the non-gate assets.

20. Third, Midway claims that Northwest committed fraudulent misrepresentation when Northwest's senior representatives allegedly misrepresented their authority to enter into an agreement to purchase substantially all of Midway's assets.

21. The Court finds, based on the following findings of fact, that Midway has failed to establish the elements of this claim by clear and convincing evidence.

22. At trial, Hanson testified about an alleged conversation with Steenland and Francht in the courtroom on October 8 at the beginning of the first recess. According to Hanson, he asked Steenland and Francht whether "they had authority to be here to make the offer" (Tr. (Hanson) 491), and "whether they had authority to make the offer that they were making." (Tr. (Hanson) 494). According to Midway, Steenland and Francht responded that they had this authority when in reality they did not. (Tr. (Hanson) 494).

23. The Court finds that there is contradictory testimony on whether the questions were even asked, much less answered. (Tr. (Cronin) 2112–14; (Steenland) 3824–25).

24. The Court finds that the record demonstrates that the Northwest representatives did have the actual authority to make the proposal which they made in Court: a firm offer to purchase Midway's gates and an offer to negotiate in good faith to acquire Midway's remaining assets subject to the conditions precedent stated to the Court. (Tr. (Steenland) 3825; (Cronin) 2113).

25. Northwest's Board expressly authorized this very proposal at its October 7 meeting, (PX 10, p. 5), and Dasburg and Gary Wilson authorized the specific terms and conditions to be included in the proposal at the meeting in Dasburg's office on the morning of October 8. (Tr. (Steenland) 3798–99; Dasburg Dep. 232–33, 309–10; Tr. (Cronin) 2095–96, 2090).

26. Furthermore, the Court finds that the proposal made, as presented to the Court on the record by Northwest, was consistent with both the Northwest representatives' authority as represented to Midway and the Northwest representatives' actual authority. (PX 13, pp. 18–20).

27. Midway's recitation of Northwest's proposal on the record was consistent with both the actual proposal made by Northwest as well as with both the Northwest representatives' authority as represented to Midway and the Northwest representatives' actual authority. (PX 13, pp. 37–43).

28. Thus, the Court finds that Midway has failed to prove by clear and convincing evidence that Northwest's representatives fraudulently misrepresented their authority.

29. Fourth, Midway alleges that Northwest committed fraud by its representatives' silence in the face of Hanson's statement to the Court that the board approval condition to Northwest's offer had been satisfied.

30. The Court finds that Hanson never so informed the Court. Thus, the Court finds that Midway has failed to prove this allegation by clear and convincing evidence.

31. Hanson informed the Court that the board approval condition to Northwest's Back–End offer had not been satisfied. (PX 13, p. 42). Hanson stated that:

Very important to us on that as well, Judge, is the Northwest statement that *subject to* reaching agreement on documentation, *board approval, which we understand they don't expect to be a problem,* they are ready to ... move ahead.

(PX 13, p. 42, emphasis supplied).

32. This statement by Hanson demonstrates that even though Midway believed approval would be forthcoming, Midway nevertheless knew Northwest's Board had not yet approved the Back–End transaction as of October 8.

33. The Court finds that Midway has failed to prove by clear and convincing evidence that Northwest's silence regarding board approval constituted a fraudulent misrepresentation thereof.

34. Fifth, Midway alleges that Northwest made a fraudulent misrepresentation that Northwest would act in good faith and use its best efforts to close the Back–End transaction within thirty days.

35. The Court finds, however, that Northwest did not commit a fraudulent misrepresentation by promising to act in good faith and use its best efforts to close the Back–End transaction within thirty days.

36. The Court has already found that Northwest did act in good faith and that Northwest did use its best efforts to close the Back–End transaction within thirty days. (Count III, Findings of Fact, ¶ 3).

37. Hence, the Court finds that Midway has failed to prove by clear and convincing evidence that Northwest committed fraud in its representations regarding good faith and best efforts.

38. Sixth, Midway claims that Northwest committed a fraudulent misrepresentation on October 8 by promising to fund Midway's post-November 7, 1991 operating losses.

39. The Court finds, however, that Northwest did not make an unconditional commitment to fund Midway's operating losses, as Northwest's statements on the record do not constitute such a commitment. (PX 13, pp. 49–50).

40. The Court has already found that Northwest's Back–End offer was expressly subject to three conditions precedent which were not satisfied as of October 8. (Count I, Findings of Fact, ¶¶ 148 and 150).

41. Midway acknowledged on the record that these three conditions precedent were not satisfied as of October 8. (PX 13, pp. 40–42).

42. The Court finds that Midway has failed to prove by clear and convincing evidence that Northwest made fraudulent misrepresentations regarding the funding of Midway's operating losses.

43. Seventh, Midway contends that Northwest made fraudulent misrepresentations based on public statements issued by Northwest between the conclusion of the hearing on October 8 and the consummation of the Gate Sale on October 11. Midway contends that the misrepresentations are contained in five documents attached to its Complaint.[1] Midway also asserts, albeit not in the Complaint, that Northwest's October 8 press release (PX 55) was a fraudulent misrepresentation. Midway claims that these documents contain statements to the effect that Northwest agreed to acquire substantially all of Midway's assets.

44. The Court finds, however, that Midway has failed to prove by clear and convincing evidence that Northwest's post-hearing public statements constitute fraudulent misrepresentation.

45. Initially, the Court finds that Midway's assertion that its own internal newsletter (Exhibit G) and its newspaper advertisement (Exhibit H) support a finding of fraudulent misrepresentation on the part of Northwest borders on the absurd and frivolous. This Court finds it incredulous that statements prepared and issued by Midway could be attributed to Northwest or could support an allegation of fraudulent misrepresentation on the part of Northwest.

---

1. The documents consist of (1) a UPI wire service story dated October 9 (Exhibit F); (2) Midway's own internal newsletter dated October 8 (Exhibit G); (3) a newspaper advertisement dated October 12 (Exhibit H); (4) a fax by Northwest to travel agents dated October 9 (Exhibit I) and; (5) an article in Northwest's internal newsletter dated October 22 (Exhibit K).

46. The Court further finds that Midway has failed to prove by clear and convincing evidence that the UPI wire service story (Exhibit F), Northwest's fax to travel agents (Exhibit I), and Northwest's internal newsletter (Exhibit K) (collectively the "three public statements") constitute fraudulent misrepresentation. Although they were statements, they were not statements of material fact.

47. The Court finds that these three public statements were not material because the representations contained in the statements were not essential elements to the Back–End transaction; Midway could not reasonably rely on these statements in determining whether or not to act; and Midway would not have conducted itself differently if it had been aware of the alleged falsity of the statements.

48. The Court finds that the representations contained in these three public statements, insofar as they suggest that Northwest had already agreed to purchase all or substantially all of Midway's non-gate assets, are false.

49. The Court finds that Northwest knew the three public statements were false because Northwest knew that the parties had not entered into a binding agreement for the Back–End transaction. (Underlying Material Background, ¶¶ 151, 155, 156, and 160–162).

50. However, the Court finds that Midway did not and could not rely on these statements, and that even if it did so rely, such reliance was unreasonable.

51. The three public statements at issue were issued subsequent to the October 8 hearing, wherein Midway had already selected the Northwest proposal in its recommendation to the Court.

52. In addition, even if Midway relied on the three public statements, its reliance would not have been reasonable. Midway knew or should have known that the Back–End transaction had not been consummated, required additional negotiations, and was subject to three conditions precedent which had not yet been satisfied. Midway should also have known that Northwest's public pro-

nouncements did not embody the legal agreements of the parties (Tr. (Steenland) 3851), and that the press releases did not memorialize the terms and conditions of the parties' agreements, as such documents were not the type of definitive documentation contemplated by the parties. (Tr. (Burgess) 962).

53. The Court finds that Midway has failed to prove by clear and convincing evidence that the three public statements were made for the purpose of causing Midway to affirmatively act.

54. There is no evidence that Northwest intended the three post-hearing public statements to embody a legal agreement with respect to the Back–End transaction or to constitute a satisfaction or waiver of the three conditions precedent. Northwest also did not intend these representations to be for Midway's use or benefit.

55. These statements were issued subsequent to the October 8 hearing, and thus could not have caused Midway to select the Northwest proposal over the Southwest proposal.

56. The Court finds that whatever injury Midway suffered as a result of the failed negotiations did not directly and proximately result from these three public statements.

57. Any injury suffered would have resulted from entering into the agreement in the first place, which would have occurred on October 8, prior to the release of the three public statements.

58. The Court finds that Midway failed to prove by clear and convincing evidence that the October 8 press release (PX 55) was a fraudulent misrepresentation.

59. The Court finds that although the October 8 press release was a statement, it was not a statement of material fact.

60. The Court finds that the October 8 press release was not material because the representations contained in the release were not essential elements to the Back–End transaction; Midway could not reasonably rely on the statements in determining whether or not to act; and Midway would not have conducted itself differently if it had been aware of the falsity of the statements.

61. The Court finds that the representations contained in the October 8 press release are false insofar as the press release states that Northwest had already agreed to purchase all or substantially all of Midway's non-gate assets. Northwest admits as much. (Tr. (Cronin) 2128; (Steenland) 3849–50, 4174; Parkins Dep. 115–24; Hibbs Dep. 113–14; Clouser Dep. 49–51; Underlying Material Background, ¶¶ 155, 156, 160, 161, and 164).

62. The Court finds that Northwest knew the October 8 press release was false. (Tr. (Cronin) 2128; (Steenland) 3849–50, 4174; Parkins Dep. 115–24; Hibbs Dep. 113–14; Clouser Dep. 49–51; Underlying Material Background, ¶¶ 155, 156, 160, 161, and 164).

63. However, the Court finds, for the same reasons as with the other three public statements, that Midway did not and could not rely on the October 8 press release, and that even if it did so rely, such reliance was unreasonable. (Findings of Fact, ¶ 52 supra).

64. The Court finds, for the same reasons articulated with respect to the three public statements, that the October 8 press release was not made for the purpose of causing Midway to affirmatively act. (Findings of Fact, ¶¶ 54–55 supra).

65. Finally, the Court finds, for the same reasons as with the three public statements, that whatever injury Midway suffered as a result of the failed negotiations did not directly and proximately result from the October 8 press release. (Findings of Fact, ¶¶ 56–57 supra).

66. Eighth, Midway attempted to prove at trial that Northwest fraudulently misrepresented the views of the three KLM directors with respect to the proposed acquisition of Midway's non-gate assets. According to Midway, Northwest's representatives specifically told Midway that the Board was "fully advised, fully informed ... and supportive of this transaction" and that "the KLM directors, like the entire board ... supported the transaction." (Tr. (Burgess) 872).

67. The Court finds that Midway has failed to prove by clear and convincing evidence that Northwest made these material misrepresentations concerning KLM or the Northwest Board of Directors as a whole.

68. The Court finds that Midway has failed to prove that these alleged statements were ever made by any Northwest representative at any time.

69. Midway's two outside counsel, Hanson and Burgess, testified that the KLM directors were mentioned at the recess. At trial, Hanson testified that during the first recess, Northwest said that the KLM directors "were on board." (Tr. (Hanson) 499). Burgess testified that Northwest said "KLM was fully supportive, and KLM, like the entire board, was fully informed and supported the transaction." (Tr. (Burgess) 872).

70. Burgess testified that Schick specifically inquired of Northwest about KLM's position with respect to the Midway acquisition. (Tr. (Burgess) 871–72). Specifically, Burgess testified that Schick stated that it was his impression that KLM was not happy, and that Northwest responded that KLM was fully supportive, fully informed, and supported the transaction. (Tr. (Burgess) 871–72).

71. Schick, however, testified that he did not recall any follow-up discussion regarding board approval by any Midway representative. (Schick Dep. 39).

72. Upon reviewing Schick's testimony regarding the recess meeting and the board approval condition, the Court finds that Schick did not inquire of Northwest about the KLM directors.

73. The Court finds that the testimony of Hanson and Burgess is contradicted and uncorroborated by the testimony of the other participants in that recess meeting.

74. Three Midway representatives (Altschul, Jenkins, and Koeneke) testified that there was no discussion whatsoever of KLM's views on the transaction during the recess discussion. (Tr. (Altschul) 3591; Jenkins Dep. 147; Koeneke Dep. 126).

75. Hinson testified that other than Midway asking about whether board approval was a problem, no other inquiries were made

by Midway about board approval. (Tr. (Hinson) 130–31).

76. The four Northwest representatives also testified that KLM was not discussed at the recess discussion. (Tr. (Cronin) 2117–18; (Steenland) 3822; Francht Dep. 117; Parkins Dep. 160).

77. Thus, the Court finds that Midway has failed to prove by clear and convincing evidence that Northwest represented to Midway that the KLM directors were "on board" or "supported" the Back–End transaction.

78. Burgess and Hanson were uncertain about who on behalf of Northwest made the alleged misrepresentation regarding KLM. (Tr. (Burgess) 1002–03; (Hanson) 499). Neither Hanson nor Burgess could positively identify who made this alleged misrepresentation on behalf of Northwest. *Id.*

79. Furthermore, all three of the alternative Northwest representatives who Midway alleges participated in the conversation—Cronin, Steenland, and Francht—testified, as had Altschul, that KLM was never discussed at the recess. (Tr. (Cronin) 2117–18; (Steenland) 3822; Francht Dep. 117).

80. The Court finds that the weight of the trial testimony of Burgess and Hanson on this point is further reduced by the affidavits that they executed on May 19 and May 21, 1992, respectively, in connection with Midway's opposition to Northwest's motion for summary judgment.

81. Burgess' May 19, 1992 affidavit—which was the end result of several drafts which Burgess worked on with Midway's litigation counsel (Tr. (Burgess) 1004–05)—contained a paragraph about the alleged recess conversation between Northwest and Midway concerning KLM. The affidavit says nothing about Northwest representing at the recess that KLM supported the transaction. (Tr. (Burgess) 1003–04). At trial, however, Burgess testified that Northwest represented at the recess that "KLM was fully supportive" and "supported" the transaction. (Tr. (Burgess) 872).

82. Although Burgess tried to explain this inconsistency between his affidavit and his trial testimony in various ways, (Tr. (Burgess) 1003–07), the Court finds it should not

give significant weight to either those explanations or his testimony on this issue.

83. Hanson's trial testimony concerning the supposed conversation at the recess about KLM was inconsistent with his deposition testimony. At trial, Hanson testified that Northwest specifically represented that the KLM directors "were on board." (Tr. (Hanson) 499). In his deposition, however, he testified that he could not remember anything that was said specifically about KLM. (Tr. (Hanson) 633–34). Moreover, there is no reference to KLM in Hanson's notes of the recess meeting, which the Court found admissible. (DX 96/PX 676; Tr. (Hanson) 1372–73).

84. In sum, the Court does not give significant weight to the trial testimony of Burgess or Hanson regarding the alleged discussion of KLM at the recess meeting because it was inconsistent with their prior sworn statements, and because their trial testimony was contradicted and uncorroborated by the trial testimony of all of the other witnesses who attended the recess meeting, including Midway's own representatives.

85. The Court has reviewed all of the testimony, viewed the demeanor of all of the witnesses, and judged their credibility. Pursuant to same, the Court finds that the evidence fails to clearly and convincingly prove that one or more of the Northwest representatives made the statements that the Northwest Board was "fully advised, fully informed ... and supportive of this transaction" and that "the KLM directors, like the entire board ... supported the transaction."

86. Finally, Midway asserts that Cronin's statement that he believed that Northwest Board approval was not a problem constituted a fraudulent misrepresentation. Midway also asserts that Steenland's silence and failure to correct Cronin's statement constitutes a fraudulent misrepresentation by omission.

87. The Court finds that neither Cronin's representation regarding board approval, nor Steenland's silence as to that representation, constitute fraudulent misrepresentation individually or collectively.

88. In a conversation during the first recess, Burgess inquired of Northwest about the board approval condition. (Tr. (Hanson) 499; (Burgess) 869; (Cronin) 2114).

89. Cronin's response to Burgess' question was that he did not think board approval would be a problem. (Tr. (Hinson) 130–31; (Hanson) 498–99, 528, 631; (Burgess) 870, 999; (Cronin) 2114, 2297–98; Schick Dep. 36–39; Parkins Dep. 158; Jenkins Dep. 146).

90. Steenland, who attended the October 7 meeting of Northwest's Board, and who was aware of KLM's reservations regarding the Midway acquisition, did not correct or amend Cronin's statement. (Tr. (Burgess) 873).

91. At the first recess meeting, no Northwest representative indicated any disagreement with Cronin's statement on the board approval issue. (Tr. (Burgess) 873).

92. Midway made no further inquiries about board approval after Cronin's response. (Findings of Fact, ¶ 71 supra).

93. The Court finds that Midway has failed to prove by clear and convincing evidence that Cronin's statement that he did not believe that approval by Northwest's Board would be a problem constituted a fraudulent misrepresentation.

94. The Court finds that Midway has failed to prove by clear and convincing evidence that Cronin's statement was a statement of material fact.

95. Rather, the Court finds that Cronin's statement was his personal opinion.

96. The Court finds that, although Cronin's representation was a statement, as it was a verbal assertion, the representation itself was nevertheless not material, though it related to a material matter, namely, Northwest's Board approval condition to its Back–End offer.

97. The Court finds that while board approval was one of the three conditions precedent to the Back–End transaction, which were essential elements thereto, Midway's reliance on Cronin's statement was not reasonable.

98. As a sophisticated corporation represented by experienced agents, attorneys, and businessmen, Midway knew that board approval could not be promised or guaranteed in advance.

99. Midway, despite the opportunity to do so, failed to inquire further regarding the condition. Instead, Midway solely relied, unreasonably, on Cronin's mere opinion. Midway knew that, if it accepted Northwest's proposal over Southwest's, the agreement would only be to negotiate in good faith for the non-gate assets.

100. The Court further finds that although Northwest had more knowledge of available facts than did Midway, Midway nonetheless had sufficient opportunity to investigate the facts. Midway could have inquired further of the Northwest representatives.

101. Midway failed to follow up and conduct any subsequent investigation or inquiry of Cronin or other Northwest representatives regarding Northwest's board approval condition during the recess meeting.

102. Moreover, the Court finds that there is no evidence that Midway would have acted differently. The record is devoid of any evidence that Midway would have certainly accepted Southwest's last offer, rather than Northwest's last offer, if it had been told that the KLM directors had abstained on the vote at the October 7 Northwest Board meeting.

103. Midway's decision to recommend that the Court approve the Northwest offer was not based on the board approval condition; rather, it was based on the attractive financial package offered and the important factor that a substantial number of Midway's employees would have continued employment under Northwest's proposal but not under Southwest's proposal. (PX 13, pp. 38–39; Underlying Material Background, ¶¶ 68, 71, and 140).

104. Although Burgess testified that it would have led him to further inquiry (Tr. (Burgess) 876), the Court finds that there is no testimony that Northwest's proposal would have then been rejected had the abstentions of the KLM directors on the Northwest Board been disclosed.

105. In fact, several of Midway's representatives testified that they preferred Northwest's offer to Southwest's offer because Northwest's offer was more favorable to Midway's employees. (PX 13, pp. 58–59; Schick Dep. 31; Tr. (Burgess) 977–80, 982–83; (Hinson) 224–25).

106. The Court finds that Cronin's statement was also not one of an existing fact; rather, it was merely one of personal opinion. His statement related to a future or contingent event. Cronin was speaking to a legal event, that, if it were to take place at all, would take place in the future, and of which there was no guarantee or certainty. Board approval had not occurred at the time Cronin uttered the statement; therefore it was not a pre-existent or present fact. Hence, Cronin's representation was not as to an existing fact. Cronin merely gave his opinion as to the outcome of a future event.

107. The Court finds that Midway has failed to prove by clear and convincing evidence that Cronin's representation was a statement of material fact.

108. The Court finds that Midway has failed to prove by clear and convincing evidence that Cronin's statement was false. At the time the statement was made (*i.e.* the recess meeting on October 8), it was not false. At the October 7 Northwest Board meeting, the Board voted 11–0, with three abstentions, in favor of the Gate Sale transaction and authorized Northwest to negotiate in good faith for Midway's non-gate assets. (PX 10; Tr. (Steenland) 3786, 3830–31).

109. Objectively viewed, the Court finds that the statement was not false based on the absence of opposing votes by any members of Northwest's Board.

110. The abstentions of the KLM directors were based on (a) a lack of time within which to consider the acquisition (b) a lack of information and (c) a disagreement with the characterization of the proposed acquisition as "strategic." (Aziz Dep. 61–62; Bouw Dep. 34–36; Van Wijk Dep. 27–28, 40, 63–64).

111. As to the last ground for abstention, the Court finds that the uncontroverted testimony indicates that (a) Northwest's Board had, in meetings prior to October 7, identified what it considered to be Northwest's strategic weaknesses (Van Wijk Dep. 48–49); (b) the acquisition of Midway's non-gate assets was presented to Northwest's Board as a strategic move, that is, a move designed to correct those perceived weaknesses (PX 10, pp. 3–4); (c) those perceived weaknesses included a lack of "presence" and "preference" in Northwest's competition with American Airlines, United Airlines, and Delta Airlines (PX 10, pp. 3–4); (d) the KLM directors merely disagreed that the Midway deal would strengthen those weaknesses (Bouw Dep. 40–41; Aziz Dep. 61; Van Wijk Dep. 48–51); and (e) however, the KLM directors did not object per se to the acquisition of Midway's non-gate assets; thus they did not vote "no" and instead abstained. (Bouw Dep. 34–36; Van Wijk Dep. 63–64, 27, 40; Aziz Dep. 61; Tr. (Steenland) 4094–95).

112. KLM was a minority shareholder, controlling only three of the fifteen seats on Northwest's Board. (Tr. (Steenland) 3778–79, 3786; Dasburg Dep. 67–68).

113. Furthermore, even if all three voted no instead of abstaining, the vote would have still been 11–3 in favor, a 79% approval.

114. Wilson and Checchi, as co-chairmen of Northwest's Board of Directors, were majority shareholders when combined (62%) and also controlled nine of the seats on the Board. (Tr. (Steenland) 3777–78). Wilson and Checchi both supported the Back–End transaction. (Tr. (Cronin) 2114–15).

115. The abstentions show that while the KLM directors were not prepared to vote in favor, they were not so opposed as to vote against the proposed acquisition. The Court finds that the deposition testimony of the three KLM directors supports the finding that their abstentions on October 7 would not have blocked the proposed Back–End transaction.

116. In addition, the testimony of Van Wijk supports the Court's finding that Cronin's statement was not false.

117. Van Wijk testified that, even after abstaining, he did not think that board approval would be a problem. Specifically, Van Wijk testified:

Q: Mr. Van Wijk, as of October 8th, in your opinion was board approval of the Midway transaction by Northwest a problem?

. . . . .

A: Was approval given?

Q: Yes.

A: Then in my opinion, the answer is no.

Q: All right.

A: Was it a problem could mean that if the Northwest management came back with a proposal, that the board might vote it down. So those are two different things in my opinion.

Q: I understand the ambiguity. Let me ask it this way. As of October 8th, in your opinion, was obtaining approval by the board for the Midway acquisition by Northwest a problem?

A: If the circumstances did not materially change, it was my feeling that it would not be a problem.

(Van Wijk Dep. 60–61).

118. Thus, on the basis that the vote of the Northwest Board was 11–0 with three abstentions by the KLM directors, and on the basis of the uncontroverted deposition testimony of the KLM directors, the Court finds that there would be no reason as of the October 8 hearing to suspect or expect that Northwest's Board would not approve the Back–End transaction.

119. Ultimately, the Northwest Board rejected the Midway acquisition on the basis of unanticipated subsequent developments, not on the basis of the issues raised by the KLM directors. That is, the circumstances did materially change (Van Wijk Dep. 60–61), thus precipitating a change in the position of Northwest's Board.

120. Northwest's Board convened a meeting on November 12. At that meeting, Dasburg informed the Board that there had been no resolution of three principal issues: the DOT data issue; the environmental issue; and the liens and cure costs issue. (Underlying Material Background, ¶ 202). Dasburg also reviewed the revenue shortfalls stemming from the DOT filings, and reported that there was no solution to the problems uncov-ered regarding the due diligence. *Id.* Accordingly, he recommended that the Board not approve the Back–End transaction. *Id.* Northwest's Board then resolved to not approve the Back–End transaction. *Id.* at ¶ 203.

121. The Court finds that Midway has failed to prove by clear and convincing evidence that on October 8, Cronin knew or believed his statement was false.

122. Cronin did not attend the October 7 board meeting, did not review the minutes of that meeting, and had not been briefed on the specific positions of the individual board members. (Tr. (Cronin) 2086–87, 2118). Cronin had every reason to believe that the Board would approve a Back–End transaction based on his meeting with Gary Wilson, Dasburg, and Steenland, wherein he was informed that the Northwest Board had met, had approved the acquisition of Midway's gates, and had authorized management to make a proposal for Midway's remaining assets subject to certain conditions. (Tr. (Cronin) 2114–15). Cronin knew that the Board almost certainly would not have authorized the purchase of the gates if it did not intend to seriously pursue acquiring the non-gate assets. (Tr. (Cronin) 2114–15). Cronin also knew that Wilson and Checchi supported the acquisition. *Id.*

123. Accordingly, the Court finds that Cronin did not know, have reason to know, nor believe his statement was false.

124. Moreover, the Court finds that, for the same reasons set forth above, Cronin was not reckless in his belief that the statement was not false.

125. The Court further finds that Midway has failed to prove by clear and convincing evidence that Midway reasonably relied on the truth of Cronin's representation.

126. Midway and its representatives certainly had extensive prior business experience. As a corporation represented by experienced agents, attorneys, and business persons, Midway knew that board approval could not be promised or guaranteed in advance. Midway also knew that the parties were in the midst of negotiations and that

nothing had been finalized, thereby precluding final approval by Northwest's board.

127. In addition, the Court finds that there is no evidence that Northwest's Board somehow delegated its approval reservation to Cronin.

128. While the parties may not have had equal knowledge of the position of Northwest's Board, Midway had the opportunity and the ability to inquire further and investigate the facts.

129. Midway did not ask any further questions after Cronin's response. (Findings of Fact, ¶¶ 71 and 92 supra). Midway's agents knew that if it accepted Northwest's proposal over Southwest's that the agreement would only be to negotiate in good faith for the non-gate assets. (PX 13, pp. 40–42). Midway's agents also knew that the Back–End offer was subject to three conditions, one of which was approval by Northwest's Board of Directors. (Count I, Findings of Fact, ¶ 148).

130. Thus, the Court finds that reliance on Cronin's representation was unreasonable.

131. Moreover, the Court finds that Midway had a reasonable opportunity to investigate further and to ascertain the truth of the statement regarding the board approval condition and what Northwest's Board had already done. Midway had the ability to inquire about the positions of the individual board members, but did not do so.

132. Midway inquired about other aspects of the Back–End offer, inter alia, due diligence, the composition of the purchase price, the ATL, and non-Fidelcor aircraft. (Underlying Material Background, ¶¶ 94–104; Tr. (Hanson) 3808–3816). In fact, Midway discussed one of the three conditions precedent, due diligence, "fairly extensively." (Tr. (Hanson) 3816).

133. Therefore, the Court finds that Midway had an opportunity to further investigate regarding board approval, but did not investigate further.

134. In addition, the Court finds that there were no other peculiar circumstances that induced Midway to rely solely on Cronin's statement. The mere fact that Midway was selling its assets at a section 363 sale in the bankruptcy court and had a significant cash flow problem does not constitute peculiar circumstances so as to justify Midway's sole reliance on Cronin's statement without further inquiry.

135. The Court further finds that Midway did prove by clear and convincing evidence that Cronin's statement was made for the purpose of causing Midway to affirmatively act.

136. Cronin made the statement in the context of negotiations when he knew Midway was asking about board approval for the purpose of making a decision on whether to select Northwest's or Southwest's offer.

137. The Court finds that Midway has failed to prove by clear and convincing evidence that the reliance by Midway directly and proximately led to its injury as Midway did not even rely on the statement in making its decision.

138. The Court finds that the record is devoid of clear and convincing evidence that Midway would have accepted Southwest's offer, rather than Northwest's offer, if it had been told on October 8 that the KLM directors had abstained on the vote at the October 7 Northwest Board meeting. (Findings of Fact, ¶¶ 102–105 supra). Midway's decision to recommend that the Court approve the Northwest offer was not based on the board approval condition; rather, it was based on the attractive total financial package offered by Northwest and the important factor that the Midway employees would have continued employment. (PX 13, pp. 38–39; Findings of Fact, ¶¶ 103–105 supra).

139. However, even if Midway did rely on the statement, the Court finds that it did not lead to any alleged injury because Midway did not recommend acceptance of the Northwest offer based on board approval alone. (Findings of Fact, ¶ 119 supra).

140. The only evidence concerning Midway's reliance came from Burgess, who testified that knowledge of the KLM abstentions "would have given me cause for concern and would have led to further questioning on my part as to the state of mind, if you will, of the board of directors." (Tr. (Burgess) 876).

141. The Court finds that this evidence does not constitute proof of direct and proximate injury sufficient to meet this element because the decision not to go forward with the Back–End transaction was based on other factors, not board approval. (Count I, Findings of Fact, ¶¶ 195–203).

142. In sum, based on the foregoing findings of fact, the Court finds that Midway has failed to prove by clear and convincing evidence that Cronin's statement amounts to fraudulent misrepresentation because Midway failed to prove each element by clear and convincing evidence.

143. Next, the Court finds that Midway has failed to prove by clear and convincing evidence that Steenland's silence when Cronin made the statement that he believed that board approval would not be a problem constituted a fraudulent misrepresentation by omission.

144. The Court finds that Midway has failed to prove by clear and convincing evidence that Steenland concealed a material fact.

145. Midway in essence argues that Steenland should have spoken up about the undisclosed positions of the KLM directors.

146. It is undisputed that Steenland did not respond one way or the other when Cronin made his statement regarding board approval. (Underlying Material Background, ¶ 108).

147. Steenland was silent regarding an essential element—board approval. Nevertheless, board approval was not material because Midway could not reasonably rely on Steenland's silence and because it is not clear that Midway would have acted differently had it known of the three KLM abstentions.

148. As a corporation represented by experienced agents, attorneys, and business persons, Midway knew that board approval could not be promised or guaranteed in advance.

149. Moreover, Midway did not ask any further questions after Cronin's response. Midway, despite the opportunity to do so, failed to pursue the matter further.

150. In addition, it is not clear that Midway would have acted differently had it known of the KLM abstentions. Midway had reasons independent of any concerns over the board approval condition to select Northwest's proposal over Southwest's proposal. (Findings of Fact, ¶¶ 103, 105, and 138 supra). What was essential was board approval and Northwest had done so to the extent that the Board authorized its representatives, specifically Cronin, Steenland, and Francht, to negotiate for the Back–End transaction.

151. The Court finds that Midway has failed to prove by clear and convincing evidence that the concealment was intended to induce a false belief, under circumstances creating a duty to speak.

152. The record is devoid of any evidence that Steenland intended to induce Midway to falsely believe the truth of Cronin's statement.

153. Steenland believed the statement was correct. (Tr. (Steenland) 3830–31). Thus, as Steenland believed that Cronin's statement was correct or accurate, he could not have intentionally failed to correct that which he did not believe to be incorrect.

154. The Court finds that Steenland's subjective belief was objectively reasonable based on the following:

- Steenland was present at the October 7 Northwest Board meeting (Tr. (Steenland) 3780);

- Steenland knew the vote was eleven in favor, none opposed, with three abstentions, and thus the votes necessary to formally pass the resolution were there (Tr. (Steenland) 3786, 3830–31);

- Steenland knew that by spending $20 million for the Gate Sale assets, Northwest was making a substantial investment indicating commitment to the Back–End transaction (Tr. (Steenland) 3831);

- Steenland knew that the two co-chairmen of Northwest's Board, Wilson and Checchi, supported the acquisition and that these two men comprised the majority shareholder because they had a 62% voting interest combined while the KLM

directors only had a combined 20% voting interest (Tr. (Steenland) 3777–78, 3831); and

- Steenland had conversations with Dasburg and Wilson (who was also speaking on behalf of Checchi), and knew that they controlled the company and were then committed to a Back–End transaction (Tr. (Steenland) 3831).

155. In sum, the Court finds that Steenland had reasonable grounds upon which he testified he based his belief that Cronin's statement was accurate, thus negating any alleged fraudulent intent Steenland may have had to induce a false belief on Midway's part.

156. The Court further finds for the same reasons set forth in ¶ 154 above that Steenland was not reckless.

157. Even assuming Steenland intended to induce a false belief, the Court finds that under these facts Steenland did not have a duty to speak.

158. It is uncontroverted that Northwest did not owe a fiduciary duty to Midway to make full and fair disclosure of the reservations expressed by the KLM directors.

159. The Court finds that the parties were represented by sophisticated attorneys and agents, and were involved in arm's-length negotiations.

160. The parties were negotiating for the sale of assets.

161. There was no kinship between the parties.

162. There was no material or relevant disparity in age, health and mental condition, education, or business experience between the parties.

163. Midway did not entrust the handling of its business affairs to Northwest, and, because the parties were engaged in arm's-length negotiations, the amount of trust and confidence Midway could or would repose in Northwest would be very limited.

164. The Court finds that Steenland's silence did not contribute to Midway's alleged misapprehension of the position of Northwest's Board.

165. The Court finds that Steenland did not intentionally fail to correct any misapprehension that Midway may have had. As Steenland believed Cronin's statement was correct or accurate (Tr. (Steenland) 3830–31), he could not have intentionally failed to correct that which he did not believe to be incorrect.

166. The Court finds that Midway has failed to prove by clear and convincing evidence that Midway could not have discovered the truth through a reasonable inquiry or inspection or that it was prevented from making a further reasonable inquiry.

167. The Court finds that Midway relied on Steenland's silence as an affirmation or verification of Cronin's statement.

168. The testimony was uncontroverted that no Midway representative inquired further after Cronin stated that board approval would not be a problem. (Findings of Fact, ¶ 92 supra). Midway made no further inquiry whatsoever.

169. In addition, the Court finds that the record is devoid of any testimony that Midway was prevented from making a reasonable inquiry after Cronin uttered his representation. (Findings of Fact, ¶¶ 99 and 101 supra).

170. Midway had a reasonable opportunity to investigate, as demonstrated by Midway's additional inquiry about other aspects of the Back–End offer, *inter alia,* due diligence, the composition of the purchase price, and ATL. (Underlying Material Background, ¶¶ 94–104). Thus, the Court finds that Midway had ample opportunity to investigate regarding board approval, but did not take advantage of its opportunity.

171. The Court also finds that Midway has failed to prove by clear and convincing evidence that the concealed information was such that Midway would have acted differently had it been aware of the information. (Findings of Fact, ¶¶ 102, 105, and 138 supra).

172. The Court finds that Midway has failed to prove by clear and convincing evidence that its reliance directly and proximately led to its injury. (Findings of Fact, ¶¶ 139–141 supra).

173. Finally, the Court finds that Midway has failed to prove by clear and convincing evidence that it justifiably relied on Steenland's silence.

174. Midway knew that Northwest's board approval could not be promised or guaranteed in advance. Moreover, Midway knew that Northwest's Board had not approved the Back–End transaction as of the recess meeting on October 8. Also, Midway knew that completion of due diligence and the execution of definitive documentation were conditions precedent that had not been satisfied as of October 8.

175. In sum, based on the foregoing findings of fact, the Court finds that Midway has failed to prove by clear and convincing evidence that Steenland's silence amounts to fraudulent misrepresentation because Midway has failed to prove each element by clear and convincing evidence.

176. In addition to the fraud theories it pleaded in its Complaint, Midway unveiled new misrepresentation claims in its post-trial submissions. Midway has not sought leave to amend its Complaint to allege its new fraud claims, and Northwest did not give its express or implied consent to the adjudication of these claims. Nor did Northwest impliedly consent to their being tried, as evidenced by the fact that Northwest did not address these claims in either its pre-trial brief or its opening post-trial submissions. Accordingly, Midway's new fraud theories are barred. *See In re Rivinius, Inc.*, 977 F.2d 1171, 1175 (7th Cir.1992).

177. Even were the Court to consider Midway's new fraud theories, however, the Court finds that Midway has failed to sustain its burden of proving any of them by clear and convincing evidence.

178. Midway asserts for the first time in its post-trial brief that Northwest defrauded Midway by supplying Northwest's October 7 Board resolution, which authorized execution of the Gate Sale Agreement, at the October 11 Gate Sale closing. Accusing Northwest of "crafty draftsmanship," Midway alleges that the resolution was "deceptive" because it did not mention the board approval condition.

179. Far from being deceptive, the resolution (PX 12) states that Northwest's Board had approved only the acquisition of Midway's gates, and shows that the Back–End transaction had not yet been approved by Northwest's Board.

180. The Court finds that Midway has failed to show that the resolution was erroneous, let alone fraudulent.

181. In addition, the Court finds that Midway has failed to present clear and convincing evidence that Northwest intended to defraud Midway in drafting the resolution, which Midway required Northwest to provide for the closing of the Gate Sale. (PX 19, ¶ 8.1(a)).

182. Midway fails to cite any evidence demonstrating that it relied on the resolution in deciding to pursue the Northwest offer for the non-gate assets and accepting the Northwest offer for the Gate Sale.

183. Midway asserts, in its proposed conclusions of law, a series of allegations which it claims, for the first time, constitute material misrepresentations or omissions. These allegations include: (1) Northwest's offer would leave the estate with approximately $58 million in administrative claims; (2) Northwest's Board had refused management's request for "blanket authority" to acquire substantially all of Midway's assets; and (3) Northwest's Board and management considered the Midway acquisition to be a "close call."

184. The Court finds that these last-minute allegations are entitled to no consideration whatsoever because they were not tried by implied consent. *See Rivinius*, 977 F.2d at 1175.

185. In addition, the Court finds that Midway makes no attempt to show that the purported representations were false; that Northwest made them with the intent to defraud; or that Midway relied on them.

186. Northwest alleges that Midway may not recover under this count because Northwest sustained its burden of proving the following affirmative defenses: (1) Paragraph 7 of the Confidentiality Agreement bars Midway's fraudulent misrepresentation claim; and (2) this claim is barred because North-

west was induced to make the Back–End offer by Midway's misrepresentations or omissions regarding the data it submitted to the DOT.

187. The Court has already found that these affirmative defenses lack merit, and thus the Court will not reconsider these defenses. *See* Count I.

### CONCLUSIONS OF LAW

1. As the party alleging fraudulent misrepresentation, Midway has the burden of proving each element of its fraudulent misrepresentation claim by clear and convincing evidence. *Ray v. Winter,* 67 Ill.2d 296, 304, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977); *National Republic Bank of Chicago v. National Homes Constr. Corp.,* 63 Ill. App.3d 920, 924, 21 Ill.Dec. 80, 83, 381 N.E.2d 15, 18 (1st Dist.1978); *Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 190–91 (7th Cir.1993).

2. Courts have defined "clear and convincing" evidence most often as the quantum of proof that leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question. Although stated in terms of reasonable doubt, courts consider clear and convincing evidence to be more than a preponderance while not quite approaching the degree of proof necessary to convict a person of a criminal offense. The spectrum of increasing degrees of proof, from preponderance of the evidence, to clear and convincing evidence, to evidence beyond a reasonable doubt, would be clearer if the degrees of proof were defined, respectively, as probably true, highly probably true, and almost certainly true. *In re Estate of Ragen* (1979), 79 Ill.App.3d 8, 13–14, 34 Ill. Dec. 523, 528, 398 N.E.2d 198, 203. *Parsons v. Winter,* 142 Ill.App.3d 354, 359, 96 Ill.Dec. 776, 780, 491 N.E.2d 1236, 1240 (1st Dist.1986).

3. To prevail on a fraudulent misrepresentation claim, Midway has the burden of proving each of the following elements:

(1) the representation must be a statement of material fact, rather than a mere promise or opinion; (2) the representation must be false; (3) the person making the statement must know or believe the representation is false; (4) the person to whom the representation is made must reasonably rely on the truth of the statement; (5) the statement must have been made for the purpose of causing the other party to affirmatively act; and (6) the reliance by the person to whom the statement was made [must have] led to his injury.

*LaScola v. US Sprint Communications,* 946 F.2d 559, 567–68 (7th Cir.1991). *See also Board of Educ. v. A, C & S, Inc.,* 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 646, 546 N.E.2d 580, 591 (1989); *Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980).

4. As the Court has found that Midway failed to prove by clear and convincing evidence that Northwest represented to Midway that Northwest had, in all material respects, completed its due diligence, (Findings of Fact, ¶¶ 5–14 supra), the Court concludes that, as a matter of law, Midway failed to prove that Northwest committed fraudulent misrepresentation with respect to this allegation.

5. As the Court has found that Midway failed to prove by clear and convincing evidence that Northwest represented to Midway that Northwest would acquire substantially all of Midway's assets in a transaction valued at $174.7 million, (Findings of Fact, ¶¶ 16–19 supra), the Court concludes that, as a matter of law, Midway failed to prove that Northwest committed fraudulent misrepresentation with respect to this allegation.

6. As the Court has found that Midway failed to prove by clear and convincing evidence that senior Northwest representatives misrepresented their authority to enter into an agreement to purchase substantially all of Midway's assets, (Findings of Fact, ¶¶ 21–28 supra), the Court concludes that, as a matter of law, Midway failed to prove that Northwest committed fraudulent misrepresentation with respect to this allegation.

7. As the Court has found that Midway failed to prove by clear and convincing evidence that Northwest represented that it

would unconditionally fund Midway's operating losses from thirty days post-hearing onward, (Findings of Fact, ¶¶ 39–42 supra), the Court concludes that, as a matter of law, Midway failed to prove that Northwest committed fraudulent misrepresentation with respect to this allegation.

8. As the Court has found that Midway's counsel did not inform the Court that the board approval condition had been satisfied, (Findings of Fact, ¶¶ 30–33 supra), the Court concludes that Northwest's silence on that point does not constitute fraudulent misrepresentation by omission as a matter of law.

9. As the Court has found that Northwest did act in good faith and use its best efforts to close the Back–End transaction within thirty days, (Findings of Fact, ¶¶ 35–37 supra), Northwest could not have fraudulently misrepresented that it would.

10. The Court concludes that this allegation fails as a matter of law.

11. The Court has found that even though the public statements were false, Northwest knew them to be false, and Northwest did not correct them, Midway did not rely nor did it reasonably rely on those public statements. (Findings of Fact, ¶¶ 47–65 supra).

12. As such, the Court concludes that Midway has failed to prove this allegation by clear and convincing evidence.

13. The Court will separately analyze Cronin's statement and Steenland's silence in light of the foregoing elements of fraudulent misrepresentation.

14. For the reasons set forth below, the Court concludes that, as a matter of law, Cronin's representation does not constitute a fraudulent misrepresentation.

15. Pursuant to the first element of fraudulent misrepresentation, Midway must prove by clear and convincing evidence that Cronin made a statement of material fact, as opposed to a mere promise or opinion. The Court finds that Midway has failed to meet its burden with respect to this element.

16. This element can be broken down into three components: (1) there must be a statement; (2) the statement must be one of fact,

not one of opinion; and (3) the fact must be material.

17. A statement is an oral or written assertion or nonverbal conduct of a person if that person intends the conduct to be an assertion. *See* FED.R.EVID. 801(a). Cronin made a statement through his oral assertion.

18. In Illinois, neither a statement of opinion nor a promise of future action constitute actionable fraud. *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 49, 28 Ill.Dec. 226, 237, 390 N.E.2d 393, 404 (1st Dist.1979). Rather, a "statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation." *Metropolitan Bank & Trust Co. v. Oliver*, 4 Ill.App.3d 975, 978, 283 N.E.2d 62, 64 (1st Dist.1972). *See also West v. Western Casualty and Surety Co.*, 846 F.2d 387, 393 (7th Cir.1988) (a "statement that merely expresses an opinion or that relates to future or contingent events, rather than past or present facts, does not constitute an actionable misrepresentation") (citing *Peterson Industries, Inc. v. Lake View Trust and Sav. Bank*, 584 F.2d 166, 169 (7th Cir.1978) (per curiam)).

19. In other words, a statement referring to the occurrence of a specific legal event is factual only if the event has already occurred or is presently occurring, and if it goes beyond opinion, conjecture, speculation, and prediction.

20. "Whether a statement is one of fact or opinion depends on all the facts and circumstances of a particular case." *West*, 846 F.2d at 393.

21. The Court concludes that, based on all the facts and circumstances of this case, Cronin's statement was not one of fact, but, rather, one of opinion.

22. Therefore, the Court concludes that Cronin's statement that he believed board approval would not be a problem was merely his opinion and thus did not constitute actionable fraudulent misrepresentation.

23. The Illinois Supreme Court has not defined the term material. In order for a representation to be material, it "must be an essential element to the transaction between the parties." *Mack v. Plaza Dewitt Ltd. Partnership*, 137 Ill.App.3d 343, 350–51, 92 Ill.Dec. 169, 175, 484 N.E.2d 900, 906 (1st Dist.1985).

24. However, even if it is an essential element to the transaction between the parties, a statement can only be one of material fact if it "is one upon which the plaintiff could reasonably rely in determining whether or not to act" (*Jeffrey M. Goldberg & Assocs., Ltd. v. Collins Tuttle & Co.*, 264 Ill.App.3d 878, 885, 202 Ill.Dec. 367, 372, 637 N.E.2d 1103, 1108 (1st Dist.1994); *State Security Ins. Co. v. Frank B. Hall & Co.*, 258 Ill. App.3d 588, 592, 196 Ill.Dec. 775, 778, 630 N.E.2d 940, 943 (1st Dist.1994); *Metzger v. New Century Oil and Gas Supply Corp. Income and Development Program—1982*, 230 Ill.App.3d 679, 692, 171 Ill.Dec. 698, 708, 594 N.E.2d 1218, 1228 (1st Dist.), *appeal denied*, 146 Ill.2d 631, 176 Ill.Dec. 803, 602 N.E.2d 457 (1992)), and "if it is such that, had the other party been aware of the [falsity of the] statement, he would have conducted himself differently." *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill.App.3d 258, 266, 184 Ill.Dec. 488, 495, 613 N.E.2d 805, 812 (2d Dist.), *appeal denied*, 152 Ill.2d 559, 190 Ill. Dec. 889, 622 N.E.2d 1206 (1993). *See also Mack*, 137 Ill.App.3d at 350–51, 92 Ill.Dec. at 175, 484 N.E.2d at 906 (same).

25. The Court concludes that while the subject of Cronin's statement, approval by Northwest's Board of Directors, was an essential element and condition precedent to the Back–End transaction between the parties, Cronin's statement of opinion was nevertheless not material because Midway could not reasonably rely on that statement (Findings of Fact, ¶ 97 supra) and, even if Midway had been aware of the alleged falsity of the statement, it would have still selected Northwest's offer over Southwest's offer (Findings of Fact, ¶¶ 102–105 supra).

26. Pursuant to the second element, Midway must prove by clear and convincing evidence that Cronin's statement was false. The Court concludes that Midway has failed to prove this element by clear and convincing evidence.

27. The determination as to the falsity of the statement should be made as of the time the statement was made.

28. The Court concludes that, based on the Findings of Fact, as of the recess meeting on October 8, Cronin's statement regarding board approval was not false, and thus Midway has not met its burden on this element.

29. Pursuant to the third element, Midway must prove by clear and convincing evidence that Cronin, at the time he made the statement, knew or believed the statement was false or was reckless in making the statement. The Court concludes that Midway has failed to prove this element by clear and convincing evidence.

30. "[A] misrepresentation is fraudulent either where a party makes the representation knowing it is false *or* where the misrepresentation was made with a reckless disregard for its truth or falsity." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 193, 131 Ill.Dec. 155, 161, 538 N.E.2d 530, 536, *cert. denied*, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989) (emphasis in original). *See also Stewart v. Thrasher*, 242 Ill.App.3d 10, 14, 182 Ill.Dec. 930, 933, 610 N.E.2d 799, 802 (4th Dist.1993); *Frymire– Brinati*, 2 F.3d at 190.

31. Cronin could not have known his statement was false because he had not yet been told anything about the KLM directors' abstentions. (Findings of Fact, ¶ 122 supra). *Cf. Stewart*, 242 Ill.App.3d at 16, 182 Ill.Dec. at 935, 610 N.E.2d at 804 ("There can be no concealment of a fact if the [person] alleged to be concealing the fact is unaware of it."). Furthermore, the Court has already found that Cronin believed his statement was true. (Findings of Fact, ¶¶ 122 and 123 supra). Therefore, the Court concludes that Midway has failed to meet its burden with respect to this element.

32. Pursuant to the fourth element, Midway must prove by clear and convincing evidence that Midway and its representatives reasonably relied on Cronin's statement.

The Court concludes that Midway has failed to prove this element by clear and convincing evidence.

33. The Seventh Circuit has noted that "[i]t is harder to prevail under Illinois law than under federal [securities] law because of the greater burden of persuasion (clear and convincing rather than preponderance) and because of the reasonable-reliance requirement, which federal securities law does not contain except to the extent it bears on the determination of materiality." *Frymire–Brinati*, 2 F.3d at 191.

34. Justifiable or reasonable reliance has been explained as follows:

> In determining whether a party justifiably relies on another's representations, all of the circumstances surrounding the transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience, will be taken into consideration. Only where the parties do not have equal knowledge, or access thereto, or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other will a person be found to have justifiably relied upon the others' representations.

*Runnemede Owners, Inc. v. Crest Mortgage. Corp.*, 861 F.2d 1053, 1058 (7th Cir.1988) (quoting *Luciani v. Bestor*, 106 Ill.App.3d 878, 884, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (3d Dist.1982)); *see also Soules*, 79 Ill.2d at 286, 37 Ill.Dec. at 599, 402 N.E.2d at 601; *Chicago Export Packing Co. v. Teledyne Indus., Inc.*, 207 Ill.App.3d 659, 663, 152 Ill. Dec. 639, 642, 566 N.E.2d 326, 329 (1st Dist. 1990).

35. "A party is not justified in relying on representations when it has ample opportunity to ascertain the truth of the representations." *Metropolitan Bank*, 4 Ill.App.3d at 979, 283 N.E.2d at 65. *See also National Republic Bank*, 63 Ill.App.3d at 925, 21 Ill. Dec. at 83, 381 N.E.2d at 19 (citing *Metropolitan Bank*). Moreover, "one is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations." *Gerill*, 128 Ill.2d at 195, 131 Ill.Dec. at 162, 538 N.E.2d at 537.

36. Based on the Findings of Fact (¶¶ 97–99; 125–130 supra), the Court concludes that Midway and its representatives did not justifiably or reasonably rely on Cronin's statement.

37. Furthermore, the Court concludes that even if Midway did rely on Cronin's statement regarding board approval, such reliance was not justified. (Findings of Fact, ¶¶ 131–134 supra). Therefore, the Court concludes that Midway has failed to prove this element by clear and convincing evidence.

38. Pursuant to the fifth element, Midway must prove by clear and convincing evidence that Cronin's statement was made for the purpose of causing Midway to affirmatively act. The Court concludes that Midway has met its burden with respect to this element.

39. The Court concludes that Midway proved by clear and convincing evidence that Cronin's statement was made for the purpose of causing Midway to affirmatively act because Cronin made the statement in the context of negotiations when he knew that Midway was asking about board approval, one of the three conditions precedent Northwest had imposed on the Back–End offer, for the purpose of deciding whether to choose Northwest's or Southwest's proposal for the sale of its assets. (Findings of Fact, ¶ 136 supra).

40. Pursuant to the sixth and final element, Midway must prove by clear and convincing evidence that Midway's reliance led to its injury. The Court concludes that Midway has not met its burden with respect to this element.

41. In Illinois, "plaintiffs' injuries in fraud actions must directly and proximately result from defendants' misrepresentations and cannot be assessed upon mere speculation or hypothetical assumptions." *State Security*, 258 Ill.App.3d at 592, 196 Ill.Dec. at 779, 630 N.E.2d at 944. Moreover, it appears that Illinois courts "consistently and emphatically" stress the necessity of proving this element. *Id.*

42. The Court has already found that Midway did not reasonably rely on Cronin's statement (Findings of Fact, ¶¶ 97–99; 125–130 supra); thus, Midway's alleged injury did not derive from Cronin's statement.

43. Even assuming *arguendo* that Midway did so rely, the Court concludes that Midway's alleged injury did not directly and proximately result from its reliance on Cronin's statement.

44. The Court concludes that Midway has not proven that its injuries were a direct and proximate result of Cronin's statement. (Findings of Fact, ¶¶ 137–141 supra).

45. Based on the Findings of Fact and the Conclusions of Law as set forth herein, the Court concludes that Midway has failed to prove by clear and convincing evidence that Cronin's statement that he did not believe board approval would be a problem constituted fraudulent misrepresentation.

46. Midway has alleged that Steenland's silence or failure to speak or respond to Cronin's statement regarding board approval constitutes fraudulent misrepresentation. For the reasons set forth below, the Court concludes that Midway has failed to prove this allegation by clear and convincing evidence.

47. Even though Steenland did not make an affirmative oral statement, his silence may nonetheless constitute fraudulent misrepresentation. Fraudulent misrepresentation "may consist of either an untrue statement or the concealment of a material fact. The concealment may not be a mere passive omission of facts during the business transaction but must have been done with the intent to deceive under circumstances creating an opportunity and a duty to speak." *Chapman v. Hosek*, 131 Ill.App.3d 180, 186, 86 Ill.Dec. 379, 384, 475 N.E.2d 593, 598 (1st Dist.1985). Moreover,

> a misrepresentation may consist of the concealment of the truth as well as the assertion of what is false. When the failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and an affirmative misrepresentation is tenuous. Even if a statement is technically true, it may still be a misrepresentation where it omits qualifying material, because a half truth may be more misleading than an outright lie.

*Stewart*, 242 Ill.App.3d at 16, 182 Ill.Dec. at 934, 610 N.E.2d at 803 (citing *Lindsey v. Edgar*, 129 Ill.App.3d 718, 723, 84 Ill.Dec. 876, 879–80, 473 N.E.2d 92, 95–96 (4th Dist. 1984)).

48. Under Illinois law, "mere silence or a passive failure to disclose does not [usually] constitute a misrepresentation; instead, defendants are [typically] liable only for affirmative falsehoods or misstatements." *Gerdes v. John Hancock Mut. Life Ins. Co.*, 712 F.Supp. 692, 701 (N.D.Ill.1989) (citing W. Keeton, *Prosser and Keeton on Torts* § 106 (5th ed. 1984)). However, if the defendant has a duty to speak, such as when he stands in some confidential or fiduciary relationship to the plaintiff, then the failure to speak may be actionable. *Id.*

49. "For an omission to rise to the level of fraud, ... there must be a duty to disclose." *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1040 (7th Cir.1990).

50. A duty to disclose arises where: (1) the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct the plaintiff's misapprehension or (2) the defendant owes some fiduciary duty to the plaintiff to make full and fair disclosure and fails to correct a misapprehension of a material fact. *Coca–Cola Co. Foods Div. v. Olmarc Packaging Co.*, 620 F.Supp. 966, 973 (N.D.Ill.1985).

51. "While silence in a business transaction does not necessarily amount to fraud, silence accompanied by deceptive conduct or suppression of material facts results in active concealment" (*Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 180, 92 Ill.Dec. 809, 816, 485 N.E.2d 855, 862 (2d Dist.1985)), "and it then becomes the duty of a person to speak" (*Russow v. Bobola*, 2 Ill.App.3d 837, 841, 277 N.E.2d 769, 771 (2d Dist.1972)).

52. Although the elements of fraudulent misrepresentation apply equally as well to affirmative statements and silence or omis-

sions, the analysis is slightly different regarding fraud by silence or omission.

53. Thus, in the case of concealment, the analysis is modified, and in order to prove the concealment amounted to a fraudulent misrepresentation the plaintiff must prove: (1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak *Lindsey*, 129 Ill.App.3d at 723, 84 Ill.Dec. at 880, 473 N.E.2d at 96; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury.

*Stewart*, 242 Ill.App.3d at 16, 182 Ill.Dec. at 935, 610 N.E.2d at 804 (citing *Huls v. Clifton, Gunderson & Co.*, 179 Ill.App.3d 904, 909, 128 Ill.Dec. 858, 862, 535 N.E.2d 72, 76 (4th Dist.1989)). In addition, the plaintiff must also prove that it justifiably relied on the defendant's silence. *Soules*, 79 Ill.2d at 286, 37 Ill.Dec. at 599, 402 N.E.2d at 601.

54. Pursuant to the first element, Midway must prove by clear and convincing evidence that Steenland's silence concealed a material fact. The Court concludes that Midway has not met its burden on this element.

55. There is no dispute that Steenland did not say anything one way or the other when Cronin made his statement about board approval. However, his failure to speak regarding the abstention of the KLM directors does not amount to concealment of a material fact.

56. In order for a representation to be material, it "must be an essential element to the transaction between the parties." *Mack*, 137 Ill.App.3d at 350–51, 92 Ill.Dec. at 175, 484 N.E.2d at 906.

57. However, even if it is an essential element to the transaction between the parties, a statement can only be one of material fact if it "is one upon which the plaintiff could reasonably rely in determining whether or not to act" (*Jeffrey M. Goldberg*, 264 Ill. App.3d at 885, 202 Ill.Dec. at 372, 637 N.E.2d at 1108; *State Security*, 258 Ill.App.3d at 592, 196 Ill.Dec. at 778, 630 N.E.2d at 943; *Metzger*, 230 Ill.App.3d at 692, 171 Ill.Dec. at 708, 594 N.E.2d at 1228), and "if it is such that, had the other party been aware of the [falsity of the] statement, he would have conducted himself differently." *Heider*, 245 Ill. App.3d at 266, 184 Ill.Dec. at 495, 613 N.E.2d at 812. *See also Mack*, 137 Ill.App.3d at 350–51, 92 Ill.Dec. at 175, 484 N.E.2d at 906 (same).

58. The Court concludes that it is not clear that Midway would have acted differently had it known of the abstentions because Midway had reasons independent of any concerns over the board approval condition to select Northwest's proposal over Southwest's proposal. (Findings of Fact, ¶ 150 supra). Moreover, the record is devoid of any evidence that Midway would have acted any differently had it known of the three KLM abstentions. (Findings of Fact, ¶ 171 supra). Therefore, the Court concludes that Midway has failed to prove this element by clear and convincing evidence.

59. Pursuant to the second element, Midway must prove by clear and convincing evidence that Steenland's silence was intended to induce a false belief on Midway's part under circumstances creating a duty to speak. The Court concludes that Midway has not met its burden on this element.

60. The Court concludes that there is no evidence that Steenland had any intent to induce Midway to falsely believe the truth of Cronin's statement, or was reckless, as Steenland firmly believed the truth and accuracy of Cronin's statement. (Findings of Fact, ¶¶ 151–156 supra). The Court concludes that Steenland had reasonable grounds upon which he could have based his belief that Cronin's statement was accurate (Findings of Fact, ¶ 154 supra), thus negating any alleged intent Steenland may have had to induce a false belief on Midway's part.

61. Second, even assuming Steenland did so intend, the Court concludes that under these facts, Steenland did not owe Midway a duty of disclosure.

62. In Illinois, a duty of disclosure may arise in one of two scenarios: (1) where "the defendant owes some fiduciary duty to the plaintiff to make full and fair disclosure and fails to correct a misapprehension of a material fact" or (2) where "the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension." *Coca–Cola*, 620 F.Supp. at 973.

63. "A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former." *State Security*, 258 Ill.App.3d at 594, 196 Ill.Dec. at 780, 630 N.E.2d at 945 (citation omitted).

64. When a fiduciary relationship does not arise as a matter of law, the party asserting same has the burden of proving its existence by clear and convincing evidence. *Id.*

65. In determining whether a fiduciary relationship exists, the relevant factors to consider include: (1) the degree of kinship between the parties; (2) disparity in age, health and mental condition, education, and business experience between the parties and; (3) the extent to which the allegedly "servient party" entrusted the handling of its business affairs to the "dominant party" and placed its trust and confidence in it. *State Security*, 258 Ill.App.3d at 597, 196 Ill.Dec. at 781, 630 N.E.2d at 946.

66. The Court concludes that the relationship between Midway and Northwest did not, as a matter of law, give rise to a fiduciary duty.

67. Further, the Court concludes that no special circumstances existed that would warrant the imposition of a fiduciary duty between the parties. The parties were each represented by able and sophisticated agents during arm's-length negotiations. The fact that a business transaction involving the Gate Sale and the Back–End transaction occurred, is insufficient to establish special circumstances as well. *See State Security*, 258 Ill.App.3d at 597, 196 Ill.Dec. at 782, 630 N.E.2d at 947. Therefore, the Court holds that Northwest did not owe a fiduciary duty to Midway such that it should have disclosed the abstentions of the KLM directors.

68. The Court also concludes that Northwest owed no duty to Midway to disclose the abstentions of the KLM directors because Steenland's silence did not contribute to any misapprehension by Midway regarding the intent of the majority of Northwest's Board. Further, the Court concludes that Steenland did not intentionally or recklessly fail to correct any misapprehension.

69. The Court concludes that because Northwest generally, and Steenland specifically, did not owe Midway a duty to disclose the abstentions, and because Steenland did not intend to induce Midway to falsely believe the truth of Cronin's statement, Midway has failed to prove this element by clear and convincing evidence.

70. Pursuant to the third element, Midway must prove by clear and convincing evidence that it could not have discovered the truth through a reasonable inquiry or inspection or was prevented from making a reasonable inquiry or inspection and that it relied upon Steenland's silence as a representation that the fact did not exist. Based on the Findings of Fact (¶¶ 166–170 supra), the Court concludes that Midway has failed to meet its burden with respect to this element.

71. Pursuant to the fourth element, Midway must prove that had it known the position of the KLM directors, it would have acted differently. There was no evidence that Midway would have acted differently had it known of the abstentions or positions of the KLM directors. (Findings of Fact, ¶ 171 supra). Therefore, the Court concludes that Midway failed to prove this element by clear and convincing evidence.

72. Pursuant to the fifth element, Midway must prove that its reliance on Steenland's silence led to its injury. The Court has already found that Midway's reliance on Steenland's silence did not directly and proxi-

mately result in Midway declining to select the Southwest proposal. (Findings of Fact, ¶ 172 supra). Thus, the Court concludes that Midway has failed to prove this element by clear and convincing evidence.

73. Pursuant to the sixth element, Midway must prove that it justifiably relied on Steenland's silence. Based on the Findings of Fact (¶¶ 173 and 174 supra), the Court concludes that Midway did not justifiably rely on Steenland's silence.

74. In conclusion, for the foregoing reasons, the Court concludes that Midway has failed to prove by clear and convincing evidence that Steenland's silence was a fraudulent misrepresentation because Midway failed to prove each element by clear and convincing evidence.

75. Furthermore, the Court concludes that Cronin's statement and Steenland's silence coupled together do not constitute fraudulent misrepresentation. For the same reasons, as separately set forth above with respect to Cronin's statement and Steenland's silence, the Court concludes that Midway has failed to prove all the elements of fraudulent misrepresentation by clear and convincing evidence as to Cronin's statement coupled with Steenland's silence.

76. Accordingly, the Court concludes that Midway failed to prove by clear and convincing evidence all of the requisite elements of fraudulent misrepresentation for any of the alleged fraudulent misrepresentations.

### COUNT VI

#### FINDINGS OF FACT

1. In Count VI, Midway asserts a claim for equitable estoppel.

2. Midway makes essentially the same allegations with respect to its claim for equitable estoppel as it does in its claim for fraudulent misrepresentation. (Count V, Findings of Fact, ¶¶ 1 and 2). Midway asserts that Northwest is estopped from asserting that Northwest had no obligation to proceed with the Back–End transaction.

3. Due to the similarity in the factual allegations and the legal elements for both Counts V and VI, the Court adopts and incorporates by reference its Findings of Fact made in Count V for purposes of this count.

4. In addition, the Court finds that Midway did not rely in good faith on any of Northwest's alleged representations.

5. The Court finds that some of the representations, as alleged, were directly contrary to what actually transpired on October 8.

6. The Court has already found that some of the alleged representations were not even made. (Count V, Findings of Fact, ¶¶ 5, 16, 23, 24, 30, 39, and 67).

7. Midway's own term sheets contradict its claim that it relied in good faith on Northwest's representations. (DX 251; DX 12; DX 246).

8. Furthermore, Midway's post-October 8 hearing conduct contradicts its claim that it relied in good faith on Northwest's representations. *See* Count I.

9. Northwest alleges that Midway may not recover on its equitable estoppel claim based on the following affirmative defenses: (1) in Paragraph 7 of the Confidentiality Agreement, Midway waived its claim for equitable estoppel; and (2) Midway induced Northwest's participation at the October 8 hearing by virtue of Midway's misrepresentations or omissions regarding the data Midway submitted to the DOT. In addition, Northwest asserts that Midway's claim is barred under the unclean hands doctrine.

10. The Court has already found that these affirmative defenses lack merit, and thus will not reconsider those defenses. *See* Counts I and IV.

#### CONCLUSIONS OF LAW

1. The burden of proof is on the party claiming estoppel. *Marks v. Rueben H. Donnelly, Inc.*, 260 Ill.App.3d 1042, 1052, 201 Ill.Dec. 393, 400, 636 N.E.2d 825, 832 (1st Dist.), *appeal denied*, 157 Ill.2d 504, 205 Ill. Dec. 166, 642 N.E.2d 1283 (1994).

2. Therefore, to prove a claim for equitable estoppel, Midway must prove each of the following elements: (1) words or conduct on

Northwest's part amounting to a misrepresentation or concealment of material facts; (2) Northwest knew or had reason to know at the time the representations were made that the representations were untrue; (3) Midway's lack of knowledge, at the time the representations were made and at the time that they were acted upon, that the representations were untrue; (4) Northwest intended or reasonably expected that the representations would be acted upon; (5) Midway relied in good faith upon the representations to its detriment; and (6) Midway acted so as to be prejudiced because of Northwest's representations. *Vaughn v. Speaker*, 126 Ill.2d 150, 162–63, 127 Ill.Dec. 803, 808, 533 N.E.2d 885, 890 (1988), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3218, 106 L.Ed.2d 568 (1989).

 3. The parties take issue with the proper standard of proof required under equitable estoppel. After doing extensive research on this issue, the Court finds that the Illinois courts have employed three different standards of proof: (1) clear and convincing evidence; (2) a preponderance of the evidence; and (3) clear, precise, and unequivocal evidence.

4. This Court has been unable to find any cases under Illinois law distinguishing between the three standards. The Court concludes that the clear, precise, and unequivocal evidence standard closely resembles the clear and convincing evidence standard. Therefore, evidence sufficient to meet one standard should suffice for the other.

5. Some courts have applied the clear and convincing evidence standard for equitable estoppel. *See, e.g., Stough v. Brach*, 395 Ill. 544, 551, 70 N.E.2d 585, 589 (1946); *In re Marriage of Duerr*, 250 Ill.App.3d 232, 237, 190 Ill.Dec. 251, 255, 621 N.E.2d 120, 124 (1st Dist.), *appeal denied*, 152 Ill.2d 557, 190 Ill. Dec. 886, 622 N.E.2d 1203 (1993); *Elliott v. Elliott*, 137 Ill.App.3d 277, 279, 91 Ill.Dec. 923, 925, 484 N.E.2d 482, 484 (4th Dist.1985); *In re Marriage of Schaefer*, 161 Ill.App.3d 841, 847, 113 Ill.Dec. 725, 729, 515 N.E.2d 710, 714 (1st Dist.1987); *Ruster v. Ruster*, 91 Ill.App.3d 355, 358, 46 Ill.Dec. 874, 877, 414 N.E.2d 927, 930 (2d Dist.1980); *In re Marriage of Strand*, 86 Ill.App.3d 827, 830–31, 42 Ill.Dec. 37, 39, 408 N.E.2d 415, 417 (1st Dist.

1980). For the reasons set forth below, the Court concludes that these cases are distinguishable and thus the clear and convincing evidence standard is not necessarily the proper standard for equitable estoppel.

6. In *Stough*, the Illinois Supreme Court held that "[w]here the terms of a written instrument are to be varied by oral agreements or conduct constituting estoppel, the proof thereof should be clear and convincing." 395 Ill. at 551, 70 N.E.2d at 589. This Court concludes that *Stough* is limited to the unique factual situation where a party is trying to vary a written instrument using oral evidence.

7. In *Duerr*, the court stated that the appropriate standard for equitable estoppel was clear and convincing evidence and relied on the decision in *Elliott* as the supporting source for this standard. *Duerr*, 250 Ill. App.3d at 237, 190 Ill.Dec. at 255, 621 N.E.2d at 124. The court in *Elliott*, however, did not state the proposition for which it was cited in *Duerr*. Rather, the court in *Elliott*, in discussing agreements to reduce child support payments, held that such agreements must be proved by clear and convincing evidence. *Elliott*, 137 Ill.App.3d at 279, 91 Ill.Dec. at 925, 484 N.E.2d at 484. Nowhere in the opinion does the court discuss the appropriate standard for equitable estoppel. Therefore, reliance on *Elliott* regarding the appropriate standard for equitable estoppel is misplaced.

8. The court in *Schaefer* cited *In re Marriage of Matzen*, 69 Ill.App.3d 69, 25 Ill.Dec. 557, 387 N.E.2d 14 (3d Dist.1979) for the proposition that "[t]he facts upon which equitable estoppel is based must be proven by clear and convincing evidence by the party asserting equitable estoppel." *Schaefer*, 161 Ill.App.3d at 847, 113 Ill.Dec. at 729, 515 N.E.2d at 714. However, the court in *Matzen* did not use the clear and convincing standard. Rather, the Court in *Matzen* used the clear, precise, and unequivocal evidence standard. *Matzen*, 69 Ill.App.3d at 72–73, 25 Ill.Dec. at 559, 387 N.E.2d at 16. Thus, reliance on *Matzen* for stating the clear and convincing standard is misplaced.

9. In *Ruster*, the court initially stated that the clear and unequivocal evidence standard was appropriate and correctly cited to two cases in which the clear and unequivocal evidence standard was used. *Ruster*, 91 Ill. App.3d at 358, 46 Ill.Dec. at 877, 414 N.E.2d at 930 (citing *Jozwick v. Jozwick*, 72 Ill. App.3d 17, 21, 28 Ill.Dec. 321, 324, 390 N.E.2d 488, 491 (1st Dist.1979) and *Lewis v. Lewis*, 48 Ill.App.3d 281, 284, 6 Ill.Dec. 577, 579, 363 N.E.2d 106, 108 (5th Dist.1977)). However, the court in *Ruster*, in applying the facts, stated the clear and convincing evidence standard. 91 Ill.App.3d at 359, 46 Ill.Dec. at 878, 414 N.E.2d at 931. Although the clear and convincing evidence standard appears to be similar to the clear, precise, and unequivocal evidence standard, the vast majority of courts have dealt with each standard separately. It appears that the court in *Ruster* inadvertently interchanged the two standards. Therefore, the Court concludes that *Ruster* should be read to follow the clear, precise, and unequivocal evidence standard.

10. The court in *Strand*, like the court in *Ruster*, used the two standards interchangeably. 86 Ill.App.3d at 830–31, 42 Ill.Dec. at 39, 408 N.E.2d at 417. For the same reasons as set forth above with respect to *Ruster*, the Court treats *Strand* as following the clear, precise, and unequivocal evidence standard. The Court declines to adopt the clear and convincing evidence standard in equitable estoppel cases because the aforementioned cases are distinguishable or contain drafting inconsistencies.

11. In *Pantle v. Industrial Commission*, 61 Ill.2d 365, 369, 335 N.E.2d 491, 494 (1975), the Illinois Supreme Court stated that the appropriate standard for equitable estoppel was the preponderance of the evidence standard. That finding, however, was made in the context of a claimant's attempt to defeat statutory limitations provisions contained in the Workman's Compensation Act. *Id.* The court in *Pantle* failed to cite to Illinois Supreme Court precedent that had found the clear, precise, and unequivocal standard to be the applicable standard. *See Coal Belt Electric Ry. Co. v. Peabody Coal Co.*, 230 Ill. 164, 169, 82 N.E. 627, 629 (1907). Moreover, the court in *Pantle*, cited no other Illinois authority to support the proposition, despite the abundance of appellate opinions that have applied the clear, precise, and unequivocal evidence standard. In light of the foregoing, the Court concludes that the decision in *Pantle* regarding the appropriate standard of proof for equitable estoppel is limited to its facts.

12. The Seventh Circuit in *Combined Network, Inc. v. Equitable Life Assurance Soc'y of the United States*, 805 F.2d 1292 (7th Cir.1986) has also spoken to this issue. After examining the case law from Illinois as well as from other jurisdictions, the court in *Combined Network* held that under Illinois law a preponderance of the evidence is the appropriate standard for equitable estoppel. *Id.* at 1297. The court's choice of the preponderance standard was based on three factors: (1) the split of authority in other jurisdictions; (2) the perceived lack of clear authority in Illinois; and (3) the rationale for using a higher burden in fraud cases (to reduce the risk of tarnished reputation) and in child support and custody cases (due to the nature of the dispute). *Id.*

13. For the reasons set forth below, the Court respectfully declines to follow the pronouncement in *Combined Network* on this issue of Illinois law. The Seventh Circuit stated that "Illinois courts have not established the burden of proof to be required in equitable estoppel cases" and that "Illinois has addressed the issue *only* with respect to proof necessary in child custody and support cases where the nature of the dispute requires additional assurances of a correct result." *Id.* at 1297 (citations omitted) (emphasis supplied).

14. As of the time *Combined Network* was written, the Illinois courts had established an appropriate standard of proof for equitable estoppel. These courts consistently set forth the clear, precise, and unequivocal evidence standard. *See, e.g., Western Casualty & Surety Co. v. Brochu*, 105 Ill.2d 486, 500, 86 Ill.Dec. 493, 500, 475 N.E.2d 872, 879 (1985); *Coal Belt*, 230 Ill. at 169, 82 N.E. at 629; *Union Nat'l Bank and Trust Co. of Joliet v. Carlstrom*, 134 Ill.App.3d 985, 990, 89 Ill.Dec. 749, 752, 481 N.E.2d 300, 303 (3d

Dist.1985); *Johnson v. Security Ins. Co. of Hartford,* 135 Ill.App.3d 690, 694, 90 Ill.Dec. 352, 355, 481 N.E.2d 1263, 1266 (2d Dist. 1985); *Carey v. City of Rockford,* 134 Ill. App.3d 217, 219, 89 Ill.Dec. 278, 279–80, 480 N.E.2d 164, 165–66 (2d Dist.1985); *Gary–Wheaton Bank v. Meyer,* 130 Ill.App.3d 87, 96, 85 Ill.Dec. 180, 187, 473 N.E.2d 548, 555 (2d Dist.1984); *In re Estate of Muhammad,* 123 Ill.App.3d 756, 763, 79 Ill.Dec. 178, 184, 463 N.E.2d 732, 738 (1st Dist.1984); *Wilson v. Illinois Benedictine College,* 112 Ill.App.3d 932, 939, 68 Ill.Dec. 257, 264, 445 N.E.2d 901, 908 (2d Dist.1983); *Joliet Mass Transit Dist. v. Illinois Fair Employment Practices Commission,* 85 Ill.App.3d 270, 273, 40 Ill.Dec. 849, 852, 407 N.E.2d 80, 83 (3d Dist.1980); *Gasbarra v. St. James Hosp.,* 85 Ill.App.3d 32, 45, 40 Ill.Dec. 538, 549, 406 N.E.2d 544, 555 (1st Dist.1979); *Jozwick,* 72 Ill.App.3d at 21, 28 Ill.Dec. at 324, 390 N.E.2d at 491; *Matzen,* 69 Ill.App.3d at 72–73, 25 Ill.Dec. at 559, 387 N.E.2d at 16; *Old Mutual Casualty Co. v. Clark,* 53 Ill.App.3d 274, 279, 11 Ill. Dec. 151, 154, 368 N.E.2d 702, 705 (1st Dist. 1977); *Monarch Gas Co. v. Illinois Commerce Commission,* 51 Ill.App.3d 892, 897, 9 Ill.Dec. 434, 438, 366 N.E.2d 945, 949 (5th Dist.1977); *Lewis v. Lewis,* 48 Ill.App.3d 281, 284, 6 Ill.Dec. 577, 579, 363 N.E.2d 106, 108 (5th Dist.1977); *City of Chicago v. Nielsen,* 38 Ill.App.3d 941, 947, 349 N.E.2d 532, 539 (1st Dist.1976); *National Tea Co. v. 4600 Club, Inc.,* 33 Ill.App.3d 1000, 1003, 339 N.E.2d 515, 518 (1st Dist.1975); *Ellingwood v. Ellingwood,* 25 Ill.App.3d 587, 592, 323 N.E.2d 571, 575 (1st Dist.1975); *Allstate Ins. Co. v. National Tea Co.,* 25 Ill.App.3d 449, 462, 323 N.E.2d 521, 530 (1st Dist.1975); *Allstate Ins. Co. v. Horn,* 24 Ill.App.3d 583, 588, 321 N.E.2d 285, 289 (1st Dist.1974); *Slavis v. Slavis,* 12 Ill.App.3d 467, 474, 299 N.E.2d 413, 418 (1st Dist.1973); *Jennings v. Bituminous Casualty Corp.,* 47 Ill.App.2d 243, 249, 197 N.E.2d 513, 517 (5th Dist.1964).

15. Moreover, the Illinois courts, as of the writing of *Combined Network,* had addressed the issue in cases other than child custody and support cases. *See, e.g., Western Casualty,* 105 Ill.2d at 500, 86 Ill.Dec. at 500, 475 N.E.2d at 879; *Coal Belt,* 230 Ill. at 169, 82 N.E. at 629; *Union Nat'l Bank,* 134 Ill. App.3d at 990, 89 Ill.Dec. at 752, 481 N.E.2d

at 303; *Johnson,* 135 Ill.App.3d at 694, 90 Ill.Dec. at 355, 481 N.E.2d at 1266; *Carey,* 134 Ill.App.3d at 219, 89 Ill.Dec. at 279–80, 480 N.E.2d at 165–66; *Gary–Wheaton Bank,* 130 Ill.App.3d at 96, 85 Ill.Dec. at 187, 473 N.E.2d at 555; *Muhammad,* 123 Ill.App.3d at 763, 79 Ill.Dec. at 184, 463 N.E.2d at 738; *Wilson,* 112 Ill.App.3d at 939, 68 Ill.Dec. at 264, 445 N.E.2d at 908; *Joliet Mass Transit,* 85 Ill.App.3d at 273, 40 Ill.Dec. at 852, 407 N.E.2d at 83; *Gasbarra,* 85 Ill.App.3d at 45, 40 Ill.Dec. at 549, 406 N.E.2d at 555; *Old Mutual Casualty,* 53 Ill.App.3d at 279, 11 Ill.Dec. at 154, 368 N.E.2d at 705; *Monarch Gas,* 51 Ill.App.3d at 897, 9 Ill.Dec. at 438, 366 N.E.2d at 949; *Nielsen,* 38 Ill.App.3d at 947, 349 N.E.2d at 539; *4600 Club,* 33 Ill. App.3d at 1003, 339 N.E.2d at 518; *Allstate Ins. Co. v. National Tea Co.,* 25 Ill.App.3d at 462, 323 N.E.2d at 530; *Horn,* 24 Ill.App.3d at 588, 321 N.E.2d at 289; *Jennings,* 47 Ill.App.2d at 249, 197 N.E.2d at 517.

16. Furthermore, the court in *Combined Network* cited no Illinois authority to support its selection of the preponderance of the evidence standard. In addition, this is directly contrary to the Illinois Supreme Court's decision in *Coal Belt.* Accordingly, the Court declines to adopt the preponderance of the evidence standard due to the lack of Illinois state court authority to do so, as well as Illinois Supreme Court authority to this contrary.

17. This Court affirms its prior finding that the appropriate standard for equitable estoppel is the clear, precise, and unequivocal evidence standard. *See Midway v. Northwest,* 1993 WL 65673 at * 18 (denying summary judgment in this matter). The weight of authority in Illinois supports such a conclusion. The Illinois Supreme Court has held this to be the appropriate standard. *Coal Belt,* 230 Ill. at 169, 82 N.E. at 629; *Western Casualty,* 105 Ill.2d at 500, 86 Ill. Dec. at 500, 475 N.E.2d at 879. Moreover, the vast majority of Illinois appellate courts follow this standard. *See, e.g., Marks v. Rueben H. Donnelly, Inc.,* 260 Ill.App.3d 1042, 1052, 201 Ill.Dec. 393, 400, 636 N.E.2d 825, 832 (1st Dist.), *appeal denied,* 157 Ill.2d 504, 205 Ill.Dec. 166, 642 N.E.2d 1283 (1994); *Feiler v. Covenant Medical Center of Cham-*

paign–Urbana, 232 Ill.App.3d 1088, 1093, 174 Ill.Dec. 179, 182, 598 N.E.2d 376, 379 (4th Dist.1992); *Central Transport, Inc. v. Village of Hillside,* 210 Ill.App.3d 499, 515, 154 Ill. Dec. 910, 920, 568 N.E.2d 1359, 1369 (1st Dist.), *appeal denied,* 159 Ill.2d 594, 159 Ill. Dec. 105, 575 N.E.2d 912 (1991); *Stoller v. Exchange Nat'l Bank of Chicago,* 199 Ill. App.3d 674, 684, 145 Ill.Dec. 668, 675, 557 N.E.2d 438, 445 (1st Dist.1990); *Farmers & Merchants Bank v. Davis,* 151 Ill.App.3d 929, 937, 104 Ill.Dec. 850, 856, 503 N.E.2d 565, 571 (2d Dist.), *appeal denied,* 115 Ill.2d 540, 110 Ill.Dec. 455, 511 N.E.2d 427 (1987); *Union Nat'l Bank,* 134 Ill.App.3d at 990, 89 Ill.Dec. at 752, 481 N.E.2d at 303; *Lewis,* 48 Ill.App.3d at 284, 6 Ill.Dec. at 579, 363 N.E.2d at 108. The Seventh Circuit has also recently followed this standard. *Essex Ins. Co. v. Stage 2, Inc.,* 14 F.3d 1178, 1181 (7th Cir.1994). Therefore, based on the foregoing, the Court concludes that under Illinois law, the clear, precise, and unequivocal evidence standard is the appropriate standard for equitable estoppel. However, due to the conflicting case law, the Court will nevertheless evaluate Midway's claim for equitable estoppel under all three of the aforementioned standards. The Court concludes that Midway has failed to prove its claim for equitable estoppel under any of the three standards.

18. "Estoppel refers to reliance by one party on the word or conduct of another so that the party changes his position and subsequently suffers harm. It arises whenever one by his conduct, affirmative or negative, intentionally or through culpable negligence, induces another to believe and have confidence in certain material facts, and the latter having the right to do so, relies and acts thereon, and is as a reasonable and inevitable consequence, misled to his injury." *Gary–Wheaton Bank,* 130 Ill.App.3d at 95–96, 85 Ill.Dec. at 186–87, 473 N.E.2d at 554–55. *See also Byron Community Unit Sch. Dist. No. 226 v. Dunham–Bush, Inc.,* 215 Ill.App.3d 343, 348, 158 Ill.Dec. 990, 993, 574 N.E.2d 1383, 1386 (2d Dist.1991); *Lindahl v. City of Des Plaines,* 210 Ill.App.3d 281, 295, 154 Ill.Dec. 857, 866, 568 N.E.2d 1306, 1315 (1st Dist.1991); *Stoller,* 199 Ill.App.3d at 684, 145 Ill.Dec. at 675, 557 N.E.2d at 445.

19. Fraudulent intent is not necessary to estoppel. *Northern Trust Co. v. Oxford Speaker Co.,* 109 Ill.App.3d 433, 439, 65 Ill.Dec. 113, 117, 440 N.E.2d 968, 972 (1st Dist.1982); *In re Maxwell,* 40 B.R. 231, 239 (N.D.Ill.1984). Rather, estoppel is appropriate against a person who adopts a position which reasonably misleads someone into detrimental reliance, regardless of the intent of his actions, if to hold otherwise would have an unjust effect. *Buczak v. Central Sav. & Loan Ass'n,* 230 Ill.App.3d 490, 500, 171 Ill. Dec. 771, 777, 594 N.E.2d 1291, 1297 (1st Dist.1992); *Northern Trust,* 109 Ill.App.3d at 439, 65 Ill.Dec. at 117, 440 N.E.2d at 972; *Combined Network,* 805 F.2d at 1297 ("[E]quitable estoppel requires proof of misrepresentation. Fraud differs in that it requires proof of an intent to harm."); *M.J. Oldenstedt Plumbing Co. v. K–Mart Corp.,* 257 Ill.App.3d 759, 764, 195 Ill.Dec. 906, 910, 629 N.E.2d 214, 218 (3d Dist.1994) ("Fraudulent intent is not necessary to estoppel.").

20. "[E]ven in the absence of a confidential relationship, estoppel may be based on conduct consisting of a failure to disclose plus an affirmative statement or act which, together, mislead the party claiming estoppel." *Buczak,* 230 Ill.App.3d at 500, 171 Ill.Dec. at 777, 594 N.E.2d at 1297.

21. Pursuant to the first element of equitable estoppel, Midway must prove by clear, precise, and unequivocal evidence that Northwest's words or conduct amounted to misrepresentations or concealment of material facts.

22. Because the first element of equitable estoppel closely resembles the first element of fraudulent misrepresentation, the Court, for the first element of equitable estoppel, adopts by reference its Conclusions of Law regarding the first element of fraudulent misrepresentation. (Count V, Conclusions of Law, ¶¶ 16–20; 56–57).

23. This Court has already found that none of the alleged representations amounted to misrepresentations or concealment of material facts. (Count V, Findings of Fact, ¶¶ 11, 14, 18, 19, 28, 33, 35, 37, 42, 44, 58, 67, 68, 85, and 87). For the same reasons articulated in Count V, the Court concludes that

Midway has failed to prove this element by clear, precise, and unequivocal evidence. Moreover, the Court concludes that Midway has failed to prove this element either by a preponderance of the evidence or by clear and convincing evidence.

24. Pursuant to the second element of equitable estoppel, Midway must prove by clear, precise, and unequivocal evidence that Northwest knew or had reason to know, at the time the representations were made, that the representations were false.

25. "The party against whom the estoppel is alleged must have had knowledge at the time the representations were made that the representations were untrue. This knowledge need not be actual but may be implied; misrepresentation made with gross negligence can form a basis for equitable estoppel." *Vaughn*, 126 Ill.2d at 162, 127 Ill.Dec. at 808, 533 N.E.2d at 890 (citation omitted).

26. With respect to Midway's allegations, except for those concerned with the so-called public statements, this Court has already found that Northwest did not make any false representations, and that Northwest did not know that such representations were false. (Count V, Findings of Fact, ¶¶ 5, 16, 24, 27, 30, 33, 36, 39, 68, 85, 108, 109, 121, 152, and 153). Because the statements were not false, Northwest could not have known or had reason to know they were false. For the same reasons articulated in Count V, the Court concludes that Midway has failed to prove this element by clear, precise, and unequivocal evidence. The Court further concludes that Midway has failed to prove this element by a preponderance of the evidence or by clear and convincing evidence.

27. With respect to Midway's allegations concerning the public statements, the Court holds that Northwest cannot be equitably estopped on the basis of either Midway's internal newsletter (Exhibit G) or its newspaper advertisement (Exhibit H), as those were statements made by Midway, not Northwest. The Court finds Midway's assertion that its self-generated propaganda supports a claim of equitable estoppel against Northwest to be disingenuous at best.

28. However, the Court has already found that the UPI wire service story (Exhibit F), Northwest's fax to travel agents (Exhibit I), Northwest's internal newsletter (Exhibit K), and Northwest's October 8 press release (PX 55) were false at the time made. (Count V, Findings of Fact, ¶¶ 48 and 61). This Court has also already found that Northwest knew them to be false at the time made. (Count V, Findings of Fact, ¶¶ 49 and 62). Therefore, with respect to these four statements, the Court concludes that Midway has met its burden on this element.

29. Pursuant to the third element, Midway must prove by clear, precise, and unequivocal evidence that Midway did not know at the time Northwest made the representations, as well as at the time Midway acted thereupon, that the representations were false.

30. The party claiming estoppel must have had no knowledge or convenient means of discovering the true facts about which it was allegedly deceived. *See Pack v. Santa Fe Park Enters., Inc.*, 209 Ill.App.3d 648, 652, 154 Ill.Dec. 360, 363, 568 N.E.2d 360, 363 (1st Dist.1991) (" '[a] party claiming the benefit of an estoppel cannot shut [its] eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge [its] ignorance to others' ") (citations omitted); *Dodd v. Cavett Rexall Drugs, Inc.*, 178 Ill.App.3d 424, 436, 127 Ill.Dec. 614, 621, 533 N.E.2d 486, 493 (1st Dist.1988) ("The party claiming estoppel must have had no knowledge or convenient means of discovering the true facts."); *Buczak*, 230 Ill.App.3d at 500, 171 Ill.Dec. at 777, 594 N.E.2d at 1297 ("[T]here comes a time when a party is entitled to believe that no further investigation is necessary.").

31. With respect to the allegations other than those concerning the public statements, while Midway may not have known the true facts, the Court has already found that Midway did have convenient means of discovering the true facts. (Count V, Findings of Fact, ¶¶ 100, 101, 131, 132, 133, 168, 169, and 170).

32. As to the public statements, this Court has already found that Midway knew the true facts and knew the public state-

ments were false insofar as they suggested that Northwest had agreed to purchase the non-gate assets. (Count V, Findings of Fact, ¶¶ 48 and 49).

33. Accordingly, the Court concludes that Midway has failed to prove this element by clear, precise, and unequivocal evidence. The Court also concludes that Midway has failed to prove this element by a preponderance of the evidence or by clear and convincing evidence.

34. Pursuant to the fourth element, Midway must prove by clear, precise, and unequivocal evidence that Northwest intended or reasonably expected that Midway would act based on Northwest's representations.

35. "The conduct and representations must be such as would ordinarily lead to the results complained of." *Vaughn,* 126 Ill.2d at 162, 127 Ill.Dec. at 808, 533 N.E.2d at 890 (citation omitted).

36. With respect to the allegations other than those concerning the public statements, this Court has already found that Northwest intended that Midway would act based on Northwest's representations. (Count V, Findings of Fact, ¶¶ 135 and 136).

37. Therefore, the Court concludes that Midway has met its burden on this element, except as to the public statements.

38. This Court has already found that Northwest did not intend that Midway would act based on the public statements. (Count V, Findings of Fact, ¶¶ 53–55). The Court also concludes that, as a corollary, Northwest did not expect that Midway would act based on the public statements.

39. Accordingly, the Court concludes that, as to the public statements, Midway has failed to prove this element by clear, precise, and unequivocal evidence. Moreover, the Court concludes that, as to the public statements, Midway has failed to prove this element by a preponderance of the evidence or by clear and convincing evidence.

40. Pursuant to the fifth element, Midway must prove by clear, precise, and unequivocal evidence that Midway in good faith detrimentally relied on Northwest's representations.

41. The standard for determining whether Midway's reliance was detrimental "is whether the reliance played a substantial part, and so was a substantial factor, in influencing [Midway's actions]." *Vaughn,* 126 Ill.2d at 165, 127 Ill.Dec. at 809, 533 N.E.2d at 891.

42. This Court has already found that Midway did not rely to its detriment on any of the alleged misrepresentations as Midway did not suffer any injury as a direct and proximate result of the failed negotiations. (Count V, Findings of Fact, ¶¶ 56–57, 139–141). Midway's reliance, if any, did not play a substantial part, nor was a substantial factor, in influencing Midway's actions. (Count V, Findings of Fact, ¶¶ 103–105, 138, and 140).

43. Moreover, any reliance by Midway on Northwest's alleged representations was not in good faith.

44. Therefore, the Court concludes that Midway has failed to prove this element by clear, precise, and unequivocal evidence. The Court further concludes that Midway has failed to prove this element by a preponderance of the evidence or by clear and convincing evidence.

45. Pursuant to the sixth element, Midway must prove by clear, precise, and unequivocal evidence that Midway acted so as to be prejudiced because of Northwest's representations.

46. The Court concludes that Midway was not prejudiced because of Northwest's representations.

47. Whatever injury Midway suffered did not result from Northwest's representations concerning the failed negotiations for the Back–End transaction.

48. Therefore, the Court concludes that Midway has failed to prove this element by clear, precise, and unequivocal evidence. In addition, the Court also concludes that Midway has failed to prove this element by a preponderance of the evidence or by clear and convincing evidence.

49. Accordingly, the Court concludes that Midway has failed to prove by clear, precise, and unequivocal evidence, by clear and con-

vincing evidence, or by a preponderance of the evidence all of the elements for equitable estoppel.

## COUNT VII

### FINDINGS OF FACT

1. In Count VII, Midway asserts a claim for negligent misrepresentation based on the same alleged misrepresentations that it relies on in its fraudulent misrepresentation (Count V) and equitable estoppel (Count VI) claims. The Court makes the following findings in connection with Midway's claim for negligent misrepresentation.

2. Further, the Court adopts by reference its Findings of Fact made in Count V for purposes of this count.

3. Northwest is in the business of operating an international airline. Northwest's regular principal business involves non-information products or services, including the sale of airline tickets, the air transportation of passengers, and the air transportation of cargo. Northwest was not principally in the business of providing information to third parties on October 8 or at any relevant time thereafter. Such information provided third parties was secondary or ancillary to its principal business.

4. Northwest and Midway did not have a close relationship with one another on October 8. Rather, they were competitors in certain matters.

5. For purposes of the October 8 hearing, the relationship between Midway and Northwest was typical of the arm's-length relationship often existing between parties negotiating a major transaction.

6. In its dealings with Northwest, Midway did not rely on Northwest for protection. Rather, Midway relied on its experienced officers, consultants, outside and inside counsel, and investment advisor.

7. The alleged misrepresentations were not made to guide Midway with respect to a business transaction with Southwest or any other third party. Rather, the alleged misrepresentations were made to guide Midway with respect to its proposed business transaction with Northwest.

8. Northwest alleges that Midway's negligent misrepresentation claim is defeated by the following affirmative defenses: (1) Midway waived its claim under Paragraph 7 of the Confidentiality Agreement; and (2) Midway's claim is barred because Northwest's participation in the October 8 hearing was induced by Midway's misrepresentations or omissions regarding its DOT data.

9. The Court has previously found that these affirmative defenses lack merit, and thus will not reconsider those defenses. *See* Count I.

### CONCLUSIONS OF LAW

1. To establish negligent misrepresentation, Midway must prove the following: (1) Northwest owed Midway a duty to communicate accurate information; (2) Northwest made false statements of material fact; (3) Northwest was negligent in ascertaining the truth of its statements; (4) Midway acted in reliance on the truth of Northwest's statements; and (5) Midway was damaged as a result of its reliance. *Board of Education v. A, C & S. Inc.,* 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 646, 546 N.E.2d 580, 591 (1989); *Chicago Export Packing Co. v. Teledyne Indus., Inc.,* 207 Ill.App.3d 659, 664, 152 Ill. Dec. 639, 643, 566 N.E.2d 326, 330 (1st Dist. 1990); *August, Bishop & Meier, Inc. v. Premium Link, Ltd.,* 738 F.Supp. 1166, 1169 (N.D.Ill.1990).

2. Negligent misrepresentation entails "the breach of a duty to use care in obtaining and communicating information upon which others may reasonably be expected to rely in the conduct of their economic affairs." *Stewart v. Thrasher,* 242 Ill.App.3d 10, 13–14, 182 Ill.Dec. 930, 933, 610 N.E.2d 799, 802 (4th Dist.1993).

3. Negligent misrepresentation has essentially the same elements as fraudulent misrepresentation, except that the defendant need not know the statement is false and the plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information. *A, C & S,* 131 Ill.2d at 452–53, 137 Ill.Dec. at 646–47, 546 N.E.2d at 591–92; *see also Caraluzzi v. Prudential Se-*

*curities, Inc.,* 824 F.Supp. 1206, 1214 (N.D.Ill.1993).

4. In Illinois, under the *"Moorman* doctrine," a plaintiff normally cannot recover solely economic losses under a tort theory. *See Moorman Mfg. Co. v. National Tank Co.,* 91 Ill.2d 69, 88, 61 Ill.Dec. 746, 754–55, 435 N.E.2d 443, 451–52 (1982) (policy underlying rule against recovery of economic losses in tort is that "contract, rather than tort, law provides the appropriate set of rules for recovery").

5. Economic loss has been defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property...." *Moorman,* 91 Ill.2d at 82, 61 Ill.Dec. at 752, 435 N.E.2d at 449 (citing Note, *Economic Loss in Products Liability Jurisprudence,* 66 COLUM.L.REV. 917, 918 (1966)).

6. Midway makes no claim of personal injury or damage to property. Hence, its claims are properly characterized as economic loss and the *Moorman* doctrine applies on its face to prevent Midway's recovery under its negligent misrepresentation claim.

7. However, there are two exceptions to the *Moorman* doctrine that allow plaintiffs to recover economic losses in tort. The court in *Moorman* held that economic losses are recoverable in tort (1) if the defendant either "intentionally makes false representations" or (2) "where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." 91 Ill.2d at 88–89, 61 Ill.Dec. at 755, 435 N.E.2d at 452; *see also Black, Jackson & Simmons Ins. Brokerage, Inc. v. International Business Mach. Corp.,* 109 Ill.App.3d 132, 134, 64 Ill.Dec. 730, 731–32, 440 N.E.2d 282, 283–84 (1st Dist.1982).

8. Accordingly, to qualify under these exceptions, Midway must establish either (1) that Northwest intentionally made a false representation (which essentially encompasses the tort of fraudulent misrepresentation) or (2) that Northwest was in the business of supplying information and that Northwest supplied the information to guide others in their business transactions with third parties. *See University of Chicago Hosp. v. United Parcel Serv.,* 231 Ill.App.3d 602, 604, 173 Ill.Dec. 64, 67, 596 N.E.2d 688, 691 (1st Dist. 1992); *Coleman Cable Sys., Inc. v. Shell Oil Co.,* 847 F.Supp. 93, 95 (N.D.Ill.1994) (citing *Rankow v. First Chicago Corp.,* 870 F.2d 356, 362–66 (7th Cir.1989)); *General Elec. Capital, Corp. v. Equifax Servs., Inc.,* 797 F.Supp. 1432, 1442–43 (N.D.Ill.1992); *see also Gerdes v. John Hancock Mut. Life Ins. Co.,* 712 F.Supp. 692, 699 (N.D.Ill.1989).

9. Although there are exceptions for negligent misrepresentation, "courts must construe narrowly the negligent-misrepresentation exception to the *Moorman* doctrine prohibiting recovery of economic losses in tort, lest the exception swallow the rule." *Gerdes,* 712 F.Supp. at 699 (footnote omitted).

10. The Court concludes that Midway does not fit within the first exception to the *Moorman* doctrine. The Court has already found that Midway failed to establish that Northwest intentionally made any false representations or committed fraudulent misrepresentation. *See* Count V.

11. In addition, the Court concludes that Midway does not fit within the second exception to the *Moorman* doctrine, as Northwest was not in the business of supplying information. Thus, the Court concludes that Midway may not recover its economic losses under a theory of negligent misrepresentation.

12. "The determination whether an enterprise is 'in the business of supplying information' requires a fact-intensive, case-specific analysis focusing on the 'nature of the information at issue in a particular case and its relation to the kind of business being conducted.'" *Gerdes,* 712 F.Supp. at 697 (quoting *Rankow,* 870 F.2d at 361). "[O]ne need not be exclusively in the business of supplying information to qualify for the negligent misrepresentation exception." *Coleman,* 847 F.Supp. at 96.

13. The requirement that the defendant be in the business of supplying

information is strictly construed. *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 133 Ill.App.3d 844, 850, 88 Ill.Dec. 863, 867, 479 N.E.2d 476, 480 (4th Dist.1985), *aff'd*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986). A party is in the business of supplying information when its product is information, as in the real estate broker business. *Gerdes*, 712 F.Supp. at 698. A party may also be in the business of supplying information if its product line includes information and non-informational goods or services, as in the financial services field. *Gerdes*, 712 F.Supp. at 698. However, businesses whose regular business is to provide non-informational products are not in the business of supplying information. *Id.* at 697. *See also Rankow*, 870 F.2d at 364–65; *Schwartz v. System Software Assocs., Inc.*, 813 F.Supp. 1364, 1367 (N.D.Ill.1993); *Landon v. GTE Communications Servs., Inc.*, 696 F.Supp. 1213, 1220 (N.D.Ill.1988); *National Union Fire Ins. Co. v. Continental Illinois Corp.*, 654 F.Supp. 316, 318 (N.D.Ill.1987); *Anderson*, 115 Ill.2d at 153–54, 104 Ill.Dec. at 692–93, 503 N.E.2d at 249–50.

14. A defendant that has supplied information to facilitate a business transaction between itself and another party, but whose regular business is to supply non-informational products or services, is not in the business of supplying information. *Schwartz*, 813 F.Supp. at 1367; *Fink v. De-Classis*, 745 F.Supp. 509, 513 (N.D.Ill.1990); *Gerdes*, 712 F.Supp. at 697; *Bonfield v. AAMCO Transmissions, Inc.*, 708 F.Supp. 867, 887 (N.D.Ill.1989); *National Union Fire Ins. Co.*, 654 F.Supp. at 318.

15. Northwest was not in the regular business of principally supplying information. Rather, Northwest is an international airline, whose regular principal business involves non-informational products or services, including the sale of airline tickets, the air transportation of passengers, and the air transportation of cargo.

16. Northwest merely incidentally supplied the information upon which Midway bases its claim in order to facilitate the Back–End transaction.

17. Midway asserts that Northwest was "in the business of supplying information" because it supplied information at the October 8 hearing which "was central to the transaction." Midway's assertion is incorrect as a matter of law. Companies, such as Northwest, that provide a non-informational product or service, are not "in the business of supplying information" even if they supply information during a business transaction. *Gerdes*, 712 F.Supp. at 697.

18. The "central to the business transaction" standard is applied only in situations involving "entities whose business consists of furnishing both information as well as non-informational goods and services. Businesses that fall within this category generally provide financial services and, therefore, present a particularly difficult problem, because 'there is a very thin line between an exchange of information about finances and actual financial transactions.'" *Gerdes*, 712 F.Supp. at 698 (citations omitted). Northwest, a commercial airline, does not fall into the category of a business providing both information and non-informational goods and services. Midway's attempt to apply the "central to the business transaction" test to Northwest is misguided.

19. The communication of information during an arm's-length commercial transaction does not transform a non-informational business into a company which is "in the business of supplying information." *Schwartz*, 813 F.Supp. at 1367; *Fink*, 745 F.Supp. at 513; *Gerdes*, 712 F.Supp. at 697; *Bonfield*, 708 F.Supp. at 887; *Tan v. Boyke*, 156 Ill.App.3d 49, 59, 108 Ill.Dec. 229, 235, 508 N.E.2d 390, 396 (2d Dist.), *appeal denied*, 116 Ill.2d 577, 113 Ill.Dec. 318, 515 N.E.2d 127 (1987).

20. A plaintiff must also prove that the information the defendant supplied was for guidance in the plaintiff's business transaction with third parties. *Gerdes*, 712 F.Supp. at 698; *Black, Jackson*, 109 Ill.App.3d at 136, 64 Ill.Dec. at 732, 440 N.E.2d at 284. The Court concludes that Midway is not entitled to recover for negligent misrepresentation because it failed to prove that Northwest supplied Midway with information to guide Midway in its business transactions with

third parties. Rather, any information that Northwest provided Midway related to the potential transaction between Midway and Northwest.

21. On October 8, Northwest merely set forth its proposal so that Midway could decide whether or not it wanted to pursue Northwest's proposal. This type of information does not meet the "guidance of others in their business transactions with third parties" requirement. *See Black, Jackson,* 109 Ill.App.3d at 136, 64 Ill.Dec. at 732, 440 N.E.2d at 284 (information given by two sellers to guide the buyer in its purchase of the sellers' product did not satisfy the guidance of others in their business transactions requirement). Accordingly, the Court concludes that Midway does not qualify under the second prong of the exception to the *Moorman* doctrine.

22. Because Midway's claim for economic losses pursuant to a theory of negligent misrepresentation does not come within one of the two exceptions to the *Moorman* doctrine, the Court concludes that Midway cannot recover the requested economic losses under this theory.

## COUNT VIII

### FINDINGS OF FACT

1. In Count VIII, Midway asserts a claim for intentional interference with prospective economic advantage based on substantially the same misrepresentations it alleges in its fraudulent misrepresentation claim (Count V), its equitable estoppel claim (Count VI), and its negligent misrepresentation claim (Count VII). Midway alleges that, but for Northwest's misrepresentations, Midway would have accepted Southwest's offer at the October 8 hearing.

2. The Court adopts and incorporates by reference its Findings of Fact made in Counts V, VI, and VII for purposes of this count.

3. For the reasons set forth herein, the Court hereby finds that Midway has failed to prove the elements of its intentional interference with prospective economic advantage claim by a preponderance of the evidence as to each of the alleged misrepresentations.

4. The Court finds that the business relationship that Midway claims Northwest interfered with was a prospective business relationship, not an existing contractual relationship.

5. Prior to the October 8 hearing, Midway met with Southwest's representatives on numerous occasions to discuss Southwest's offer. (Tr. (Hanson) 480; (Burgess) 841–42; PX 77; PX 670; Jenkins Dep. 31–32).

6. Prior to the October 8 hearing, Midway and First Boston considered Southwest's offer. (DX 98/PX 677; Tr. (Hinson) 125, 224; (Hanson) 480–82).

7. At the October 8 hearing, Midway met with representatives of Southwest and seriously considered Southwest's offer. (Tr. (Hanson) 514–15; (Burgess) 880–81; PX 13, pp. 55–57, 58–60, 65–66).

8. As presented to the Court on October 8, Southwest's final offer was competitive with Northwest's offer. (PX 13).

9. The Court finds that there is no dispute regarding Northwest's knowledge of the prospective business relationship between Midway and Southwest.

10. Northwest knew that Southwest had made a proposal for some of Midway's assets. (Tr. (Cronin) 2083).

11. Northwest knew that Southwest was at the October 8 hearing for the purpose of furthering its attempt to acquire Midway's assets. (Tr. (Cronin) 2083).

12. On October 8, Northwest knew that Midway was choosing between Northwest's and Southwest's proposals. (Tr. (Cronin) 2083).

13. Northwest knew that Midway had an expectancy of entering into a business relationship with Southwest. (Tr. (Cronin) 2083).

14. The Court has already found that Northwest did not commit the alleged fraudulent misrepresentations. *See* Count V.

15. Northwest's alleged misrepresentations were not communicated directly to Southwest.

16. The evidence is undisputed that the only representations Northwest made were made directly to Midway.

17. The Court finds that Midway, not Southwest, made the decision not to enter into a business relationship with Southwest.

18. The Court further finds that Midway's decision to select Northwest's proposal over Southwest's proposal was made with the assistance of its outside counsel, experienced representatives, and investment banker. The Court has already found that Midway's decision was not based on Northwest's alleged misrepresentation because the record is devoid of any evidence that Midway would have selected Southwest's proposal but for the alleged misrepresentations. (Count V, Findings of Fact, ¶¶ 102–105 and 138).

19. Southwest did not rescind or withdraw its offer at any time, let alone due to Northwest's alleged interference.

20. The statements and conduct which Midway alleges constitute interference did not cause Southwest to refuse to enter into a business relationship with Midway.

21. Northwest asserts that even if it committed the tort of intentional interference with prospective economic advantage, it was privileged to do so.

22. For the reasons set forth herein, the Court finds that Northwest has sufficiently proven this affirmative defense.

23. Northwest and Southwest were competitors. The two airlines competed in the passenger airline industry. Moreover, each sought to purchase Midway's gates as well as Midway's non-gate assets to the exclusion of the other.

24. The Court finds that Northwest's representations to Midway were in furtherance of what the Court has already found to be legitimate competitive efforts at acquiring Midway's assets. (Findings of Fact, ¶¶ 8 and 10–12 supra).

25. The Court finds that Northwest was acting to protect a conflicting interest that was equal or greater to Midway's business expectancy regarding Southwest. Northwest's interest in consummating a deal with Midway conflicted with Midway's interest in consummating a deal with Southwest, as Northwest and Southwest were competing for the purchase of Midway's non-gate assets. (Findings of Fact, ¶¶ 10–12 supra).

26. The Court finds that Northwest's actions were legal.

27. Northwest did not commit fraudulent misrepresentation or negligent misrepresentation. *See* Counts V and VII.

28. Northwest's actions were in the context of a section 363 sale, wherein Northwest made a legitimate bid to acquire Midway's gates and a legitimate offer to continue negotiating for Midway's non-gate assets.

29. The Court finds that Northwest's actions were not unreasonable under the circumstances.

30. Both parties were aware of the extreme time constraints placed on the October 8 hearing and recess meetings. (PX 13, pp. 5–7, 12–13).

31. Both sides have testified to the chaotic negotiating conditions. (Tr. (Burgess) 989; (Steenland) 3806–07; Jenkins Dep. 149; Tr. (Cronin) 2099–2100).

32. The Court finds it was not unreasonable for Northwest's representatives to make the representations that they did.

33. Midway has made no allegation that Northwest's conduct continued an unlawful restraint of trade.

34. Midway produced no evidence that Northwest acted with malice.

35. The Court finds that Northwest was not solely motivated on October 8 by the desire to prevent Southwest from acquiring Midway's assets. (Dasburg Dep. 27, 76–78; Tr. (Cronin) 2353–54; Francht Dep. 46; Roseboom Dep. 66–67).

36. Northwest acted, at least in part, to further its own interests. The testimony was uncontroverted that Northwest's management, as well as the majority of its Board of Directors, believed that the acquisition of Midway's assets would be a major boost to Northwest. (PX 10; Dasburg Dep. 39). For example, Northwest believed that the transaction would improve its "presence" vis a vis its main competitors (American Airlines,

United Airlines, and Delta Airlines). (PX 10, pp. 3–4).

37. Furthermore, Northwest asserts the following additional affirmative defenses: (1) Paragraph 7 of the Confidentiality Agreement bars Midway's intentional interference with a prospective economic advantage claim; and (2) this claim is barred because Northwest was induced to participate in the October 8 hearing and to make the Back–End offer by Midway's misrepresentations or omissions regarding the data Midway submitted to the DOT.

38. The Court has previously found that these affirmative defenses lack merit, and thus will not reconsider these affirmative defenses in this count. *See* Count I.

### CONCLUSIONS OF LAW

■ 1. The tort of intentional interference with a prospective economic advantage recognizes that a person's business relationships constitute a property interest and as such are entitled to protection from unjustified tampering by another. *Belden Corp. v. InterNorth, Inc.,* 90 Ill.App.3d 547, 551, 45 Ill.Dec. 765, 768, 413 N.E.2d 98, 101 (1st Dist.1980). This cause of action implies "a balancing of societal values: an individual has a general duty not to interfere in the business affairs of another, but he may be privileged to interfere, depending on his purpose and methods, when the interference takes a socially sanctioned form, such as lawful competition." *Id.*

2. Under Illinois law, in order to establish the tort of intentional interference with a prospective economic advantage, Midway must prove the following by a preponderance of the evidence: (1) Midway's reasonable expectation of entering into a valid business relationship; (2) Northwest's knowledge of Midway's expectancy; (3) purposeful interference by Northwest that prevents Midway's legitimate expectancy from ripening into a valid business relationship; and (4) damages to Midway resulting from such interference. *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 656, 568 N.E.2d 870, 878 (1991).

■ 3. Pursuant to the first element, Midway must prove by a preponderance of the evidence that it had a reasonable expectation of entering into a valid business relationship with Southwest.

4. The Court concludes that Midway has met its burden on this element.

5. Midway's expectation of entering into a valid business relationship with Southwest was reasonable because prior to and on October 8, Midway's representatives met with Southwest's representatives for the express purpose of considering Southwest's proposal; Midway did seriously consider the Southwest proposal; and Southwest's proposal was very competitive with Northwest's proposal. (Findings of Fact, ¶¶ 5, 6, 7, and 8 supra). Therefore, the Court concludes that Midway has sufficiently proven this element.

6. Pursuant to the second element, Midway must prove by a preponderance of the evidence that Northwest knew of Midway's expectation of entering into a business relationship with Southwest.

7. The Court concludes that Midway has met its burden on this element.

■ 8. Midway need not prove that Northwest knew the specific details of the prospective relationship between Midway and Southwest; rather, Midway need only prove that Northwest was aware of the existence of the prospective relationship. *Malatesta v. Leichter,* 186 Ill.App.3d 602, 619, 542 N.E.2d 768, 780–81 (1st Dist.), *appeal denied,* 128 Ill.2d 664, 548 N.E.2d 1071 (1989).

9. Based on the uncontroverted evidence (Findings of Fact, ¶ 9 supra), the Court concludes that Northwest knew of the existence of the prospective business relationship between Midway and Southwest. Thus, Midway has met its burden on this element.

10. Pursuant to the third element, Midway must prove by a preponderance of the evidence that Northwest intentionally interfered with the prospective business relationship between Midway and Southwest, thereby preventing Midway's legitimate expectancy from ripening into a valid business relationship.

11. For the reasons set forth below, the Court concludes that Midway has failed to meet its burden with respect to this element.

12. This element can be broken down into four components: (1) Northwest must have interfered with Midway's prospective business relationship with Southwest; (2) Northwest's conduct that constituted the interference (*i.e.* the alleged misrepresentations) must have been directed toward Southwest, as a specific third party (*See Zakutansky v. Bionetics Corp.*, 806 F.Supp. 1362, 1366 (N.D.Ill.1992); *Laser Indus., Ltd. v. Eder Instrument Co, Inc.*, 573 F.Supp. 987, 994 (N.D.Ill.1983); *McIntosh v. Magna Sys., Inc.*, 539 F.Supp. 1185, 1192–93 (N.D.Ill. 1982); *DP Service, Inc. v. AM Int'l*, 508 F.Supp. 162, 167–68 (N.D.Ill.1981); *Willcutts v. Galesburg Clinic Ass'n*, 201 Ill.App.3d 847, 851, 147 Ill.Dec. 853, 856, 560 N.E.2d 1, 4 (3d Dist.1990), *appeal denied*, 136 Ill.2d 556, 153 Ill.Dec. 386, 567 N.E.2d 344 (1991); *IK Corp. v. One Financial Place Partnership*, 200 Ill. App.3d 802, 819, 146 Ill.Dec. 198, 209, 558 N.E.2d 161, 172 (1st Dist.), *appeal denied*, 135 Ill.2d 556, 151 Ill.Dec. 383, 564 N.E.2d 838 (1990); *Galinski v. Kessler*, 134 Ill. App.3d 602, 608, 89 Ill.Dec. 433, 437, 480 N.E.2d 1176, 1180 (1st Dist.), *appeal denied*, 108 Ill.2d 562 (1985); *Parkway Bank & Trust Co. v. City of Darien*, 43 Ill.App.3d 400, 402–03, 2 Ill.Dec. 234, 237, 357 N.E.2d 211, 214·(2d Dist.1976)); (3) Northwest's interference must have been intentional; and (4) Northwest's interference must have caused Southwest, as the third party, to refuse to enter into the prospective business relationship with Midway (*see McIntosh*, 539 F.Supp. at 1193; *DP Service*, 508 F.Supp. at 167–68).

13. The Court concludes that Northwest did not interfere with Midway's prospective business relationship with Southwest.

14. Midway argues that Northwest's alleged fraudulent misrepresentations constituted "interference" sufficient to support its claim for tortious interference with a prospective business advantage in that Midway would have selected Southwest's proposal over Northwest's proposal but for the alleged misrepresentations. However, the Court has already found that Northwest did not commit the alleged fraudulent misrepresentations. *See* Count V. The Court has also found that Northwest did not commit negligent misrepresentations. *See* Count VII. In the absence of any misrepresentations, Midway's claim fails due to a lack of evidence of interference on the part of Northwest.

15. The Court concludes that Northwest's conduct that constituted the alleged interference (*i.e.* the alleged misrepresentations) was· not directed toward Southwest.

16. "A party cannot be held liable ... for interfering with his own prospective business relationship." *Laser*, 573 F.Supp. at 994.

17. The Court concludes that the statements which constituted the· alleged misrepresentations were communicated directly to Midway. The evidence is uncontroverted that Northwest did not make any statements to Southwest. (Findings of Fact, ¶¶ 15 and 16 supra). Thus, the Court concludes that Midway failed to demonstrate that Northwest's conduct was directed toward Southwest, as a specific third party.

18. The Court concludes that Northwest's alleged interference was not intentional.

19. The Court has already held that Northwest did not make any fraudulent misrepresentations (*see* Count V), and thus did not interfere in the manner alleged by Midway.

20. Even assuming that Northwest did interfere with the prospective business relationship between Midway and Southwest, such interference was not purposeful or intentional, but, rather, was inadvertent or incidental to Northwest's attempts to acquire Midway's assets.

21. The record demonstrates that Northwest's Board of Directors and management both desired to proceed with making a proposal to benefit Northwest for reasons outside of, and independent of, any alleged desire to keep Southwest from gaining an advantage over Northwest. (Findings of Fact, ¶¶ 35 and 36 supra).

22. The Court concludes that Northwest lacked any intent to interfere with the prospective business relationship between Midway and Southwest. Rather, Northwest in-

tended to acquire Midway's assets to affirmatively benefit Northwest, not merely to prevent Southwest from gaining a strategic foothold in the passenger airline industry. (Findings of Fact, ¶¶ 35 and 36 supra).

23. Based on this Court's Findings of Fact (¶¶ 15–20 supra), the Court concludes that, assuming Northwest interfered with the prospective business relationship between Midway and Southwest, such interference did not cause Southwest to not enter into that business relationship.

24. Pursuant to the fourth element, Midway must prove by a preponderance of the evidence that it suffered damage as a result of Northwest's interference with its prospective business relationship with Southwest.

25. The Court has already concluded that Northwest did not interfere with the prospective business relationship between Midway and Southwest. (Conclusions of Law, ¶¶ 13 and 14 supra). Moreover, the Court has already found that Midway did not suffer any losses that can be attributed to Midway's selection of Northwest's proposal, as Northwest did not commit the alleged fraudulent or negligent misrepresentations. *See* Counts V and VII.

26. Therefore, the Court concludes that Midway has failed to meet its burden on this element, as it has not proven by a preponderance of the evidence that it was damaged by Northwest's alleged interference with its prospective business relationship with Southwest.

27. Accordingly, the Court concludes that Northwest's alleged interference with Midway's prospective business relationship with Southwest was not intentional.

28. Northwest has asserted that even if it intentionally interfered with the prospective business relationship between Midway and Southwest, Northwest nevertheless had a so-called "competitor's privilege" to do so.

29. "Where a defendant in a tortious interference action asserts that he is privileged, he is, in effect, asserting that even if he ... had deliberately interfered with the plaintiff's prospective business opportunities, given the importance of the privileged conduct, the plaintiff is not entitled to prevail in the action." *Roy v. Coyne,* 259 Ill.App.3d 269, 281, 196 Ill.Dec. 859, 867, 630 N.E.2d 1024, 1032 (1st Dist.1994). This is an affirmative defense, and thus the burden of pleading and proving the existence of a competitor's privilege rests with Northwest. *Id.*

30. Under Illinois law, a plaintiff's interest in a prospective business relationship is entitled to less protection than its interest in existing contract rights:

> An individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract. When a business relationship affords the parties no enforceable expectations, but only the hope of ... benefits, the parties must allow for the rights of others. They therefore have no cause of action against a bona fide competitor unless the circumstances indicate unfair competition, that is, an unprivileged interference with prospective advantage.

*Fishman v. Estate of Wirtz,* 807 F.2d 520, 546 (7th Cir.1986) (quoting *Belden,* 90 Ill. App.3d at 552, 45 Ill.Dec. at 769, 413 N.E.2d at 102).

31. The right to engage in a lawful business is not absolute, but must be exercised with reasonable regard for the conflicting rights of others. Lawful competition is not actionable even though carried to the extent of ruining a rival. Exploitation of the market should be conducted with the intent at least in part to further one's business; but if pursued solely in spite or ill will and not in the advancement of competitive interests, the conduct is not privileged.

*Candalaus Chicago, Inc. v. Evans Mill Supply Co.,* 51 Ill.App.3d 38, 48, 9 Ill.Dec. 62, 70, 366 N.E.2d 319, 327 (1st Dist.1977) (citations omitted).

32. Illinois follows the Restatement (Second) of Torts regarding the competitor's privilege. Section 768 thereof provides that the competitor's privilege applies only if:

(a) the relation concerns a matter involved in the competition between the actor and the other;

(b) the actor does not employ wrongful means;

(c) his action does not create or continue an unlawful restraint of trade; and

(d) his purpose is at least in part to advance his interest in competing with the other.

RESTATEMENT (SECOND) OF TORTS § 768 (1979); *Galinski,* 134 Ill.App.3d at 610, 89 Ill.Dec. at 439, 480 N.E.2d at 1182. *See also Herman v. Prudence Mut. Casualty Co.,* 41 Ill.2d 468, 473–74, 244 N.E.2d 809, 812 (1969) (Restatement of the Law of Torts § 766).

33. "Legitimate competitive efforts, such as indicating interest in and making offers to acquire a company, are not tortious interferences with business." *Feldman v. Allegheny Int'l, Inc.,* 850 F.2d 1217, 1224 (7th Cir.1988).

34. The competitor's privilege protects a defendant's right to interfere in the plaintiff's prospective economic relations. The competitor's privilege arises when the " 'business relation concerns a matter involving competition between the actor [Northwest] and the competitor [Southwest].' " *See A–Abart Elec. Supply, Inc. v. Emerson Elec. Co.,* 956 F.2d 1399, 1405 (7th Cir.) (quoting *Mannion v. Stallings & Co., Inc.,* 204 Ill.App.3d 179, 190–91, 149 Ill.Dec. 438, 445, 561 N.E.2d 1134, 1141 (1st Dist.1990)), *cert. denied,* —— U.S. ——, 113 S.Ct. 194, 121 L.Ed.2d 137 (1992).

35. A defendant's conduct is considered privileged when the defendant is acting to protect a conflicting interest that is considered to be of equal value to or greater than the plaintiff's business expectancy, such as the interest in lawful economic competition, and the defendant's actions are legal and not unreasonable in the circumstances. *Getschow v. Commonwealth Edison Co.,* 111 Ill. App.3d 522, 530, 67 Ill.Dec. 343, 349, 444 N.E.2d 579, 585 (1st Dist.1982), *aff'd in part and rev'd in part on other grounds,* 99 Ill.2d 528, 77 Ill.Dec. 83, 459 N.E.2d 1332 (1984) (per curiam).

36. Based on the Court's Findings of Fact as set forth above, the Court concludes, assuming that Northwest tortiously interfered with the prospective business relationship between Midway and Southwest, that Northwest has met its burden of proving by a preponderance of the evidence that Northwest was acting under the competitor's privilege at the time, and is therefore not liable to Midway for any damage Midway may have suffered as a result.

37. Once the defendant has proven that its conduct was privileged, then the plaintiff has the burden to plead and prove that the defendant acted with malice. *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 156–58, 137 Ill. Dec. 19, 24, 545 N.E.2d 672, 677 (1989); *see also Fellhauer,* 142 Ill.2d at 512, 154 Ill.Dec. at 657, 568 N.E.2d at 878 (following *HPI* in the context of interference with a prospective economic advantage). Therefore, as the Court has concluded that Northwest's conduct was privileged, the burden shifts to Midway to prove that Northwest acted with malice.

38. The Court concludes that Midway has failed to prove that Northwest acted with malice.

39. Malice in this context refers not to "ill will," but, rather, to the legal sense of malice, which encompasses intentional interference without justification. *HPI,* 131 Ill.2d at 156–57, 137 Ill.Dec. at 24, 545 N.E.2d at 677; *Candalaus,* 51 Ill.App.3d at 47, 9 Ill. Dec. at 69, 366 N.E.2d at 326; *see also Fellhauer,* 142 Ill.2d at 512, 154 Ill.Dec. at 657, 568 N.E.2d at 878 (following *HPI* in the context of interference with a prospective economic advantage).

40. Interference resulting from a defendant's pursuit of its own ends by proper means is not actionable. *Bank Computer Network Corp. v. Continental Ill. Nat'l Bank & Trust Co.,* 110 Ill.App.3d 492, 500, 66 Ill.Dec. 160, 166, 442 N.E.2d 586, 592 (1st Dist.1982) (" '[O]ne who has an interest may take action to protect his rights, and even if the interference is done with malice he cannot be held financially liable for the result of his actions'.") (citation omitted). The plain-

tiff must show that the desire to harm was the defendant's sole motivation. *Candalaus,* 51 Ill.App.3d at 47, 9 Ill.Dec. at 70, 366 N.E.2d at 327 (trial court erred in entering judgment against a competitor who did not act solely out of spite or ill will, but at least in part to further his own interest); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 298 (7th Cir.) (no cause of action for intentional interference with prospective business advantage where defendants were acting with the well-being of the corporation in mind), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

41. The Court has already concluded that Northwest did not intentionally interfere with the prospective business relationship between Midway and Southwest. (Conclusions of Law, ¶¶ 20–22 supra). Moreover, any interference was with justification as Northwest was in good faith competition with Southwest to acquire Midway's assets. (Findings of Fact, ¶¶ 30–31 supra).

42. Moreover, Midway has failed to show that Northwest had a desire to harm Midway's prospective business relationship with Southwest.

43. Therefore, the Court concludes that Midway has failed to prove that Northwest acted with malice.

44. Based on the Court's Findings of Fact and Conclusions of Law as set forth above, the Court concludes that Midway has failed to prove its claim of intentional interference with a prospective economic advantage by a preponderance of the evidence.

45. The Court further concludes that Northwest has nevertheless proven by a preponderance of the evidence its affirmative defense of competitor's privilege.

## COUNT IX

### *FINDINGS OF FACT*

1. In Count IX, Midway asserts a claim for breach of contract. Specifically, Midway alleges that Northwest breached Section 2.2(b)(iii) of the Gate Sale Agreement in two respects: (a) Northwest failed to reimburse Midway for the October 1991 lease arrearage payment Midway made to the City of Chica-

go, and (b) Northwest failed to reimburse Midway for the October 1991 and November 1991 security deposit payments Midway made to the City of Chicago.

2. Midway and the City of Chicago entered into an agreement dated September 1, 1991 in order to settle certain claims the City of Chicago had against Midway (the "Settlement Agreement"). (DX 428). In that agreement, Midway agreed, *inter alia,* to repay certain arrearages on an installment basis that had accrued under the lease of Midway's gates at Midway Airport. (DX 428, ¶¶ 1 and 2). Midway agreed to repay a total of $4,779,195.93 in monthly installments of $190,345.49. (DX 428).

3. Pursuant to the Settlement Agreement, Midway made a lease arrearage payment to the City of Chicago in October 1991 in the amount of $190,345.49.

4. Midway contends that Northwest was obligated to reimburse Midway for this payment, but did not do so.

5. The Court finds that Northwest was obligated to reimburse Midway for the October 1991 lease arrearage payment.

6. Northwest agreed to assume certain lease arrearage payments at the October 8 hearing. (PX 13, p. 49).

7. Northwest and Midway modified that agreement after the October 8 hearing. (PX 612).

8. Midway and Northwest executed the modified Gate Sale Agreement (PX 19) on October 11, 1991.

9. The Court has already found that the Gate Sale Agreement was a valid, binding, and enforceable contract. (Count III, Findings of Fact, ¶ 5).

10. The Court finds that Midway performed its obligations under the Gate Sale Agreement.

11. Section 2.2(b)(iii) of the Gate Sale Agreement provides that Northwest shall assume "the liabilities of Seller [Midway] under numbered paragraphs 1 and 2 of that certain Letter Agreement with the City of Chicago dated as of September 1, 1991 . . . ." (PX 19)

12. It is undisputed that Northwest did not reimburse Midway for the October 1991 lease arrearage payment in the amount of $190,345.49.

13. The Court finds that Northwest's failure to reimburse Midway for the October 1991 lease arrearage payment constitutes a breach of Northwest's contractual obligation to do so under the Gate Sale Agreement.

14. The Court finds that Midway would have received $190,345.49 had Northwest fully consummated the Gate Sale Agreement.

15. The Court finds that Midway has neither recovered nor will recover any of that sum as mitigation of its damages.

16. Northwest concedes that if the Court finds that Northwest breached the Gate Sale Agreement by not reimbursing Midway for the October 1991 lease arrearage payment, then the amount of damage would be $190,-345.49. (Tr. (Morris) 1604–05; (Burton) 4492–93; PX 729 at MAA03; DX 562, pp. 15–16).

17. In addition to the repayment of the lease arrearages, the Settlement Agreement obligated Midway to pay the City of Chicago a $1 million security deposit, which was payable in twelve monthly installment of $83,-333.33. (DX 428, ¶ 4).

18. It is undisputed that Midway made installment payments on the security deposit obligation in October and November 1991, totalling $166,666.66.

19. Midway contends that Northwest was obligated to reimburse Midway for these payments, but did not do so.

20. The Court finds, based on the unambiguous language of the Gate Sale Agreement and the Settlement Agreement, that Northwest was not obligated to reimburse Midway for its security deposit installment payments.

21. The Gate Sale Agreement only obligated Northwest to assume those liabilities Midway was responsible for in "paragraphs 1 and 2 of that certain Letter Agreement with the City of Chicago dated as of September 1, 1991...." (PX 19, § 2.2(b)(iii)).

22. Nowhere else in the Gate Sale Agreement did Northwest agree to assume Midway's security deposit payments.

23. The security deposit obligation is set forth in Paragraph 4 of the Settlement Agreement. (DX 428, ¶ 4).

24. Neither of the two relevant paragraphs of the Settlement Agreement (¶¶ 1 and 2) refer to either paragraph 4 or the security deposit obligation. (DX 428).

25. The Court finds that Northwest was not contractually obligated under the Gate Sale Agreement to assume Midway's obligations for the security deposit installment payments.

26. It is undisputed that Northwest did not reimburse Midway for the October or November 1991 security deposit installment payments.

27. The Court finds that, because Northwest was not obligated to reimburse Midway for the security deposit installment payments, Northwest's failure to do so does not constitute a breach of the Gate Sale Agreement.

28. There is no agreement between the parties that expressly provides for prejudgment interest.

29. The Court finds that a debtor-creditor relationship had come into being by virtue of Northwest's assumption of Midway's obligation to make the lease arrearage payments as embodied in Section 2.2(b)(iii) of the Gate Sale Agreement.

30. The Court finds that the amount due pursuant to Section 2.2(b)(iii) of the Gate Sale Agreement is fixed or liquidated.

31. The Court further finds that the amount due pursuant to Section 2.2(b)(iii) of the Gate Sale Agreement is subject to easy computation.

32. The Court finds that the contract between Midway and Northwest as embodied by the Gate Sale Agreement is a written instrument.

33. Northwest contends that it did not breach Section 2.2(b)(iii) of the Gate Sale Agreement by failing to pay the October 1991 lease arrearage payment because its

offer to assume the lease arrearages on October 8 was induced by Midway's misrepresentations and omissions regarding the data submitted to the DOT. Alternatively, Northwest contends that the agreement to assume the lease arrearages was the result of the parties' mistaken belief (or Northwest's mistaken belief) concerning the data Midway submitted to the DOT.

34. The Court has previously found that Northwest's affirmative defenses that it was induced by Midway's misrepresentations and omissions regarding the DOT data, and that the parties were operating under a mistaken belief concerning Midway's DOT data lack merit. *See* Count I. Thus, the Court will not reconsider those affirmative defenses in this count.

### CONCLUSIONS OF LAW

1. In Illinois, " 'a party seeking to enforce an agreement has the burden of establishing the existence of the agreement.' " *Bower v. Jones*, 978 F.2d 1004, 1013 (7th Cir.1992) (quoting *Commonwealth Edison Co. v. Industrial Comm'n*, 167 Ill.App.3d 229, 233, 118 Ill.Dec. 91, 93, 521 N.E.2d 159, 161 (3d Dist.1988)).

2. "Under a contract theory, the plaintiffs carry the burden to prove all elements of a contract...." *Johnson v. Johnson*, 244 Ill. App.3d 518, 527, 185 Ill.Dec. 214, 221, 614 N.E.2d 348, 355 (1st Dist.1993).

3. In order to establish a breach of contract, Midway must prove by a preponderance of the evidence that: (1) Midway and Northwest entered into a binding contract; (2) Midway performed its obligations under the contract; (3) Northwest breached its obligations under the contract; and (4) Midway suffered damages as a proximate result of the breach. *Mannion v. Stallings & Co.*, 204 Ill.App.3d 179, 186, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1st Dist.1990); *Bercoon, Weiner, Glick & Brook v. Manufacturers Hanover Trust Co.*, 818 F.Supp. 1152, 1155 (N.D.Ill.1993). *Accord Penzell v. Taylor*, 219 Ill.App.3d 680, 688, 162 Ill.Dec. 142, 147, 579 N.E.2d 956, 961 (1st Dist.), *appeal denied*, 142 Ill.2d 656, 164 Ill.Dec. 919, 584 N.E.2d 131 (1991); *see also Valenti v. Qualex, Inc.*,

970 F.2d 363, 366 (7th Cir.1992) (citing *Penzell*).

4. Based on the Findings of Fact as set forth above, the Court concludes that Midway successfully proved by a preponderance of the evidence that Midway and Northwest entered into a binding contract in the form of the Gate Sale Agreement, that Midway performed its obligations under the contract, that Northwest breached its obligation to assume Midway's lease arrearage obligation, and that Midway suffered damages as a proximate result of Northwest's breach.

5. The Court further concludes, based on the undisputed evidence, that Midway suffered damages in the amount of $190,345.49, the amount paid to the City of Chicago in October 1991 as a lease arrearage payment pursuant to the Settlement Agreement.

6. The measure of damages available to Midway for Northwest's breach of its agreement to assume Midway's lease obligations to the City of Chicago is the value Midway would have received had Northwest consummated the contract, less the amount Midway has recovered or will recover in its efforts to mitigate those damages. *Hentze v. Unverfehrt*, 237 Ill.App.3d 606, 611, 178 Ill. Dec. 280, 284, 604 N.E.2d 536, 540 (5th Dist. 1992); *Village of Pawnee v. Azzarelli Constr. Co.*, 183 Ill.App.3d 998, 1022, 132 Ill.Dec. 332, 347, 539 N.E.2d 895, 910 (4th Dist.1989); RESTATEMENT (SECOND) OF CONTRACTS, § 347 (1981).

7. The amount necessary to place Midway in the same position it would have been in had Northwest performed under Section 2.2(b)(iii) of the Gate Sale Agreement includes all foreseeable consequential damages incurred by Midway as a result of Northwest's breach. *Hentze*, 237 Ill.App.3d at 611–12, 178 Ill.Dec. at 284, 604 N.E.2d at 540; *Cole Energy Dev. Co. v. Ingersoll–Rand Co.*, 913 F.2d 1194, 1202 (7th Cir.1990).

8. Midway is not required to prove the amount of damages with absolute certainty. "Rather, evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *LeFevour v. Howorka*, 224 Ill.App.3d 428, 431, 166 Ill.

Dec. 698, 700, 586 N.E.2d 656, 658 (1st Dist. 1991); *see also Bowman v. Zimny*, 256 Ill. App.3d 386, 390, 194 Ill.Dec. 887, 891, 628 N.E.2d 384, 388 (1st Dist.1993).

9. The Court concludes that Midway has been damaged by Northwest's breach of the Gate Sale Agreement in the amount of $190,-345.49.

10. Based on the Findings of Fact as set forth above, the Court concludes that Midway failed to prove by a preponderance of the evidence that, as to Northwest's assumption of the security deposits, Northwest breached its obligations under the Gate Sale Agreement as Midway failed to prove by a preponderance of the evidence that the Gate Sale Agreement obligated Northwest to assume those particular liabilities.

■■■ 11. Midway seeks pre-judgment interest under this count of its Complaint. Northwest contends that Midway is not entitled to pre-judgment interest. The Court concludes that Midway is entitled to pre-judgment interest as to the damages it suffered with respect to Northwest's failure to reimburse Midway for the October 1991 lease arrearage payment.

12. "Under Illinois law, the decision to award or deny prejudgment interest as an element of recoverable damages is committed to the discretion of the trial judge." *United States ex rel. Treat Bros. Co. v. Fidelity & Deposit Co. of Maryland*, 986 F.2d 1110, 1121 (7th Cir.1993) (quoting *Ross–Berger Cos. v. Equitable Life Assurance Soc'y of the United States*, 872 F.2d 1331, 1339 (7th Cir. 1989)).

13. In Illinois, there is generally no right to recover pre-judgment interest unless it is permitted by statute or there is an agreement between the parties that expressly provides for an award of interest. *Moody v. First Nat'l Bank of Moline*, 239 Ill.App.3d 986, 990, 608 N.E.2d 589, 591 (3d Dist.1993); *Alguire v. Walker*, 154 Ill.App.3d 438, 447, 506 N.E.2d 1334, 1341 (1st Dist.1987).

14. As there is no agreement between the parties expressly providing for pre-judgment interest, the Court must look to the applicable Illinois statute. Pursuant to Section 2 of the Illinois Interest Act:

Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance[;] on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

815 ILCS 205/2.

15. The courts interpreting this statute have found the statute requires an award of pre-judgment interest in cases in which there is an amount due "in the sense that a debtor-creditor relationship has come into being" and the amount due was "fixed or easily computed" prior to judgment. *South Bend Lathe, Inc. v. Amsted Indus., Inc.*, 925 F.2d 1043, 1049 (7th Cir.1991) (citing *Advance Mortgage Corp. v. Concordia Mut. Life Ass'n*, 135 Ill.App.3d 477, 485, 90 Ill.Dec. 225, 231, 481 N.E.2d 1025, 1031 (1st Dist.1985)); *see also Servbest Foods, Inc. v. Emessee Indus., Inc.*, 82 Ill.App.3d 662, 677, 37 Ill. Dec. 945, 957, 403 N.E.2d 1, 13 (1st Dist. 1980). "Prejudgment interest will only be awarded for amounts due on an instrument of writing if the amount due was liquidated or subject to easy computation." *Oldenburg v. Hagemann*, 207 Ill.App.3d 315, 327, 152 Ill.Dec. 339, 347, 565 N.E.2d 1021, 1029 (2d Dist.1991); *see also Tomaso v. Plum Grove Bank*, 130 Ill.App.3d 18, 29, 85 Ill.Dec. 220, 228–29, 473 N.E.2d 588, 596–97 (1st Dist. 1985).

16. "An amount due under a contract is liquidated if the parties agree on the amount." *Oldenburg*, 207 Ill.App.3d at 327, 152 Ill.Dec. at 347, 565 N.E.2d at 1029.

17. The Court has found that Northwest breached the Gate Sale Agreement with respect to Northwest's failure to reimburse Midway for the October 1991 lease arrearage payment. (Findings of Fact, ¶ 13 supra).

■■■ 18. The Court has also found that Northwest admitted that if the Court found such a breach, the amount of damage would

be that which Midway had claimed, that is, $190,345.49. (Findings of Fact, ¶ 16 supra).

19. Therefore, the Court concludes that the amount due was liquidated.

20. Moreover, the Court concludes the amount due was subject to easy calculation based on the unambiguous written language contained in both the Settlement Agreement and the Gate Sale Agreement.

21. Pursuant to the statute, there must be an "instrument of writing." 815 ILCS 205/2. A contract is an "instrument of writing" within the meaning of the pre-judgment interest statute. *See E.M. Melahn Constr. Co. v. Village of Carpentersville,* 100 Ill.App.3d 544, 550, 56 Ill.Dec. 101, 106, 427 N.E.2d 181, 186 (2d Dist.1981) ("A building or construction contract is an instrument in writing within the meaning of the interest statute.").

22. The Court concludes that Midway is entitled to pre-judgment interest pursuant to 815 ILCS 205/2 because a debtor-creditor relationship arose out of a written instrument (the Gate Sale Agreement) and the amount due is of a fixed and calculable amount.

23. Accordingly, Midway is hereby granted pre-judgment interest to which it is due, running from November 13, 1991, the date of Northwest's breach of its agreement with Midway to the date of judgment herein of March 10, 1995, at five percent per annum. The Court concludes that Midway is entitled to $31,602.57 as pre-judgment interest.

24. In addition, the Court concludes that Midway is entitled to post-judgment interest.

25. "Post-judgment interest is authorized by both Illinois and federal statutes." *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund,* 956 F.2d 152, 153 (7th Cir. 1992).

26. In Illinois, the awarding of post-judgment interest is governed by statute. *See* 735 ILCS 5/12–109 ("Every judgment . . . shall bear interest thereon as provided in Section 2–1303.").

27. Section 2–1303 provides in pertinent part, "Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied. . . ." 735 ILCS 5/2–1303.

28. "From the date of that judgment forward, 'post-judgment' interest applies until the judgment debtor tenders full payment along with any accrued interest." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.,* 157 Ill.2d 282, 301, 193 Ill.Dec. 180, 190, 626 N.E.2d 213, 223 (1993).

29. Pursuant to the Illinois statute, the awarding of post-judgment interest is mandatory.

30. Therefore, the Court awards Midway post-judgment interest on the judgment amount of $190,345.49 at the rate of 9% per annum to be calculated from the date of judgment, March 10, 1995, forward to the date Northwest tenders full payment including the accrued interest.

## NORTHWEST'S COUNTERCLAIM

### THE BACKGROUND FACTS FOR COUNT I OF COUNTERCLAIM

1. Midway, like other major airlines, filed numerous reports with the United States Department of Transportation ("DOT") containing information on all aspects of its business operations and finances, including the Form 41 report, the T–1, T–3, and T–100 Schedules, and the Passenger–Origin Destination Survey Report. (DX 28; 14 C.F.R. Pt. 241, § 22 (1993)).

2. Midway generated the reports it filed with the DOT, as well as its numerous internal management reports, using a computerized revenue accounting system. (Tr. (Tate) 3683–85).

3. Midway's computerized revenue accounting system was provided by Airline Software, Inc. ("ASI"). (Tr. (Tate) 3679, 3689; (Bormus) 3989).

4. Midway's revenue accounting system ran from a database consisting of 100 percent of the tickets "lifted" (physically taken) from Midway passengers when they boarded a Midway aircraft. (Tr. (Tate) 3683).

5. Midway installed numerous safeguards in its revenue accounting system to ensure

the accuracy of the database, including the following: the review of fare data at the sales agent point; the review of sales reports at the revenue accounting level; the review of "lifted" tickets at the boarding point; the review of inputted data at the data entry point; and the review of the data output during the budgeting process by appropriate department heads. (Tr. (Tate) 3685–88; Asai Dep. 78–81).

6. Midway's independent outside accountant audited the revenue accounting system each year as part of supplying audited financial statements. (Tr. (Tate) 3684, 3688).

7. One of the reports generated by Midway's revenue accounting system was the Passenger–Origin Destination Survey Report (alternately referred to as either the "O & D Survey Report" or the "DOT data"). (Tr. (Tate) 3689).

8. The O & D Survey Report contains information regarding revenue-producing passenger trips, both domestic and international, by market. (DX 28; 14 C.F.R. Pt. 241, § 19–7 (1993), Appendix to Pt. 241, § 19–7, Narrative Description (1993)).

9. In contrast to Midway's internal reports, which were based upon a 100 percent sample of lifted tickets, the O & D Survey Report is based on a sample of at least 1 percent of the tickets for all domestic major markets and a sample of 10 percent of tickets for other markets. *Id.*

10. The O & D Survey Report contains data related to: (1) the routing of each passenger trip from the city of origin to the city of destination; (2) the summarized fare basis codes for each stage of the trip; and (3) the total value of the fare and tax for an entire ticket. *Id.*

11. "Fare" refers to the dollar value per ticket. *Id.*

12. "Fare basis codes" are combinations of alphabetic and numeric codes appearing on a ticket, which primarily consist of: "F"—first class; "FD"—discount first class; "Y"—Coach; "YD"—discount coach; "UK"—unknown; and "Z"—others. (DX 28; 14 C.F.R. Pt. 241, § 19–7, Glossary of Terms (1993)).

13. "Traffic" refers to the number of passengers in a market. (Tr. (Fornaro) 2989).

14. "Revenue" is calculated by multiplying the number of passengers by fare. (Tr. (Morris) 2503, 2506).

15. "Revenue per passenger mile" ("RPM") is calculated by multiplying the number of passengers by miles. (Jehn Dep. 90).

16. "Yield" is a measure of revenue that is calculated by dividing revenue by RPM, which is quantified in cents per mile. (Tr. (Morris) 2476).

17. Midway began to experience financial problems in 1990 as a result of the high costs of Midway's unsuccessful development of a Philadelphia hub and the adverse impact on the airline industry of Iraq's invasion of Kuwait. (Tr. (Hinson) 104–05).

18. During this time, Hinson made preliminary contacts with Northwest about a possible business relationship. (Tr. (Hinson) 106–110).

19. The first meeting between Midway and Northwest occurred in February 1991, when senior officers of Midway and Northwest assembled for an informal dinner. (Tr. (Hinson) 108–09; Fornaro Dep. 56–57; Dasburg Dep. 10).

20. The purpose of this meeting was to engage in exploratory discussions regarding possible business relationships. (Tr. (Hinson) 109; (Fornaro) 3086; Tague Dep. 14–17).

21. Northwest did not request any internal data from Midway at this initial meeting. (Tr. (Fornaro) 3087).

22. Following the meeting, Fornaro (Northwest's Senior Vice President of Marketing and Planning) sent John Tague (Midway's Senior Vice President of Marketing and Planning) a letter dated March 20, 1991 (DX 31) requesting that Midway supply Northwest with ten categories of Midway's confidential business information. Among the confidential data Fornaro requested was Midway's "actual yield and traffic data by route." (Tr. (Fornaro 2980–81; Tague Dep. 5–7; PX 118/DX 31).

23. Tague and other Midway officers discussed Fornaro's March 20, 1991 letter, including their concerns regarding the sensitive nature of the data that Northwest had requested, the highly competitive relationship between Midway and Northwest, the possibility that, if 'Northwest's intentions were not serious, the data could be used in a retaliatory fashion against Midway, and the need for a confidentiality agreement before Midway could supply such internal data to Northwest. (Tague Dep. 32–34).

24. In response to Fornaro's letter of March 20, therefore, Tague told Fornaro that Midway was involved in other matters and that a confidentiality agreement was necessary before Midway would supply its internal data to Northwest. (Tague Dep. 34–35).

25. The next contact between Northwest and Midway occurred when Hinson (Chairman of Midway's Board of Directors and Chief Executive Officer) and Tague met at Midway's headquarters with Fornaro and Garel (Vice President of Financial Planning for Northwest). (Garel Dep. 7, 13).

26. The meeting occurred some time after Midway had filed a Chapter 11 bankruptcy petition and before Northwest executed a confidentiality agreement. (Tr. (Fornaro) 2984).

27. At this meeting, Fornaro requested Midway's internal fare and traffic data. (Fornaro Dep. 73, 78–80; Garel Dep. 17).

28. Hinson expressed concern about Fornaro's request because of the existing competition between Northwest and Midway. (Tr. (Fornaro) 2986).

29. Hinson told Garel and Fornaro that he would not give Northwest Midway's internal information at that time, but that the public information available to Northwest was sufficient to enable Northwest to begin analyzing a potential business transaction. (Tr. (Fornaro) 2986; Garel Dep. 17–18).

30. Hinson did not specify any publicly available Midway report. (Fornaro Dep. 81, 83).

31. Fornaro did not interpret Hinson's hesitancy to provide Northwest with Midway's confidential data prior to the execution of a confidentiality agreement as forever denying Northwest access to Midway's internal data. (Tr. (Fornaro) 3094).

32. Garel told Fornaro that Northwest could do its preliminary analysis based on the publicly available data. (Tr. (Fornaro) 2987).

33. Sometime before Northwest and Midway entered into a confidentiality agreement, Hinson also had a telephone conversation with John Dasburg (President and Chief Executive Officer of Northwest). (Dasburg Dep. 115, 228, 231).

34. In the conversation, Dasburg requested Midway's confidential internal traffic and yield data. (Dasburg Dep. 228).

35. Hinson told Dasburg that Midway would not provide competitively-sensitive internal data prior to the execution of a confidentiality agreement. (Dasburg Dep. 116, 230–231).

36. From Hinson's response, Dasburg assumed that Northwest could rely on the data that Midway reported to the DOT. (Dasburg Dep. 231).

37. Throughout the late spring and early summer of 1991, Hinson also had conversations with Cronin (a consultant for Checchi and Associates and Northwest's lead negotiator). (Tr. (Hinson) 173).

38. In these conversations, Hinson and Cronin discussed when Northwest would sign a confidentiality agreement. (Tr. (Hinson) 173).

39. Cronin told Hinson that Northwest did not want to sign a confidentiality agreement at that time because Northwest was simultaneously negotiating with Midway as well as with Northwest's pilots. (Tr. (Hinson) 176). Midway knew that "if [Northwest] were to sign a confidentiality agreement it would be a strong indication that [Northwest was] moving forward with the transaction and the result would be an impairment of [Northwest's] leverage in their negotiating position with the pilots." (Tr. (Hinson) 176).

40. In response, Hinson "suggested that [Northwest] could use DOT data to get a sense of how Midway looked at the time, and

if they liked what they saw, they could go forward ... and sign [a] confidentiality agreement" and thus obtain Midway's internal data. (Tr. (Hinson) 173–74, 178).

41. Midway and Northwest executed the Confidentiality Agreement in late July 1991.

42. Thereafter, Northwest received from First Boston (Midway's investment banker) the Offering Memorandum (PX 602), which contained confidential information, including Midway's historical traffic, yield, and revenue data, as well as Midway's projections of its future performance. (Tr. (Hinson) 112–14; (Cronin) 2052–53; PX 602).

43. After Northwest signed the Confidentiality Agreement and received the Offering Memorandum, Midway was ready and willing to provide Northwest with any additional confidential business information it requested. (Tr. (Hinson) 114, 178–79; (Morris) 2853; Schick Dep. 164).

44. Midway made available to prospective investors a room containing additional confidential information. (Tr. (Altschul) 3610–12, 3620). This confidential information included Midway's internal traffic data and pricing policies. (Id.; PX 607). Investors who asked for additional internal data received access to this data and members of Midway's senior management were available to answer follow-up questions. (Tr. (Altschul) 3610–12, 3620; PX 607; DX 5/PX 664).

45. Northwest understood that, after signing the Confidentiality Agreement, it had access, upon request, to other confidential information. (Tr. (Cronin) 2217, 2224; (Steenland) 4062).

46. From the time the Confidentiality Agreement was signed until September 26, 1991, Northwest did not ask Midway for any of Midway's internal traffic, yield, or revenue data. (Tr. (Hinson) 180–81; (Fornaro) 3102).

47. At the July 24 meeting of Northwest's Board of Directors, Gary Wilson (Co–Chairman of Northwest's Board of Directors) raised the possibility of acquiring Midway. (Bouw Dep. 10; Van Wijk Dep. 19–20; PX 69 at 10).

48. Wilson outlined the strategic benefits of acquiring Midway. (Aziz Dep. 12–13).

49. Northwest's strategic interest in acquiring Midway came from Northwest's desire to become larger and have a much greater presence in major business markets such as Chicago. (Tr. (Cronin) 2173; Leonard Dep. 20, 26).

50. After Wilson's presentation, Northwest's Board concurred that a Midway acquisition should be explored. (PX 69 at 10).

51. After the July 24, 1991 board meeting, Northwest assembled a series of detailed discounted cash flow "feasibility analyses." Each analysis contained revenue and cost projections and the resulting net present value ("NPV") which Northwest hoped to realize from a Northwest operation out of Midway Airport (the "acquisition analysis"). (Tr. (Jehn) 2699–2700, 2705; PX 309; PX 313; PX 317; PX 319).

52. According to Northwest's projections, eliminating Midway's aggressive pricing from the market would allow Northwest to increase its revenue. (Tr. (Fornaro) 3114–15; PX 319 at R–11, R–12).

53. Northwest's analysis culminated in an acquisition analysis dated September 20, 1991 and referred to as the "Pink Book." (Tr. (Jehn) 2606; PX 53).

54. Northwest assembled its Pink Book acquisition analysis on its own without consulting Midway. (Tr. (Jehn) 2737).

55. Garel was responsible for coordinating the Pink Book analysis, which included preparing the strategic case and the financial projections behind the proposed acquisition of Midway. (Tr. (Garel) 3474).

56. Garel supervised the analysts working on the cost side of the acquisition analysis. (Tr. (Jehn) 2703).

57. Fornaro supervised the work performed by Schutzbank and Jehn on the revenue side of the acquisition analysis. (Tr. (Jehn) 2703; (Fornaro) 2991; Schutzbank Dep. 6, 33–34).

58. The cost projections in Northwest's acquisition analysis were based on data reported by Midway to the DOT on the Form 41 report, as well as on certain confidential, internal cost data that Midway provided to

Northwest. (Tr. (Jehn) 2702; Spano Dep. 79).

59. The internal cost data Midway supplied to Northwest included information regarding labor contracts, seniority lists, financial information, Midway's facilities, and fuel prices. (Tr. (Garel) 3526; Garel Dep. 45–47).

60. Northwest's revenue projections included two components. First, Northwest estimated the revenue from passengers connecting through Midway Airport, assuming Northwest's actual yields and Northwest's own market share · of the traffic in those markets. (Tr. (Garel) 3476). Second, Northwest estimated the revenue from local passengers, those beginning or ending their trip at Midway Airport. *Id.*

61. In assembling Northwest's acquisition analysis, the analysts and officers responsible for Northwest's internal revenue projections for a Midway acquisition, namely, Jehn and his superiors, Schutzbank and Fornaro, assumed that the O & D Survey Report data was the same as the traffic, yield, and revenue data generated internally by Midway. (Tr. (Jehn) 2622, 2720; (Fornaro) 3077, 3198; Schutzbank Dep. 95).

62. Northwest chose the methodology behind its revenue projections without consulting Midway. (Tr. (Jehn) 2700–01).

63. After making its "base year" cost and revenue assumptions, Northwest applied growth rate assumptions to each component and calculated the projected NPV from its ten-year cash flow projections using a fifteen percent discount rate. (PX 53 at 3).

64. In May 1991, Jehn, a first-year analyst in Northwest's business planning department, was instructed to prepare a financial analysis of a Northwest acquisition of Midway. (Tr. (Jehn) 2581, 2698, 2704; Jehn Dep. 6–7).

65. Jehn used O & D Survey Report data in his financial analysis of a possible acquisition of Midway. (Tr. (Cronin) 2041–42, 2055; (Jehn) 2714).

66. At that time, Northwest did not inform Midway that it was preparing a feasibility study of a possible acquisition. (Tr. (Cronin) 2213).

67. Despite its detailed analyses of the Midway acquisition during the spring and summer, Northwest did not meet with Midway's market planning officials to discuss Midway's operations until September 26, three days after the Letter of Intent was finalized. (Tr. (Phillips) 2896; (Fornaro) 3117; PX 95).

68. During the September 26 meeting, David Kunstler (Midway's Vice President of Marketing and Planning), Ted Phillips (Midway's Vice President of Planning), Fornaro, and Schutzbank discussed Midway's scheduling proposals, which included increasing flights to certain cities and initiating service to others. (Tr. (Phillips) 2897; Kunstler Dep. 8; PX 95).

69. Northwest's representatives did not show Kunstler or Phillips the Pink Book or any other Northwest acquisition analysis at the September 26 meeting. (Tr. (Phillips) 2941–42; (Fornaro) 3118; Schutzbank Dep. 65, 291–92).

70. Northwest did not disclose the exact data or the forecasted figures it was using in its acquisition analysis or tell Midway the details of its acquisition analysis calculations at the September 26 meeting (or at any time prior to October 8). (Tr. (Hinson) 283–84, 295–96; (Phillips) 2894, 2942; (Jehn) 2755; (Fornaro) 3119; Schutzbank Dep. 65, 292).

71. At the close of the September 26 meeting, Phillips offered Fornaro and Schutzbank any confidential Midway data that Northwest wanted. (Tr. (Phillips) 2895, 2943).

72. Fornaro and Schutzbank at that time requested Midway's current internal traffic and yield data. (Tr. (Phillips) 2943; Schutzbank Dep. 77).

73. This was the first request by Northwest for Midway's internal traffic and yield information since the parties had executed the Confidentiality Agreement in late July. (Tr. (Phillips) 2943–44).

74. Due to antitrust issues, Midway expressed concerns about providing Northwest with data on Midway's Detroit and Minneapolis routes, as they were direct competitors on those routes. (Schutzbank Dep. 77–78).

75. Northwest agreed that Midway could withhold data related to those two routes. (Tr. (Phillips) 2896; Schutzbank Dep. 78).

76. Later that day, Midway sent Northwest a computer disk with a month-by-month compilation of Midway's passenger, yield, average fare, RPM, and revenue data on all of Midway's local routes for the period September 1990 through August 1991. Northwest received the disk on Friday, September 27. (Tr. (Jehn) 2618, 2741; PX 97; DX 146).

77. From September 26 until October 4, no one at Northwest requested that Midway supply additional internal traffic and yield data nor did anyone share Northwest's acquisition analysis with Midway. (Tr. (Jehn) 2755–56; (Phillips) 2947).

78. At the direction of his superiors, from Monday, September 30, through Friday, October 4, 1991, Jehn worked with the internal data Midway had provided and Northwest had received on September 27 and prepared several spreadsheet analyses. (Tr. (Jehn) 2619, 2621, 2624–26, 2749–50; PX 97; PX 98; PX 99; PX 101; PX 103).

79. Jehn used the spreadsheets only to begin the calculations of the "ramp-up" cost, *i.e.* the cost to bring Midway to its pre-bankruptcy performance level. (Tr. (Jehn) 2616–17).

80. As part of his analysis, Jehn compared the following: the yields from Midway's local routes for the 12 months ending August 1991, as shown in the internal data Midway had provided on September 27; the yields Northwest had derived from Midway's O & D Survey Report for 1990; and the adjusted yields Northwest had used in its revenue projections. (Tr. (Jehn) 2625–26; PX 103).

81. On October 3, Jehn showed his analysis (PX 103) to Fornaro and Schutzbank. (Tr. (Jehn) 2626).

82. Fornaro, Schutzbank, and Jehn were each disappointed with the results because the results indicated that Midway's yields had dropped off more sharply in recent months than Northwest had expected. (Tr. (Jehn) 2626–27, 2753).

83. Fornaro directed Jehn to call Phillips and discuss the reasons why Midway's performance had declined so sharply. (Tr. (Jehn) 2626–27; (Fornaro) 3010).

84. On October 4, Jehn telephoned Phillips. Jehn stated that Schutzbank had asked him to contact Phillips. (Tr. (Phillips) 2904, 2950).

85. Jehn told Phillips that Northwest was concerned about the drop-off in Midway's performance in 1991, as reflected in the internal data for the year-ending August 1991 that Midway had provided to Northwest on September 27. (Tr. (Jehn) 2628–29; (Phillips) 2904).

86. To facilitate a discussion of Northwest's concerns, Jehn faxed Phillips a spreadsheet comparing the yields. (Tr. (Jehn) 2629–30; DX 134).

87. Jehn, though, did not fax Phillips the spreadsheet Jehn had prepared for his superiors (PX 103), which showed the base-year local yield assumptions that Northwest had used in its acquisition analysis. (Tr. (Jehn) 2630).

88. Instead, at Schutzbank's direction, Jehn sent Phillips a spreadsheet (DX 134) which excluded Northwest's forecasted yields. Jehn also retained a copy of the spreadsheet for himself (PX 104). (Tr. (Jehn) 2629–30, 2755–56; (Phillips) 2903–04; PX 104; DX 134).

89. After receiving the spreadsheet (DX 134), Phillips sought out Morris (Midway's Manager of Schedule Planning). (Tr. (Morris) 2470; (Phillips) 2907).

90. Phillips gave Morris a copy of DX 134. (Tr. (Phillips) 2097). Phillips asked Morris to prepare a side-by-side comparison of the 1990 DOT data with Midway's 1991 internal data. *Id.*

91. Morris prepared the comparison per Phillips' request. (DX 135; Tr. (Morris) 2478–79).

92. The evidence is undisputed that Midway did not disclose its comparison in DX 135 to Northwest.

93. When Phillips and Morris called Jehn back, Jehn began the conversation with Phillips and Morris by repeating his concerns

about the apparent deterioration in Midway's performance during the year-ending August 1991 versus its performance during 1990. (Tr. (Jehn) 2632).

94. In response, Phillips and Morris explained that economic conditions such as the Gulf War, the recession, and Midway's bankruptcy possibly lowered Midway's yields in 1991. (Tr. (Morris) 2474; (Jehn) 2632–33; (Phillips) 2908–09).

95. Phillips told Jehn that the yields derived from Midway's O & D Survey Report might be too high relative to Midway's internal yields. (Tr. (Jehn) 2634; (Phillips) 2910).

96. Phillips then told Jehn that comparing the 1990 yields, which were derived from Midway's O & D Survey Report, to Midway's internal yields through August 1991, which came from Midway's internal reports, was an "apples to oranges" comparison. (Jehn Dep. 294–95).

97. As Morris told Jehn, "there is the inherent discrepancy in comparing the two data sources, because they are two separate data sources. One is a 100 percent sample and the other is a ten percent sample that has a margin of error associated with it." (Tr. (Morris) 2473; (Jehn) 2759–60).

98. Morris and Phillips told Jehn that it was their suspicion that zero-fare passengers—passengers who are flying on frequent flyer bonus coupons—were not being counted as passengers in Midway's O & D Survey Report. (Tr. (Morris) 2490, 2847; (Phillips) 2910).

99. Morris and Phillips explained this to be due to Midway's old and "deficient" software system which had been assembled years before and had not been updated. (Tr. (Jehn) 2761–62; Jehn Dep. 292).

100. Phillips suggested that Jehn use Midway's internal data, rather than the DOT data, to compare Midway's performance in 1990 and 1991. (Jehn Dep. 293–95).

101. At the end of the conversation, Phillips offered to send Jehn additional internal Midway traffic and yield data, just as he had offered Northwest "anything [Midway] had" on September 26. (Tr. (Jehn) 2811–12; (Phillips) 2950, 2953).

102. In the afternoon of October 4, Morris faxed to Jehn a spreadsheet (PX 105) containing 20 months of Midway's internal traffic, yield, and revenue data broken down by individual market for the period January 1, 1990 through August 31, 1991. (Tr. (Morris) 2560–61; (Phillips) 2951; PX 105).

103. During the October 4 conversation, Jehn did not disclose to Phillips or Morris any of the passenger, yield, or revenue assumptions Northwest was using in its acquisition analysis. (Tr. (Morris) 2500–01, 2846–47; (Jehn) 2755).

104. Jehn told Fornaro and Schutzbank that Midway was experiencing the type of business problems which Northwest had anticipated. (Tr. (Jehn) 2640–41).

105. Jehn also reported to Fornaro and Schutzbank that Midway's O & D Survey Report was defective because it did not include zero-fare passengers. (Tr. (Jehn) 2641; (Fornaro) 3014).

106. Fornaro, Schutzbank, and Jehn then concluded that Midway's possible non-reporting of zero-fare passengers was an "innocuous problem" that would have no impact on Northwest's revenue projections. They reached this conclusion before they reviewed the internal data which Midway was sending. (Tr. (Jehn) 2642, 2769–70; (Fornaro) 3153–54; Schutzbank Dep. 125–28).

107. Northwest's witnesses, including its expert, conceded that it was apparent that the non-inclusion of zero-fare passengers in Midway's O & D Survey Report could not explain the difference between the yields used by Northwest in its acquisition analysis (PX 103) and Midway's actual yields (PX 105). (Tr. (Fornaro) 3177; (Smick) 3413–15).

108. After Midway had sent Northwest twenty months of its internal traffic yield and revenue data in the form of PX 105, Phillips assumed that Northwest would be cross-checking its acquisition analysis using this internal data. (Tr. (Phillips) 2950).

109. Morris also believed that Jehn would use the best source he could possibly get, *i.e.* the Midway internal data, in his acquisition analysis. (Tr. (Morris) 2500, 2561).

110. Jehn did not disclose to Midway during the October 4 conversation that Northwest was going to use Midway's internal traffic and yield data solely for a ramp-up analysis, but would continue to use O & D Survey Report data for the other parts of its acquisition analysis. (Tr. (Morris) 2472, 2562, 2848; (Jehn) 2766–67).

111. Northwest did not disclose to Midway that Northwest had no plans to rerun or cross-check its revenue projections using Midway's internal traffic and yield data. (Tr. (Jehn) 2655–56, 2766; (Morris) 2847; (Fornaro) 3106; Schutzbank Dep. 95, 130).

112. Northwest did not cross-check its revenue assumptions using Midway's internal data prior to the October 8 hearing or at any time between the hearing and October 15. (Tr. (Jehn) 2742, 2784; (Fornaro) 3106; Schutzbank Dep. 95, 130–31).

113. Thayer, an expert witness for Midway, testified that, based on his knowledge and experience in the airline industry, no reasonable potential purchaser of an airline would fail to cross-check its traffic and revenue assumptions with the seller's internal data whenever that data was available. (Tr. (Thayer) 4674, 4676, 4680, 4695–96, 4698).

114. The ramp-up cost which Jehn calculated on October 7 came to approximately $40 million for the combined Midway–Northwest operations. Northwest would incur this cost during the first six months after the acquisition. (Tr. (Jehn) 2778; Jehn Dep. 172; PX 327).

115. On Monday, October 7, Jehn examined the most recent internal data that Midway had sent (PX 105). (Tr. (Jehn) 2768; Francht Dep. 195; Dasburg Dep. 218, 234; PX 105).

116. At the direction of his superiors, Jehn began calculating a ramp-up cost using PX 105 during the morning of October 7. (Tr. (Jehn) 2649–50).

117. While preparing his ramp-up analysis, Jehn spoke with both Fornaro and Schutzbank. In these conversations, Jehn showed or discussed PX 105 with both of them. (Tr. (Jehn) 2777–78; (Fornaro) 3015).

118. In looking at PX 105, Jehn, Schutzbank, and Fornaro focused on one aspect of data—the percentage change in system-wide yields from 1990 and 1991—which they then used in the ramp-up calculation. (Tr. (Jehn) 2646–48).

119. Northwest did not use Midway's internal data that Northwest had in its possession to check or complete its Pink Book analysis. (Tr. (Jehn) 2656, 2784; (Fornaro) 3106; (Smick) 3419, 3465).

120. Soon after his conversation on October 4 with Jehn, Morris told Paul Tate (Midway's Vice President of Information. Systems) that Northwest had questioned the accuracy of Midway's traffic, revenue, and yield data. (Tr. (Tate) 3665, 3671–74).

121. In response to Morris' inquiry, Tate directed his staff to double-check the accuracy of the internal traffic and revenue data that Midway had provided to Northwest on September 27 (PX 97) and October 4 (PX 105). The staff found the data to be correct. The staff also started an initial investigation into Midway's O & D Survey Report reporting system. (Tr. (Tate) 3690–91).

122. The computer programs Midway used to generate its O & D Survey Report were written and serviced by Gordon Rosen (President of ASI). (Tr. (Tate) 3679, 3691; Rosen Dep. 5).

123. Rosen had over ten years of experience in computer programming for the airline industry and had constructed numerous programs for airlines reporting data to the DOT. (Rosen Dep. 6, 8–13).

124. In the mid–1980's, Rosen had met with the DOT on several occasions to review the ASI computer programs which generated Midway's O & D Survey Report. (Tr. (Tate) 3697; Asai Dep. 54–56; Rosen Dep. 96–97; PX 657 at 6, n. 1). The DOT did not require any change to Midway's programs. (Tr. (Tate) 3697; Asai Dep. 54–56; Rosen Dep. 97; PX 657 at 6, n. 1).

125. The fare summarization program Midway used in 1991 to generate its O & D Survey Report was the same one the DOT had reviewed in the mid–1980's. (Tr. (Tate) 3697–98).

126. In 1990, Midway received two reports from the DOT which compared the accuracy of Midway's O & D Survey Report against its T-9/T-100 Report. (Tr. (Tate) 3698; DX 76; DX 78).

127. These analyses showed that Midway's O & D Survey Report not only fell within the DOT's accuracy parameters but was more accurate than the industry average. (Tr. (Tate) 3698; DX 76; DX 78).

128. From its receipt of the July 1990 letter from the DOT until its cessation of operations, Midway did not receive any communications from the DOT indicating any questions, concerns, or criticisms regarding Midway's O & D Survey Report. (Tr. (Tate) 3702).

129. On October 4, Tate called Rosen and asked Rosen to meet with Tate and to be prepared to discuss the computer programs which generated Midway's O & D Survey Report. (Tr. (Tate) 3679, 3691).

130. In the course of their October 4 conversation, Rosen told Tate that he felt comfortable and confident that his programs generating Midway's O & D Survey Report fully complied with DOT regulations. (Tr. (Tate) 3692).

131. On October 7, Rosen arrived at Midway for one of his regularly scheduled visits. (Tr. (Tate) 3680, 3682; (Bormus) 4007).

132. During his visit, Rosen was scheduled to review, among other things, Midway's maintenance and engineering programs and frequent flyer system issues. (Tr. (Tate) 3680, 3691; Rosen Dep. 100).

133. During his October 7 visit, Rosen reviewed and discussed the computer programs which generated Midway's O & D Survey Report and the applicable DOT regulations with representatives from Midway's MIS department and with Morris. Prior to October 7, the MIS department had not reviewed these programs. (Tr. (Morris) 2509–11, 2856; (Tate) 3737; Rosen Dep. 58–59).

134. This review of Midway's O & D Survey Report programs had no bearing on the accuracy of Midway's internal traffic and yield data that Midway had supplied to Northwest before the October 8 hearing. (Tr. (Morris) 2570).

135. Rosen's initial review of the O & D Survey Report program showed that, while the programs apparently selected Midway's zero-fare passengers, not all of the zero-fare passengers were being included in the final report. (Tr. (Morris) 2510–11).

136. The review also revealed that the computer programs generating Midway's O & D Survey Report appeared to summarize and then report ticket itineraries by assigning the last dollar fare to each grouping of otherwise identical tickets. (Tr. (Morris) 2513–14).

137. Because one of the computer programs sorted the identical itineraries into ascending order by fare, this assignment resulted in the highest fare being listed last and being applied across the group of identical tickets. (Tr. (Morris) 2514; Rosen Dep. 83–84).

138. When the October 7 meeting ended, no definite conclusions were reached on how the O & D Survey Report programs worked or whether the programs complied with DOT regulations. (Tr. (Morris) 2548, 2526–27, 2516–17, 2856–57).

139. No one from Midway told anyone from Northwest about the October 7 meeting with Rosen or about the problem Midway had discovered in Midway's software that generated the DOT data (the "computer software problem").

140. On October 15, Morris again told Northwest to not use Midway's DOT data, because Midway had identified possible problems with its O & D Survey Report program in addition to those suggested on October 4. (Tr. (Jehn) 2668–69, 2792; (Morris) 2860).

141. On October 15, Jehn again ran Northwest's revenue projections, this time using the traffic and yield data from Midway's internal reports (PX 105), which Midway had sent Northwest no later than October 4. (Tr. (Jehn) 2785).

142. Within a matter of hours, Jehn recalculated Northwest's revenue projections and determined that using Midway's internal traffic and yield numbers reduced the pro-

jected annual revenue of the Midway acquisition by approximately $35 million. (Tr. (Jehn) 2672–74, 2678–79).

143. In response to Northwest's inquiries, Midway's officers held several meetings between October 16 and October 30 in an attempt to further understand the computer programs generating Midway's O & D Survey Report and to verify that Midway was in compliance with DOT regulations. (Tr. (Morris) 2537; (Phillips) 2952; Schick Dep. 160).

144. Following Midway's shutdown on November 13, 1991, the Office of the Inspector General, Department of Transportation ("Inspector General's Office"), contacted Midway as part of an investigation into Midway's reporting to the DOT. (Tr. (Morris) 2551).

145. The contact resulted from a request by United States Representative James L. Oberstar of Minnesota. (PX 656; PX 406 at K00452).

146. At the conclusion of the Inspector General's Office's investigation, the Research and Special Programs Administration, Associate Administrator for Research, Technology and Analysis Office of Airline Statistics, issued a full report (the "RSPA Report"). (PX 657).

147. In addition, the Inspector General's Office wrote a letter to Representative Oberstar dated February 24, 1992, to report its findings. (PX 656).

148. Midway did not see drafts of or have any input into the RSPA Report or the letter to Oberstar. (Tr. (Tate) 3704–05).

149. The RSPA Report stated that "[e]xperienced users are aware that [O & D Survey Report] data should be used only in conjunction with other key data for critical, high stakes financial decisions." (PX 657, p. 1).

150. Further, RSPA reported that it was "not surprised that [Midway] had internal (special) data that differed from the [O & D Survey Report] data [Midway] filed with the DOT. RSPA is aware that several airlines maintain detailed corporate data bases, especially if they have computer reservation sys-

tems, that have more precise data than is represented in DOT's ten percent sample [O & D Survey Report]." (PX 657, p. 7).

151. In the letter to Oberstar, the Inspector General concluded that "nothing came to [its] attention during the course of [its] review to indicate that Midway deliberately filed mispresented sample [O & D Survey Report] data." (PX 656 at NW057396–057397).

152. Northwest offered no evidence of any damages it sustained as a result of Midway's alleged fraudulent misrepresentations.

### NORTHWEST'S COUNTERCLAIM

#### COUNT I

##### FINDINGS OF FACT

1. In Count I of its Counterclaim, Northwest asserts that Midway committed fraudulent misrepresentation in three ways: (1) Midway intentionally misrepresented to Northwest that its Passenger–Origin Destination Survey Report ("O & D Survey Report," also referred to as "DOT data") was accurate and that Northwest could rely on it; (2) Midway gave Northwest an incomplete and misleading explanation regarding Midway's O & D Survey Report on October 4, 1991; and (3) Midway failed to disclose to Northwest on October 7, 1991 that the O & D Survey Report was inaccurate and unreliable.

2. The Court finds that Northwest has failed to establish the elements of its fraudulent misrepresentation claim by clear and convincing evidence as to each of the alleged misrepresentations. The Court will address each alleged misrepresentation in turn.

3. First, Northwest alleges that Midway committed fraudulent misrepresentation with respect to the O & D Survey Report by representing that the Report was accurate and that Northwest could rely on it.

4. The Court finds that Northwest has failed to demonstrate by clear and convincing evidence that Midway represented to Northwest that the O & D Survey Report was accurate or that Northwest could or should rely on the O & D Survey Report.

5. Prior to July 24, 1991, Hinson and Tague, on behalf of Midway, met with Fornaro and Garel, representing Northwest, wherein Fornaro requested Midway's internal fare and traffic data. (Tr. (Fornaro) 2984; Fornaro Dep. 73, 78–80; Garel Dep. 17).

6. Hinson responded that it was not "prudent at that time to open [Midway's] internal information to [Northwest], but the public information available to them was widespread and sufficient enough to be able to analyze possible business combinations." (Tr. (Fornaro) 2986; Garel Dep. 17–18).

7. Even though the O & D Survey Report was among the information publicly available, Hinson made no representation as to the accuracy of the O & D Survey Report or any other publicly available information. (Tr. (Hinson) 181).

8. The Court finds that Hinson referred Northwest to the publicly available information because the parties had not yet executed a Confidentiality Agreement, which Midway wanted in order to protect itself due to the competitively sensitive nature of the data requested, and because, until the parties did execute a Confidentiality Agreement, the publicly available information would at least give Northwest a beginning point. (Counterclaim, Count I Background Facts, ¶ 29).

9. Hinson did not tell Garel and Fornaro that Northwest should rely upon publicly available data to make an offer to acquire Midway. (Garel Dep. 18).

10. Prior to the execution of the Confidentially Agreement, Hinson and Dasburg had a telephone conversation, wherein Dasburg requested Midway's internal traffic and yield data. (Dasburg Dep. 115, 228, 231). Hinson again refused to divulge Midway's confidential internal data due to the competitively sensitive nature of the requested data. (Dasburg Dep. 116, 230–31).

11. Hinson also spoke with Cronin regarding the signing of a confidentiality agreement. (Tr. (Hinson) 173). Cronin expressed reluctance to signing a confidentiality agreement, so Hinson "suggested that [Northwest] could use DOT data to get a sense of how Midway looked at the time, and if they liked what they saw, they could go forward ... and sign [a] confidentiality agreement" and thus obtain Midway's internal data. (Tr. (Hinson) 173–74, 178).

12. The Court finds that Hinson did not represent to Northwest that the data Midway reported to the DOT in the O & D Survey Report was accurate. (Tr. (Hinson) 181).

13. The Court further finds that at no time did Hinson tell any Northwest representative that Northwest could or should rely on Midway's DOT data to decide what the terms of an offer to acquire Midway should be. (Tr. (Hinson) 181).

14. The Court finds that Midway made no representations to Northwest with respect to the accuracy of Midway's O & D Survey Report.

15. The Court finds that Midway did not direct Northwest to make an offer to acquire Midway based upon a review of O & D Survey Report data.

16. The Court finds that Midway made no representations to Northwest to the effect that Northwest should or could rely on the DOT data for Northwest's acquisition analysis; rather, the evidence demonstrates that Midway merely represented to Northwest that Northwest could rely on the DOT data for a preliminary analysis until the parties signed a confidentiality agreement, at which point Midway would freely divulge its internal data.

17. Second, Northwest alleges that Midway committed fraudulent misrepresentation with respect to the O & D Survey Report by giving Northwest an incomplete and misleading explanation on October 4, 1991 for the discrepancy between Midway's 1990 O & D Survey Report and Midway's internal data for the year ending August 1991.

18. The Court finds that Northwest has failed to demonstrate by clear and convincing evidence that Midway gave a false and misleading explanation on October 4, 1991 for the discrepancy between Midway's 1990 O & D Survey Report and Midway's internal data for the year ending August 1991.

19. On October 4, 1991, Jehn telephoned Phillips to discuss Northwest's concerns about the discrepancy between Midway's O & D Survey Report for 1990 and Midway's internal data for the year ending August 1991. (Counterclaim, Count I Background Facts, ¶¶ 84 and 85).

20. Morris made a comparison on October 4 of the DOT data and the internal data, which revealed discrepancies. (DX 135; Tr. (Morris) 2478–79).

21. Once the discrepancies were verified, Phillips and Morris then telephoned Jehn to suggest possible explanations for those discrepancies. (Counterclaim, Count I Background Facts, ¶¶ 93–101).

22. Phillips and Morris suggested that the discrepancy could be explained by the following: (a) poor economic conditions such as the Gulf War, the recession, and Midway's 1991 bankruptcy filing; (b) the discrepancy inherent in comparing the two data sources; and (c) Midway may have inadvertently not counted the zero-fare passengers in its 1990 O & D Survey Report because Midway used an old and deficient software system. (Counterclaim, Count I Background Facts, ¶¶ 94–100).

23. Northwest alleges that this explanation was incomplete and misleading because there was a more serious problem with the DOT data, which Midway knew of but failed to disclose to Northwest.

24. The Court finds that, as of October 4, the explanation suggested by Phillips and Morris was neither incomplete nor misleading.

25. DX 135 was prepared in the context of the concerns Jehn had raised regarding the discrepancies in the data. (Counterclaim, Count I Background Facts, ¶¶ 89–91).

26. The results contained in DX 135 merely verified the existence of the discrepancies and quantified them.

27. The calculations contained in DX 135 did not reveal to Midway any problems other than what they already then knew, namely, that there were discrepancies.

28. Midway did not send DX 135 to Northwest because Midway, in particular Morris, believed that Northwest would have or should have done this type of analysis itself, otherwise why would Midway send the internal data to Northwest. (Tr. (Morris) 2486; Counterclaim, Count I Background Facts, ¶¶ 108 and 109).

29. Midway was not trying to keep anything from Northwest. Rather, Midway reasonably assumed that Northwest itself would make the comparative analysis. (Tr. (Morris) 2486, 2500, 2561).

30. The Court finds that, as of October 4, neither Morris nor Phillips knew or had reason to know that the discrepancies were due to anything other than the reasons they suggested to Jehn on the afternoon of October 4. (Tr. (Morris) 2491; (Phillips) 2949).

31. Tate, in response to Morris' inquiry regarding the discrepancies, instructed his staff to check into the accuracy of the internal traffic and revenue data given to Northwest. (Counterclaim, Count I Background Facts, ¶ 121). The data was found to be correct. *Id.* In addition, Tate initiated an investigation into Midway's O & D Survey Reporting system on October 4. *Id.*

32. Midway did not learn of a possible additional explanation for the discrepancy between the 1990 DOT data and the year ending August 1991 internal data until October 7, when Rosen, Midway's computer software consultant, examined Midway's DOT reporting software and discovered a problem with Midway's software. (Counterclaim, Count I Background Facts, ¶¶ 131–137).

33. The Court finds that, on October 4, Midway did not fail to disclose information about the DOT data software problem to Northwest because Midway did not know or have reason to know of the software problem on October 4.

34. The Court also finds that Northwest was not misled by Midway's explanations.

35. In assembling Northwest's acquisition analysis, the analysts and officers responsible for Northwest's internal revenue projections for a Midway acquisition, namely, Jehn and his superiors, Schutzbank and Fornaro, assumed that the O & D Survey Report data was the same as the traffic, yield, and reve-

nue data generated internally by Midway. (Tr. (Jehn) 2622, 2720; (Fornaro) 3077, 3198; Schutzbank Dep. 95).

36. The Court finds that Northwest knew or should have known that there are discrepancies inherent in comparing an airline's DOT data with its internal data.

37. The Court further finds that Northwest knew or should have known that it should have used Midway's available internal data, as opposed to the DOT data, in its acquisition analysis of Midway.

38. The O & D Survey Report differs from an airline's internal data.

39. Airlines do not consider O & D Survey Report data to be the same as data contained in internal reports. (Tr. (Morris) 2842; (Smick) 3385; (Thayer) 4684–85; Tague Dep. 68).

40. DOT data is used in the airline industry to analyze prospective routes and to analyze the competition. (Tr. (Morris) 2842–43; (Fornaro) 2988; (Smick) 3268; (Thayer) 4679–80; Tague Dep. 70–71, 76–77, 125).

41. DOT data is based on at least a one percent sample of the tickets for all domestic major markets and a sample of ten percent of tickets for other markets. (Counterclaim, Count I Background Facts, ¶ 9).

42. In contrast, Midway's internal reports contained a 100 percent sample of Midway's lifted tickets. (Tr. (Morris) 2473; Counterclaim, Count I Background Facts, ¶ 4).

43. Airlines typically devote a much higher level of resources and attention to generating their internal reports than they do for DOT reports. (Tr. (Thayer) 4682–84).

44. Although the O & D Survey Report is one of the reports which airlines file with the DOT, reporting airlines do not necessarily use the O & D Survey Report to analyze their own operations because more complete internal reports generated from their own revenue accounting systems are available. (Tr. (Morris) 2850–51; (Thayer) 4683–84).

45. Smick, Northwest's expert, conceded that O & D Survey Report data is only an approximation of an airline's internal traffic and revenue data reported in its internal reports. (Tr. (Smick) 3385).

46. Sampling error alone causes the data in the O & D Survey Report to vary from one to five percent from a carrier's internal data. (Tr. (Smick) 3385–86; Fornaro Dep. 429).

47. The O & D Survey Report traffic numbers typically vary from actual passenger numbers by an additional five to ten percent. (Tr. (Smick) 3306, 3389).

48. Moreover, there are other differences between O & D Survey Report data and internal data, such as the exclusion from the O & D Survey Report of (1) commissions to travel agents; (2) override commissions to travel agents; (3) interline agreements between airlines; and (4) the contributions from commuter airlines. (Tr. (Morris) 2842–43; (Thayer) 4685–87).

49. It is well-known in the airline industry that an airline's internal traffic and yield data is more accurate than its O & D Survey Report data. (Tr. (Phillips) 2940; (Thayer) 4695–96, 4698; Tague Dep. 68).

50. For these reasons, prospective purchasers of airlines usually make acquisition decisions based on an airline's internal data, rather than O & D Survey Report data, whenever such internal data is available. (Tr. (Hinson) 283; (Thayer) 4681, 4695–96, 4712; (Phillips) 2938).

51. As Joseph Leonard (Executive Vice President of Customer Service for Northwest) testified, business prudence requires using internal data in an acquisition analysis. (Leonard Dep. 65).

52. However, in acquiring a going entity, internally-reported, actual data, not DOT sample data, is the preferred data. (Tr. (Phillips) 2938; (Thayer) 4680–81, 4690).

53. The Court finds that Northwest was purchasing Midway as a going concern and could have utilized the internal data that Midway made available to it in advance of the October 8 hearing.

54. Northwest's failure to fully use the internal data cannot be attributed to any act or omission to act on the part of Midway. Rather, by industry standards, Northwest erred in using the DOT data, and its decision

to do so was not based on Midway's representations or lack thereof.

55. To the contrary, Phillips suggested that Jehn use Midway's internal data, rather than the DOT data, to compare Midway's performance in 1990 and 1991. (Jehn Dep. 293–95).

56. In the afternoon of October 4, Morris faxed to Jehn (PX 105) a spreadsheet containing 20 months of Midway's internal traffic, yield, and revenue data broken down by individual market for the period January 1, 1990 through August 31, 1991. (Tr. (Morris) 2560–61; (Phillips) 2951; PX 105).

57. The Court finds that after executing the Confidentiality Agreement in late July 1991, Northwest had access to Midway's confidential data, internal traffic data, and internal revenue data, but did not repeat its request for such data until September 26, 1991.

58. Regarding the projected local revenue, Northwest made yield and traffic assumptions based upon Midway's O & D Survey Report data, rather than upon Midway's internally generated revenue data. (Tr. (Garel) 3476; PX 53 at 6).

59. Northwest's continued use of O & D Survey Report data in its Midway acquisition analysis after receiving access to Midway's internal traffic and revenue data ·was contrary to Northwest's practice in its other acquisition projects. (Tr. (Cronin) 2223–24).

60. The Court finds that Northwest's erroneous use of O & D Survey Report data in its acquisition analysis, instead of Midway's internal data then in Northwest's possession, was attributable to Northwest's own mistaken belief that the two data sources were equivalent. (Counterclaim, Count I Background Facts, ¶ 61).

61. Thus, it was Northwest's erroneous assumption that the two data sources were equivalent (Counterclaim, Count I Background Facts, ¶ 61) that led to Northwest's use of the DOT data as opposed to the internal data, not any act or omission to act on the part of Midway.

62. The Court finds that Midway did not intentionally or recklessly give a misleading or incomplete explanation and that North-west was not mislead by the explanation given as of October 4, 1991.

63. The Court finds that Northwest ignored, for purposes of its revenue projections, the internal traffic and yield data that Midway timely supplied directly to Northwest, and which bore all the attributes of being the best and most reliable source of Midway's traffic and yield data.

64. Third, Northwest alleges that Midway committed fraudulent misrepresentation by failing to disclose to Northwest on October 7, 1991 that the O & D Survey Report was inaccurate and unreliable.

65. The Court finds that Northwest has failed to establish the elements of its fraudulent misrepresentation claim by clear and convincing evidence as to Northwest's allegation that Midway failed to disclose on October 7, 1991 that the O & D Survey Report was inaccurate and unreliable.

66. The evidence is undisputed that Midway did not disclose the computer software problem to Northwest on October 7, 1991. (Counterclaim, Count I Background Facts, ¶ 139).

67. The Court finds that the additional explanation for the discrepancies between the internal data and the DOT data, namely, the computer software problem, was not an essential element to the transaction between the parties.

68. The Court finds that if Northwest had been aware of the computer software error, Northwest would have acted differently, in that Northwest would not have gone forward with its offer. (PX 47, p. 2; Tr. (Cronin) 2174; (Fornaro) 3025–26).

69. The Court finds that this explanation was not one upon which Northwest could reasonably rely in determining whether or not to act. In other words, Northwest's reliance on the DOT data in the first place, for anything more than a starting point in its acquisition analysis, was not reasonable.

70. The Court has already found that pursuant to industry custom, an airline contemplating an acquisition of another airline should and would normally rely on the target airline's internal data, not its DOT data.

(Counterclaim, Count I Background Facts, ¶¶ 38–52).

71. The Court has already found that pursuant to Northwest's own internal practices, Northwest normally would rely on the target airline's internal data, not its DOT data. (Findings of Fact, ¶ 59 supra).

72. The Court finds that Northwest was on notice as to the general unreliability of DOT data.

73. In 1988, the DOT, as part of an industry-wide analysis of the accuracy of O & D Survey Reports, sent a letter to Northwest indicating that Northwest apparently had a "mass error" in its O & D Survey Report. (PX 431; PX 432).

74. In its report, the DOT found that, in 437 out of 580 of Northwest's markets (75 percent of Northwest's markets), there was a variance of 10 percent or more between the passenger numbers Northwest reported in its O & D Survey Report and the passenger numbers Northwest reported to the DOT in another report Northwest filed with the DOT, which was based upon a 100 percent sample of lifted tickets. (PX 431; PX 432).

75. Since approximately 1989, Northwest has consistently shown a 5 to 10 percent understatement in its O & D Survey Reports passenger numbers versus its internal passenger numbers. (Cron Dep. 35).

76. The Court finds that the DOT's 1988 analysis put Northwest on notice of the potential problems and inaccuracies associated with the O & D Survey Report.

77. The Court finds that, prior to the October 8 hearing, Northwest received information from Data Base Products which should have put Northwest on notice that there was a material difference between the data reported to the DOT by Midway and Midway's internal traffic and revenue data.

78. In the summer of 1991, Jehn asked Earl Doolin (President of Data Base Products) for Doolin's help. (Tr. (Jehn) 2718). Doolin then compared the passenger numbers in Midway's T–9 Traffic Report with comparable passenger numbers from Midway's O & D Survey Report. (Tr. (Jehn) 2714–19). The T–9 Report, now known as the T–100 Report, contains a 100 percent sample of all passengers flying on each Midway route. (Tr. (Jehn) 2714–15, 2718).

79. Doolin generated the comparison, known as a Reliability Index Report (PX 273) using Data Base Products software which it supplied to Northwest. (Tr. (Jehn) 2714, 2718; Doolin Dep. 57–58; PX 273).

80. The Reliability Index Report revealed that Midway's T–9 Traffic Report numbers differed from the traffic numbers in Midway's O & D Survey Report for a number of Midway markets, including Los Angeles, by approximately 13 percent. (Tr. (Jehn) 2716, 2719; PX 273 at N419024).

81. Based on the Reliability Index Report, Doolin told Jehn that Midway must not have been doing a good job of reporting its traffic for the Los Angeles market, the market upon which Jehn was focusing his attention. (Tr. (Jehn) 2718; PX 273).

82. Jehn did not pursue the matter further. He did not question Doolin about Midway's reporting in its other markets and he did not request Midway's internal traffic, yield, or revenue data to ensure that Northwest's projections were based on the most accurate information available. (Tr. (Jehn) 2718–19).

83. The Court finds that Northwest was on notice regarding the inaccuracies and variances associated with O & D Survey Reports in general and Midway's O & D Survey Report in particular.

84. The Court has already found that Northwest continued to rely on Midway's DOT data, not Midway's internal data, in all phases of its acquisition analysis except for the ramp-up projections, despite Midway's recommendation to the contrary. (Counterclaim, Count I Background Facts, ¶ 100; Findings of Fact ¶ 55 supra).

85. The Court finds that Northwest failed to prove by clear and convincing evidence that Midway's concealment was intended to induce a false belief. The Court has been unable to find any evidence indicating that Midway intended by its non-disclosure of the computer software problem to induce Northwest to falsely believe the DOT data was accurate and reliable.

86. Midway's conduct shows no intent to deceive Northwest.

87. Between the signing of the Confidentiality Agreement in late July and the October 8 hearing, Midway responded promptly and fully to each Northwest request for its internal information. (Tr. (Phillips) 2895, 2943, 2950, 2953; (Jehn) 2811–12).

88. Midway even offered on at least two occasions prior to October 8 to supply Northwest with whatever internal traffic and yield data Northwest wanted. *Id.*

89. The Court finds that Midway did not breach any duty of disclosure to Northwest.

90. It is uncontroverted that a fiduciary relationship did not exist between Midway and Northwest, either as a matter of law, or under the circumstances. (Count V, Findings of Fact, ¶¶ 158–163).

91. The Court has already found that the parties were represented by sophisticated attorneys and agents, and were involved in arm's-length negotiations. (Count V, Findings of Fact, ¶ 159).

92. The Court has already found that there was no kinship between the parties. (Count V, Findings of Fact, ¶ 161).

93. The Court has already found that there was no material or relevant disparity in age, health and mental condition, education, or business experience between the parties. (Count V, Findings of Fact, ¶ 162).

94. Northwest did not entrust the handling of its business affairs to Midway, and, because the parties were engaged in arm's-length negotiations, the amount of trust and confidence Northwest could or would repose in Northwest would be very limited.

95. The Court finds that Midway's nondisclosure on October 7, 1991 did not contribute to Northwest's misapprehension of a material fact.

96. The computer software problem regarding the DOT data, though it related to a material issue, was not itself material.

97. The Court finds that Northwest had a misapprehension regarding the DOT data, but that misapprehension was more a result of Northwest's erroneous reliance upon the DOT data in the first place, than a result of Northwest's reliance on Midway's silence as a representation of accuracy and reliability.

98. The Court finds that Midway did not intentionally fail to correct Northwest's misapprehension.

99. Midway told Northwest to rely on the internal data and to not rely on the DOT data. (Jehn Dep. 293–95).

100. Midway assumed that Northwest would use the internal data once Midway sent it to Northwest. (Tr. (Morris) 2486, 2499–2500).

101. Midway was not aware of Northwest's misapprehensions. (Tr. (Morris) 2500–01).

102. The Court finds that Northwest failed to prove by clear and convincing evidence that Northwest could not have discovered the truth through a reasonable inquiry or inspection.

103. The Court finds that Northwest failed to prove by clear and convincing evidence that it was prevented from making a reasonable inquiry or inspection.

104. The Court finds that Northwest proved by clear and convincing evidence that it relied on Midway's silence as a representation that the fact did not exist.

105. The Court has already found that Phillips and Morris offered Midway an explanation for the apparent discrepancies between the 1990 DOT data and Midway internal data for the year ending August 1991. (Counterclaim, Count I Background Facts, ¶ 94; Findings of Fact, ¶ 22 supra).

106. The Court has already found that prior to October 8, Northwest used Midway's internal data only for a "ramp-up analysis," *i.e.* an analysis of the cost to bring Midway to its pre-bankruptcy profit level. (Findings of Fact, ¶ 84 supra).

107. Northwest did not use Midway's internal data for the rest of its acquisition analysis, despite Midway's suggestion to do so and Northwest's knowledge that internal data is more accurate and appropriate for use in an acquisition analysis than DOT data. *Id.*

108. Northwest did not inquire further about the discrepancies.

109. Once Midway sent Northwest Midway's internal data on October 4, Northwest did not then do a comparative analysis similar to that evidenced in DX 135.

110. Even though there may have been as much as a 61 percent difference between the 1990 yields, which Northwest had derived from Midway's O & D Survey Report and used in its revenue forecasts, and Midway's internal yields as shown in PX 105, neither Fornaro, Schutzbank, Jehn, nor anyone else at Northwest compared the yield figures or analyzed the reasons for these differences. (Tr. (Jehn) 2770–71, 2774; (Fornaro) 3149; PX 103; PX 105; PX C (for demonstrative purposes only)).

111. Jehn knew at the time that only 5 to 6 percent of the passengers that airlines typically carry are zero-fare passengers. (Tr. (Jehn) 2762–63).

112. Smick, Northwest's expert on DOT data and acquisition analysis, testified that airlines typically carry 5 to 8 percent zero-fare passengers. (Tr. (Smick) 3229–30, 3237, 3414).

113. Northwest's witnesses, including its expert, conceded that it was apparent that the non-inclusion of zero fare passengers in Midway's O & D Survey Report could not explain the difference between the yields used by Northwest in its acquisition analysis (PX 103) and Midway's actual yields (PX 105). (Tr. (Fornaro) 3177; (Smick) 3413–15).

114. Northwest conceded that had it been aware of the results of a comparative analysis similar to DX 135, Northwest would have conducted a further inquiry into the matter. (Fornaro Dep. 294–95; Garel Dep. 136; Tr. (Smick) 3415).

115. The Court finds that Northwest proved by clear and convincing evidence that Northwest would have acted differently had it been aware of the computer software problems.

116. The Court has already found that Northwest would have acted differently had it known of the computer software problems. (Findings of Fact, ¶ 68 supra).

117. The Court finds that Northwest failed to prove by clear and convincing evidence that Northwest's reliance on Midway's silence directly and proximately led to any injury Northwest suffered.

118. The Court further finds that Northwest failed to offer any proof that Northwest suffered any quantifiable injury as a result of its reliance on Midway's silence regarding the computer software problem.

119. The Court finds that Northwest failed to prove by clear and convincing evidence that Northwest justifiably relied on Midway's silence.

120. The Court has already found that Northwest did not reasonably rely on Midway's silence regarding the computer software problem. (Findings of Fact, ¶ 69 supra).

121. For the same reasons as set forth above regarding materiality, the Court finds that Northwest has failed to prove by clear and convincing evidence that Northwest justifiably relied on Midway's silence. (Findings of Fact, ¶ 69 supra).

## CONCLUSIONS OF LAW

1. As the party alleging fraudulent misrepresentation, Northwest has the burden of proving all of the elements of its fraudulent misrepresentation claim by clear and convincing evidence. *Ray v. Winter,* 67 Ill.2d 296, 304, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977); *National Republic Bank of Chicago v. National Homes Constr. Corp.,* 63 Ill.App.3d 920, 924, 21 Ill.Dec. 80, 83, 381 N.E.2d 15, 18 (1st Dist.1978); *Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 190–91 (7th Cir.1993).

2. To prevail on a fraudulent misrepresentation claim, Northwest has the burden of proving each of the following elements: (1) the representation must be a statement of material fact, rather than a mere promise or opinion; (2) the representation must be false; (3) the person making the statement must know or believe the representation is false; (4) the person to whom the representation is made must reasonably rely on the truth of the statement; (5) the

statement must have been made for the purpose of causing the other party to affirmatively act; and (6) the reliance by the person to whom the statement was made [must have] led to his injury.

*LaScola v. US Sprint Communications,* 946 F.2d 559, 567–68 (7th Cir.1991). *See also Board of Educ. v. A, C & S, Inc.,* 131 Ill.2d 428, 452, 137 Ill.Dec. 635, 646, 546 N.E.2d 580, 591 (1989); *Soules v. General Motors Corp.,* 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980).

3. As the Court has found that Northwest has failed to prove by clear and convincing evidence that Midway represented to Northwest that Midway's O & D Survey Report was accurate and that Northwest could rely thereon (Findings of Fact, ¶¶ 4 and 14–16 supra), the Court concludes that, as a matter of law, Northwest has failed to prove that Midway committed fraudulent misrepresentation.

4. Furthermore, as the Court has found that Northwest has failed to prove by clear and convincing evidence that Midway gave Northwest an incomplete and misleading explanation regarding Midway's O & D Survey Report on October 4, 1991 (Findings of Fact, ¶¶ 18 and 60–62 supra), the Court concludes that, as a matter of law, Northwest has failed to prove that Midway committed fraudulent misrepresentation.

5. The Court concludes that Northwest has failed to prove by clear and convincing evidence that Midway committed fraudulent misrepresentation by failing to disclose to Northwest on October 7, 1991 that the O & D Survey Report was inaccurate and unreliable.

6. Fraudulent misrepresentation "may consist of either an untrue statement or the concealment of a material fact. The concealment may not be a mere passive omission of facts during the business transaction but must have been done with the intent to deceive under circumstances creating an opportunity and a duty to speak." *Chapman v. Hosek,* 131 Ill.App.3d 180, 186, 86 Ill.Dec. 379, 384, 475 N.E.2d 593, 598 (1st Dist.1985). Moreover,

> a misrepresentation may consist of the concealment of the truth as well as the assertion of what is false. When the failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and an affirmative misrepresentation is tenuous. Even if a statement is technically true, it may still be a misrepresentation where it omits qualifying material, because a half truth may be more misleading than an outright lie.

*Stewart v. Thrasher,* 242 Ill.App.3d 10, 16, 182 Ill.Dec. 930, 934, 610 N.E.2d 799, 803 (4th Dist.1993) (citing *Lindsey v. Edgar,* 129 Ill.App.3d 718, 723, 84 Ill.Dec. 876, 879–80, 473 N.E.2d 92, 95–96 (4th Dist.1984)).

7. Under Illinois law usually "mere silence or a passive failure to disclose does not [usually] constitute a misrepresentation; instead, defendants are [typically] liable only for affirmative falsehoods or misstatements." *Gerdes v. John Hancock Mut. Life Ins. Co.,* 712 F.Supp. 692, 701 (N.D.Ill.1989) (citing W. Keeton, *Prosser and Keeton on Torts* § 106 (5th ed. 1984)). However, if the defendant has a duty to speak, such as when he stands in some confidential or fiduciary relationship to the plaintiff, then the failure to speak may be actionable. *Id.*

8. "For an omission to rise to the level of fraud, ... there must be a duty to disclose." *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.,* 896 F.2d 1035, 1040 (7th Cir. 1990).

9. A duty to disclose arises where: (1) the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension or (2) the defendant owes some fiduciary duty to the plaintiff to make full and fair disclosure and fails to correct a misapprehension of a material fact. *Coca–Cola Co. Foods Div. v. Olmarc Packaging Co.,* 620 F.Supp. 966, 973 (N.D.Ill.1985).

10. "While silence in a business transaction does not necessarily amount to fraud, silence accompanied by deceptive conduct or suppression of material facts results in active concealment" (*Munjal v. Baird & Warner, Inc.,* 138 Ill.App.3d 172, 180, 92 Ill.Dec. 809, 816, 485 N.E.2d 855, 862 (2d Dist.1985)), "and it then becomes the duty of a person to

speak" (*Russow v. Bobola*, 2 Ill.App.3d 837, 841, 277 N.E.2d 769, 771 (2d Dist.1972)).

11. Although the elements of fraudulent misrepresentation apply equally as well to affirmative statements and silence or omissions, the analysis is slightly different regarding fraud by silence or omission.

12. Thus, in the case of concealment, the analysis is modified, and in order to prove the concealment amounted to a fraudulent misrepresentation the plaintiff must prove: (1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak *Lindsey*, 129 Ill.App.3d at 723, 84 Ill. Dec. at 880, 473 N.E.2d at 96; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury.

*Stewart*, 242 Ill.App.3d at 16, 182 Ill.Dec. at 935, 610 N.E.2d at 804 (citing *Huls v. Clifton, Gunderson & Co.*, 179 Ill.App.3d 904, 909, 128 Ill.Dec. 858, 862, 535 N.E.2d 72, 76 (4th Dist.1989)). In addition, the plaintiff must also prove that it justifiably relied on the defendant's silence. *Soules*, 79 Ill.2d at 286, 37 Ill.Dec. at 599, 402 N.E.2d at 601.

13. Pursuant to the first element, Northwest must prove by clear and convincing evidence that Midway concealed a material fact. The Court concludes that Northwest has not met its burden on this element.

14. There is no dispute that Midway did not say anything one way or the other to Northwest about the computer software problem. However, Midway's failure to speak regarding this problem does not amount to concealment of a material fact.

15. The Illinois Supreme Court has not defined the term material. In order for a representation or concealment to be material,

it "must be an essential element to the transaction between the parties." *Mack v. Plaza Dewitt Ltd. Partnership*, 137 Ill.App.3d 343, 350, 92 Ill.Dec. 169, 175, 484 N.E.2d 900, 906 (1st Dist.1985).

16. However, even if it is an essential element to the transaction between the parties, a statement or concealment can only be one of material fact if it "is one upon which the plaintiff could reasonably rely in determining whether or not to act" (*Jeffrey M. Goldberg & Assocs., Ltd. v. Collins Tuttle & Co.*, 264 Ill.App.3d 878, 885, 202 Ill.Dec. 367, 372, 637 N.E.2d 1103, 1108 (1st Dist.1994); *State Security Ins. Co. v. Frank B. Hall & Co.*, 258 Ill.App.3d 588, 592, 196 Ill.Dec. 775, 778, 630 N.E.2d 940, 943 (1st Dist.1994); *Metzger v. New Century Oil and Gas Supply Corp. Income and Development Program— 1982*, 230 Ill.App.3d 679, 692, 171 Ill.Dec. 698, 708, 594 N.E.2d 1218, 1228 (1st Dist.), *appeal denied*, 146 Ill.2d 631, 176 Ill.Dec. 803, 602 N.E.2d 457 (1992)), and "if it is such that, had the other party been aware of the [falsity of the] statement, he would have conducted himself differently." *Heider v. Leewards Creative Crafts, Inc.*, 245 Ill.App.3d 258, 266, 184 Ill.Dec. 488, 495, 613 N.E.2d 805, 812 (2d Dist.), *appeal denied*, 152 Ill.2d 559, 190 Ill. Dec. 889, 622 N.E.2d 1206 (1993). *See also Mack*, 137 Ill.App.3d at 350–51, 92 Ill.Dec. at 175, 484 N.E.2d at 906 (same).

17. The Court concludes that although Northwest would have acted differently had it known of the computer software problem, Northwest nevertheless failed to prove by clear and convincing evidence that it reasonably relied on Midway's concealment. (Findings of Fact, ¶¶ 68 and 69 supra).

18. Pursuant to the second element, Northwest must prove by clear and convincing evidence that Midway's silence regarding the computer software problem was intended to induce a false belief on Northwest's part under circumstances creating a duty to speak. The Court concludes that Northwest has not met its burden on this element.

19. The Court concludes that the record is devoid of any evidence that Midway had any intent to induce a false belief on Northwest's part as to the accuracy and reliability

**1006**

of the O & D Survey Report. (Findings of Fact, ¶ 85 supra).

■ 20. Even assuming Midway did so intend, the Court concludes that, under these facts, Midway did not owe Northwest a duty of disclosure.

21. In Illinois, a duty of disclosure may arise in one of two scenarios: (1) where "the defendant owes some fiduciary duty to the plaintiff to make full and fair disclosure and fails to correct a misapprehension of a material fact" or (2) where "the defendant's acts contribute to the plaintiff's misapprehension of a material fact and the defendant intentionally fails to correct plaintiff's misapprehension." *Coca–Cola*, 620 F.Supp. at 973.

22. "A fiduciary relationship may arise as a matter of law by virtue of the parties' relationship, e.g., attorney-client, or it may arise as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former." *State Security*, 258 Ill.App.3d at 594, 196 Ill.Dec. at 780, 630 N.E.2d at 945 (citation omitted).

23. When a fiduciary relationship does not arise as a matter of law, the party asserting same has the burden of proving its existence by clear and convincing evidence. *Id.*

24. In determining whether a fiduciary relationship exists, the relevant factors to consider include: (1) the degree of kinship between the parties; (2) disparity in age, health and mental condition, education, and business experience between the parties and; (3) the extent to which the allegedly "servient party" entrusted the handling of its business affairs to the "dominant party" and placed its trust and confidence in it. *State Security*, 258 Ill.App.3d at 597, 196 Ill.Dec. at 781, 630 N.E.2d at 946.

25. Based on the Findings of Fact as set forth above, the Court concludes that the relationship between Midway and Northwest did not, as a matter of law, give rise to a fiduciary duty. (Findings of Fact, ¶¶ 90–94 supra).

26. Further, the Court concludes that no special circumstances existed that would warrant the imposition of a fiduciary duty between the parties. The parties were each represented by able and sophisticated agents during arm's-length negotiations. The fact that a business transaction involving the Gate Sale and the Back–End transaction occurred, is insufficient to establish special circumstances as well. *See State Security*, 258 Ill.App.3d at 597, 196 Ill.Dec. at 782, 630 N.E.2d at 947. Therefore, the Court concludes that Midway did not owe a fiduciary duty to Northwest such that Midway should have disclosed the computer software problem.

27. The Court also concludes that Midway owed no duty to Northwest to disclose the computer software problem because Midway's silence did not contribute to any misapprehension by Northwest regarding the DOT data. (Findings of Fact, ¶¶ 95–97 supra).

28. Further, the Court concludes that Midway did not intentionally or recklessly fail to correct any misapprehension as Midway was not aware of Northwest's alleged misapprehension, Midway had sent the internal data to Northwest, and Midway assumed, justifiably, that Northwest would use the internal data. (Findings of Fact, ¶¶ 98–101 supra).

29. The Court concludes that because Midway did not owe Northwest a duty to disclose the computer software problem, Northwest has failed to prove this element by clear and convincing evidence.

30. Pursuant to the third element, Northwest must prove by clear and convincing evidence that it could not have discovered the truth through a reasonable inquiry or inspection or was prevented from making a reasonable inquiry or inspection and that it relied upon Midway's silence as a representation that the fact did not exist.

31. Based on the Findings of Fact as set forth above, the Court concludes that Northwest has failed to meet its burden with respect to this element.

32. Pursuant to the fourth element, Northwest must prove by clear and convincing evidence that had it known of the computer software problem, it would have acted differently.

33. The Court has already found that Northwest would have acted differently had it known of the computer software problem with the DOT data. (Findings of Fact, ¶ 68 supra).

34. Therefore, the Court concludes that Northwest has met its burden with respect to this element.

35. Pursuant to the fifth element, Northwest must prove by clear and convincing evidence that its reliance on Midway's silence directly and proximately led to its injury.

36. In Illinois, "plaintiffs' injuries in fraud actions must directly and proximately result from defendants' misrepresentations and cannot be assessed upon mere speculation or hypothetical assumptions." *State Security*, 258 Ill.App.3d at 592, 196 Ill.Dec. at 779, 630 N.E.2d at 944. Moreover, it appears that Illinois courts "consistently and emphatically" stress the necessity of proving this element. *Id.*

37. Based on the Findings of Fact as set forth above, the Court concludes that Northwest has failed to prove this element by clear and convincing evidence.

38. Pursuant to the sixth element, Northwest must prove by clear and convincing evidence that it justifiably relied on Midway's silence.

39. The Seventh Circuit has noted that "[i]t is harder to prevail under Illinois law than under federal [securities] law because of the greater burden of persuasion (clear and convincing rather than preponderance) and because of the reasonable-reliance requirement, which federal securities law does not contain except to the extent it bears on the determination of materiality." *Frymire–Brinati*, 2 F.3d at 191.

40. Justifiable or reasonable reliance has been explained as follows:

In determining whether a party justifiably relies on another's representations, all of the circumstances surrounding the transactions, including the parties' relative knowledge of the facts available, opportunity to investigate the facts and prior business experience, will be taken into consideration. Only where the parties do not have equal knowledge, or access thereto,

or where there are other peculiar circumstances inducing the injured party to rely solely on the representation of the other will a person be found to have justifiably relied upon the others' representations.

*Runnemede Owners, Inc. v. Crest Mortgage. Corp.*, 861 F.2d 1053, 1058 (7th Cir.1988) (quoting *Luciani v. Bestor*, 106 Ill.App.3d 878, 884, 62 Ill.Dec. 501, 506, 436 N.E.2d 251, 256 (3d Dist.1982)); *see also Soules*, 79 Ill.2d at 286, 37 Ill.Dec. at 599, 402 N.E.2d at 601; *Chicago Export Packing Co. v. Teledyne Indus., Inc.*, 207 Ill.App.3d 659, 663, 152 Ill. Dec. 639, 642, 566 N.E.2d 326, 329 (1st Dist. 1990).

41. "A party is not justified in relying on representations when it has ample opportunity to ascertain the truth of the representations." *Metropolitan Bank & Trust Co. v. Oliver*, 4 Ill.App.3d 975, 979, 283 N.E.2d 62, 65 (1st Dist.1972). *See also National Republic Bank*, 63 Ill.App.3d at 925, 21 Ill.Dec. at 84, 381 N.E.2d at 19 (citing *Metropolitan Bank*). Moreover, "one is justified in relying upon the representations of another, without independent investigation, where the person to whom the representations are made does not have the same ability to discover the truth as the person making the representations." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 195, 131 Ill.Dec. 155, 162, 538 N.E.2d 530, 537, *cert. denied*, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989).

42. The Court concludes that, under all of the circumstances surrounding the transactions, Northwest did not justifiably rely on Midway's silence regarding the computer software problem.

43. The Court concludes that Northwest's reliance was unjustified because Northwest acted contrary to industry custom as well as Northwest's own internal practices by using O & D Survey Report data for its acquisition analysis after Northwest had access to and possession of Midway's internal data; Northwest had notice and knowledge of the discrepancies inherent in comparing internal data with DOT data; Northwest had notice of the discrepancies between Midway's internal data and Midway's DOT data; and Mid-

way advised Northwest to use Midway's internal data rather than the DOT data. Northwest cannot convert its erroneous use of Midway's DOT data, rather than Midway's internal data, into a claim for fraudulent misrepresentation where Northwest had access to the internal data, Northwest had possession of the internal data, and Northwest knew that the internal data inherently was substantially more reliable than the DOT data.

44. Based on the Findings of Fact as set forth above, the Court concludes that Northwest has not met its burden with respect to this element.

45. In conclusion, for the foregoing reasons, the Court concludes that Northwest has failed to prove by clear and convincing evidence that Midway's silence regarding the computer software problem was a fraudulent misrepresentation because Northwest failed to prove each element by clear and convincing evidence.

46. Accordingly, the Court concludes that Northwest failed to prove by clear and convincing evidence all of the requisite elements of fraudulent misrepresentation for any of the alleged fraudulent misrepresentations.

### NORTHWEST'S COUNTERCLAIM

### COUNT II

### FINDINGS OF FACT

1. Pursuant to this count, Northwest alleges that Midway's filing and prosecution of this adversary proceeding constitutes a breach of Paragraph 7 of the Confidentiality Agreement. This allegation mirrors one of the affirmative defenses Northwest asserts in several counts of the Complaint.

2. The Court's Findings of Fact regarding this allegation are fully set forth in Count I of this Opinion relating to Midway's first cause of action. (Count I, Findings of Fact, ¶¶ 313–323). The Court hereby adopts and incorporates by reference those Findings of Fact in this count.

### CONCLUSIONS OF LAW

1. The Court's Conclusions of Law regarding this claim are fully set forth in Count I of this Opinion relating to Midway's first cause of action. (Count I, Conclusions of Law, ¶¶ 96–113). The Court hereby adopts and incorporates by reference those Conclusions of Law in this count.

2. The Court concludes that Paragraph 7 of the Confidentiality Agreement does not bar Midway from filing this lawsuit.

### CONCLUSION

Both sides should be mindful of Plutarch's reference to Pyrrhus: "One more such victory and we are lost." For the reasons set forth above, the Court hereby grants judgment in favor of Northwest and against the Trustee on Counts I, III, IV, V, VI, VII, and VIII of the Complaint. The Court grants judgment in favor of the Trustee and against Northwest on Count IX of the Complaint in the sum of $190,345.49 plus $31,602.57 as pre-judgment interest, as well as post-judgment interest. As to the Counterclaim, the Court grants judgment in favor of the Trustee and against Northwest on Counts I and II of the Counterclaim. Each party shall bear its own respective costs and fees.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.